## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

MEGAN PETE, an individual

*Plaintiff,*                                          Civil Action No. 1:24-cv-24228-CMA

v.

MILAGRO ELIZABETH COOPER,
an individual,                                        **FIRST AMENDED COMPLAINT**
                                                      **JURY TRIAL DEMANDED**

*Defendant.*
_____

  Pursuant to Federal Rule of Civil Procedure Rule 15(a)(1), Plaintiff Megan Pete hereby files the First Amended Complaint as a matter of course (hereinafter, the "First Amended Complaint" or "FAC") against Milagro Elizabeth Cooper ("Defendant"). Ms. Pete alleges the following facts, upon her own knowledge and upon information and belief:

### NATURE OF THE ACTION

  1. Defendant is the longtime mouthpiece of Daystar Peterson (aka "Tory Lanez"), a convicted felon who shot Ms. Pete in 2020 and has been working with him ever since to falsely brand Ms. Pete an incompetent liar and alcoholic. As part of their vendetta, Defendant spreads vicious and hateful rumors about Ms. Pete to Defendant's over 100,000 social media followers, causing Ms. Pete extreme emotional distress. Defendant's malicious intent is clear: discredit and shame Ms. Pete because of her testimony at Mr. Peterson's trial, which ultimately landed him in prison where he is currently serving a ten year sentence for shooting Ms. Pete. Even from behind bars, prison calls show Mr. Peterson is still orchestrating this campaign with Defendant as his mouthpiece.

2.      Since Mr. Peterson's 2020 indictment for felony assault with a firearm after shooting Ms. Pete, to his later conviction in December 2022 (the "Trial"), up through today, Defendant has performed Mr. Peterson's bidding by spreading malicious falsehoods about Ms. Pete. Defendant does so by engaging in disgusting acts of harassment directed at Ms. Pete on Defendant's online social media platforms.  The only purpose of her statements are to bully, harass and punish Ms. Pete for Mr. Peterson's conviction, to tarnish her reputation, and to cause her severe emotional distress.

3.      The lengths to which Defendant has gone to harass and maliciously injure Ms. Pete knows no bounds. For example, she has promoted a deepfake pornographic video artificially depicting Ms. Pete purportedly engaging in sexual acts without her knowledge or consent. After Defendant's promotion of this video led to a firestorm of negative reaction from others, Defendant doubled-down in a YouTube video on June 9, 2024, claiming Ms. Pete was a "professional victim" and denying any wrongdoing. But Defendant is wrong—her conduct was an unlawful promotion of an altered sexual depiction that caused, and was intended to cause, Ms. Pete severe emotional distress and reputational harm.

4.      Defendant has also defamed Ms. Pete and sought to destroy her reputation by spreading falsehoods repeatedly asserting that Ms. Pete is a liar who perjured herself in the Trial, falsely accused Mr. Peterson of a felony, and is continuing to lie to the courts. Incredibly, Defendant has continued to spread such defamatory falsehoods even after Mr. Peterson was found unanimously guilty by a jury, beyond a reasonable doubt, for the exact crimes Ms. Pete testified that he committed. Defendant attended the Trial and is well aware of Mr. Peterson's guilty verdict—which is nearly two years old—but continues to spread a false narrative without any factual basis that Ms. Pete lied.

5.      Defendant has even publicly admitted to spreading misinformation about the Trial. She first promoted the frivolous conspiracy theory that Ms. Pete was never injured by a gunshot wound, but simply stepped on broken glass. She then claimed that if Ms. Pete was indeed shot, it was not Mr. Peterson who shot her, and later falsely claimed that Mr. Peterson is an innocent man stuck behind bars because the firearm from the shooting is missing and cannot be tested, a complete lie. After perpetuating this misinformation campaign, Defendant *finally*, on November 19, 2024, admitted her claims were bogus.

6.      Defendant's false statements regarding the Trial are part and parcel of a conspiratorial relationship with Mr. Peterson in which Defendant acts as a paid surrogate used to spread Mr. Peterson's lies about Ms. Pete. Indeed, on October 29, 2024, Defendant implied that she was "still on [Mr. Peterson's] payroll." Further, as Mr. Peterson's prison call logs obtained through early discovery in this case demonstrate, Mr. Peterson has repeatedly discussed Defendant with his father—the two confidently asserted that Ms. Pete would never be able to prove that Mr. Peterson pays or paid Defendant for attacking Ms. Pete. By consciously coordinating with Ms. Pete's convicted assaulter simply to amplify Mr. Peterson's disproven and baseless theories to help him seek retribution against Ms. Pete—the true victim of Mr. Peterson's criminal acts—Defendant engaged in extreme and outrageous conduct that has caused, and continues to cause, Ms. Pete severe emotional distress.

7.      Defendant's defamatory statements are not limited to accusing her of perjury at the Trial. Indeed, Defendant has repeatedly attacked Ms. Pete with false accusations that she is mentally retarded, requires a guardian and suffers from alcoholism. Defendant has no personal relationship with Ms. Pete and no basis in fact to make such accusations. It is without question that

Ms. Pete—a world renowned hip-hop artist and Grammy winner—is not mentally retarded, does not have a guardian, and is not an alcoholic.

8.      Ms. Pete has repeatedly taken to social media to address the toll that accusations of her lying about Mr. Peterson and the Trial have had on her mental health and wellbeing. At one point during the Trial, Ms. Pete testified to having suicidal thoughts. In response to Ms. Pete's vulnerability and pleas for peace, Defendant suggested that Ms. Pete should "just get over it, or go away."

9.      Enough is enough. Ms. Pete—a victim of a violent crime and champion of women's rights to her millions of fans worldwide—will no longer stand for Defendant's campaign of harassment. She brings this First Amended Complaint for damages and equitable relief to end Defendant's vendetta against her.

## II.     **THE PARTIES**

### A.     **The Plaintiff**

10.     Megan Pete, a performance artist also known as Megan Thee Stallion, is a citizen of Florida who permanently resides in Miami, Florida.

11.     Since 2021, Ms. Pete's primary and permanent residence is and has been in Florida. She pays state taxes in Florida. Florida is the principal place of business for her business entities— Hot Girl Touring, LLC and Megan Thee Stallion, Entertainment, Inc. Her personal possessions— such as cars, clothing, awards, and her pet dogs—stay and remain in Florida when she travels for business. She spends her holidays in Florida. This year, Ms. Pete obtained a Florida driver's license and is registered to vote in Florida. In sum, Ms. Pete intends to stay and remain in Florida.

### B.     **The Defendant**

12.     Milagro Elizabeth Cooper, also known as Milagro Gramz or Mobz World, is a citizen of Texas who permanently resides in Houston, Texas. Defendant Cooper's Mobz World

website lists a Houston, Texas address as its permanent address. She has over 100,000 followers, some of whom are Florida residents and therefore received her salacious and defamatory statements about Ms. Pete.

## III.   **JURISDICTION AND VENUE**

13.    This Court has subject-matter jurisdiction over the state law claims alleged herein under 28 U.S.C. § 1332 (Diversity Jurisdiction) and 28 U.S.C. § 1367 (Supplemental Jurisdiction), because there is complete diversity between the parties, the amount in controversy exceeds the sum of $75,000 exclusive of interest, costs and fees, and all the claims are so related that they form part of the same case or controversy under Article III of the United States Constitution.

14.    The Court has personal jurisdiction over Defendant. Defendant published defamatory material on the Internet, intentionally making her defamatory statements instantly available to anyone with an Internet connection. By publishing defamatory statements about Ms. Pete, a Florida citizen, Defendant directed her false statements regarding a Florida citizen to readers worldwide—including those in Florida. Upon information and belief, numerous third-parties in Florida accessed Defendant's defamatory statements in Florida. Accordingly, Defendant committed tortious acts within this state. § 48.193(1)(a)(2), Fla. Statutes; *Internet Solutions Corp. v. Marshall*, 39 So. 3d 1201, 1214-1216 (Fla. 2010) (holding a nonresident defendant commits a tortious act in Florida by virtue of posting defamatory statements about a Florida resident on a website accessed in Florida). Defendant has minimum contacts with Florida such that the exercise of personal jurisdiction over her comports with the traditional notions of fair play and substantial justice and is consistent with the Due Process Clause of the United States Constitution. Defendant's intentional tort of defamation was purposefully directed at Ms. Pete, a Florida resident, and the brunt of harm was felt by Ms. Pete in Florida. Ms. Pete's claims directly arise

from and relate to the false and defamatory statements Defendant made. *See Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 773-74, 781 (1984); *Calder v. Jones*, 465 U.S. 783, 788-89 (1984); *Internet Solutions Corp.*, 39 So. 3d at 1214-1216.

15.     Venue is proper in the Miami Division of the United States District Court for the Southern District of Florida because Defendant published defamatory statements to a wide audience that include persons who reside within the Miami Division. Defendant caused substantial harm to Ms. Pete's personal and professional reputations in Florida. Additionally, a substantial part of the events giving rise to the claims stated in this action occurred in the Southern District of Florida.

## IV.     FACTUAL ALLEGATIONS

### A.     The Criminal Trial And Conviction Of Mr. Peterson.

16.     To understand the context surrounding Defendant's defamatory statements, it is imperative to understand the history of Mr. Peterson's criminal conduct against Ms. Pete, his Trial, and his conviction on three felony charges which resulted in Mr. Peterson's ten-year prison sentence.

17.     On July 12, 2020, the Los Angeles Police Department conducted a traffic stop on Mr. Peterson's car after it received reports of shots fired in the Hollywood area and Mr. Peterson's car matched the suspect's description. During the traffic stop, police discovered a firearm, warm to the touch and with its magazine fully emptied, underneath the floorboard where Mr. Peterson was seated, and arrested him on charges of carrying a concealed weapon.

18.     On that night, Ms. Pete was present in the car with Mr. Peterson and his driver, along with Kelsey Harris, Ms. Pete's former best friend and assistant. Through the course of the traffic stop, it was discovered that Ms. Pete had injuries to her foot. She was taken to a hospital for treatment.

19.     On July 15, 2020, Ms. Pete announced via social media that the injuries she suffered on the night of Mr. Peterson's arrest were gunshot wounds. Later, on August 20, 2020, Ms. Pete publicly identified Mr. Peterson as the person responsible for shooting her.

20.     On October 8, 2020, the Los Angeles County district attorney's office charged Mr. Peterson with felony assault with a semiautomatic firearm for the injuries he caused Ms. Pete on July 12, 2020. The district attorney's office later added charges for illegal possession of a firearm and negligent discharge of a firearm.

21.     On December 12, 2022, Mr. Peterson's Trial began. The following day, Ms. Pete took the stand as a witness for the prosecution and the victim of Mr. Peterson's crimes. Ms. Pete testified that on the night of the shooting, she exited Mr. Peterson's car and was walking away with her back facing Mr. Peterson, when Mr. Peterson pointed the gun at her, said "Dance, bitch" and fired five shots at her, causing gunshot wounds to her feet. She also testified to the trauma she has faced since the shooting.

22.     Ms. Pete stated: "Because I was shot, I've been turned into some kind of villain, and he's the victim. This has messed up my whole life ... This whole situation in the industry is like a big boy's club ... I'm telling on one of y'all friends, now you're all about to hate me." Ms. Pete also testified to the online backlash she received from individuals who claimed that she lied about the fact that Mr. Peterson shot her, or that she was even shot at all. Ms. Pete stated: "I can't even be happy. I can't hold conversations with people for a long time. I don't feel like I want to be on this earth. I wish he would have just shot and killed me, if I knew I would have to go through this torture." She also testified to suffering from suicidal thoughts since the shooting.

23.     Defendant was present in the courtroom for the entirety of the Trial, including Ms. Pete's testimony.

24.     On December 23, 2022, after a two-day deliberation, the jury returned a unanimous guilty verdict, finding Mr. Peterson guilty beyond reasonable doubt of all three felony charges brought against him for the shooting of Ms. Pete.

25.     On December 12, 2023, Mr. Peterson filed a writ of habeas corpus challenging his conviction. On February 26, 2024, Mr. Peterson filed an opening brief to appeal his conviction. And on October 23, 2024, Mr. Peterson filed another writ of habeas corpus challenging his conviction. The attorney general of California has opposed Mr. Peterson's appeal and writs.

**B.      Defendant Is A Malicious Actor That Operates Social Media Accounts That Spread False And Harassing Content.**

26.     Defendant is an online social media personality.

27.     Defendant controls and operates X (formerly Twitter) accounts under the usernames @MobzWorld, @NiggaGirl_, and @MilagroGramz__; Instagram and TikTok accounts under the username @milagrogramz; a YouTube account under the username @MobRadio; and a Stationhead account under the username @MILAGROGRAMZ (collectively, the "Social Media Accounts"). Defendant has the power to determine the subject matter and specific content that is published on her Social Media Accounts, and to remove or refrain from publishing content if she chooses. Defendant is the sole speaker, writer and/or editor of every post on her Social Media Accounts. Collectively across her Social Media Accounts, Defendant has over 100,000 followers.

28.     Defendant has publicly admitted that she is not a journalist.  Rather, it is apparent that she is—try as she might to conceal it from her followers—a hired gun for Mr. Peterson.

**C.      Defendant Cooper Conspired With Mr. Peterson And Others To Intentionally Spread Misinformation About Ms. Pete And Cause Severe Emotional Distress.**

29.     Defendant has conspired with Mr. Peterson and his father to execute a widespread campaign to maliciously injure Ms. Pete's reputation and inflict severe emotional distress upon

her in retaliation for her testimony regarding Mr. Peterson's unlawful act of gun violence against her.

30.     It is no secret that Defendant has a close relationship with Mr. Peterson. Not only has she repeatedly demonstrated her support for Mr. Peterson on her Social Media Accounts, she has publicly acknowledged her friendship with Mr. Peterson's father, Sonstar Peterson. In a February 27, 2022 Instagram post that has since been deleted, Defendant shared a video of herself out with Sonstar Peterson. A true and correct copy of a screenshot of that post is attached below.



31.     While Defendant's social media posts celebrating the Petersons portray merely an innocent and supportive relationship, Defendant also has a financial incentive to act as a paid surrogate to spread defamatory statements about Ms. Pete while Mr. Peterson serves a ten-year prison sentence.

32.     In an October 29, 2024 livestream posted to her Social Media Accounts, Defendant implied that she is "still on [Mr. Peterson's] payroll." This is consistent with statements made by Defendant's former best friend, King Noir, who exposed Defendant for working alongside Mr.

Peterson to smear Ms. Pete's reputation. King Noir stated that Defendant "talks to Tory's daddy" in an effort to leak information to the press that comes from Mr. Peterson himself.[1]

33.     Moreover, as Mr. Peterson's prison call logs demonstrate, Mr. Peterson has repeatedly discussed Defendant with his father. In one phone call, the Petersons confidently asserted that Ms. Pete would be unable to prove that Mr. Peterson paid Defendant for attacking Ms. Pete.

34.     On information and belief, Defendant has also coordinated with Mr. Peterson's criminal defense attorneys, the same attorneys who have now agreed to represent her in this civil lawsuit, to spread misinformation related to Mr. Peterson's trial, conviction and appeal. As an early example of Defendant's relationship with Mr. Peterson's (prior) criminal defense attorneys, Defendant released confidential information to the public ahead of its disclosure in court in an attempt to manufacture a false narrative about Mr. Peterson and rally the public against Ms. Pete. For instance, in a February 23, 2022 livestream posted to her X account, Defendant admitted that she and blogger Livingston Allen "got the same sources" that Mr. Peterson's DNA was not present on the firearm. This "source" could only have been Mr. Peterson's then-criminal defense attorneys, to whom the DNA report was turned over. In truth, at the pre-Trial hearing on February 23, 2022— held after Defendant and Mr. Allen shared the misinformation regarding Mr. Peterson's DNA— no one stated that Mr. Peterson's DNA was not found on the firearm.[2]  In reality, the DNA results from the firearm were "inconclusive," meaning that Mr. Peterson could not be excluded or included as one of the possible contributors of the mixed genetic material.

---

[1]  https://thesource.com/2022/07/27/former-friend-of-milagro-gramz-blasts-her-for-allegedly-working-with-tory-lanez-in-smear-efforts-against-megan-thee-stallion/

[2]  https://www.politifact.com/factchecks/2022/feb/28/facebook-posts/hearing-did-not-include-dna-evidence-vindicate-rap/

35.     On information and belief, Defendant also coordinated with the Petersons to employ online "bot" accounts to attack Ms. Pete and her supporters with hateful, derogatory, and malicious statements on social media.

36.     Further, Defendant has used her social media platform to incite violence against Ms. Pete. On December 21, 2022, Defendant posted a livestream video to her Instagram account wherein she stated: "A bitch fuck with my n***a I'ma slap that hoe and whatever comes after it comes after it." Defendant's statement is reasonably understood to refer to Ms. Pete and her involvement in Mr. Peterson's trial.

37.     Defendant knew and/or should have known that Ms. Pete was susceptible to severe emotional distress regarding the false and disproven theories Defendant shared on behalf of Mr. Peterson. Defendant was present for the Trial and Ms. Pete's testimony. During her testimony, Ms. Pete lamented that she has "been turned into some kind of villain" and "wish[es] he would have just shot and killed me, if I knew I would have to go through this torture." She also testified to suffering from suicidal thoughts since the shooting.

38.     By consciously coordinating with Ms. Pete's convicted assaulter to amplify Mr. Peterson's disproven and baseless theories to help him seek retribution against Ms. Pete, Defendant engaged in extreme and outrageous conduct that has caused, and continues to cause, Ms. Pete severe emotional distress.

## D.     **Defendant Engaged In A Years-Long Campaign of Harassment Against Ms. Pete.**

39.     Throughout Mr. Peterson's Trial and continuing through today, Defendant has engaged in a campaign of harassment on behalf of Mr. Peterson to spread false and harassing messages about Ms. Pete on her Social Media Accounts.

**Defendant Promoted The Deepfake Video.**

40.     Commencing no later than June 8, 2024, Defendant began promoting a deepfake video purporting to show an artificially created version of Ms. Pete engaging in sexually explicit acts (the "Deepfake Video") to her over 100,000 Social Media Accounts followers.

41.     It is unknown who created the Deepfake Video. Ms. Pete had no knowledge of or involvement in the creation or distribution of the Deepfake Video, nor did she consent to or authorize the creation or distribution of the Deepfake Video.

42.     In June 2023, Defendant registered for an X account using the screenname @MobzWorld. In registering for an X account, Defendant created a profile on X, including, among other things, a "Likes" page on her X profile. "Likes" are a feature of X whereby a user can show their support for a post by clicking the "like" button, which is portrayed as a heart symbol under each individual X post. "Likes" are then recorded for each post and publicized as a statistic that is visible on each post, with more popular posts featuring a higher number of "likes," and less popular post showing few to no "likes." As with any X user, Defendant's "Likes" page on her X profile tracked and displayed the posts that Defendant "liked," *i.e.* posts which Defendant pressed the "like" icon from her X account. Defendant's "Likes" page was featured as a tab on Defendant's X profile and accessible to all third-party X users.[3]

43.     On or about June 8, 2024, Defendant "liked" an X post that included the Deepfake Video. By "liking" this X post, the post was archived to and displayed on Defendant's "Likes" page, and the video in that post could be viewed from her "Likes" page by visitors.

---

[3]   X has since made "Likes" inaccessible to the public such that only the owner of a profile can see his/her own likes. At the time of Defendant's posts, however, "Likes" were accessible for all of her followers to see, a fact Defendant knew.

44.     Defendant knew or reasonably should have known that the Deepfake Video was an altered sexual depiction. Indeed, on that same day, Defendant posted on her X account: "With the way deep fake and AI be going these days…..If it's not her she should sue whoever made it. That sht [sic] dry af [sic] to do to people." The "her" Defendant referred to is reasonably understood to mean Ms. Pete.

45.     Nonetheless, on or about the same day, Defendant further promoted the Deepfake Video by posting the following statement on her X account: "Go to my likes[.]" Of course, Defendant intended for this statement to encourage her followers and other members of the public to watch the Deepfake Video, which had been added to her "Likes" page around the same time. When a user went to Defendant's "Likes" page, they could access the archived post "liked" by the Defendant that displayed the Deepfake Video, which could then be played by anyone visiting her "Likes" page. A true and correct copy of a screenshot of the X post is below.[4]



---

[4]     As the screenshot below notes, Defendant has since deleted the "[g]o to my likes" X post from her X profile.

46.     Numerous subscribers, followers, viewers, and other third-party individuals followed the Defendant's advice and accessed the Deepfake Video via her X "Likes" page. As one media outlet reported, the Deepfake Video "***gained popularity***" after Defendant "liked" the Deepfake Video post and encouraged her followers to view it.[5] (emphasis added).

47.     On June 8, 2024, the Defendant published a livestream video on her Stationhead account where she discussed her "[g]o to my likes" X post that promoted the Deepfake Video.

48.     In the Stationhead post, the Defendant stated: "If y'all want to be mad at something, this is what I'll give you: ***be mad that I drew attention to it***," referring to her conduct in promoting and directing her followers to the Deepfake Video. (emphasis added).

49.     The next day, on June 9, 2024, the Defendant published a video on her YouTube account to her more than 74,000 subscribers that addressed her "[g]o to my likes" X post related to the Deepfake Video.[6]

50.     In the YouTube post, Defendant shared an image of Ms. Pete over a news chyron that questioned whether Ms. Pete is "[a] professional victim." A true and correct copy of the screenshot of the image is below.



---

[5] https://uproxx.com/music/megan-thee-stallion-ai-sex-tape-response/

[6] https://youtu.be/FUUzzmSNWIQ?si=aGv89UlmII2BcMlE

51.     Defendant then shared a screenshot of the June 8, 2024 X post that directed her followers to "[g]o to my likes" referenced in Paragraph 44, *supra*.

52.     In her June 9, 2024 YouTube post, the Defendant affirmed that she had previously promoted the Deepfake Video by stating that she "told whoever follows me on social media to go to my likes to see what it is that we're discussing[.]"

53.     By "liking" the Deepfake Video such that it then became archived and displayed on, and viewable from, the "Likes" page of her X profile, and then by directing and encouraging her over 100,000 social media followers across her various Social Media Accounts to her X "Likes" page to watch the Deepfake Video, the Defendant promoted, transmitted, published, distributed, circulated, disseminated, presented, exhibited, posted, and shared an altered sexual depiction of Ms. Pete online that was done without Ms. Pete's consent.

### Defendant Engaged In Campaign Of Spreading Malicious Falsehoods Regarding Ms. Pete.

54.     The Defendant has wielded her influence on her Social Media Accounts to engage in a sustained campaign of repeatedly defaming Ms. Pete with malicious, knowing, and injurious falsehoods accusing her of everything from (a) lying under oath in Mr. Peterson's trial and falsely accusing him of a felony, (b) being an alcoholic, and (c) being someone who is mentally incapacitated and in need of a guardian.

> *a.*     **Defendant Spread The Falsehood That Ms. Pete Lied Under Oath And Falsely Accused Mr. Peterson Of A Felony.**

55.     The Defendant has not only spread misinformation regarding Mr. Peterson's trial, she has also used her Social Media Accounts to falsely brand Ms. Pete as a liar. The result of Defendant's conduct has caused Ms. Pete severe emotional distress and mental anguish—at one

point during the Trial, Ms. Pete contemplated suicidal thoughts. More recently, Ms. Pete stated publicly that she "would rather not live through this than to have to live with this."[7]

56.     The Defendant has made repeated false statements that Ms. Pete lied during her testimony against Mr. Peterson in the trial and perjured herself. For example, on December 21, 2022—a mere week after Ms. Pete testified at the Trial and the day before jury deliberations began—Defendant posted a livestream video to her Instagram account wherein she stated: "At the end of the day, ***a bitch lying*** on somebody is low down […] Yes she got hurt. And that's cool. But how did you get hurt? How? And what are the circumstances? And what after that? So bitch, if you think I'm finna be sitting up here boo hooing for a bitch that played up in yall face. Not mine, because ***I always said her ass was lying***. Bitch, I don't. You think I feel sorry for the bitch? I don't. The fuck? A bitch fuck with my n***a I'ma slap that hoe and whatever comes after it comes after it." (emphasis added). Defendant's statements are reasonably understood to refer to Ms. Pete because they refer to the woman who "got hurt"—*i.e.*, Ms. Pete—and assert that this individual lied under oath during her testimony at trial and falsely accused another person of a felony. Defendant's statement further incited physical violence against Ms. Pete by stating, "I'ma slap that hoe and whatever comes after it comes after it."

57.     Additionally, on or around December 21, 2022, Defendant posted a statement to her X account that accused Ms. Pete of being a "non credible witness" who falsely accused Mr. Peterson of a felony. A true and correct copy of a screenshot of the X post is attached below.

---

[7]   Ms. Pete discussed the psychological and emotional harm she underwent as a result of Defendant's conduct regarding the trial in her recent documentary, *Megan Thee Stallion: In Her Own Words*: https://www.primevideo.com/region/eu/detail/Megan-Thee-Stallion-In-Her-Words/0OKIOBAGN7RJ89Z589INBE881H



**Milagro Gramz** ✔
@MilagroGramz__

All this case taught anyone was that your father, brother, cousin, or son could face over 20 years in prison without proper evidence, a botched investigation, & another likely suspect just because non credible witnesses said you did something.

& y'all slow as😵‍💫s cheering

The above statement is reasonably understood to refer to Ms. Pete as a "non credible witness[]," and to assert that she falsely accused Mr. Peterson of a felony and gave false testimony under oath.

58.     On December 23, 2022, Mr. Peterson was found guilty by a jury of his peers of shooting Ms. Pete. Incredibly, despite Defendant being fully aware that Mr. Peterson had been found guilty, she nonetheless knowingly persisted in pressing the false narrative that Ms. Pete lied in claiming Mr. Peterson shot her.

59.     On June 22, 2023, X user account @holidayholidayK shared audio of Defendant wherein she stated: "I believe that this is exactly how they feel about you, Megan. I believe that this is exactly how they feel about you. ***We know you a lying ass hoe***, and you have absolutely ruined Tory's life."[8] (emphasis added). Defendant further endorsed that post by "liking" it from her own X account. Once again, Defendant's statement is reasonably understood as asserting that

---

[8]   https://x.com/holidayholidayK/status/1671979971953172492/video/1

Ms. Pete lied under oath and falsely accused Mr. Peterson of shooting her and thus committing felony perjury because it refers to "Megan"—*i.e.*, Ms. Pete—as a "lying ass hoe" who "ruined Tory's [*i.e.*, Mr. Peterson's] life."

60.    The following month, on July 23, 2023, Defendant posted on her X account: "He shot her because his ego was bruised. She's the bigger star…[sic] That's never been a fact & dmn sure ain't one today. Tory Lanez is behind bars presumed guilty getting better numbers and charting." Defendant's X post included images of Mr. Peterson and Ms. Pete's respective Spotify profiles, which listed each artist's amount of monthly listeners. Defendant's statement is reasonably understood as asserting that Ms. Pete lied under oath about the fact that Mr. Peterson shot her, *i.e.* that it has "never been a fact" that Mr. Peterson shot Ms. Pete and that Mr. Peterson is "presumed guilty" as a result of Ms. Pete's alleged false testimony and accusations. A true and correct copy of a screenshot of Defendant's X post is exhibited below.



61.    Then again, on August 7, 2024, after posting with reference to an entirely unrelated lawsuit a former videographer filed against Ms. Pete in April 2024 and Ms. Pete's motions to

dismiss in that lawsuit, Defendant falsely stated on her X account: "Was Megan Thee Stallion caught ***trying to deceive the courts again***?" (emphasis added). This statement is reasonably understood as asserting that Ms. Pete previously deceived the court, which is a defamatory reference to her prior testimony in the Trial, and thus that Ms. Pete lied under oath in her testimony at the Trial.

62.     The above statements by Defendant (*supra*, ¶¶ 56-61) are false.  Ms. Pete did not lie under oath in Mr. Peterson's trial and did not falsely accuse Mr. Peterson of shooting her. The truth is that Mr. Peterson shot Ms. Pete. This has been confirmed time and time again, including by a unanimous jury verdict beyond a reasonable doubt. Defendant is the one who has lied—repeatedly.  In doing so, she has maliciously defamed Ms. Pete by accusing her of the infamous crime of perjury and of egregious dishonesty in falsely accusing another of a felony, and thus caused substantial damage to Ms. Pete's personal and professional reputation by subjecting her to hatred, ridicule, and disgrace.

> *b.*     **Defendant Impugns Ms. Pete's Mental Capacity And Falsely Accuses Her Of Suffering From Alcoholism.**

63.     Defendant's malicious campaign of defamatory and harassing statements also encompassed statements falsely accusing Ms. Pete of being mentally incapacitated to such an extreme extent that she allegedly is in need of a guardian, and of suffering from alcoholism.

64.     For example, on January 29, 2024, Defendant posted a statement to her X account wherein she stated: "Let me go find this receipt of Megan's ex bestie telling me she wasn't fcking t Farris that's her guardian." This statement is reasonably understood as asserting that Ms. Pete is mentally incapacitated to such an extent that she requires a guardian to make decisions for her. Worse, this statement is reasonably understood as asserting that Ms. Pete is engaged in a sexual

relationship with her purported guardian. A true and correct copy of a screenshot of Defendant's X post is attached below.



65.     Later that day, Defendant posted a statement to her X account wherein she stated: "Ok, so back in 2020 I'm doing what I do now & a rumor was circulating that MTS [Ms. Pete] was fcking T Farris. I reported on it and since ole girl and her friends/family watched my show, one of her besties that I had an internet rapport with hit me. As you can see, she said it wasn't possible for MTS to be sleeping with T. Farris because he was her guardian... (like a father figure). I thought the verbiage was odd, but as time went on *I realized MTS was slow and needed one* so it made all the sense then." (emphasis added). This statement is reasonably understood as asserting that Ms. Pete is mentally incapacitated to such an extent that a guardian needs to be appointed to make decisions for her. Moreover, the "receipt" Defendant referred to as proof Ms. Pete was engaged in a sexual relationship with her purported guardian disclaimed any existence of such relationship. Defendant made no effort to clarify or retract her earlier accusation in spite of her lack of evidence or basis in fact.

66.     Then again, on July 30, 2024, Defendant posted a livestream to her X account wherein she stated:  "What is Megan's mental status? Does she have a guardian or not? ***Has she been listed as a capable person? Has she ever been deemed, like, legally retarded?*** Like anything

20

of the nature? Anything of the sort?" (emphasis added). Again, this statement is reasonably understood as asserting that Ms. Pete is mentally incapacitated to such an extent that a guardian needs to be appointed to make decisions for her.

67.    The above statements by Defendant Cooper (*supra*, ¶¶ 64-66) are false. Ms. Cooper is not and has never been "slow," "legally retarded," or incapable, incompetent, or of an incapacitated mental state. She is not and has never been in any state or condition for which a guardian or conservator would be appropriate under any circumstance. She does not now have, nor has she ever had, a guardian or conservator.

68.    Ms. Cooper's false statements (*supra*, ¶¶ 64-66) are so removed from reality that they constitute inherently improbable assertions for which Ms. Cooper had no basis in fact. But she nonetheless made these statements, which are reasonably understood to assert that Ms. Pete suffered from mental defects so severe that she could not care for herself and required a guardian or conservator to be appointed to make decisions for her. Such statements are directly injurious to Ms. Pete's personal and professional reputations.

69.    Defendant Cooper has also falsely accused Ms. Pete of suffering from alcoholism. On November 3, 2024—nearly a week after Ms. Pete filed her Complaint in this action—Defendant posted a livestream wherein she addressed the allegations in the Complaint, accused Ms. Pete of unspecified "crimes," and stated Ms. Pete was an alcoholic: "You ought to be somewhere for your alleged crimes, ***drunkie***. Why do you even speak? Like ***does your liver even function well***?" (emphasis added).  This statement is reasonably understood as asserting that Ms. Pete is an alcoholic.

70.    Defendant has also implied that Ms. Pete was an alcoholic by falsely claiming she comes from a family of addicts. For example, on an October 30, 2024 livestream hosted on her

Twitch channel where she admitted to making many of the false statements alleged here, Defendant stated: "When you have drinking seemingly running through a family, yes I did post certain questions to my page. Yes I did."

71.     Again, on or about the same day, October 30, 2024, Defendant Cooper posted on her Social Media accounts asserting that Ms. Pete comes from a family of "alcoholics. Because the fact of the matter is, you have a grandfather that was an alcoholic. Your daddy, was your daddy on drugs? Or was he in and out of the system? What was that for? Do you want to talk about that? Is stealing worse than drugs and shit?" Such statements are reasonably understood to assert that Ms. Pete suffers from alcoholism by virtue of having come from a family that suffered from addiction.

72.     Although Ms. Pete has never denied that she consumes alcohol, Ms. Pete is not and has never been an alcoholic, has never been diagnosed as an alcoholic or having any alcohol use disorder, and she does not suffer from addiction. Defendant had no basis in fact to publish her defamatory statements to her over 100,000 collective social media followers accusing Ms. Pete of substance abuse issues.

**<u>Defendant's Defamatory Statements Were Made With Actual Malice.</u>**

73.     Defendant acted with actual malice because she made her defamatory statements with knowledge of, and/or reckless disregard for, the falsity of these statements.

74.     Indeed, even after a jury found Mr. Peterson guilty beyond a reasonable doubt of shooting Ms. Pete on December 23, 2022, Defendant—who was fully aware of the guilty verdict—continued to falsely accuse Ms. Pete of having lied under oath about whether Mr. Peterson shot her. Defendant did so knowing that Mr. Peterson's guilt had been established in a court of law

beyond a reasonable doubt. Accordingly, Defendant knew that her statements regarding Ms. Pete were false, or at the very least, recklessly disregarded whether they were true.

75.     Defendant's malice in defaming Ms. Pete is also evident from the fact that she has admitted to spreading misinformation and falsehoods about Mr. Peterson's criminal act of gun violence against Ms. Pete. Defendant's falsehoods of and concerning Ms. Pete, as well as her misinformation campaign about the Trial generally, reflect Defendant's deep-seated ill-will toward Ms. Pete and her intent on pressing a pre-conceived and false narrative at the behest of Mr. Peterson. Among other things, Defendant has repeatedly promoted at least three false and debunked theories: (1) there was no firearm recovered at the crime scene related to the Trial, and if there was, the Los Angeles Police Department lost or misplaced it; (2) Mr. Peterson was not the person who shot Ms. Pete; and (3) Ms. Pete did not suffer a bullet wound as a result of Mr. Peterson's criminal assault, but rather suffered injuries as a result of stepping on broken glass.

76.     For example, on October 28, 2024, Defendant stated on her X account: "[T]he GUN and BULLET FRAGMENTS associated with the crime have gone missing! Didn't I tell y'all tht [sic] the gun was never presented in court and tht ain't make no damn sense? They gave the serial number and breezed past it. Liiike, first off whose is it?? Origin point please."

77.     Similarly, in a October 28, 2024 YouTube video posted to her account, Defendant stated: "How do you hold someone in prison when you don't have a damn weapon or what was supposedly coming up out of [Ms. Pete's] foot[.]" In that same video, Defendant  also stated: "Y'all did not prove that she was shot in court. You did not prove that. You don't have any bullet fragments, and now you don't have a damn gun. So you don't have anything that would prove that this actually even took place. How fucking convenient." Defendant later states in the post: "The gun was collected at the scene and it was supposed to be processed. The bullet fragments were

taken out at the hospital, they say. Even though, do yall remember how long it took for charges to be raised? Them people had pulled that shit out of her foot, she done went home […] That n***a didn't get charged until October […] If they had pulled bullet fragments out of her foot or had she been stabbed, the police would have been called and a report would have been filed that very moment […] That's not odd to anybody? […] That don't even make no god damn sense. Let's go ahead and pull up the receipt, people. No gun[.]"

78.     In a separate video posted that same day to her X account, Defendant stated: "***Can you even prove that you was shot***?"[9]  (emphasis added).

79.     None of Defendant's statements above are true. A firearm was recovered at the crime scene related to the Trial, and it remains in the custody of the Los Angeles Police Department. Indeed, the Senior Property Officer of the Los Angeles Police Department's Evidence and Property Management Division confirmed in a sworn declaration in opposition to Mr. Peterson's writ of habeas corpus that the firearm remains in its custody. Defendant could have easily verified this information, but chose to ignore it and instead promulgated lies about the integrity of Ms. Pete's testimony at the Trial and the criminal investigation into Mr. Peterson.

80.     The same is true for Defendant's blatant misstatements regarding Ms. Pete's injury. Time and time again, it has been proven that Ms. Pete suffered a gunshot wound to her foot committed by Mr. Peterson and did not injure herself by stepping on broken glass. Rather than acknowledging that fact, Defendant has doubled-down on her false theory and repeatedly published misstatements to her tens of thousands of fans across her Social Media Accounts. Indeed, a December 23, 2022 Los Angeles Times article noted that Defendant "***showed no remorse***

---

[9]   https://x.com/MobzWorld/status/1851068034229956698

for pushing the 'Megan might have stepped on glass' theory ***long after a surgeon had found bullet fragments in her foot***[.]"[10] (emphasis added).

81.     It was not until after this suit was filed, that on November 19, 2024, Defendant — *for the first time*—**admitted** the falsity of these statements and shared the truth with her followers, stating: "[F]rom this day forward today is November 19th and the public has been made aware of this form, I have to acknowledge that the gun, the bullet fragments […] the magazine and the bullet casings are with the LAPD."[11] The "form" Defendant referred to is the October 31, 2024 declaration of Martin Preciado, the Senior Property Officer of the Los Angeles Police Department's Evidence and Property Management Division, submitted in support of the California attorney general's opposition to Mr. Peterson's writ of habeas corpus. Mr. Preciado's declaration affirmed under oath that the Los Angeles Police Department's "Evidence and Property Management Division has the firearm, the firearm magazine, and all the bullet casings and the bullet fragments that were booked" in connection with Mr. Peterson's Trial. Defendant should have already known this information to be true because it was consistent with the testimony Defendant heard at the Trial, wherein multiple experts—such as the doctor who operated on Ms. Pete on the night Mr. Peterson shot her and multiple forensics experts—confirmed the use of a firearm and presence of bullet fragments in Ms. Pete's foot.

82.     Defendant acted with actual malice because she promoted her false and defamatory statements due to her relationship with the Petersons wherein she acts as a spokesperson to spread misinformation on behalf of Mr. Peterson while he serves his ten-year prison sentence for criminally assaulting Ms. Pete.

---

[10]   https://www.latimes.com/entertainment-arts/music/story/2022-12-23/megan-thee-stallion-tory-lanez-verdict-influencers-bloggers.

[11]   https://www.youtube.com/live/s52R4xOlUYY?si=e-OYCrcUDQgCxbRm

83.     Defendant further demonstrated actual malice by publishing and reiterating the false and defamatory statements out of pure hatred for Ms. Pete. Defendant's former best friend, King Noir, noted that Defendant has "a disdain for Megan[.]"[12]

84.     Defendant also refused to cease making her false and defamatory statements after Ms. Pete publicly and repeatedly pleaded on her social media for individuals like Defendant to stop spreading such false misinformation. In response, Defendant posted on her X account: "Megan wants to know what she has to do to stop being posted on certain outlets […] My suggestion would be to just get over it, or go away." A true and correct copy of a screenshot of this X post is below.



Defendant published and reiterated the false and defamatory statements out of a desire to gain notoriety, generate revenues and profits for her herself, and hurt Ms. Pete emotionally and professionally. Indeed, since Defendant began her campaign of harassment against Ms. Pete, her social media following and online recognition has grown exponentially, resulting in massive public exposure and the potential for advertisements and sponsorships.

---

[12]   https://thesource.com/2022/07/27/former-friend-of-milagro-gramz-blasts-her-for-allegedly-working-with-tory-lanez-in-smear-efforts-against-megan-thee-stallion/

## <u>The Lasting Impact of Defendant's Defamatory Statements.</u>

85.     Defendant's false and defamatory statements regarding Ms. Pete lying at the Trial, as well as her mental competency and purported alcoholism, have caused, and continue to cause, Ms. Pete severe and substantial emotional and mental pain and suffering. Each time Ms. Pete sees media reports about the Defendant's lies, she must relive the worst experience of her life, resulting in emotional pain, anguish, and suffering. As Ms. Pete expressed on her social media, "Imagine how I feel waking every day seeing people LIE and turn my trauma into a joke? That whole team figures out ways to create doubt with my story every week and the media eats it up."[13] Defendant's conduct at points during the Trial pushed Ms. Pete to contemplate suicide; as Ms. Pete recently recounted publicly that she "would rather not live through this than to have to live with this."

86.     Additionally, Defendant's false, defamatory, and inflammatory statements have incited large swaths of her follows to personally attack Ms. Pete on social media based on Defendant's lies. For example, after Defendant falsely stated that the firearm and bullet fragments from the Trial "have gone missing" in her October 27, 2024 X Post, followers commented: "And everybody who defend that lying btch said 'well he went to jail for gun possession' but this entire time there was no gun smh;" "So she ain't no bullet fragment foot ass bitch but a glass fragment foot ass bitch????;" "No Gun, No bullets, No case 💯;" "This been old news ... that's how I don't understand how this man was convinced [sic] but the main evidence was 'missing' ...." In another X post from October 5, 2024 wherein Defendant questioned "who shot Megan?," Defendant's followers responded with attacks against Ms. Pete, including: "Everybody's walkin on eggshells around Megan bcuz they're afraid of offending the angry black woman stereotype! Most r Roc Nation bots n bullies. Actual victims don't behave that way. Close friends n industry peers kno

---

[13]     https://x.com/theestallion/status/1352328565543510016

she's a compulsive liar. We all kno she's lying! 😂;" "Megan was never shot! Tory lawyers clearly worked for rocnation;" "Nobody believes Tory shot that horse. They mad Tory been outstreaming her all year and the public still rock with him. Tell Marcus post her Spotify wrapped this year, I guarantee you Tory did more streams all while being shadow banned. Meanwhile she plastered on the front page."

87.     The financial impact of Ms. Pete's emotional and mental pain and suffering ultimately will be an amount to be determined at trial in excess of $75,000 exclusive of costs, interest and fees.

88.     In addition to this harm, Ms. Pete's reputation for honesty has been called into question by Defendant's false and defamatory statements, not only in front of colleagues within the entertainment community, but in front of the public at large, including her millions of fans worldwide. As a consequence, Ms. Pete has suffered reputational harm that has affected and will continue to affect her both in her profession as a performance artist, as well as in future sponsorship and other business opportunities.

## CAUSES OF ACTION

### COUNT ONE
### Defamation *Per Se*

89.     Ms. Pete repeats and re-alleges paragraphs 1 through 88 as if fully set forth here.

90.     Defendant published a series of false and defamatory statements of fact of and concerning Ms. Pete to third parties, such as subscribers, viewers, and followers on her Social Media Accounts.

91.     *First*, Defendant published false and defamatory statements accusing Ms. Pete of the crime of perjury and of egregious dishonesty in falsely accusing another of a felony. Specifically, Defendant stated:

- "At the end of the day, a bitch lying on somebody is low down […] Yes she got hurt. And that's cool. But how did you get hurt? How? And what are the circumstances? And what after that? So bitch, if you think I'm finna be sitting up here boo hooing for a bitch that played up in yall face. Not mine, because I always said her ass was lying. Bitch, I don't. You think I feel sorry for the bitch? I don't. The fuck? A bitch fuck with my n*a I'ma slap that hoe and whatever comes after it comes after it."

- "All this case taught anyone was that your father, brother, cousin, or son could face over 20 years in prison without proper evidence, a botched investigation, & another ikely suspect just because non credible witnesses said you did something. & y'all slow asses cheering."

- "He shot her because his ego was bruised. She's the bigger star…[sic] That's never been a fact & dmn sure ain't one today. Tory Lanez is behind bars presumed guilty getting better numbers and charting."

- "I believe that this is exactly how they feel about you, Megan. I believe that this is exactly how they feel about you. We know you a lying ass hoe, and you have absolutely ruined Tory's life."

- "Was Megan Thee Stallion caught trying to deceive the courts again?"

92.     Defendant's false statements regarding Ms. Pete's testimony at the Trial described above are defamatory *per se* because they charge Ms. Pete with committing an infamous crime. A reasonable reader or listener of Defendant's statements that Ms. Pete was "caught trying to deceive the courts again" and otherwise lied, fabricated or falsified her testimony during the Trial regarding Mr. Peterson's use of a firearm or her wound from that firearm would understand them as charging her with perjury, which is a third-degree felony in Florida and an infamous crime.  *See* § 837.02, Fla. Statutes; *Klayman v. Jud. Watch, Inc.*, 22 F. Supp. 3d 1240, 1247, n.3.

93.     The false statements described above are also defamatory *per se* because they tend to subject Ms. Pete to hatred, distrust, contempt, and disgrace. A reasonable reader or listener of Defendant's statements would understand them to mean that Ms. Pete falsely accused Mr. Peterson of committing felony assault with a firearm and gave untruthful testimony that resulted in Mr.

Peterson's wrongful conviction, which is a despicable manipulation of the justice system and would garner hatred, distrust, contempt, and disgrace from the public.

94.     Finally, Defendant's false statements described above are defamatory *per se* because they tend to injure Ms. Pete in her profession. A reasonable reader or listener of Defendant's statements regarding Ms. Pete's egregious dishonesty in falsely accusing another of a felony would view Ms. Pete as untrustworthy and may hesitate before entering into professional contracts with her.

95.     *Second*, Defendant published false and defamatory statements that stated Ms. Pete was or is mentally incompetent and required a guardian. Specifically, Defendant stated:

- "Let me go find this receipt of Megan's ex bestie telling me she wasn't fcking t Farris that's her guardian."

- "Ok, so back in 2020 I'm doing what I do now & a rumor was circulating that MTS [Ms. Pete] was fcking T Farris. I reported on it and since ole girl and her friends/family watched my show, one of her besties that I had an internet rapport with hit me. As you can see, she said it wasn't possible for MTS to be sleeping with T. Farris because he was her guardian… (like a father figure). I thought the verbiage was odd, but as time went on I realized MTS was slow and needed one so it made all the sense then."

- "What is Megan's mental status? Does she have a guardian or not? Has she been listed as a capable person? Has she ever been deemed, like, legally retarded? Like anything of the nature? Anything of the sort?"

96.     Defendant's false statements regarding Ms. Pete's purported mental incompetency are defamatory *per se* because they subject Ms. Pete to ridicule and disgrace. A reasonable reader or listener of Defendant's statement that Ms. Pete was legally retarded, "slow," or required a guardian would come to ridicule Ms. Pete, as it implies Ms. Pete is unable to care for herself and requires round-the-clock medical assistance, which would also subject her to disgrace. Such statements are directly injurious to Ms. Pete's personal reputation.

97.     Defendant's false statements described above are also defamatory *per se* because they tend to injure Ms. Pete in her profession. A reasonable reader or listener of Defendant's statement that Ms. Pete was legally retarded, "slow," or required a guardian would view Ms. Pete as unable to manage or sustain her own career as a mainstream and high-functioning performance artist, causing harm to her professional reputation.

98.     *Third*, Defendant published false and defamatory statements that stated Ms. Pete was and is an alcoholic. Specifically, Defendant stated:

- "You ought to be somewhere for your alleged crimes, drunkie. Why do you even speak? Like does your liver even function well?"

- "When you have drinking seemingly running through a family, yes I did post certain questions to my page. Yes I did."

- Ms. Pete comes from a family of "alcoholics. Because the fact of the matter is, you have a grandfather that was an alcoholic. Your daddy, was your daddy on drugs? Or was he in and out of the system? What was that for? Do you want to talk about that? Is stealing worse than drugs and shit?"

99.     Defendant's false statements are defamatory *per se* because they tend to subject Ms. Pete to hatred, distrust, ridicule, contempt, and disgrace. A reasonable reader or listener of Defendant's statements that Ms. Pete is a "drunkie" who comes from a line of alcoholics would come to hold Ms. Pete in hatred, contempt, and disgrace, as it falsely implies that Ms. Pete is an alcoholic who has a serious addiction that requires professional help.

100.    Defendant's false statements are also defamatory *per se* because they tend to injure Ms. Pete in her profession. A reasonable reader or listener of Defendant's statements regarding Ms. Pete's alleged alcoholism would view Ms. Pete as unable to competently perform her duties as a mainstream performance artist, causing harm to her professional reputation.

101.    Defendant's false and defamatory statements caused Ms. Pete to suffer and incur both presumed and actual damages, including loss and injury to her business, insult, pain,

embarrassment, humiliation, mental suffering, harm to Ms. Pete's name and reputation, out-of-pocket loss, and other actual damages in an amount to be determined at trial, but in no instance less than $75,000 exclusive of interests, costs and fees.

102.    Defendant acted with actual malice and/or reckless disregard for the truth for the following reasons:

- Defendant continued to accuse Ms. Pete of having lied under oath about whether Mr. Peterson shot her *after* a unanimous jury convicted Mr. Peterson beyond a reasonable doubt of committing felony assault against Ms. Pete, and with full knowledge of the jury's guilty verdict.

- Defendant pursued and published pre-conceived, false, and disproven narratives—such as Ms. Pete did not suffer a gunshot wound, Mr. Peterson did not shoot Ms. Pete, and the firearm at issue was lost or misplaced by the Los Angeles Police Department—as part of a campaign of misinformation and harassment against Ms. Pete, which demonstrates deep-seated ill-will and resentment. Indeed, the Los Angeles Times noted that Defendant "showed no remorse for pushing the 'Megan might have stepped on glass' theory long after a surgeon had found bullet fragments in her foot[.]"

- Defendant promoted her false and defamatory statements due to her conspiratorial relationship with the Petersons wherein she acts as a paid mouthpiece to spread misinformation on behalf of Mr. Peterson while he serves his ten-year prison sentence for criminally assaulting Ms. Pete. Indeed, Defendant implied that she is "still on [Mr. Peterson's] payroll," and maintains regular contact with Mr. Petersons' father and lawyers. The Petersons also stated that Ms. Pete would be unable to prove that they are paying Defendant for her services.

- Defendant published and reiterated the false and defamatory statements out of a desire to gain notoriety, generate revenues and profits for her herself, and hurt Ms. Pete emotionally and professionally. Indeed, Defendant's social media following has grown exponentially since she began a campaign of harassment to defame Ms. Pete, topping over 100,000 followers across her Social Media Accounts.

- Defendant's attacks on Ms. Pete's purported mental competency and alcoholism issues are so far removed from reality that they are inherently improbable, baseless, and devoid of facts such that they are malicious and intended solely to impugn Ms. Pete's personal and professional reputations.

- Defendant demonstrated extreme ill-will against Ms. Pete and intended to cause her emotional, mental, and reputational harm. Defendant's former

best friend stated that Defendant has "a disdain for Megan," which Defendant exhibited in her defamatory statements against Ms. Pete.

103.    Defendant lacked reasonable grounds for any belief in the truth of her statements and acted negligently in failing to determine the true facts.

104.    As a direct and proximate result of the Defendant's defamation, Ms. Pete suffered substantial presumed and actual damages and loss, including, but not limited to, pain and suffering, emotional distress and trauma, insult, anguish, stress and anxiety, public ridicule, humiliation, embarrassment, indignity, permanent damage and injury to her personal and professional reputations, loss of business and income, attorney's fees, costs, and other out-of-pocket expenses in an amount to be determined at trial, but no less than an amount that exceeds $75,000 exclusive of interest, costs and fees.

105.    Defendant published or caused to be published, and has continued to promote, the false statements concerning Ms. Pete with the specific intent to cause harm to Ms. Pete and in order to boost her own reputation and social media following, and showing willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which raises the presumption of conscious indifference to consequences, justifying an award of punitive damages.

**COUNT TWO**
**Promotion of an Altered Sexual Depiction,**
**Section 836.13, Florida Statutes**

106.    Ms. Pete repeats and re-alleges paragraphs 1 through 88 as if fully set forth here.

107.    Ms. Pete is an identifiable person as defined under the statute. Ms. Pete is a performance artist who is recognizable as an actual person by her face, likeness, and/or other distinguishing characteristic(s).

108.    The Deepfake Video is an altered sexual depiction as defined under the statute.  It is a digital, electronic, mechanical, and/or other modification, alteration, or adaptation that depicts

a realistic version of Ms. Pete with computer-generated nude body parts presented as the nude body parts of Ms. Pete engaged in sexual conduct as defined in Section 847.001, Florida Statutes, in which Ms. Pete did not engage or participate.

109.    Defendant willfully and maliciously promoted the Deepfake Video by transmitting, transmuting, publishing, distributing, circulating, disseminating, presenting, exhibiting, sending, posting, sharing, and/or advertising it on her X account. Defendant "liked" a post containing the Deepfake Video, which in turn resulted in that post being displayed on—and the video viewable from—the "likes" section of her X profile. Defendant then encouraged her followers to "[g]o to my likes," where they could view the Deepfake Video.

110.    Defendant admitted that she promoted the Deepfake Video. On June 8, 2024, Defendant went on her Stationhead account and stated: "If y'all want to be mad at something, this is what I'll give you: be mad that I drew attention to it," referring to her conduct in directing her followers to the Deepfake Video. Further, on June 9, 2024, Defendant shared a YouTube video to her account wherein she admitted that she "told whoever follows me on social media to go to my likes to see what it is that we're discussing" with regard to the Deepfake Video.  Taken together, Defendant willfully and maliciously promoted the Deepfake Video without Ms. Pete's consent.

111.    Defendant knew or reasonably should have known that the Deepfake Video was an altered sexual depiction. Indeed, on June 8, 2024, Defendant posted on her X account: "With the way deep fake and AI be going these days…..If it's not her she should sue whoever made it. That sht [sic] dry af [sic] to do to people." The "her" Defendant referred to is reasonably understood to mean Ms. Pete.

112.    As a result of Defendant's misconduct, Ms. Pete has been injured in an amount to be proven at trial.

113.    Ms. Pete is entitled to recover monetary damages to include $10,000 or actual damages, whichever is greater, as well as an award of Ms. Pete's reasonable attorneys' fees and costs, and a permanent injunction barring Defendant from any future use or publication of intimate visual depictions of her.

## COUNT THREE
### Intentional Infliction of Emotional Distress

114.    Ms. Pete repeats and re-alleges paragraphs 1 through 88 as if fully set forth here.

115.    Defendant engaged in extreme and outrageous conduct against Ms. Pete. Defendant's extreme and outrageous conduct consists of coordinating with Mr. Peterson—the convicted assaulter of Ms. Pete and a felon—his father, Sonstar Peterson, and Mr. Peterson's attorneys, to promote, distribute, spread, promulgate, communicate, and disseminate Mr. Peterson's false and disproven theories about Ms. Pete while Mr. Peterson serves a ten-year prison sentence. The false and disproven theories Defendant has spread on behalf of Mr. Peterson include: (1) there was no firearm recovered at the crime scene related to the Trial, and if there was, the Los Angeles Police Department lost or misplaced it; (2) Mr. Peterson did not shoot Ms. Pete; and (3) Ms. Pete did not suffer a bullet wound as a result of Mr. Peterson's criminal assault, but rather suffered injuries as a result of stepping on glass.

116.    Defendant's conduct is extreme and outrageous because she acted on behalf of a convicted felon to spread the misinformation described above in order to harass his victim all while receiving a financial benefit from Mr. Peterson. Defendant has implied that she is "still on [Mr. Peterson's] payroll." Moreover, as Mr. Peterson's prison call logs demonstrate, Mr. Peterson has repeatedly discussed Defendant with his father. In one phone call, the Petersons confidently asserted that Ms. Pete would be unable to prove that Mr. Peterson paid Defendant for attacking Ms. Pete. Further, on information and belief, Defendant also coordinated with the Petersons to

35

employ online "bot" accounts to attack Ms. Pete and her supporters with hateful, derogatory, and malicious statements on social media.

117.    Defendant's conduct described above is extreme and outrageous because it goes beyond all possible bounds of decency and is regarded as shocking, atrocious, and utterly intolerable in a civilized community.

118.    Defendant intentionally, and/or with reckless disregard of the high probability, caused Ms. Pete to suffer severe emotional distress. Defendant knew and/or should have known that the statements she shared on behalf of Mr. Peterson were false, untrue, debunked, and meritless. Indeed, on November 19, 2024, Defendant finally acknowledged the falsity of her statements and shared the truth with her followers, stating: "[F]rom this day forward today is November 19th and the public has been made aware of this form, I have to acknowledge that the gun, the bullet fragments […] the magazine and the bullet casings are with the LAPD."

119.    Defendant knew and/or should have known that her extreme and outrageous conduct would cause Ms. Pete to suffer severe emotional distress. Defendant knew and/or should have known that Ms. Pete was susceptible to severe emotional distress regarding the false and disproven theories Defendant shared on behalf of Mr. Peterson, yet Defendant spread those theories nonetheless. Defendant was present for the Trial and heard Ms. Pete's testimony. During her testimony, Ms. Pete stated: "Because I was shot, I've been turned into some kind of villain, and he's the victim. This has messed up my whole life ... This whole situation in the industry is like a big boy's club ... I'm telling on one of y'all friends, now you're all about to hate me." Ms. Pete further testified: "I can't even be happy. I can't hold conversations with people for a long time. I don't feel like I want to be on this earth. I wish he would have just shot and killed me, if I knew I would have to go through this torture." She also testified to suffering from suicidal thoughts

since the shooting. More recently, Ms. Pete stated publicly that she "would rather not live through this than to have to live with this," referring to the false theories Defendant has spread on behalf of Mr. Peterson. As such, Defendant knew and/or should have known that her continued false statements regarding Ms. Pete and the Trial would, and did, cause Ms. Pete severe emotional distress.

120.    As a direct and proximate result of the Defendant's extreme and outrageous conduct, Ms. Pete suffered substantial presumed and actual damages and loss, including, but not limited to, pain and suffering, severe emotional distress and trauma, insult, anguish, stress and anxiety, public ridicule, humiliation, embarrassment, indignity, permanent damage and injury to her personal and professional reputations, loss of business and income, attorney's fees, costs, and other out-of-pocket expenses in an amount to be determined at trial.

### COUNT FOUR
### Cyberstalking Injunctive Relief,
### Section 784.0485, Florida Statutes

121.    Ms. Pete repeats and re-alleges paragraphs 1 through 88 as if fully set forth here.

122.    Defendant has communicated—both directly and indirectly—a course of conduct designed to cause severe emotional distress to Ms. Pete as laid forth herein.  She has done so through electronic means and therefore meets the definition of cyberstalking pursuant to Section 784.048, Florida Statutes. Accordingly, she is entitled to an injunction against cyberstalking pursuant to 784.0485, Florida Statutes.

123.    Ms. Pete incorporates by reference the attached affidavit as required by statute. *See* Exhibit A.

124.    WHEREFORE, Ms. Pete seeks an injunction restraining Defendant from committing any acts of cyberstalking against her and providing any terms the Court deems

necessary for the protection of Ms. Pete, including any injunctions or directives to law enforcement agencies.

## JURY DEMAND

Ms. Pete requests a jury trial on all issues to be tried.

## PRAYER FOR RELIEF

WHEREFORE, Ms. Pete respectfully requests that this Court enter judgment in an amount for all damages owed to Ms. Pete, including but not limited to compensatory damages, punitive damages, statutory damages, attorney's fees, costs, interest, and all other damages as are just and proper, as well as declaratory judgment to remedy Defendant's unlawful behavior, and an injunction to prevent further misconduct.

Dated:  December 10, 2024

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

/s/ Daniel L. Humphrey
Olga Vieria (Fla. Bar No. 29783)
Daniel L. Humphrey (Fla. Bar No. 1024695)
olgavieira@quinnemanuel.com
danielhumphrey@quinnemanuel.com
(305) 402-4880
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
2601 S. Bayshore Dr., Suite 1500
Miami, FL 33133

Mari F. Henderson (pro hac vice)
Julian T. Schoen (pro hac vice)
marihenderson@quinnemanuel.com
julianschoen@quinnemanuel.com
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
(213) 443-3000

*Attorneys for Plaintiff Megan Pete*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on December 10, 2024, I electronically filed the foregoing

document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing is being

served this day on all counsel of record in the manner specified, either via transmission of

Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for

those counsel who are not authorized to receive Notice of Electronic Filing.

By: <u>*/s/ Daniel L. Humphrey*</u>
Daniel L. Humphrey
Fla. Bar No. 1024695
