**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
Case No. 24-24228-CIV-ALTONAGA

MEGAN PETE, an individual

    *Plaintiff,*

v.

MILAGRO ELIZABETH COOPER,
an individual,

    *Defendant.*

_____/

## DEFENDANT'S MOTION TO DISMISS FIRST AMENDED COMPLAINT

    Defendant, MILAGRO ELIZABETH COOPER, through undersigned counsel, pursuant to Rule 12(b)(6), Fed.R.Civ.P., files this, her Motion to Dismiss Plaintiff's First Amended Complaint, and in support thereof, states the following:

## INTRODUCTION

    *"Let me never fall into the vulgar mistake of dreaming that I am persecuted whenever I am contradicted." ~ Ralph Waldo Emerson*

    Plaintiff, MEGAN PETE, a well-known celebrity in the hip-hop universe known for her sexually explicit lyrics, and who goes by the moniker "Megan Thee Stallion," filed the instant action against the Defendant, an online personality/social media blogger who regularly livestreams and posts about current topics including celebrities and the hip-hop community. (DE 28, ¶ 12). In her original Complaint, Plaintiff attempted to assert statutory claims under Florida law plus tort claims of intentional infliction of emotional distress and invasion of privacy. With a dismissal of her original complaint hanging over her like the Sword of Damocles, Plaintiff has changed her strategy course by attempting to manufacture a defamation action against the Defendant in her First Amended Complaint originating primarily from Defendant's coverage and commentary regarding the public criminal trial of celebrity rapper Daystar Peterson (aka "Tory Lanez").  Rather than rebut the commentary or debate the issues raised by Defendant's comments so people can make up their own minds, Plaintiff has succumbed to the current trend of using the legal system in an attempt to cancel those opinions she disagrees with. Plaintiff is also attempting to revive her statutory claims under Fla. Stat §836.13 and Fla. Stat. §784.0485 as well as her dubious claim of intentional infliction of emotional distress. While the First Amended Complaint may make

1

interesting reading by the media and Plaintiff's social media followers, it too fails to present clear and convincing evidence to plausibly state a viable cause of action in tort and a plausible statutory violation under Florida law. Therefore, for the reasons set forth herein, Defendant respectfully requests that Plaintiff's First Amended Complaint be **DISMISSED**.

## I.     Count One Fails to State a Claim for Defamation

Having abandoned her attempt to bring a claim for invasion of privacy, a legal theory not recognized in Florida for over fifteen years, Plaintiff now attempts to bring a claim for defamation *per se* against the Defendant based on various statements made by Defendant on various online platforms. In this diversity action, the substantive law of Florida applies to Plaintiff's defamation claims as well as her other tort and statutory claims. *Turner v. Wells*, 879 F.3d 1254, 1262 (11th Cir. 2018) *aff'd,* 879 F.3d 1254 (11th Cir. 2018). Defendant submits that Count One of the Amended Complaint should be dismissed for two reasons: (1) Plaintiff's failure to provide Defendant with presuit notice per Florida Statute § 770.01; and (2) Plaintiff's failure to allege a plausible claim of defamation against a public figure. Defendant will address each one in turn.

## A.    Plaintiff's Failure to Comply with the Requirements of Florida Statute § 770.01 Requires that Count One be Dismissed

Florida Statute § 770.01 provides: "[b]efore any civil action is brought for publication or broadcast, in a newspaper, periodical, or other medium, of a libel or slander, the plaintiff shall, at least 5 days before instituting such action, serve notice in writing on the defendant, specifying the article or broadcast and the statements therein which he or she alleges to be false and defamatory." Here the Plaintiff has failed to comply with this condition precedent under Florida law prior to the filing of the defamation action against the Defendant. Accordingly, Count One should be **DISMISSED**. *See Comins v. Canvoorhis*, 135 So.2d 545, 559  (5th DCA 2014) (holding that in light of Florida Supreme Court decision in *Jews for Jesus, Inc. v. Rapp*, 997 So.2d 1098 (Fla. 2008), blogger with YouTube channel was "entitled to presuit notice under section 770.01" and affirming dismissal of defamation action); *accord Grlpwr, LLC v. Rodriguez,* No. 3:23CV16480-TKW-HTC, 2023 WL 5666203, at *2 (N.D. Fla. Aug. 25, 2023); *See also Tobinick v. Novella*, 2015 WL 1191267, at *9 (S.D. Fla. Mar. 16, 2015) (noting that even if the defendant "has a particular agenda ... [this] does not rob it of the protections afforded it by the pre-suit notice statute" because a defendant "may qualify as a member of the media for purposes of Florida's pre-suit notice provision if it 'editorialize[s] as to matters of public interest without being commissioned to do so by its clients'")

(second alteration in original) (quoting *Ortega Trujillo v. Banco Central Del Ecuador*, 17 F. Supp. 2d 1334, 1338 (S.D. Fla. 1998)).

**B. Plaintiff's Amended Complaint Fails to Allege a Plausible Claim for Defamation of a Public Figure as a Matter of Law**

In the instant case, Plaintiff's Defamation claim is predicated on the following allegations: (1) that the Defendant published and falsely accused "Ms. Pete of the crime of perjury" by questioning her credibility as a witness in a high profile criminal trial (DE 28, ¶¶ 56-57, 91-92); (2) Defendant called Plaintiff "slow" and "retarded," and questioned her mental competency; (¶¶ 64-67, 95-96) and (3) Defendant published false statements that suggested that Ms. Pete was an alcoholic by calling Ms. Pete a "drunkie" and stating that drinking ran in her family. (¶¶ 69-71, 98-99). When the actual statements are reviewed in their full context rather than in a hypersensitive safe-space echo chamber, it is clear that the multiple allegations of "defamation" are an overreach as these statements are not susceptible to a defamatory meaning in the mind of a *reasonable person*. As such, Plaintiff's Defamation Claim should be dismissed for the following reasons: (1) none of the statements complained of state or suggest that the Plaintiff committed the crime of perjury; (2) the statements made by Defendant are substantially true, and (3) the statements made by Defendant in their full context establish that they are clearly opinion and/or rhetorical hyperbole and therefore not actionable as a matter of law. Further, the Plaintiff has failed to establish malice by clear and convincing evidence as required by the First Amendment and the law of Florida. Plaintiff's deliberate decision to cherry pick statements outside of their context as well as her promulgation of self-serving and overreaching innuendos regarding these statements fail to bring her claim into the realm of plausibility. To help assist the Court in its determination of this Motion, the Defendant has filed full and complete transcripts of the relevant recordings and the actual online X posts specifically referenced in the Amended Complaint.[1] When reviewing the complained of statements

---

[1] Although a Court's review on a motion to dismiss generally is limited to the four corners of the complaint, in defamation cases, the Court may consider documents integral to the complaint's allegations that are referenced or cited within the complaint without the motion being converted into one for summary judgment. *Reed v. Chamblee*, 2023 WL 6292578, at *10 (M.D. Fla. Sept. 27, 2023), citing *Horsley v. Feldt*, 304 F. 3d 1225, 1134 (11th Cir. 2002); *See also Smith v. Cuban Am. Nat'l Found.*, 731 So. 2d 702, 705 (Fla. 3d DCA 1999) (collecting cases); *Martinez v. Netflix, Inc.*, No. 20-cv-24328-WPD, 2023 WL 2630337, at *3 (S.D. Fla. Feb. 23, 2023) (court noted it watched entire film containing alleged defamatory statements to adjudicate the motion to dismiss). Here, the Amended Complaint cites all of the online posts by date and provides links containing the source of the alleged defamatory statements where applicable.

in their proper context, it is evidently clear that the Plaintiff has wholly failed to allege a plausible claim for defamation against a public figure as a matter of law.

1.

In order to state a cause of action for defamation against a public figure, a plaintiff must show (1) publication; (2) falsity; (3) the actor acted with knowledge or reckless disregard as to the falsity on a matter, (4) actual damages; and (5) the statement is defamatory. *Jews for Jesus, Inc. v. Rapp,* 997 So.2d 1098, 1106 (Fla. 2008). A written or verbal publication, such as one on a social media platform will rise to the level of libel or slander per se only "if, when considered alone and without innuendo, it (1) charges that a person has committed an infamous crime; (2) charges a person with having an infectious disease; (3) tends to subject one to hatred, distrust, ridicule, contempt, or disgrace; or (3) tends to injure one in [her] trade or profession." *Murray v. Pronto Installations, Inc.,* 2020 WL 6728812 at *2 (M.D. Fla. 2020) *quoting Richard v. Gray*, 62 So. 2d 597, 598 (Fla. 1953)) (emphasis added). The statement should not be interpreted in the extreme, but as the "'common mind' would normally understand it." *Ortega Trujillo v. Banco Central Del Ecuador*, 17 F. Supp. 2d 1334, 1339 (S.D. Fla. 1998). And "[w]here the court finds that a communication could not possibly have a defamatory or harmful effect, the court is justified in ... dismissing the complaint for failure to state a cause of action." *Wolfson v. Kirk*, 273 So. 2d 774, 778 (Fla. 4th DCA 1973); *See also Turner v. Wells,* 198 F. Supp. at 1370 (finding a statement not "subject to empirical proof" or an "objectively verifiable event" to be a protected opinion). Moreover, a defamation plaintiff must provide evidence identifying allegedly defamatory statements with "sufficient particularity." *Brown Jordan Int'l Inc. v. Carmicle,* No. 0:14-CV-60629, 2015 WL 6123520, at *10 (S.D. Fla. Oct. 19, 2015). Additionally, a court "must consider all the words used, not merely a particular phrase or sentence." *Byrd v. Hustler Magazine, Inc.,* 433 So. 2d 593, 595 (Fla. 4th DCA 1983) (citation omitted). Attention should also be "given to any cautionary terms used by the publisher in qualifying the statement." *Turner*, 879 F.3d at 1263 (admonishing plaintiff for "cherry pick[ing] statements ... out of context").

It is for the Court to decide whether the complained of words are actionable expressions of fact or non-actionable expressions of pure opinion and/or rhetorical hyperbole. *See Colodny v. Iverson, Yoakum, Papiano & Hatch*, 936 F.Supp. 917, 923 (M.D.Fla.1996) ("[W]hether the alleged defamatory word is a[ ] non-actionable expression of pure opinion or an actionable expression of pure fact ... is a question of law for the Court.") (citing Florida cases). "In determining whether an allegedly defamatory statement is an expression of fact or an expression of pure opinion and/or

4

rhetorical hyperbole, context is paramount." *Fortson*, 434 F. Supp. 2d at 1379; *see also From v. Tallahassee Democrat, Inc.,* 400 So.2d 52, 57 (Fla. 1st DCA 1981) ("[T]he test to be applied in determining whether an allegedly defamatory statement constitutes an actionable statement of fact requires that the court examine the statement in its totality and the context in which it was uttered or published.").

A statement is considered rhetorical hyperbole when "the language itself negates the impression that the writer was seriously maintaining that the plaintiff committed the particular act forming the basis of the defamation." *Fortson v. Colangelo,* 434 F. Supp. 2d 1369, 1379 (S.D. Fla. 2006). Although rhetorically hyperbolic statements may at first blush appear to be factual, they cannot reasonably be interpreted as stating actual facts about their target." *Id.* 1378-79. "In determining whether an allegedly defamatory statement is an expression of fact or an expression of rhetorical hyperbole, context is paramount." *Id.* at 1379. "All of the circumstances surrounding the publication must be considered, including the medium by which it was disseminated and the audience to which it was published." *Keller v. Miami Herald Publ'g Co.,* 778 F.2d 711, 714 (11th Cir. 1985). As noted by the court in *Fortson v. Colangelo,* 434 F.Supp.2d 1369, 1381-82 (S.D. Fla. 2006), "[w]here an issue is controversial, evoking strongly held views, statements relating thereto are more likely to be deemed rhetorical hyperbole." *Id.* (holding that statements by an NBA team owner who referred to player on opposing team who committed a hard foul against one of his players, as a "thug", and a newspaper sports columnist referring to the same player as a "gangsta" and "wanksta" were examples of hyperbole and not defamatory) *citing Old Dominion Branch No. 496 v. Austin*, 418 U.S. 264, 284 (1974) ("strong disagreement" between union members and opponents of unionization supported finding that challenged statements were protected); *Hay v. Independent Newspapers, Inc.,* 450 So.2d (293 (Fla. 2d DCA 1984)(affirmed dismissal of libel action brought by a private person who was called a crook and a criminal in a letter to the editor as statements were pure opinion).

Finally, with respect to a public figure, it is paramount that they establish actual malice. Actual malice requires that a plaintiff plead and ultimately establish that the defendant acted with the knowledge that it was false or with reckless disregard of whether it was false or not and must be shown by clear and convincing evidence, not mere speculation and belief. *Nodar v. Galbreath*, 462 So. 2d 803, 806 (Fla. 1984). Thus, surviving Defendant's 12(b)(6) argument on this point requires Plaintiff to plead allegations that allow the Court to reasonably infer that Defendant "actually entertained serious doubts as to the veracity of the published account, or was highly

aware that the account was probably false." *Michel v. NYP Holdings, Inc.,* 816 F.3d 686, 702-03 (11th Cir. 2016). Malice in this context refers to the truth, not to Plaintiff. This standard is extremely high. *Id.*; *Meisler v. Gannett Co.,* 12 F.3d 1026, 1030 (11th Cir. 1994) (affirming summary judgment for defendant newspaper because defendants' actions were, at most, negligent, which is "not the appropriate standard for proving actual malice"). As noted by the Supreme Court in *Hustler Magazine, Inc. v. Falwell,* 485 U.S. 46 (1988),  "in the world of debate about public affairs, many things done with motives that are less than admirable are protected by the First Amendment … when a speaker or writer "is motivated by hatred or ill will his expression was protected by the First Amendment….Thus while such a bad motive may be deemed controlling for purposes of tort liability in other areas of the law, we think the First Amendment prohibits such a result in the area of public debate about public figures." *Id.* at 53.

2.

As noted recently in the media, the trial of Canadian rapper Tory Lanez, whose legal name is Daystar Peterson, "created a firestorm in the hip-hop community, churning up issues including the reluctance of Black victims to speak to police, gender politics in hip-hop, online toxicity, protecting Black women and the ramifications of misogynoir, a particular brand of misogyny Black women experience."[2] As such, there is no dispute that this public criminal trial of Mr. Lanez concerned issues of public concern. Along with this comes a panoply of views and opinions as is expected when celebrities are involved. "Speech by citizens on matters of public concern lies at the heart of the First Amendment, which 'was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.'" *Lane v. Franks*, 573 U.S. 228, 235–36 (2014) *quoting Roth v. United States,* 354 U.S. 476, 484 (1957).  It is clear from the allegations of the Amended Complaint that the Plaintiff takes issue with the opinions and statements made by Defendant regarding this trial. Evidently, the Plaintiff believes that her narrative of events is an undeniable and fails to realize that in a trial, both sides cannot be correct, and rarely is there something that is absolutely true. Thus, it is nonsensical to presume that in every case the losing side committed perjury or that the winning side told the truth. Criminal trials are essentially battles of narratives. Each

---

[2] AP News, Dec. 17, 2024, "Megan Thee Stallion seeks restraining order, says imprisoned Tory Lanez continues to harass her."  Found at https://apnews.com/article/megan-thee-stallion-tory-lanez-restraining-order-83e18781439708638a78571b09a070a3?fbclid=IwY2xjawHPCG9leHRuA2FlbQIxMQABHf85y9euvSPvxv3KzZkBiAArufbhpkP4rmKCPogADYixXrjVg6ftCkI6oA_aem_Cwq6b6jo3IR_hHxR0WTuiA

side has a version of events they want a jury and the public to believe, and they will do what they can to present evidence that matches up with that story. Juries and trial observers will then form their opinions regarding the credibility of witnesses, documentary, and physical evidence. Some observers may give credence to some witnesses and not to others. In a criminal trial, a group of individuals can view the same evidence and reach different conclusions from "justice was served" on one end to "this was a travesty of justice" on the other end. In the instant case, of the five statements which Plaintiff contends accused her of being a felonious perjurer, two of the statements were posts on X and three were from online livestreams.  Plaintiff's allegations are at best disingenuous given that it was widely reported that Plaintiff gave inconsistent statements to the police and given that she admitted on national television that she lied about her sexual relationship with Lanez.[3]

The first purported statement that begins with "at the end of the day" was an excerpt from a December 21, 2022, livestream.[4] It is clear from the complete statements that the Defendant was discussing an article published by NBC and then discusses her opinion and conclusions based on her observations of what happened at the trial including inconsistencies and credibility issues. She discusses witness testimony including that of Kelsey Harris and Sean Kelly who themselves made suggestions that some of the witnesses were drunk at the night of the shooting. It is not surprising that the Plaintiff did not quote the entire post because it undermines her claim. Nothing in this December 21, 2022, post suggests that Plaintiff committed the crime of perjury. It clearly is pure opinion on a newsworthy matter. If you believe one side over the other and you express this view because you have doubts regarding a witness's credibility at trial, this falls far short of accusing someone of committing the felony of perjury. Again, this is not something that can be proven as true or false "because an individual's state of mind at a particular point in time 'is not subject to empirical proof.'" *Turner v. Wells,* 198 F. Supp. 3d at 1370. The jury believed some witnesses and those trial observers, including the Defendant, evidently believed other witnesses. The same thing can be said about the X post referenced at paragraph 57 where the Defendant is opining on what she believed was a botched investigation and non-credible witnesses (plural). Again, simply suggesting someone was not credible is a far cry from saying they committed perjury. The suggestion by Plaintiff is a canard for if this were the case, then every losing party in a criminal or civil case would be prosecuted for perjury. The X

---

[3]  "Tony Lanez Found Guilty in Megan Thee Stallion Shooting Trial", by Shawn Setaro, GQ Magazine, 12-23-2022 found at https://www.gq.com/story/tory-lanez-guilty-trial-megan-thee-stallion-shooting-kelsey-harris
[4] A true and correct transcript of the entire livestream can be found at Exhibit A-1.

post referenced at paragraph 60 also falls short of accusing the Plaintiff of having committed a felony. It too constitutes pure opinion and rhetorical hyperbole where the Defendant is essentially finding fault with the prosecution's theory of the case (that Peterson shot Ms. Pete because his ego was bruised). *See Montgomery v. Risen,* 197 F. Supp. 3d 219, 248-249 (D.DC 2016) (assertion that the plaintiff was motivated out of greed or ambition was a subjective judgment and calling the plaintiff a con artist and a fraud were nonactionable opinion). Again, this is not a statement that can be proven as true or false and further is not susceptible of any defamatory meaning towards Plaintiff.

The next statement where Defendant says, "We know you a lying ass hoe, and you have absolutely ruined Tory's life." Again, Plaintiff fails to include the complete post.[5] Nevertheless, this too is clearly opinion and rhetorical hyperbole. Also ignored by Plaintiff is Defendant's later statement in the post where she says, "You understand? You ain't a solid b***h in that regard. Then you lied on set. You just don't tell the truth." Again, it is undisputed by Plaintiff's own words that she admitted in a television interview about lying about her relationship with Lanez. (*See* note 3*, supra*). The content appears to be a stream of personal opinions and reactions expressed in a confrontational tone. So, at best, this statement is substantially true and at worst, pure opinion/hyperbole; not defamation as the law does not require perfect accuracy, only that the publication be substantially true. *Nelson v. Associated Press, Inc*., 667 F.Supp. 1468, 1477 (S.D. Fla. 1987).

The final statement is another cherry picked line from a larger post. The complete August 7, 2024 X post is found at Exhibit A-3.[6]  Playing fast and loose with the facts is precisely what the Eleventh Circuit criticized the plaintiff in the *Turner* case and this is what the Plaintiff is doing here. 879 F.3d at 1263. The full X Post reads:

> Was Megan Thee Stallion caught trying to deceive the courts again? The answer is yes if you ask her former cameraman Emilio Garcia. After Emilio filed a lawsuit alleging an unstable work environment, MTS filed to dismiss the lawsuit brought against her with the potential to have the case re-filed in New York. The thing is, Emilio is calling bullshit and says Megan is lying and lives in California. (He has hotel receipts, tests, and emails.)

The post then includes screenshot excerpts from Mr. Garcia's motion filed in the civil case and some exhibits. Again, this is clearly Defendant's lay person assessment of the pleadings and allegations of a lawsuit involving a public celebrity and is not susceptible to a defamatory meaning as the common mind would understand them when viewed in full context. *See Turner*. Again, Plaintiff's testimony

---

[5]  A Transcript of the June 22, 2023 post is found at Exhibit A-2.

[6]  https://x.com/MobzWorld/status/1821131325736194328

at trial cannot be proven true or false given the different narratives. The fact that the jury convicted Mr. Lanez does not necessarily mean that Plaintiff's testimony was infallible and an absolute truth; rather, it is what a jury chose to believe. A different jury may reach a different conclusion. Hence why this statement is opinion and not defamation.

3.

The next set of statements at paragraphs 64 and 95, purportedly livestreamed and posted on X, as described in the Amended Complaint, are once again cherry picked lines clothed in Plaintiff's self-serving innuendos while ignoring the full context of the post. A complete copy of the January 29, 2024, X post is found at Exhibit A-4. This post does not suggest as alleged that Plaintiff was engaged in a sexual relationship with her Manager, T. Farris; to the contrary, the post suggests the exact opposite. As far as the statement made by Defendant that she believed Ms. Pete was "slow" because someone told her that Ms. Pete needed a guardian is not defamation *per se*. Essentially, Plaintiff is suggesting that insulting someone by calling them "slow" or "retarded" somehow rises to the level of defamation. In reality, these words constitute rhetorical hyperbole. Whether the language is hyperbolic is relevant to distinguishing fact from opinion. Rhetorical hyperbole — "language that, in context, was obviously understood as an exaggeration, rather than a statement of literal fact"—is not actionable. In particular, "[t]he ad hominem nature of abusive epithets, vulgarities, and profanities," which some writers and speakers "use to enliven their prose," especially in the hip-hop universe, indicates that the statement by its very nature is hyperbole. *See* generally 50 AM.JUR.2D LIBEL AND SLANDER § 111 (2006). As noted by the Eleventh Circuit, "name-calling, however inconsiderate, is not false … [S]tatements that [plaintiff] was "stupider" and "crazy" constitute … opinion and thus cannot be proven false." *See Cook-Benjamin v. MHM Corr. Servs., Inc.,* 571 F. App'x 944, 947 (11th Cir. 2014) (applying Georgia law) *citing Info. Sys. and Networks Corp. v. City of Atlanta,* 281 F.3d 1220, 1228 (11th Cir.2002); *Demoya v. Walsh,* 441 So. 2d 1120 (3d DCA 1983)(applying Florida law holding that calling someone a "raving maniac" and "raving idiot" in the presence of co-workers while "personally insulting" did not rise to the level of actionable defamation); *See also Steinhausen v. HomeServices of Nebraska, Inc.,* 289 Neb. 927, 941–42, 857 N.W.2d 816, 829 (2015)(real estate agent referring to a home inspector as a "total idiot" not defamatory, but hyperbole). Further, "courts have held that referring to someone as an 'idiot,' 'raving idiot,' '[i]diots [a]float,' and more vulgar variants were rude statements of opinion, rather than lay diagnoses of mental capacity. Similarly, courts have held that statements calling the plaintiff 'stupid,' a 'moron,' and a 'nincompoop' were not actionable. Courts have also held that

9

statements potentially referring to the plaintiff's mental health, such as 'raving maniac' 'pitiable lunatics', 'wacko,' 'nut job,' and 'hysterical', 'crazy' and 'crank,' were statements of opinion." *Steinhausen,* at 941-42 (collecting cases). As to the third statement where Defendant states, "What is Megan's Mental Status? Does she have a guardian or not? Has she been listed as a capable person? Has she ever been deemed, like, legally retarded? Like anything of the nature? Anything of the sort?" This type of statement by its very nature is a speculative opinion that cannot form the basis of a defamation action as they are not statements of fact. *See Turner v. Wells,* 879 F.3d at 1262.

4.

> *At night, I'm sittin' in a dark room thinkin'; Probably why I always end up drinkin'; Yes, I'm very depressed; How can somebody so blessed wanna slit they wrist? Shit, I'd probably bleed out some Pinot; When they find me, I'm in Valentino, ayy; He pourin' me shots, thinkin' it's lit; Hah, little did he know.[7]*

Plaintiff suggestion that the November 3, 2024, statements by Defendant at paragraph 98 referring to Plaintiff's drinking as defamatory is nonsensical as they too are pure opinion and rhetorical hyperbole by their very nature, to wit:[8]

- "You ought to be somewhere for your alleged crimes, drunkie. Why do you even speak? Like does your liver even function well?"

- "When you have drinking seemingly running through a family, yes I did post certain questions to my page. Yes I did."

- Ms. Pete comes from a family of "alcoholics. Because the fact of the matter is, you have a grandfather that was an alcoholic. Your daddy, was your daddy on drugs? Or was he in and out of the system? What was that for? Do you want to talk about that? Is stealing worse than drugs and shit?"

Given the parameters of Rule 11, it seems quite perverse that a performing artist with her own tequila brand and who routinely raps about heavy drinking such as in her hit song "Cobra", and who livestreams a drunken video of herself online,[9] would somehow suggest that the above comments were defamatory. In fact, in her recent documentary Ms. Pete states, that she was "getting lit" to get her through her pain and "I wasn't no bad person, but I was definitely drinking like a motherfucker,

---

[7] "Cobra" by Megan Pete, published Nov. 3, 2023,  https://youtu.be/LO-gVqR58_0?si=yl0TAeFpRqWrFE0T
[8] Defendant was unable to obtain a transcript of this post.
[9] https://www.youtube.com/watch?v=yytoHcYURsk

though. But I wasn't fighting. The worst thing I was doing was drinking and fucking. That's it."[10]
Nevertheless, as with the other comments complained of in the Amended Complaint, these statements
are partially true, opinion and hyperbole. *See Demoya v. Walsh,* 441 So. 2d 1120 (3d DCA 1983).
"Under the substantial truth doctrine, a statement does not have to be perfectly accurate if the 'gist'
or 'sting' of the statement is true." *Wentz v. Project Veritas,* No. 6:17-cv-1164-Orl-18GJK, 2019
WL 1716024, at *4 (M.D. Fla. Apr. 16, 2019).  Further, these comments pale to those uttered in
*Horsley v. Rivera*, 292 F.3d 695, 702-03 (11th Cir. 2002) where the court held that statements made
by a television host that an anti-abortion activist's online posts made him "an accomplice to homicide"
in the murder of a doctor who performed abortions was rhetorical hyperbole as the host's words were
used "to convey the view that [the plaintiff] was morally responsible for [the doctor's] death" and
were thus protected by the First Amendment. *See also Turner* at 1264 (report stating that the plaintiff,
a former NFL Coach, participated in "homophobic taunting" and bullying of  NFL players was
opinion and not actionable); *Pullum v. Johnson,* 647 So.2d 254 (Fla. 1st DCA 1994)(holding that
religious broadcaster referring to a local head of tourist development counsel and restaurant owner
as a "drug pusher" because of the plaintiff's public support allowing liquor sales in the County
was "rhetorical hyperbole" and protected speech under the First Amendment).

5.

Notwithstanding that the Plaintiff's Amended Complaint fails to show that any of the
statements made by the Defendant constitute anything more than pure opinion and hyperbole, further
sinking her claims is the fact that she also fails to establish malice by clear and convincing evidence.
In fact, Plaintiff treats this claim as if it were one brought by a private individual as evidenced by the
negligence standard cited in paragraph 103. *See Meisler v. Gannett Co.,* 12 F.3d at 1030 (affirming
summary judgment for defendant newspaper because defendants' actions were, at most, negligent,
which is "not the appropriate standard for proving actual malice"). Moreover, a "failure to investigate
before publishing, even when a reasonably prudent person would have done so, is not sufficient to
establish reckless disregard." *Harte-Hanks Comm'ns, Inc. v. Connaughton*, 491 U.S. 657, 688
(1989); *Lovingood v. Discovery Commc'ns, Inc.,* 800 F. App'x 840, 850 (11th Cir. 2020). As noted
by the Eleventh Circuit,

> In [defamation] cases, there is a powerful interest in ensuring that free speech is not
> unduly burdened by the necessity of defending against expensive yet groundless
> litigation. Indeed, the actual malice standard was designed to allow publishers the

---

[10] Megan Thee Stallion: In Her Words (2024)
https://www.springfieldspringfield.co.uk/movie_script.php?movie=megan-thee-stallion-in-her-words

> "breathing space" needed to ensure robust reporting on public figures and events
> … Forcing publishers to defend inappropriate suits through expensive discovery
> proceedings in all cases would constrict that breathing space in exactly the manner
> the actual malice standard was intended to prevent. The costs and efforts required
> to defend a lawsuit through that stage of litigation could chill free speech nearly as
> effectively as the absence of the actual malice standard altogether.

*Michel*, 816 F.3d at 702. There is no showing anywhere in the Amended Complaint by clear and convincing evidence "that the defendant purposefully avoided further investigation with the intent to avoid the truth." *Michel* at 703. Further, allegations of spite or ill will on behalf of the Defendant is not enough to establish malice and neither is the Defendant's motive. *Masson v. New Yorker Magazine, Inc.,* 501 U.S. 496, 510 (1991). At best, while Plaintiff can show spite between the Defendant and her, this is not enough to establish malice. With respect to Defendant's statements about how the Lanez trial was conducted, this too amounts to much ado about nothing as the full context of the posts show that the Defendant relied on courtroom pleadings and documents, police reports, and her observations while attending the trial, to support her opinions. While Defendant's statements may not agree with the narrative preferred by Plaintiff, she needs to understand the best response to speech you do not agree with is more speech; not the cancellation of opinions or ideas one disagrees with. "Under the First Amendment, there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas." *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 339-40 (1974). Frankly, the worst thing the Defendant could be accused of here is using colorful language to criticize the Plaintiff, other trial witnesses, and the trial itself. While Plaintiff may seem entitled to a higher sense of privilege due to her fame, prestige, and finances, she does not own a monopoly on the truth or to any particular narrative. As Count One of Plaintiff's Amended Complaint is replete with nothing more than mostly irrelevant and conclusory allegations buttressed by unwarranted innuendos, speculation and self-serving deductions, as a whole, when viewing all of the complained of statements in their full context, it is evident that Plaintiff has failed to plausibly allege that any of the Defendant's statements were substantially and materially false published with the requisite malice so as to state a claim for Defamation against a public figure. Count One should therefore be **DISMISSED**.

## II.    <u>Count Two Fails to State a Claim for Violation of Section 836.13, Florida Statutes</u>

In Count Two of the Amended Complaint, Plaintiff once again submits nothing but conclusory and fallacious allegations that the Defendant "promoted" a deep fake sex video of the Plaintiff based solely on Defendant purportedly liking a third party's posting of the video, discussing that this video came to her attention, and then in order that her listeners knew what she was discussing,

by posting on X, "go to my likes". (DE 28, ¶¶ 40-53). The suggestion by Plaintiff that Defendant's actions constitute a violation of this statute, is undermined by Plaintiff's own allegation that in this same post, Defendant herself told the public that the video appeared to be a deep fake, and that Plaintiff should sue the individuals who made it. (Id. ¶ 111). Plaintiff is a public figure and in Defendant's live discussions about this video and ultimately debunking the video as a fake, Plaintiff somehow believes that the Defendant's action constitutes the "promotion" of the video so as to trigger the statute's civil and criminal penalties. This circular reasoning defies the tenets of statutory construction and ignores the plain meaning of the statute itself.

As previously noted, in addition to its specific criminal penalties, section 836.13(5), Florida Statutes, also provides a civil remedy of injunctive relief, actual monetary damages or $ 10,000, whichever is greater, and attorney's fees and costs against "[a] person who willfully and maliciously promotes any altered sexual depiction of an identifiable person, without the consent of the identifiable person, and who knows or reasonably should have known that such visual depiction was an altered sexual depiction." Section 836.13 was enacted by the Florida Legislature in 2022. Currently, there are no cases interpreting the provisions of this statute. However, applying the general rule of statutory construction, it is axiomatic that "statutes imposing a penalty must always be construed strictly in favor of the one against whom the penalty is imposed and are never to be extended by construction." *Galbut v. City of Miami Beach*, 605 So. 2d 466, 468 (Fla. 3d DCA 1992*), opinion adhered to on denial of reh'g* (Oct. 13, 1992), *approved*, 626 So. 2d 192 (Fla. 1993) *quoting Hotel & Restaurant Comm'n v. Sunny Seas No. One, Inc.,* 104 So.2d 570, 571 (Fla.1958); *accord State v. Llopis,* 257 So.2d 17, 18 (Fla.1971); *See also 3B TV, Inc. v. State, Off. of Atty. Gen.,* 794 So. 2d 744, 749 (Fla.1st DCA 2001); *In re Forfeiture of $37,388.00*, 571 So.2d 1377 (Fla. 1st DCA 1990); *Holmberg v. Department of Natural Resources,* 503 So.2d 944 (Fla. 1st DCA 1987).

To state a cause of action pursuant to this statute, Plaintiff must establish the following: (1) that the Defendant willfully and maliciously promoted an altered sexual depiction of an identifiable person, (2) without the consent of the identifiable person(s) depicted; and (3) that at the time, the defendant knew or reasonably should have known the depiction was an altered sexual depiction. *See* FLA. STD. CRIM. JURY 11.23. Under the statute, "promote" is defined as follows: "'Promote'" means to issue, sell, give, provide, lend, mail, deliver, transfer, transmit, transmute, publish, distribute, circulate, disseminate, present, exhibit, send, post, share, or advertise or to offer or agree to do the same." Fla. Stat. § 836.13(3)(d). Given that this Court must strictly construe this statute, it is evidently clear that the Plaintiff's Amended Complaint is suggesting that this Court apply a rather liberal

construction ignoring the plain meaning of the statute's definition of "promote." Notably absent from the statute's definition is the term "discuss" or "mention" which is precisely what the Plaintiff is suggesting. Using the Plaintiff's circular reasoning, anyone who speaks or makes mention of the existence of such a video is liable under this statute regardless of the circumstances. Interestingly, the Amended Complaint also alleges that the above allegations were reported in a news publication Uproxx which evidently found the matter newsworthy and itself linked to the same video. (Id. ¶ 46, n.5). Then it is alleged that the defendant made the following statements on a post: "whoever follows me on social media to go to my likes to see what it is that we're discussing[.]" (Id. ¶¶ 49-50). The Amended Complaint then alleges that Defendant then published a video entitled "Milagro Gramz Officially Responds to Claims of A Lawsuit & Harassment Against Megan Thee Stallion" on YouTube where she "addressed her '"go to my likes' X post related to the Deepfake Video" where in the YouTube post she "questioned whether Ms. Pete is '[a] professional victim.'" (Id.). Notably, the Plaintiff concedes that on June 8, 2024, Defendant did in fact question the authenticity of the video and encouraged Plaintiff to sue the person who made it: "With the way deep fake and AI be going these days…..If it's not her she should sue whoever made it. That sht [sic] dry af [sic] to do to people." (Id. ¶ 111).[11]

It is undisputed from the Amended Complaint's allegations and the cited links to the online publications, that the Defendant did not create the video, nor did she repost or share the video on her social media or on any media. Despite the particular spin that the Plaintiff wishes to put on the facts, the reality is that the Plaintiff is suggesting that if someone refers or speaks about the existence of a deep fake video or presses the like button on a post with the video, that this constitutes the promotion of the video. Such an overbroad reading would run afoul of the First and Fourteenth Amendments. All that is alleged in this lawsuit is that: (1) the Defendant "liked" the video which had been previously posted in an online public forum which already had over 51,000 views (Ex. A-5, pp. 9-10), 2) Defendant later posted a Tweet saying "Go to my likes," so people could see what she was discussing (which she later deleted) and (3) Defendant later published a YouTube video where she discussed the Uproxx article and questioned whether the Plaintiff, a worldwide celebrity with millions of fans was a "professional victim."  Who's to say that the Uproxx article garnered more attention to the video than the Defendant who simply stated, "go to my likes." In fact, the media site Uproxx in linking to the purported video would on its face seem worse than what the Defendant did as she did not link to

---

[11] A full transcript of the June 9, 2024 YouTube video is found at Exhibit A-5.

the video in her posts, nor did she post it on any of her platforms. Plaintiff's argument that the above constitutes a violation of this statute is vexatious and frivolous. The statutory definition at §836.13(3)(d) requires that the violating party actually create and put the offending video into circulation or that they provide a copy of the offending video to someone, or that they post it online or that they provide a copy to the video in exchange for remuneration. Anything beyond that begins to trample onto First Amendment and due process territory.

In any event, there is no factual allegation that the Defendant procured, manufactured, issued, or sold the video. Neither is there any allegation that Defendant provided a copy of the video to anyone. The Amended Complaint is also devoid of any factual allegations that the Defendant broadcast or transmitted the video, transmuted it, or published it, or posted it, or exhibited it in any form. Nor is there any allegation that Defendant advertised the video for the purposes of promoting sales of the video. Nor is there any allegation that the Defendant represented that this online video was in fact the Plaintiff; to the contrary, it is undisputed that the Defendant indicated that it was not the Plaintiff and that the Plaintiff should sue whoever made the video and posted it online. There are no factual allegations that Defendant shared or disseminated the video to anyone. As such, Count Two of the Amended Complaint does not allege any facts that plausibly state a cause of action under section 836.13. If anything, the "promotion" of the alleged deep fake video was perpetrated by the unknown individual who published and posted it online, not the Defendant. Accordingly, Count Two should be dismissed with prejudice and Defendant should be awarded reasonable attorney's fees and costs pursuant to §836.13(5)(c), Fla. Stat.

### III.    Count Three Fails to State a Claim for Intentional Infliction of Emotional Distress

Once again, Count Three attempts to state a claim for intentional infliction of emotional distress ("IIED") based primarily on online commentary and opinions made by the Defendant regarding the highly publicized trial of rapper Tory Lanez.  (DE 28, ¶¶ 115-118). However, the amendments to the complaint do not rescue this Count from dismissal under Florida law. Taking into consideration the allegations that the Defendant pressed the "like" button on an unknown third-party's social media post purporting to depict a deep fake video of the Plaintiff,  (Id., ¶¶ 42-45), or Defendant's online comments about the Lanez criminal trial, (Id., ¶¶ 5-6, 29-38, 54-62, 115),  or commentary about the Plaintiff drinking (Id. ¶¶ 7, 69,70), or calling the Plaintiff "retarded" (¶¶ 66-67),  or calling the Plaintiff an "angry black woman" (¶ 86), or all of the above,  these allegations fall far short of stating a plausible claim for IIED under Florida law. Not surprising, none of the facts in the Amended Complaint allege that the Defendant committed any acts of violence against Plaintiff.

There are no allegations of assault or battery or false imprisonment or of any similar type threats. The perceived wrongs in this case are based on mere words and opinions regarding a public figure, a high-profile trial, all of which are protected by the First Amendment. If the First Amendment can protect real despicable conduct such as what is described in *Snyder v. Phelps*, 562 US 443 (2011) (reversing IIED verdict against protestors at funeral of slain marine holding signs with messages, such as "God Hates Fags," "Thank God for IEDs," and "America is Doomed"), then surely Defendant's words and opinions, which pale in comparison, are protected as well. Under Florida law, a plaintiff must plead the following elements in order to state a claim for intentional infliction of emotional distress: 1) extreme and outrageous conduct; 2) an intent to cause, or reckless disregard to the probability of causing, emotional distress; 3) severe emotional distress suffered by the plaintiff and 4) that the conduct complained of caused the plaintiff's severe emotional distress. *Blair v. NCL (Bahamas) Ltd.,* 212 F.Supp.3d 1264, 1269 (S.D. Fla. 2016) (Seitz, J.) *citing Metropolitan Life Insurance Co. v. McCarson*, 467 So.2d 277, 278 (Fla. 1985). Under the first prong, a defendant's conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Metropolitan Life,* 467 So.2d at 278–79. "While there is no exhaustive or concrete list of what constitutes outrageous conduct, Florida common law has evolved an extremely high standard." *Garcia v. Carnival Corp.,* 838 F.Supp.2d 1334, 1339 (S.D. Fla. 2012) (Moore, J.) (quoting Merrick v. Radisson Hotels Int'l, No. 06-cv-01591-T-24TGW (SCB), 2007 WL 1576361, at *4 (M.D. Fla. May 30, 2007)). As such, "courts uphold claims of intentional infliction of emotional distress only in 'extremely rare circumstances.'" *Triana v. Diaz,* 12-21309-CIV, 2014 WL 5319800, at *7 (S.D. Fla. Oct. 16, 2014) (King, J.). Whether conduct is outrageous enough to support a claim of IIED is a question of law for the court to decide, not a question of fact. *Blair*, 212 F.Supp.3d at 1269–1270.[12]

Assuming arguendo, that all of the Amended Complaint's allegations are being relied upon to support Count Three, the allegations fall quite short of stating a claim for IIED. In the limited number of cases where outrageous conduct was found, the facts were quite severe usually involving sexual assault or some severe forms of physical violence. *Vernon v. Med. Management Associates of Margate, Inc.,* 912 F.Supp. 1549, 1561 (S.D.Fla. 1996)(holding in sexual harassment case that allegations of repeatedly touching, squeezing, fondling, hugging, blowing, and tickling of the plaintiff along with the repetition of lewd and vulgar sexual remarks precluded the dismissal of plaintiff's

---

[12]   Arguably, given that this case involves a public figure, Plaintiff also needs to establish malice under the *New York Times* Standard. *See Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46 (1988).

complaint at the motion to dismiss stage); *Stockett v. Tolin,* 791 F.Supp. 1536, 1556 (S.D.Fla.1992)(holding that the plaintiff was entitled to compensatory damages for IIED where the plaintiff was pinned against the wall, refused to allow to escape, and physically attacked on a weekly basis). In *Johnson v. Thigpen,* 788 So.2d 410, 414 (Fla. 1st DCA 2001), Florida's First District Court of Appeal found that the defendant's use of sexually explicit, demeaning, and vulgar language coupled with evidence of inappropriate, unwelcomed physical contact was outrageous conduct under Florida law. *See also Urquiola v. Linen Supermarket, Inc.,* No. 94–14–CIV–ORL–19, 1995 WL 266582, at *4 (M.D.Fla. Mar. 23, 1995) (plaintiff's allegations stated a claim for intentional infliction of emotional distress where plaintiff alleged numerous incidents of kissing, groping, attempted rape, and use of sexually explicit, demeaning, and vulgar language).

In contrast, the following cases, which are significantly more severe than the Plaintiff's allegations here, the Florida courts have consistently found that the conduct was *not* so outrageous in character and extreme in degree as to go beyond the bounds of decency and be deemed utterly intolerable in a civilized society as required to state a claim for IIED. For example, the Eleventh Circuit in *Koutsouradis v. Delta Air Lines, Inc.,* 427 F.3d 1339, 1345 (11th Cir. 2005) found that insults and indignities do not support a claim for IIED. Likewise in *Gonzalez–Jimenez de Ruiz v. United States,* 378 F.3d 1229, 1231 (11th Cir. 2004), the Eleventh Circuit also held that a party's deception regarding a father's terminal medical condition, failure to provide family with reasonable access to father during his illness, failure to inform family of father's death, providing substandard medical care, and delay in transporting remains failed to state a claim of IIED. *See also Rubio v. Lopez,* 445 F. App'x 170, 175 (11th Cir. 2011) (finding failure to allege sufficient outrageous conduct where a deputy sheriff hobble-tied arrestee on black asphalt pavement in sun, resulting in second-degree burns to face and chest); *Blair v. NCL (Bahamas) Ltd.,* 212 F. Supp. 3d 1264 (S.D. Fla. 2016) (Seitz, J.) (finding failure to allege sufficiently outrageous conduct where plaintiff's child drowned in a pool advertised as "kid friendly," though lacking life guards, lifesaving equipment, and personnel prepared to respond to a drowning event); *Vamper v. United Parcel Serv., Inc.,* 14 F.Supp.2d 1301, 1306-07 (S.D.Fla. 1998)(King, J.) (explaining that the tort of intentional infliction of emotional distress is sparingly recognized by Florida courts and may proceed where there is relentless physical as well as verbal harassment and thus finding no outrageous conduct where defendants fabricated reckless driving charge against plaintiff, called him the "n" word, threatened him with termination, and physically struck him on ankle); *Howry v. Nisus, Inc.,* 910 F.Supp. 576, 580–81 (M.D.Fla.1995) (employer's action of physically touching himself and employees in a suggestive manner, using

obscene language, and commenting on sex organs was insufficient under Florida law to state a claim for IIED); *Valdes v. Gab Robins N. Am., Inc.,* 924 So.2d 862, 866 (Fla. 3d DCA 2006) (investigating and then making false statements to state agency which lead to plaintiff's arrest was "not the type of conduct that is so outrageous in character and extreme in degree as to go beyond the bounds of decency and be deemed utterly intolerable in a civilized society."), *review denied*, 949 So.2d 200 (Fla. 2007); *Legrande v. Emmanuel*, 889 So.2d 991, 995 (Fla. 3d DCA 2004) (clergyman falsely branded a thief in front of parishioners failed to state claim of intentional infliction of emotional distress); *Williams v. Worldwide Flight Servs., Inc.,* 877 So.2d 869, 870–71 (Fla. 3d DCA 2004) (constant use of "mere insults, indignities, threats, or false accusations" and derogatory racial terms failed to state cause of action for intentional infliction of emotional distress); *Lay v. Roux Laboratories, Inc.,* 379 So.2d 451, 452 (Fla. 1st DCA 1980) (same). As Plaintiff's allegations are clearly not outrageous in character and extreme in degree as to go beyond the bounds of decency and be deemed utterly intolerable in a civilized society when compared to the body of caselaw in Florida, Count Three of Plaintiff's Complaint for IIED should be **DISMISSED** *with prejudice* without leave to amend as any amendment at this point would be deemed futile.

### IV.     Count Four Fails to State a Claim for Cyberstalking and Should Be Dismissed

Count Four of the Complaint purports to bring a claim for injunctive relief for cyberstalking pursuant to Section § 784.0485, Fla. Stat. As this claim does not provide for an award of damages, and seeks only injunctive relief, presumably, Plaintiff is attempting to bring this claim by invoking this Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367. In order to be entitled to an injunction for cyberstalking, the Court must "apply a reasonable person standard, not a subjective standard, to determine whether an incident causes substantial emotional distress." *Logue v. Book*, 297 So. 3d 605, 611 (Fla. 4th DCA 2020) (citation omitted), and there must be no legitimate purposes for the conduct. *Id.* Further, injunctions are not available to stop someone from uttering insults or falsehoods. *See, e.g., Scott v. Blum,* 191 So.3d 502, 504 (Fla. 2d DCA 2016); *Concerned Citizens for Judicial Fairness, Inc. v. Yacucci,* 162 So. 3d 68, 72 (Fla. 4th DCA 2014); *Vrasic v. Leibel*, 106 So. 3d 485, 486 (Fla. 4th DCA 2013) (holding that an injunction remedy is not available to prohibit defamatory or libelous statements). The First Amendment prohibits such restraints through the use of injunctive relief. *Chevaldina v. R.K./FL Mgmt., Inc.,* 133 So. 3d 1086, 1090 (Fla. 3d DCA 2014).  As there are no allegations that the Defendant made any direct threats of violence or other allegations that fall within the statutory definition of cyberstalking, Count Four should be dismissed on the merits with prejudice.  Secondly, Count Four should also be dismissed for Plaintiff's failure to follow the

mandatory statutory requirements set forth in § 784.0485. Specifically, the statute requires that the petition be verified under Fla. Stat.§ 92.525, (equivalent to 28 U.S.C. § 1746). Plaintiff has attempted to cure this problem from the initial complaint by filing what purports to be a sworn petition. (DE 28-1). However, with respect to the facts supporting the petition, section (d), she merely states in a circular manner: "Petitioner is a victim of cyberstalking because respondent has committed cyberstalking. A description of the facts regarding respondent's cyberstalking are set forth in the Amended Complaint to which this petition is attached. See First Amended Complaint, ¶¶ 25-88." (Id. p. 2). Nowhere does Plaintiff verify that the allegations of the Amended Complaint ¶¶ 25-88 are true and correct under penalty of perjury, as one would do in a verified pleading. She merely avers that the facts are described in her Amended Complaint.[13] The statute clearly states that the facts supporting the petition must be sworn to. See § 784.0485(3)(a). As the factual allegations supporting Count Four are not under oath, they fail to comply with the statutory requirements outlined in section (3)(a), it should be dismissed. *See Harvick v. Oak Hammock Preserve Com.,* 2015 WL 667984 (M.D. Fla. Feb. 17, 2015).

In the event that the Court deems DE 28-1 complies with the statute and that the Count states a plausible claim, then Defendant once again respectfully requests that the Court decline to exercise supplemental jurisdiction over Count Four. *See Kassenoff v. Harvey,* 2024 WL 562738 at * 10-11, n. 16 (N.D. Fla. Feb. 9, 2024) ("*Kassenoff 1*")(noting "doubts that the Florida Legislature intended that claims under § 784.0845 would be litigated in federal court because the injunction contemplated by the statute is akin to a domestic violence injunction that state court judges who regularly preside over injunction dockets are better suited to handle on the expedited timeframes in the statute…." In a subsequent decision on the same case, Judge Wetherell noted that while a federal court could theoretically exercise supplemental jurisdiction over a § 784.0485 claim under 28 U.S.C. § 1367(a), however, upon further reflection, he found that there appeared to be "compelling reasons for declining jurisdiction" pursuant to 28 U.S.C. § 1367(c)(4). *Kassenoff v. Harvey,* Case No. 23-cv-24085, DE 35 slip op.  at pp. 3-4 (ND Fla. Apr. 4, 2024) ("*Kassenoff 2*").   As this case is in its earliest stages, given the well-reasoned opinion by Judge Wetherell on this exact same issue in *Kassenoff 2*, In the event the Court does not rule on the insufficiency of Count Four, then this Court should decline supplemental jurisdiction over the claim pursuant to 28 U.S.C. § 1367(c)(4). If Plaintiff wishes to obtain an

---

[13] Had Plaintiff filed a verified pleading, it would have procedurally satisfied the statute.

injunction under section 786.0485, she can re-file in the Circuit Court in Miami Dade County and testify in person and prove her case accordingly before a Circuit Court judge.

**V.     Plaintiff's Claims for Attorney's Fees in Counts I, III, and IV should be Dismissed/Stricken**

In Counts One, Three, and Four of the Amended Complaint, the Plaintiff is seeking attorney's fees. It is well settled that under Florida law, each party generally bears its own attorneys' fees unless a contract or statute provides otherwise. *Price v. Tyler*, 890 So. 2d 246, 250 (Fla. 2004). Counts One and Three are for intentional torts and Count Four is for an injunction under a statute that does not provide for the recovery of attorney's fees. Accordingly, Plaintiff's claims for attorney's fees in Counts I, III, and IV should be **DISMISSED**.

## CONCLUSION

In 1975, Nobel Prize winning songwriter and artist Bob Dylan wrote and recorded a successful song called "Hurricane" which depicted the murder trial of prizefighter Rubin "Hurricane" Carter. *Valentine v. CBS, Inc.,* 698 F.2d 430 (11th Cir. 1983). The song went on to describe the unfairness and racial undertones of the trial, and portrayed a "perceived conspiracy between Bello, Bradley, and the police to unjustly convict Carter." *Id.* at 431. Taking Ms. Pete's logic in bringing this case to its ultimate conclusion, given that a jury convicted Carter, any individual who suggested something to the contrary or who criticized the credibility of the state's witnesses in that trial should be guilty of defamation. Patty Valentine who was mentioned by name in the Dylan song thought as Ms. Pete did and sued for defamation claiming the song implied that she was involved in the conspiracy against Carter.  Both the district court and the Eleventh Circuit disagreed. If Ms. Pete's mindset had been applied back in the 1970's, then the Bob Dylan classic song should not have been published or recorded and perhaps Rubin Carter would have died in prison and the world would not have been able to enjoy this Bob Dylan classic recording.

Defendant's First Amended Complaint does little to revive her dubious claims and legal theories into plausible causes of action. Accordingly, for the reasons set forth herein, Defendant respectfully requests that her Motion to Dismiss the First Amended Complaint be **GRANTED**, and that the Court award Defendant, attorney's fees pursuant to pursuant to § 836.13(5)(c), Fla. Stat., and such other relief as the Court deems appropriate.

Dated: December 23, 2024

Respectfully submitted,

**PANCIER LAW**                                  **UNITE THE PEOPLE, INC.**

/s/ Michael Pancier                              /s/ Michael R. Hayden
Michael Pancier                                  Michael R. Hayden, Esq. (pro hac vice)
(Fla Bar No. 958484)                             (California Bar No. 343302)
mpancier@pancierlaw.com                          (Not admitted in Florida)
Tel: (954) 862-2217                              michael@unitethepeople.org
9000 Sheridan Street, Suite 93                   Tel: (888) 245-9393
Pembroke Pines, Florida 33024                    555 E. Ocean Blvd., Suite 205
                                                 Long Beach CA 90802
*Co-counsel for Defendant,*                      *Co-counsel for Defendant,*


## CERTIFICATE OF SERVICE

I hereby certify that on December 23, 2024, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing is being served this day on all counsel of record in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel who are not authorized to receive Notice of Electronic Filing.


By: */s/ Michael Pancier*
     Michael Pancier
     Fla Bar No. 958484