**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 24-24228-CIV-ALTONAGA/Reid**

MEGAN PETE,

       Plaintiff,

v.

MILAGRO ELIZABETH COOPER,

       Defendant.

_____/

**ORDER**

      **THIS CAUSE** came before the Court upon Defendant, Milagro Elizabeth Cooper's Motion to Dismiss First Amended Complaint [ECF No. 30], filed December 23, 2024. Plaintiff, Megan Pete filed a Response [ECF No. 33], to which Defendant filed a Reply [ECF No. 34]. The Court has carefully considered the record, the parties' written submissions, and applicable law. For the following reasons, the Motion is granted in part and denied in part.

**I.  BACKGROUND**

      This case centers on allegations brought by Plaintiff — a Grammy-winning hip-hop artist known professionally as Megan Thee Stallion — against Defendant, an online personality who goes by Milagro Gramz or Mobz World. (*See* Am. Compl. [ECF No. 28] ¶¶ 7, 10, 12). Plaintiff accuses Defendant of engaging in a coordinated campaign of smear and harassment through social media; using video, audio, and written "posts" to cause reputational harm and emotional distress. (*See generally id.*). The allegations are connected to the fallout from the 2022 conviction of Daystar Peterson, popularly known as Tory Lanez, a Canadian rapper and singer who was found guilty of assaulting Plaintiff with a firearm following a widely publicized trial. (*See id.* ¶¶ 16–24).

Defendant operates multiple social media accounts across platforms like Instagram, TikTok, X.com, and YouTube, collectively amassing over 100,000 followers.  (*See id.* ¶ 27). Plaintiff asserts that Defendant has sole control over these accounts and, allegedly under Peterson's direction, uses them to harass and defame Plaintiff by disseminating false narratives and conspiracy theories.  (*See id.* ¶¶ 26–34).  These include claims that Plaintiff lied under oath, suffers from alcoholism, is "mentally retarded," and needs a guardian.  (*Id.* ¶ 7).  These alleged falsehoods have severely impacted Plaintiff's mental health, leading her to contemplate suicide.  (*See id.* ¶ 8).

***The Peterson Trial.***  Fully understanding Defendant's defamatory statements requires context from Peterson's trial and conviction.  (*See id.* ¶¶ 16–24).

On July 12, 2020, Los Angeles police conducted a traffic stop involving Peterson and Plaintiff following reports of gunfire in the area.  (*See id.* ¶ 17).  During the stop, officers discovered a recently discharged firearm with an empty magazine and observed that Plaintiff had sustained injuries to her feet, later confirmed as gunshot wounds.  (*See id.* ¶¶ 17–18).  Peterson was arrested for possession of a concealed weapon, while Plaintiff was transported to the hospital for treatment.  (*See id.*).  About a month later, Plaintiff publicly identified Peterson as the shooter via social media, leading to his eventual indictment on charges of felony assault with a firearm, illegal possession of a firearm, and negligent discharge of a firearm.  (*See id.* ¶¶ 19–20).

During Peterson's trial, Plaintiff testified for the prosecution, recounting the night she was shot and the trauma it caused in her personal and professional life.  (*See id.* ¶¶ 21–22).  She recalled stepping out of his car; at which point he raised a gun, shouted, "Dance, bitch[;]" and fired five shots, injuring her feet.  (*Id.* ¶ 21 (alteration added; quotation marks omitted)).  Plaintiff also revealed that the incident, and her decision to testify, sparked backlash from parts of the music industry and online supporters of Peterson during the trial's media coverage.  (*See id.* ¶ 22).  Ten

days after Plaintiff's testimony, Peterson was convicted on all charges and sentenced to a ten-year prison term. (*See id.* ¶ 24).

**Harassment Campaign.**  Defendant allegedly attended the entire trial.  (*See id.* ¶¶ 23, 39). During and after the proceedings, Defendant — purportedly on Peterson's payroll and acting at his direction — launched a smear and harassment campaign against Plaintiff on social media. (*See id.* ¶¶ 29, 31–32, 39).  This campaign included the use of bot accounts[1] to flood Plaintiff and her supporters with "hateful, derogatory, and malicious statements[.]"  (*Id.* ¶ 35 (alteration added)). On one occasion, Defendant even called for violence against Plaintiff.  (*See id.* ¶ 36).

The overarching goal, per Plaintiff, was to "to maliciously injure [her] reputation and inflict severe emotional distress upon her[.]"  (*Id.* ¶ 29 (alterations added); *see also id.* ¶¶ 34, 37–39). Plaintiff asserts this effort was retaliation for her testimony against Peterson.  (*See id.* ¶ 29).  In executing the smear campaign, Defendant allegedly made several defamatory statements, which Plaintiff categorizes into three main accusations: Plaintiff lied under oath during Peterson's trial; she is an alcoholic; and she is mentally retarded and in need of a guardian.  (*See id.* ¶¶ 54, 90– 105).  Plaintiff asserts these statements were made with actual malice, as evidence disproving them was widely available at the time they were published.  (*See id.* ¶¶ 73–84).

**Deepfake Video.**  Defendant allegedly took her harassment a step further by promoting a deepfake[2] pornographic video depicting Plaintiff.  (*See id.* ¶ 40).  Defendant, on her @MobzWorld X.com account, "liked" a post featuring the video and then directed her followers across social

---

[1] In this context, a bot refers to "a computer program that performs automatic repetitive tasks[,]" especially "one designed to perform a malicious action[.]"  *Bot*, *Merriam-Webster.com*, https://www.merriam-webster.com/dictionary/bot (last visited Feb. 4 2025) (alterations added).

[2]  A deepfake is "an image or recording that has been convincingly altered and manipulated to misrepresent someone as doing or saying something that was not actually done or said[.]"  *Deepfake*, *Merriam-Webster.com*, https://www.merriam-webster.com/dictionary/deepfake (last visited Feb. 4 2025) (alteration added).

media — and anyone who saw her posts — to browse her then-public "Likes" page. (*See id.* ¶¶ 42–53). Plaintiff insists this was done to amplify the video's reach. (*See id.* ¶¶ 44, 53).

***Plaintiff's Claims***. On December 10, 2024, Plaintiff filed her Amended Complaint, alleging defamation *per se* (Count I); promotion of an altered sexual depiction under Section 836.13, Florida Statutes (Count II); intentional infliction of emotional distress ("IIED") (Count III); and cyberstalking[3] under Section 784.0485, Florida Statutes (Count IV). (*See id.* ¶¶ 89–124). In response, Defendant brings the present Motion, seeking dismissal of the Amended Complaint in full for failure to state claims for relief. (*See generally* Mot.; Reply).

## II. LEGAL STANDARD

"To survive a motion to dismiss [under Federal Rule of Civil Procedure 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (alteration added; quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although this pleading standard "does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (alteration added; quoting *Twombly*, 550 U.S. at 555). Pleadings must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]" *Twombly*, 550 U.S. at 555 (alteration added; citation omitted). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679 (alteration added; citing *Twombly*, 550 U.S. at 556).

To meet this "plausibility standard," a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (alteration added; citing *Twombly*, 550 U.S. at 556). "The mere possibility the defendant

---

[3] Attached to the Amended Complaint is a sworn Petition for Injunction Against Stalking ("Petition") [ECF No. 28-1] in support of this claim.

acted unlawfully is insufficient to survive a motion to dismiss." *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1261 (11th Cir. 2009) (citing *Iqbal*, 556 U.S. at 678), *abrogated on other grounds by Mohamad v. Palestinian Auth.*, 566 U.S. 449 (2012). When considering a motion to dismiss, a court must construe the complaint "in a light most favorable to the plaintiff" and take its factual allegations as true. *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997) (citation omitted).

### III. DISCUSSION

Defendant raises five grounds for dismissal. (*See generally* Mot.; Reply). First, Defendant contends Plaintiff failed to provide her required pre-suit notice for her defamation claim. (*See* Mot. 2–3).[4] Second, Defendant argues her statements are not actionable and, even if they were, Plaintiff has not alleged actual malice, as required she do for public figures. (*See id.* 3–12). Third, Defendant claims Plaintiff has not adequately alleged that Defendant "promoted" the deepfake video. (*Id.* 12 (quotation marks omitted); *see also id.* 12–15). Fourth, Defendant asserts that Plaintiff's allegations are not sufficiently outrageous to sustain an IIED claim. (*See id.* 15–18). Fifth, Defendant insists that Plaintiff has not complied with the statutory prerequisites for her cyberstalking claim. (*See id.* 18–19). Defendant also asks the Court to strike some of Plaintiff's requests for attorney's fees. (*See id.* 20).

Plaintiff opposes each of Defendant's arguments. (*See generally* Resp.). The Court considers the arguments in turn.

### A. Pre-suit Notice (Count I)

Defendant begins by asserting that Plaintiff's defamation claim in Count I should be dismissed due to noncompliance with Florida's pre-suit notice requirements. (*See* Mot. 2–3). As

---

[4] The Court uses the pagination generated by the electronic CM/ECF database, which appears in the headers of all court filings.

relevant here, Section 770.01, Florida Statutes, states:

> Before any civil action is brought for publication or broadcast, in a newspaper, periodical, or other medium[5] of a libel or slander, the plaintiff shall, at least 5 days before instituting such action, serve notice in writing on the defendant, specifying the article or broadcast and the statements therein which he or she alleges to be false and defamatory.

*Id.* (alteration added). "The Florida Supreme Court has explained that one of the objectives of the statute was to afford newspapers and periodicals an opportunity to make a full retraction to correct errors and avoid exposure to punitive damages." *Rodriguez*, 877 F. Supp. 2d at 1327 (citing *Ross v. Gore*, 48 So. 2d 412 (Fla. 1950)).   Unsurprisingly, then, "[e]very Florida court that has considered the question has concluded that the presuit notice requirement applies only to 'media defendants,' not private individuals." *Zelinka v. Americare Healthscan, Inc.*, 763 So. 2d 1173, 1175 (Fla. 4th DCA 2000) (alteration added) (collecting cases).

The parties dispute whether Defendant qualifies as a media defendant.   (*See* Mot. 2–3; Resp. 3–5).  Based on Plaintiff's well-pleaded allegations, the Court concludes she does not.

To determine whether a party qualifies as a media defendant, courts assess whether the defendant's function is to "inform and . . . initiate uninhibited, robust, and wide-open debate on public issues." *Ortega Trujillo v. Banco Cent. Del Ecuador*, 17 F. Supp. 2d 1334, 1338 (S.D. Fla. 1998) (alteration added; quotation marks omitted; quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339 (1974)).  Simply put, media defendants are those "engaged in the dissemination of news

---

[5] It is "well-settled" that "the internet constitutes a[n] 'other medium' for the purposes of [section] 770.01[.]" *Five for Ent. S.A. v. Rodriguez*, 877 F. Supp. 2d 1321, 1327 (S.D. Fla. 2012) (alterations added; citing *Alvi Armani Med., Inc. v. Hennessey*, 629 F. Supp. 2d 1302, 1307 (S.D. Fla. 2008)).

and information through the news and broadcast media[.]" *Mancini v. Personalized Air Conditioning & Heating, Inc.*, 702 So. 2d 1376, 1380 (Fla. 4th DCA 1997) (alteration added).

Some Florida courts have applied this exception to "so-called 'blogs,' which are a modern functional equivalent of traditional news media." *San Juan Prods., Inc. v. River Pools & Spas, Inc.*, No. 21-cv-2469, 2023 WL 1994087, at *3 (M.D. Fla. Feb. 14, 2023); *see also Comins v. Vanvoorhis*, 135 So. 3d 545, 547, 549–50, 560 (Fla. 5th DCA 2014) (holding that the pre-suit notice requirement applies to a student who founded his blog to "publicly comment on issues of public concern[,]" *id.* at 548 (alteration added; footnote call number and quotation marks omitted)).

Defendant styles herself a blogger "who reports on various pop culture items," not just Plaintiff.  (Reply 1).  Plaintiff's allegations, however — which the Court must accept as true — paint a different picture.  Plaintiff claims Defendant is a "longtime mouthpiece" for Peterson; Defendant engaged in a concerted effort to harass and discredit Plaintiff on his behalf.  (Am. Compl. ¶ 1; *see also id.* ¶ 31).  Nothing about this alleged conduct suggests an effort to "impartially disseminate information." *Ortega Trujillo*, 17 F. Supp. 2d at 1338 (declining to find that a public-relations firm was a media defendant because it did not "issue unsolicited, disinterested, and neutral commentary" (quotation marks and citation omitted)).  According to Plaintiff, "Defendant has [even] publicly admitted that she is not a journalist."  (Am. Compl. ¶ 28 (alteration added)).  The allegations thus depict a campaign, not journalism (*see generally id.*), and the Court cannot find that Defendant is a media defendant entitled to protection under section 770.01.[6]

---

[6] Defendant submits appendices consisting of X.com posts and livestream transcripts, as additional context for Plaintiff's defamation claim.  (*See generally* Mot., App. [ECF No. 30-1]; Reply, Suppl. to App. [ECF No. 34-1]).  Because the media defendant issue relates to the Court's jurisdiction, Defendant could have introduced evidence to establish that status — but she does not argue the appendices serve that purpose. *See Rodriguez*, 877 F. Supp. 2d at 1327 n.3; *Gold v. Geo Grp. Inc.*, No. 16-cv-73, 2016 WL 7034404, at *1 n.1 (M.D. Fla. Dec. 2, 2016) (stating the court "will not deny a motion to dismiss based on arguments Plaintiff could have made, but elected not to"); (*see also* Mot. 2–3; Reply 1–2).  Even if considered, the

### B. Defamation *per se* (Count I)

In Count I, Plaintiff alleges Defendant defamed her through three distinct assertions — (1) that she lied under oath during Peterson's trial; (2) that she is mentally incompetent and requires a guardian; and (3) that she is an alcoholic. (*See id.* ¶¶ 89–105). The statements, as alleged by Plaintiff, are reproduced below:

**[Accusations of Perjury]**

- At the end of the day, a bitch lying on somebody is low down. Yes she got hurt. And that's cool. But how did you get hurt? How? And what are the circumstances? And what after that? So bitch, if you think I'm finna be sitting up here boo hooing for a bitch that played up in yall face. Not mine, because I always said her ass was lying. Bitch, I don't. You think I feel sorry for the bitch? I don't. The fuck? A bitch fuck with my n*a I'ma slap that hoe and whatever comes after it comes after it.

- All this case taught anyone was that your father, brother, cousin, or son could face over 20 years in prison without proper evidence, a botched investigation, & another [l]ikely suspect just because non credible witnesses said you did something. & y'all slow asses cheering.

- He shot her because his ego was bruised. She's the bigger star. That's never been a fact & dmn sure ain't one today. [Peterson] is behind bars presumed guilty getting better numbers and charting.

- I believe that this is exactly how they feel about you, [Plaintiff]. I believe that this is exactly how they feel about you. We know you a lying ass hoe, and you have absolutely ruined [Peterson's] life.

- Was Megan Thee Stallion caught trying to deceive the courts again?

(*Id.* ¶ 91 (alterations added and adopted; quotation marks omitted)).

**[Accusations of Mental Incompetence]**

- Let me go find this receipt of Megan's ex bestie telling me she wasn't fcking t Farris that's her guardian.

- Ok, so back in 2020 I'm doing what I do now & a rumor was circulating that

---

appendices do not depict Defendant as a media entity impartially reporting on public matters; instead, they reveal a singular focus on Plaintiff, persistently casting her in a negative light. (*See generally* App.; Suppl.).

[Plaintiff] was fcking T Farris.  I reported on it and since ole girl and her friends/family watched my show, one of her besties that I had an internet rapport with hit me.  As you can see, she said it wasn't possible for [Plaintiff] to be sleeping with T. Farris because he was her guardian . . . (like a father figure).  I thought the verbiage was odd, but as time went on I realized [Plaintiff] was slow and needed one so it made all the sense then.

• What is [Plaintiff's] mental status?  Does she have a guardian or not?  Has she been listed as a capable person?  Has she ever been deemed, like, legally retarded?  Like anything of the nature?  Anything of the sort?

(*Id.* ¶ 95 (alterations added; quotation marks omitted)).

**[Accusations of Alcoholism]**

• You ought to be somewhere for your alleged crimes, drunkie.  Why do you even speak?  Like does your liver even function well?

• When you have drinking seemingly running through a family, yes I did post certain questions to my page.  Yes I did.

• [Plaintiff] comes from a family of 'alcoholics.  Because the fact of the matter is, you have a grandfather that was an alcoholic.  Your daddy, was your daddy on drugs? Or was he in and out of the system?  What was that for?  Do you want to talk about that?  Is stealing worse than drugs and shit?'

(*Id.* ¶ 98 (alteration added; quotation marks omitted)).

To state a defamation claim under Florida law, a plaintiff who is a public figure[7] must allege: (1) publication; (2) falsity; (3) actual malice; (4) actual damages; and (5) the statement was defamatory.[8]  *See Bongino v. Daily Beast Co., LLC*, 477 F. Supp. 3d 1310, 1316 (S.D. Fla. 2020) (citation omitted).  Defendant asserts that this claim fails because the alleged statements amount to opinion or hyperbole and Plaintiff does not adequately plead actual malice.  (*See* Mot. 3).

---

[7] Defendant presumes that Plaintiff is a general public figure (*see* Mot. 3–6); *see also Turner v. Wells*, 879 F.3d 1254, 1272 (11th Cir. 2018)); and Plaintiff, citing the FAC's extensive allegations of actual malice, assumes that standard applies for this Motion (*see* Resp. 14 n.4).

[8] The parties appear to agree that Florida law applies.  (*See* Mot. 4, 9; Resp. 11–13 (citing Florida law)); *see also Goodnight v. Bos. Sci. Corp.*, 548 F. Supp. 3d 1325, 1335–36 (S.D. Fla. 2020) (noting that it is well-settled in this and other circuits that "a party may, through its briefing (or otherwise), waive its choice-of-law arguments" (citation omitted)).

### 1. *Opinion or Hyperbole*

Under Florida law, a defamation claim requires "that the statement at issue be reasonably capable of a defamatory interpretation; this determination is to be made by the trial judge in the first instance, prior to the jury's evaluation[.]" *Keller v. Miami Herald Pub. Co.*, 778 F.2d 711, 714 (11th Cir. 1985) (alteration added; footnote call number and citations omitted).  A court should assess the relevant statement through the lens of how a reasonable person would interpret it, taking into account the circumstances in which it was expressed.  *See id.* at 716.

An opinion is incapable of being true or false and, therefore, cannot be defamatory.  *See Duffy v. Fox News Networks, LLC*, No. 14-cv-1545, 2015 WL 2449576, at *3 (M.D. Fla. May 21, 2015) (citing *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 12 (1990)).  But when an opinion implies undisclosed defamatory facts as its basis, it may still be actionable.  *See E. Air Lines, Inc. v. Gellert*, 438 So. 2d 923, 927 (Fla. 3d DCA 1983) (citation omitted).  Like an opinion, hyperbole is not actionable, as "statements that cannot reasonably be interpreted as stating actual facts about an individual" cannot be defamatory.  *Milkovich*, 497 U.S. at 2 (citation omitted).

### a. *Perjury*

Defendant characterizes her statements in the "perjury" category as mere assessments of Plaintiff's credibility as a witness in Peterson's trial; and argues that, even if these statements amounted to an accusation of perjury, they remain nonactionable as opinion or, at worst, hyperbole.  (*See* Mot. 6–7).  She maintains that such criticism and disagreement with a jury's verdict is natural and that her statements — framed as calling Plaintiff not credible rather than a liar — fall within that discourse.  (*See id.* 7 ("Juries and trial observers will . . . form their opinions regarding the credibility of witnesses, documentary, and physical evidence.  Some observers may give credence to some witnesses and not to others." (alteration added))).  Alternatively, Defendant

claims that her statements were substantially true and thus not defamatory.  (*See* Mot. 8).  Plaintiff insists that Defendant's statements were false factual assertions, while emphasizing that courts have consistently treated perjury accusations as verifiable statements.  (*See* Resp. 6–11).

Plaintiff's allegations, taken as true, indicate that Defendant was not merely opining on the jury's verdict or Plaintiff's credibility — she accused Plaintiff of perjury, calling her a "lying ass hoe" who "ruined [Peterson's] life" and questioning whether she was "caught trying to deceive the courts *again*[.]"  (Am. Compl. ¶ 91 (alterations and emphasis added)).  Given the context of Peterson's trial, a reasonable person could view these statements as factual assertions about Plaintiff's testimony rather than mere opinion.  *See Milkovich*, 497 U.S. at 21 (holding that accusations of perjury are "sufficiently factual to be susceptible of being proved true or false"); *see also Turner*, 879 F.3d at 1269 ("Whether [a] publication is defamatory becomes an issue of fact for the jury . . . where the publication is susceptible of two reasonable interpretations, one of which is defamatory." (alterations added; citations omitted)).  This is particularly true here, where Defendant made no effort to "couch[] [her statements] as expressions of opinion," omitting even minimal hedging language like "I think."  *Jefferson Cnty. Sch. Dist. No. R-1 v. Moody's Investor's Servs., Inc.*, 175 F.3d 848, 854 (10th Cir. 1999) (alterations added); *see also Gregory v. ProNAi Therapeutics Inc.*, 297 F. Supp. 3d 372, 406 (S.D.N.Y. 2018) (noting phrases like "I believe" or "I think" are "classically indicative of opinion" (quotation marks and citation omitted)).

Nor can Defendant's statements be dismissed as mere hyperbole because accusing someone of lying in court is not exaggerated rhetoric — it is an assertion of fact that can be disproven.  *See Horsley v. Rivera*, 292 F.3d 695, 701 (11th Cir. 2002) (noting that true hyperbole cannot "reasonably be interpreted as stating actual facts about an individual" (quotation marks omitted; quoting *Milkovich*, 497 U.S. at 20)).  At a minimum, a reasonable person could interpret

Defendant's statements as factual claims about Plaintiff, and in this context, there is simply nothing hyperbolic about an allegation of perjury. *Cf. Milkovich*, 497 U.S. at 21 ("This [writing] is not the sort of loose, figurative, or hyperbolic language which would negate the impression that the writer was seriously maintaining that petitioner committed the crime of perjury." (alteration added)).

Defendant also attempts to recast her statements as "substantially true" by attaching livestream transcripts and X.com posts to her Motion, offering alternative, potentially nondefamatory interpretations. (*See* Mot. 3; *see also* App.). But these materials are not properly before the Court. While the incorporation-by-reference doctrine allows the Court to consider documents attached to a motion to dismiss, that exception applies only if the document is referred to in the complaint, central to the plaintiff's claim, and undisputed — meaning its authenticity is not challenged. *See Norkin v. The Fla. Bar*, 311 F. Supp. 3d 1299, 1303 n.4 (S.D. Fla. 2018) (citing *Horsley*, 304 F.3d at 1134; *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005)).[9]

While Plaintiff mentions certain X.com posts and livestreams in her Amended Complaint, she does not reference the specific portions Defendant now seeks to introduce. (*Compare* Am. Compl. *with* App.). Nor does the Court find that these materials are central to Plaintiff's claims in the way Defendant suggests. (*See, e.g.*, Resp. 8–9). In any event, Plaintiff disputes the authenticity of the transcripts — and understandably so — "because they were generated by artificial intelligence and supported by unsworn declarations" (*id.* 9 (citation omitted)), which ends the

---

[9] The Court "declines Defendant's invitation to consider matters outside the pleadings and convert the Motion . . . into one for summary judgment." *Ferrer v. Atlas Piles, LLC*, 586 F. Supp. 3d 1286, 1296 (S.D. Fla. 2022) (alteration added; footnote call number and citations omitted); *see also Harper v. Lawrence Cnty., Ala.*, 592 F.3d 1227, 1232 (11th Cir. 2010) ("A judge need not convert a motion to dismiss into a motion for summary judgment as long as he or she does not consider matters outside the pleadings."); (Reply 10). At a minimum, Defendant has not filed a statement of material facts, as required by Local Rule 56(a)(1) for summary judgment motions. *See McDowell v. Hulsey*, No. 19-cv-00230, 2021 WL 4147010, at *2 (D. Nev. June 14, 2021) (rejecting request to convert motion for judgment on the pleadings to a summary judgment motion where the plaintiff failed to comply with Federal Rule of Civil Procedure 56 or local rules), *report and recommendation adopted*, 2021 WL 3493147 (D. Nev. Aug. 9, 2021).

Court's inquiry, *see Horsley*, 304 F.3d at 1134.  As for the X.com posts, Defendant provides no accompanying records and ultimately offers nothing for the Court to verify their content or authenticity.  *Cf. Karantsalis v. City of Miami Springs*, No. 19-24123-Civ, 2021 WL 12298351, at *3 (S.D. Fla. Dec. 20, 2021) (declining to take judicial notice of a Google map image, as it would have required authentication under Federal Rule of Evidence 901 (citation omitted)).

Even if considered, these materials do not establish that Defendant's statements were "substantially true."  *Trump v. Am. Broad. Companies, Inc.*, No. 24-21050-Civ, 2024 WL 3519177, at *7 (S.D. Fla. July 24, 2024) (quotation marks and citation omitted).  The substantial truth doctrine does not demand perfect accuracy — only that the "gist" or "sting" of a statement be true.  *Id.* (quotation marks omitted; quoting *Klayman v. Jud. Watch, Inc.*, 22 F. Supp. 3d 1240, 1253 (S.D. Fla. 2014)).  Before reaching that analysis, however, the threshold question is whether the statements are capable of a defamatory meaning — an issue of law for the Court to decide.  *See id.* (citation omitted).

At most, Defendant's explanations introduce ambiguity — precisely what precludes dismissal.  *See id.* ("If [a] statement is revealed to be confusing or ambiguous, raising the question of whether [listeners] might have [heard] it in a defamatory way, a jury question is presented." (alterations adopted and added; quotation marks and citation omitted)); *see also* (Mot. 8 (asserting Defendant's statement that Plaintiff "just [does not] tell the truth" stemmed from a past relationship between Peterson and Plaintiff (alteration added; quotation marks omitted)).

For example, Defendant contends that the question "[w]as [Plaintiff] caught trying to deceive the courts again?" is not defamatory when viewed in full context. (Mot. 8 (alterations added)). The full statement reads:

> Was [Plaintiff] caught trying to deceive the courts again?  The answer is yes if you ask her former cameraman Emilio Garcia.  After [Garcia] filed a lawsuit alleging

> an unstable work environment, MTS filed to dismiss the lawsuit brought against her with the potential to have the case re-filed in New York.  The thing is, [Garcia] is calling bullshit and says [Plaintiff] is lying and lives in California.  (He has hotel receipts, tests [sic], and emails.)

(*Id.* (alterations added)).

But context does not eliminate the ambiguity inherent to the initial question.  Is "yes" affirming that Garcia believes Plaintiff was "trying to deceive the courts" for a second time?  If so, Defendant's question could imply that Plaintiff previously deceived "the courts" when she testified at Peterson's trial.  Or is "yes" merely a statement of Garcia's opinion, which Defendant is relaying?  The ambiguity matters.

If a statement is susceptible to both defamatory and non-defamatory interpretations, the Court cannot resolve the issue as a matter of law.  *See Turner*, 879 F.3d at 1269.  Defendant's explanations do not erase the potential defamatory meaning of her words, and thus the Court cannot deem them nonactionable.

### b.  Mental Incapacity and Alcoholism

Defendant also claims that her statements calling Plaintiff "legally retarded" and in need of a guardian are opinion or hyperbole and thus not defamatory.  (Am. Compl. ¶ 95 (quotation marks omitted); *see also* Mot. 9).  She makes the same argument for her statements that Plaintiff is a "drunkie" or from a family of "alcoholics[;]" claiming they, too, are exaggerations.  (Am. Compl. ¶ 98 (alteration added; quotation marks omitted); *see also* Mot. 10).[10]

True, vague epithets — like calling someone a "maniac" or an "idiot" — have been deemed

---

[10] Defendant separately argues that her claim that Plaintiff is an alcoholic is substantially true, citing Plaintiff's own songs and livestreams where she mentions drinking and being drunk.  (*See* Mot. 10–11).  But in doing so, Defendant ventures beyond both the Amended Complaint and the context of the allegedly defamatory statements themselves.  (*See* Mot. 11 n.7–9).  In any event, because the Court finds the statements "are susceptible to a defamatory interpretation[,]" dismissal on this ground is inappropriate.  *Trump*, 2024 WL 3519177, at *7 (alteration added; citations omitted).

nondefamatory opinion. *Demoya v. Walsh*, 441 So. 2d 1120, 1120 (Fla. 3d DCA 1983) (quotation marks and citations omitted). But Defendant's statements go beyond casual name-calling. She allegedly asserted or implied that Plaintiff is legally incapacitated, requires a guardian, and suffers from alcoholism. (*See* Am. Compl. ¶¶ 95, 98). As Plaintiff notes, legal incapacity is a verifiable fact. (*See* Resp. 11–12); *see also Gellert*, 438 So. 2d at 928 (finding that accusing a pilot of paranoia was not "pure opinion" but rather a defamatory allegation of a "mental affliction").

Likewise, Florida courts have long recognized that falsely labeling someone an alcoholic can sustain a claim for defamation *per se*. *See Le Moine v. Spicer*, 1 So. 2d 730, 733 (Fla. 1941) ("[T]o falsely and maliciously charge one with being . . . often-times drunk, or with being an habitual drunkard, is actionable *per se* in this jurisdiction." (alterations added)); *cf. Glynn v. City of Kissimmee*, 383 So. 2d 774, 775 (Fla. 5th DCA 1980) (stating that accusations of "being drunk on the job" were "clearly defamatory in nature" (citation omitted)).

To be sure, the nature of online discourse can encourage an "outspewing of thoughtless rhetoric[,]" but the Court cannot conclude, as a matter of law, that Defendant's insults amount to nothing more than crude hyperbole. *Dibble v. Avrich*, No. 14-cv-61264, 2014 WL 5305468, at *4 (S.D. Fla. Oct. 15, 2014) (declining to find that a statement, even one laced with insults, was incapable of defamatory meaning) (alteration added)). Given that a reasonable person could interpret Defendant's statements as accusations of perjury, mental incapacity, and alcoholism, the Court finds they are actionable as defamation *per se*.

### 2. Actual Malice

"[T]he First Amendment requires a public figure to prove that a defamatory statement was made with actual malice to recover damages." *Grayson v. No Labels, Inc.*, No. 22-11740, 2022 WL 12144181, at *2 (11th Cir. Oct. 21, 2022) (alteration added; citing *New York Times Co. v.*

*Sullivan*, 376 U.S. 254, 279–80 (1964)).  To plead actual malice, in turn, a plaintiff "must allege facts sufficient to give rise to a reasonable inference that the false statement was made 'with knowledge that it was false or with reckless disregard of whether it was false or not.'"  *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 702 (11th Cir. 2016) (quoting *Sullivan*, 376 U.S. at 280).  The Court's central inquiry is whether "the defendant, instead of acting in good faith, actually entertained serious doubts as to the veracity of the published account, or was highly aware that the account was probably false."  *Id.* at 703 (citations omitted).

Again, the parties agree — at least for the purposes of the Motion — that Plaintiff is a public figure.  (*See* Mot. 5, 11–12; Resp. 14 n.4).  Where they part ways is actual malice.  (*See* Mot. 5, 11–12; Resp. 14–15).  Puzzlingly, Defendant argues that the Amended Complaint must establish actual malice by "clear and convincing evidence" and, failing that, Plaintiff's defamation claim must be dismissed.  (Mot. 12 (citing *Michel*, 816 F.3d at 703)).  But the very case Defendant relies on proves otherwise: at the motion-to-dismiss stage, a public figure need only plausibly allege actual malice under *Iqbal* and *Twombly*.  *See Michel*, 816 F.3d at 702.

The Amended Complaint makes a compelling case that Defendant acted with reckless disregard for the truth.  First, Plaintiff asserts that readily available information contradicted Defendant's statements at the time of publication.  (*See* Am. Compl. ¶¶ 73–81; *see, e.g.*, *id.* ¶¶ 79–81 (noting Defendant insisted Plaintiff had never been shot, despite medical evidence of bullet fragments showing otherwise)).  Second, Plaintiff alleges Defendant knowingly spread these falsehoods at Peterson's direction, fully aware they were fabricated to harm Plaintiff.  (*See id.* ¶ 82).  Third, Plaintiff contends Defendant's actions were driven by "pure hatred[.]"  (*Id.* ¶ 83 (alteration added; footnote call number omitted)).  Finally, Defendant seemingly profited from the defamation — gaining a larger social media following, online notoriety, and lucrative sponsorship

opportunities.  (*See id.* ¶ 84).

Defendant downplays these allegations, arguing that "spite" and a failure to investigate do not establish actual malice.  (Mot. 12 (citation omitted); *see also id.* 11–12).  But Plaintiff's claims extend far beyond mere negligence — they paint a picture of an intentional campaign to destroy her reputation.  That is more than enough to satisfy the pleading standard.  *See Cooper v. Fla. Dep't of Corr.*, No. 19-cv-309, 2020 WL 4287269, at *4 n.3 (M.D. Fla. July 27, 2020) ("As articulated by the Supreme Court in *Iqbal* and *Twombly*, notice-pleading is the standard." (citations omitted)).

### C.  Promotion of an Altered Sexual Depiction (Count II)

Under Section 836.13, Florida Statutes, a plaintiff may bring a civil action against anyone who "willfully and maliciously *promotes*" an "altered sexual depiction" of her without her consent. *Id*. § 836.13(2) (emphasis added).  The statute defines "promote" broadly, covering actions like publishing, distributing, exhibiting, or presenting the altered content.  *Id.* § 836.13(1)(d).

Count II of the Amended Complaint alleges Defendant did just that — first by "liking" a post on X.com containing a deepfake pornographic video of Plaintiff, then by directing her followers to her "Likes" page where the video remained accessible.  (*See* Am. Compl. ¶¶ 40–53, 106–13).  The parties do not dispute that the video meets the statute's definition of an "altered sexual depiction"; they only disagree on whether Defendant's conduct amounts to "promotion." (*See* Mot. 12–15; Resp. 16–17; Reply 5).

The Court finds little precedent directly interpreting section 836.13; thus, it "look[s] to dictionary definitions for guidance[.]"  *In re Walter Energy, Inc.*, 911 F.3d 1121, 1143 (11th Cir. 2018) (alterations added; citation omitted).  Here, the statute itself provides direction, as it defines "promote" broadly to include actions such as "exhibit" and "present."  Fla. Stat. § 836.13(d).

"Exhibit" means "to present to view[,]" *Exhibit*, *Merriam-Webster.com*, https://www.merriam-webster.com/dictionary/exhibit (last visited Feb. 4, 2025) (alteration added); and "present" means "to bring . . . before the public" or "to one's attention[,]" *Present*, *Merriam-Webster.com*, https://www.merriam-webster.com/dictionary/present (last visited Feb. 4, 2025) (alterations added).

Defendant allegedly did both. By "liking" an X.com post that featured the deepfake video, the video was exhibited on Defendant's X.com account's "Likes" page, "which tracked and displayed 'liked' posts for other users to see." (Resp. 3–4 (citation omitted); *see also* Am. Compl. ¶¶ 42–43). Defendant also brought the video "before the public" when she allegedly directed viewers of her post to click on her "Likes" page where the video had been archived. (*See* Am. Compl. ¶ 45 ("Defendant intended for this statement [('Go to my likes.')] to encourage her followers and other members of the public to watch the [d]eepfake [v]ideo, which had been added to her 'Likes' page around the same time." (alterations added and adopted))). Because Plaintiff plausibly alleges Defendant promoted the deepfake video under section 836.13, dismissal is unwarranted.

### D.  Intentional Infliction of Emotional Distress (Count III)

To state a valid IIED claim, a plaintiff must plausibly allege the following four elements: "(1) the defendant's conduct was intentional or reckless; (2) the conduct was outrageous[;] . . . (3) the conduct caused emotional distress; and (4) the emotional distress was severe." *Moore v. Pederson*, 806 F.3d 1036, 1053 (11th Cir. 2015) (alterations added; citation omitted). Defendant argues that her purported conduct was not sufficiently outrageous to support an IIED claim. (*See* Mot. 15–18). She insists that the allegations involve "mere words and opinions" rather than threats, assault, or other extreme behavior. (*Id.* 16).

"The standard for 'outrageous conduct' is particularly high in Florida." *Patterson v. Downtown Med. & Diagnostic Ctr., Inc.*, 866 F. Supp. 1379, 1383 (M.D. Fla. 1994) (citation omitted). Conduct that is offensive, harmful, or even criminal does not necessarily suffice. *See Ball v. Heilig-Meyers Furniture Co.*, 35 F. Supp. 2d 1371, 1376 (M.D. Fla. 1999) ("[O]utrageous conduct is usually something [more] than sexual discrimination or sexual harassment." (alterations added; citations omitted)); *see also Williams v. Worldwide Flight SVCS, Inc.*, 877 So. 2d 869, 870–71 (Fla. 3d DCA 2004) (finding that alleging repeated racial insults did not state a claim for IIED).

As the Florida Supreme Court has explained, liability attaches "only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Plowright v. Miami Dade Cnty.*, 102 F.4th 1358, 1368 (11th Cir. 2024) (quoting *Metro. Life Ins. Co. v. McCarson*, 467 So. 2d 277, 278–79 (Fla. 1985) (quotation marks omitted)). Whether a claim meets this threshold depends on "the sum of the allegations in the specific case at bar." *Johnson v. Thigpen*, 788 So. 2d 410, 413 (Fla. 1st DCA 2001) (citing *Watson v. Bally Mfg. Corp.*, 844 F. Supp. 1533, 1537 (S.D. Fla.1993), *aff'd*, 84 F.3d 438 (11th Cir. 1996)).

As a threshold matter, Defendant is mistaken in asserting that Plaintiff has failed to allege a threat of physical violence. The Amended Complaint states that Defendant threatened to "slap" Plaintiff in retaliation for her testimony against Peterson. (Am. Compl. ¶ 36 (quotation marks omitted)). More significantly, the Court declines to dismiss the IIED claim for two reasons. First, when viewed in context, Defendant's alleged conduct plausibly meets the extreme threshold for outrageousness — particularly given Plaintiff's vulnerable mental state. A summary makes this evident.

According to the Amended Complaint, Peterson shot at Plaintiff's feet while shouting,

"Dance, bitch[,]" injuring her.   (*Id.* ¶ 21 (alteration added; quotation marks omitted)).   At Peterson's trial — which Defendant allegedly attended — Plaintiff testified about the shooting and described the lasting trauma she endured.   (*See id.* ¶¶ 4, 22).   After that, Defendant allegedly aligned herself with Peterson, launching a campaign of harassment: publicly accusing Plaintiff of perjury, calling her a habitual drunk, suggesting she was legally incompetent, and directing followers to a deepfake pornographic video of her.   (*See id.* ¶¶ 31–36, 40–54, 115–17).   Taken in isolation, any one of these allegations might not suffice.   But taken together, and against the backdrop of Plaintiff's alleged trauma — including suicidal thoughts following the shooting — the conduct plausibly rises to the level of extreme and outrageous.   (*See id.* ¶¶ 21–22); *see also Est. of Duckett ex rel. Calvert v. Cable News Network LLLP*, No. 506-cv-444, 2008 WL 2959753, at *5 (M.D. Fla. July 31, 2008) ("[W]here the alleged conduct on the part of the [d]efendants may not be considered outrageous when the victim is of ordinary emotional and mental status, such conduct may become actionable . . . when the alleged victim suffers from known emotional and/or psychological trauma." (alterations added; footnote call number omitted)).

Second, even if Defendant's conduct was not independently extreme, dismissal would be premature given the undeveloped factual record.   "[T]he lack of any record evidence at this point concerning" Plaintiff's "mental state" and Defendant's "level of knowledge about it" precludes such an early determination.   *Calvert*, 2008 WL 2959753, at *5 (alteration added).   Because Plaintiff's trauma and Defendant's alleged exploitation of it are central to the IIED analysis, the Court cannot conclude at this stage that the claim fails as a matter of law.   *See Albert v. Nat'l Cash Reg. Co.*, 874 F. Supp. 1328, 1331 (S.D. Fla. 1994) (declining to dismiss IIED claim where "in the absence of any record evidence," the court could not determine whether the conduct met the outrageousness threshold).

### E.  Cyberstalking Injunctive Relief (Count IV)

Next**,** Defendant contends that Plaintiff fails to state a claim for cyberstalking under Section 784.0485, Florida Statutes, arguing that Defendant's alleged conduct does not justify an injunction and that Plaintiff has not complied with the statute's procedural requirements.  (*See* Mot. 18–19). Defendant also urges the Court to "decline to exercise supplemental jurisdiction" over the claim. (*Id.* 19 (citation omitted)).

Section 784.0485(1), Florida Statutes, creates a civil cause of action for injunctive relief from stalking.  *See Hoover v. Peak ex rel. C.P.*, 392 So. 3d 261, 263 (Fla. 1st DCA 2024) (citing Fla. Stat. § 784.0485(1)).  Stalking occurs when a person "willfully, maliciously, and repeatedly follows, harasses, or cyberstalks another person[.]"  Fla. Stat. § 784.048(2) (alteration added).

A separate section of the statute defines "cyberstalking" more precisely:

> To engage in a course of conduct to communicate, or to cause to be communicated, . . . words, images, or language by or through the use of electronic mail or electronic communication, directed at or pertaining to a specific person . . .
>
> causing substantial emotional distress to that person and serving no legitimate purpose.

*Id.* § 784.048(1)(d)(1) (alterations added); *see also Strober v. Harris*, 332 So. 3d 1079, 1086 (Fla. 2d DCA 2002) (applying the definition of "cyberstalk" in Section 784.048 to claims brought under Section 784.0485).

To state a claim under Section 784.0485 based on "cyberstalking," the plaintiff must allege that

> the defendant [1] willfully, maliciously, and repeatedly [2] engaged in a course of conduct [3] that involved — directly or indirectly — communicating or causing to be communicated words or images [4] using electronic communications [5] directed at or pertaining to a specific person that [6] caused substantial emotional distress to that person and [7] served no legitimate purpose.

*Kassenoff v. Harvey*, No. 23-cv-24085, 2024 WL 562738, at *10 (N.D. Fla. Feb. 8, 2024) (citing

Fla. Stat. § 784.0485(3)(b)).  Further, to obtain relief, a plaintiff must file a verified petition "alleg[ing] the existence of such [cyber]stalking" and setting forth "the specific facts and circumstances for which relief is sought."  Fla. Stat. § 784.0485(3)(a) (alterations added).

Plaintiff argues she satisfies the standard for cyberstalking because she alleges that Defendant willfully and maliciously engaged in a sustained course of online harassment; repeatedly spreading defamatory statements, using bot accounts to attack her credibility, and directing followers to a deepfake pornographic video.  (*See* Resp. 19–20; *see generally* Am. Compl.).  These communications, made through electronic means, were targeted at Plaintiff and allegedly caused her substantial emotional distress, exacerbating trauma she had already suffered.  (*See* Am. Compl. ¶¶ 21–22); *see also Strober*, 332 So. 3d at 1086–87 (recognizing that cyberstalking is not limited to direct messages or emails).  Plaintiff also asserts that Defendant's conduct served no legitimate purpose; as it was designed solely to humiliate, discredit, and retaliate against her for testifying against Peterson.  (*See* Resp. 19).

Defendant first insists that her statements had a legitimate purpose and that the First Amendment shields her from liability, precluding injunctive relief.  (*See* Mot. 18–19).  The Court disagrees.  Plaintiff does not allege mere insults or hyperbole; rather, she claims that Defendant waged a campaign of intimidation and harassment against her.  (*See* Am. Compl. ¶¶ 31–36, 115–17).  These allegations, taken as true, are sufficient to support Plaintiff's assertion that Defendant's conduct "served no legitimate interest."  (Resp. 20).

Defendant next argues that Plaintiff's Petition for Injunction against Stalking lacks sufficient factual allegations and fails to meet the statute's procedural requirements.  (*See* Mot. 18–19; *see also* Pet. 2).  On this point, the Court agrees.

The Petition merely states, "Petitioner is a victim of cyberstalking because respondent has

committed cyberstalking[,]" and then directs the reader to the Amended Complaint for further details.  (Pet. 2 (alteration added; citing Am. Compl. ¶¶ 25–88)).  This is insufficient.

Section 784.0485 requires the petitioner to *specifically* allege incidents of stalking, including when and where they occurred, and to mark applicable categories, such as whether the respondent previously harassed the petitioner.  *See* Fla. Stat. § 784.0485(3)(b).  The Petition offers no such details.  A conclusory assertion paired with a reference to an external pleading is not a substitute for a properly sworn statement.  *Cf. Britt v. United States*, 985 F. Supp. 1463, 1465 (M.D. Fla. 1998) ("The mere fact that an exhibit is attached to a verified complaint does not mean that the person verifying the pleading adopts, under oath, all statements contained in the exhibit.").

The Petition falls short, lacking the necessary detail and failing to provide a sworn account of Defendant's alleged cyberstalking as required by statute.  (*See generally* Pet.).  Plaintiff all but concedes the point and indicates she would be willing to swear to the allegations she relied on to cure this defect.  (*See* Resp. 20 (stating Plaintiff would "swear to the Amended Complaint, if the Court deems that necessary")).  The Court will permit Plaintiff to cure this defect.

Lastly, the Court declines to relinquish jurisdiction over this claim — because it has no discretion to do so.  Plaintiff correctly asserts that diversity jurisdiction applies, as the parties are completely diverse and the amount in controversy exceeds $75,000.  (*See* Am. Compl. ¶¶ 13–14; Resp. 19); *see also Doane v. Tele Cir. Network Corp.*, 852 F. App'x 404, 406 (11th Cir. 2021) (stating "exercising jurisdiction under the diversity jurisdiction statute is not discretionary" (citations and quotation marks omitted)).  Defendant's argument that Plaintiff's cyberstalking claim alone does not satisfy the amount-in-controversy requirement misses the mark.  The diversity statute governs entire *civil actions*, not individual claims.  (*See* Reply 8–9); *see also Barber v. Fireman's Fund Ins. Co.*, No. 05-cv-374, 2006 WL 8445234, at *2 (N.D. Fla. Apr. 19,

2006) ("The diversity statute provides for jurisdiction over 'civil actions' between diverse parties in which the amount in controversy exceeds $75,000. *The statute does not confer jurisdiction only over individual claims exceeding that amount.*" (emphasis added; citing 28 U.S.C. § 1332(a))).

Other than Plaintiff's deficient Petition — which she will have a chance to cure — she has adequately pleaded a claim for cyberstalking under Florida Statute section 784.0485.

### F. Attorney's Fees

Finally, Defendant moves to strike Plaintiff's requests for attorney's fees, asserted in Counts I, III, and IV, arguing that no contractual or statutory basis supports such an award. (*See* Mot. 20). Even if Defendant is correct, "in federal court, there is 'no special pleading requirement' for attorneys' fees." *Caulfield & Wheeler, Inc. v. Marsh & McLennan Agency, LLC*, No. 23-cv-81407, 2024 WL 337196, at *3 (S.D. Fla. Jan. 29, 2024) (citation omitted), *report and recommendation adopted*, 2024 WL 474399 (S.D. Fla. Feb. 7, 2024). A request for fees is just that — a request. Striking it now serves little purpose. Federal courts generally refrain from pruning pleadings based on speculative entitlement to fees, preferring to address the issue if and when the prevailing party actually moves for them. *See id.* Should Plaintiff ultimately seek attorney's fees, Defendant remains free to challenge the request at that time.

## IV. CONCLUSION

For the foregoing reasons, it is

**ORDERED AND ADJUDGED** that Defendant, Milagro Elizabeth Cooper's Motion to Dismiss First Amended Complaint **[ECF No. 30]** is **GRANTED in part and DENIED in part**. Plaintiff, Megan Pete has until **February 18, 2025** to file an amended complaint curing the deficiency in Count IV.

CASE NO. 24-24228-CIV-ALTONAGA/Reid

**DONE AND ORDERED** in Miami, Florida this 7th day of February, 2025.

_Cecilia M. Altonaga_
**CECILIA M. ALTONAGA**
**CHIEF UNITED STATES DISTRICT JUDGE**

cc:   counsel of record