**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No.: 1:24-cv-24228-ALTONAGA/REID**

MEGAN PETE, an individual

*Plaintiff*,

v.

MILAGRO ELIZABETH COOPER,
an individual,

*Defendant.*

_____

## ORDER GRANTING SPOLIATION SANCTIONS[1]

**THIS CAUSE** came before the Court upon Plaintiff Megan Pete's ("Plaintiff" or "Pete") request for sanctions against Defendant Milagro Elizabeth Cooper ("Defendant" or "Cooper") for spoliation of evidence. The undersigned conducted an evidentiary hearing. After hearing argument from counsel, testimony from Plaintiff's expert witness, and having reviewed the record and being otherwise fully advised, it is **HEREBY ORDERED AND ADJUDGED** that Plaintiff's request for sanctions for spoliation of evidence is **GRANTED**. Plaintiff shall be granted an adverse inference jury instruction at trial and monetary sanctions.

## FACTUAL BACKGROUND

This case focuses on allegations brought by Pete, a hip-hop artist known professionally as "Megan Thee Stallion," against Cooper, an online personality who goes by "Milagro Gramz" or "Mobz World." *See* Second Amended Complaint ("SAC") [ECF No. 37 ¶¶ 7, 10, 12]. Cooper is accused of engaging in a coordinated social harassment campaign, using video, audio, and written

_____

[1] The Court uses the pagination generated by the electronic CM/ECF database, which appears in the headers of all court filings.

social media "posts" to cause reputational and emotional distress to Pete. *See generally* [*id.*]. The allegations in the SAC arise from the 2022 criminal trial and conviction of Daystar Peterson ("Daystar"), popularly known as Torey Lanez, a Canadian rapper and singer who was found guilty of assaulting Plaintiff with a firearm. *See* [*id.* ¶¶ 16–24]. The criminal trial was widely publicized and had a large public following on social media.

Pete's SAC alleges defamation *per se* (Count I); promotion of an altered sexual depiction in violation of Florida Statute § 836.13 (Count II); intentional infliction of emotional distress (Count III); and cyberstalking in violation of Florida Statute § 784.0845 (Count IV). *See* [*id.* ¶¶ 89–124]. According to Pete, Defendant operates multiple social media accounts across several platforms including Instagram, TikTok, X.com,[2] and YouTube and has over 100,000 followers on these social media platforms. [*Id.* ¶ 27]. Pete contends Defendant has sole control over these accounts and, at Daystar and his affiliate's direction, uses them to harass and defame Pete by disseminating false narratives and conspiracy theories about her. [*Id.* ¶¶ 26–34]. The alleged falsities include claims that Pete lied under oath during the criminal trial, suffers from alcoholism, is "mentally retarded," and needs a guardian. [*Id.* ¶ 7]. These alleged falsehoods and harassment have purportedly taken a severe toll on Pete's mental health. [*Id.* ¶ 8]. Pete asserts Defendant made these statements with actual malice, as evidence disproving them was widely available at the time the statements were published. [*Id.* ¶ 73-84].

<u>Daystar Peterson Criminal Trial</u>

As noted, many of Cooper's alleged defamatory statements stem from the underlying 2022 criminal trial and conviction of Daystar Peterson. [*Id.* ¶¶ 16–24]. On July 12, 2020, Los Angeles police conducted a traffic stop involving Daystar and Pete after responding to reports of gunfire in

---

[2] Formerly known as and referred to as "Twitter" or "Twitter.com."

the area. [*Id.* ¶ 17]. Officers discovered a recently discharged firearm during the stop and noticed Pete had injuries to her feet. [*Id.* ¶¶ 17–18]. These injuries were later confirmed to be gunshot wounds. [*Id.*]. Plaintiff was transported to the hospital while Daystar was arrested for possession of a concealed weapon. [*Id.*]. Pete later identified Daystar as the shooter, leading to his subsequent indictment on charges for felony assault with a firearm, illegal possession of a firearm, and negligent discharge of a firearm. [*Id.* ¶¶ 19–20].

Pete testified during Daystar's trial recounting the night of the shooting and the impact the shooting had on her. [*Id.* ¶¶ 21–22]. Specifically, Pete testified that she exited Daystar's car and was walking away with her back facing Daystar. [*Id*. ¶ 21]. At this point, Daystar said "Dance, bitch[,]" and fired multiple shots at her, injuring Plaintiff's feet. [*Id.*]. Daystar was eventually convicted on all charges and sentenced to a ten-year prison term. [*Id.* ¶ 24].

<u>Defendant's Social Media Harassment</u>

According to Pete, Defendant attended Daystar's criminal trial and launched a smear and harassment campaign against Pete on social media at the behest of Daystar and his affiliates. [*Id.* ¶¶ 29, 31–32, 39]. Plaintiff alleges Cooper utilized bot accounts[3] to flood Plaintiff and her supporters with "hateful, derogatory, and malicious statements[.]" [*Id.* ¶ 35]. Defendant has also called for violence against Plaintiff. [*Id.* ¶ 36]. Plaintiff alleges the harassment is in retaliation for testifying against Daystar during the criminal trial.

Plaintiff also alleges that Cooper promoted a deepfake[4] pornographic video depicting an artificially created version of Plaintiff engaging in sexually explicit acts. [*Id.* ¶ 40]. Specifically,

---

[3] In this context, a bot refers to "a computer program that performs automatic repetitive tasks[,]" especially "one designed to perform a malicious action[.]" Bot, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/bot (last visited Sep. 4 2025) (alterations added).

[4] A deepfake is "an image or recording that has been convincingly altered and manipulated to

Defendant, on her @MobzWorld X.com account, "liked" a post featuring the deepfake video which archived the post into her public "Likes" page. [*Id.* ¶¶ 42–43]. Defendant then directed her social media followers, as well as anyone who saw Defendant's posts, to browse her then-public "Likes" page containing the video. [*Id.* ¶¶ 44–45]. Plaintiff alleges that this action was done to amplify the video's reach. *See* [*id.* ¶¶ 44, 53]. Defendant later stated on a livestream video published to her Stationhead account: "If y'all want to be mad at something, this is what I'll give you: be mad that I drew attention to it[,]" ostensibly referring to her conduct in directing her followers to access the video. *See* [*Id.* ¶¶ 47–48].

<u>Defendant's Relationship with Sonstar Peterson</u>

As it relates to the instant spoliation proceedings, Plaintiff alleges that Cooper is a paid surrogate or mouthpiece for Daystar and his father, Sonstar Peterson ("Sonstar"), and conspired with them to execute this smear campaign to maliciously injure Plaintiff's reputation and inflict severe emotional distress upon her in retaliation for her testimony during the criminal trial. [*Id.* ¶ 29]. Daystar himself is unable to speak or post directly regarding Pete due to restrictions in the underlying criminal action. *See* [*id* ¶¶ 31–38]. Pete alleges that Defendant has a close relationship with both Daystar and Sonstar Peterson, as evidenced through Defendant's social media postings. *See* [*Id.* ¶¶ 30–31]. Thus, communications between and relating to Defendant, Daystar, and Sonstar are material to Plaintiff's claims and are the focal point of these spoliation proceedings.

**PROCEDURAL BACKGROUND**

On the same day the lawsuit was commenced, October 29, 2024, Defendant was informed in a letter sent by email from Plaintiff's counsel of her duty to preserve documents and information

---

misrepresent someone as doing or saying something that was not actually done or said[.]" Deepfake, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/deepfake (last visited Sep. 4 2025) (alteration added)

related to the case as detailed in the Preservation Letter. *See* Notice of Claims and Preservation of Documents and Information (the "Preservation Letter") [ECF No. 120-1 at 584–87]; *see also* Def.'s Dep. Tr. [*id.* at 333:14–334:18].

On July 11, 2025, Plaintiff first informed the Court of potential spoliation in a Notice of Issues for Discovery Hearing. *See* Notice [ECF No. 90]. There, Plaintiff raised "concerns regarding spoliation of electronically stored information from Defendant's devices and social media platforms[.]" [*Id.* ¶ 2]. Plaintiff requested immediate provision of Defendant's login credentials to a previously agreed-upon third-party forensic vendor, FTI Consulting ("FTI"), for collection from Defendant's Discord, iMessage, WhatsApp, and Instagram Accounts. [*Id.* ¶ 2(a)]. Plaintiff also requested an adverse inference regarding the uncollected and spoliated communications from Defendant's device. [*Id.* ¶ 2(b)].

At the discovery hearing held several days later, Plaintiff's counsel explained that the forensic investigation of Defendant's cellphone had shown that Defendant deleted text messages from her phone during specific times leading up to the filing of the Complaint. *See* Disc. Hr'g Tr. [ECF No. 97 at 16:8–17:2]. Plaintiff's counsel noted specific deletions that corresponded to statements Defendant made about Plaintiff from October 5–6, 2022; July 29–30, 2024; and August 10–12, 2024. *See* [*id.* at 17:4–22]. Plaintiff also explained that the initial forensic investigation revealed that Defendant had completely deleted WhatsApp—and thus any WhatsApp messages contained on the app—off her phone during the litigation. *See* [*Id.* at 18:7–19:6].

The undersigned ordered Defendant to provide her phone and login credentials for WhatsApp and other apps to the neutral third-party forensic vendor, FTI, for analysis prior to Defendant's then-noticed deposition for July 21, 2025. *See* [*Id* at 32:2–33:9]; Disc. Order [ECF No. 93 ¶ 3]. The undersigned further deferred on ruling on the issue of spoliation until after

Defendant's deposition on July 21, 2025, so that Plaintiff could seek answers during the deposition regarding the deleted evidence. *See* Disc. Hr'g Tr. [ECF No. 97 at 24:5–20, 28:7–23]. Plaintiff was permitted to renew her request for spoliation sanctions after Defendant's deposition. *See* [*id.* at 28:11–29:15]. This was also memorialized in the Court's Order following the discovery hearing. *See* Disc. Order [ECF No. 93 ¶ 2 ("If after Defendant's deposition Plaintiff seeks to proceed on the issue of spoliation, Plaintiff must promptly contact the Undersigned to request an evidentiary hearing.")]. During the hearing, the undersigned also noted that this case had fast approaching deadlines, and that it was incumbent upon all parties to proceed promptly with discovery. *See* Disc. Hr'g Tr. [ECF No. 97 at 13:24–14:4, 14:25–15:4].

On Tuesday, July 29, 2025, Plaintiff emailed the Court renewing her request for a hearing on spoliation of evidence. On August 4, 2025, after giving the parties time to confer on availability, the Court set an evidentiary hearing for spoliation proceedings for August 7, 2025.

## EVIDENTIARY HEARING

The Parties appeared for an evidentiary hearing on spoliation on August 7, 2025. Plaintiff produced an expert witness from FTI Consulting, Matias Livachof ("Mr. Livachof"), and proffered testimony from Defendant's July 21, 2025 deposition.[5] Defendant announced that their expert was unavailable to testify in person for the hearing and Defendant herself was unable to attend due to a cancelled flight (discussed more below). *See* Hr'g Tr. [ECF No. 118 at 8:6–9:17, 86:23–88:2, 98:16–20, 114:11–14].

---

[5] While Defendant's counsel noted that Defendant was not present at the hearing to respond to what she said during the deposition, Defendant's counsel was present for the deposition itself and had the full deposition transcript in their possession. Hr'g Tr. [ECF No. 118 at 6:20–7:8].

<u>Direct Examination</u>

Mr. Livachof testified that he works for FTI and was involved in the creation of FTI's Forensic Analysis Report (the "Report") of Defendant's phone. Hr'g Tr. [ECF No. 118 at 13:16–21]. The Report itself provided findings regarding deleted text messages and WhatsApp messages from Defendant's phone. *See* Ex. M [ECF No. 120-13 (Forensic Analysis of IPHONE by Kevin Leung)].

Mr. Livachof holds a Baccalaureate of Computer Science and has been working in the digital forensics field for nineteen years, focusing on digital forensics, e-discovery, and global investigations. Hr'g Tr. [ECF No. 118 at 14:5–8]. He explained that his colleague performed the forensic image of Defendant's phone using an industry standard analysis tool called Cellebrite. [*Id.* at 16:1–25]. From there, FTI was tasked with identifying any deletions and usage of the WhatsApp and iMessage[6] apps on Defendant's phone. [*Id.* at 17:1–11]. Mr. Livachof confirmed that FTI worked with two images of Defendant's phone: an initial image taken of the phone in April 2025 and a backup hard drive of the phone later provided by Defendant in July 2025. [*Id.* at 19:20–20:15, 43:22–44:8, 45:19–46:1, 74:2–3, 75:5–8].

FTI was able to determine deletions of text messages from Defendant's phone based on missing "Row IDs" in the phone's database. [*Id.* at 17:13–19:9]. Mr. Livachof explained that when a text message is sent or received, a Row ID number is automatically created within the phone's database corresponding to the message. [*Id.*]. The Row ID numbers are created in sequential format based on when a message is sent or received.[7] [*Id.*]. Further, the Row ID number is permanently

---

[6] "iMessage" is used interchangeably with "text message" or "SMS message" for purposes of the hearing and describes text messages sent and received from Defendant's phone.

[7] For example, if a message was sent by a device at 1:34 p.m. it may be assigned a Row ID number of "1." The very next message sent or received by the device at 1:35 p.m. would be assigned a Row ID number of "2" and so on.

assigned to the corresponding message at the time the message was received or sent, and if a message is deleted, its corresponding Row ID is also deleted from the database. [*Id.* at 18:23–19:9]. The phone database also notes the time and date the Row ID was created, which corresponds to the time and date the message was sent or received. [*Id.* at 63:19–64:10]. Therefore, it is possible to identify deleted text messages based on sequential gaps in the Row ID numbers.[8] [*Id.* at 21:21–22:8, 23:20–25:13].

Mr. Livachof then displayed a demonstrative excel sheet depicting FTI's analysis of the Row ID and text message gaps found from the first imaging of Defendant's phone done in April 2025. [*Id.* at 21:14–19]. The excel sheet depicts Row ID gaps from Defendant's phone over the course of six years with the most recent message showing as April 9, 2025. The excel sheet depicts the Row ID number immediately preceding a gap, the Row ID after the gap, and the number of missing Row IDs or messages within the gap. The excel sheet also depicts the beginning and ending timestamp corresponding to the Row ID endpoints, and the time elapsed within the gaps. An example of the excel sheet data fields is below:[9]

| Previous ROWID | ROWID | Number of Missing Rows | Time | Beginning Timestamp | Ending Timestamp |
|---|---|---|---|---|---|
| 369996 | 371893 | 1896 | 44.92 | 8/10/2024 22:22 | 8/12/2024 19:17 |

Exhibits Q and R were marked for identification. [*Id.* at 23:14–16, 27:25–28:6]. Exhibit Q was identified as a message extraction from Defendant's phone depicting a text exchange between Defendant and Sonstar on December 22, 2022, at 2:58 a.m. *See* Ex. Q [ECF No. 120-15].

---

[8] For example, if Row ID numbers in a database proceed sequentially as "1, 2, 3, 7, 8, 9 . . . ," this indicates Row ID numbers "4, 5, 6" and the corresponding text messages are missing from the device.

[9] The example depicts a gap between Row ID number 369,996 to Row ID number 371,893, corresponding to 1,896 missing Row ID numbers (or text messages) from August 10, 2024, at 10:22 p.m. to August 12, 2024 at 7:17 p.m.

Specifically, Exhibit Q shows Sonstar asking Defendant to call him. [*Id.*]. Exhibit R depicted three messages sent from Daystar to Defendant on December 22, 2022, starting at 5:33 a.m. *See* Hr'g Tr. [ECF No. 118 at 28:12–16]. Exhibit R depicts Daystar reaching out to Defendant and asking her to contact him. *See* Ex. R [ECF No. 120-16].

Mr. Livachof then directed the Court to corresponding sections of the excel sheet analysis, where it showed that sixty-six Row IDs or text messages were missing immediately after the Exhibit Q message from Sonstar on December 22, 2022, at 2:58 a.m. and before the messages received from Daystar in Exhibit R on December 22, 2022, at 5:33 a.m. *See* Hr'g Tr. [ECF No. 118 at 25:16–30:9]. Moreover, there are 276 Row IDs missing after the messages received from Daystar in Exhibit R. [*Id.*]. These 276 missing Row IDs represent 276 missing text messages spanning 13.24 hours from December 22, 2022, at 5:33 a.m. (the time of Daystar's last message to Defendant) to December 22, 2022, at 6:47 p.m. [*Id.*]. These gaps from the excel analysis are provided below.

| Previous ROWID | ROWID | Number of Missing Rows | Time | Beginning Timestamp | Ending Timestamp |
|---|---|---|---|---|---|
| 233726 | 233793 | 66 | 2.58 | 12/22/2022 2:58 | 12/22/2022 5:33 |
| 233795 | 234072 | 276 | 13.24 | 12/22/2022 5:33 | 12/22/2022 18:47 |

Plaintiff and Mr. Livachof continued this exercise with Exhibit S, which depicted a four-message text conversation between Sonstar and Defendant on October 30, 2024, wherein, Sonstar asks Defendant to call him. *See* Ex. S [ECF No. 120-17]. The first message was sent by Sonstar to Defendant at 3:27 p.m. on October 30, 2024. Thereafter, FTI identified a gap of sixty-eight missing messages following this first text from 3:27 p.m. to 7:04 p.m. *See* Hr'g Tr. [ECF No. 118 at 30:18–32:22]; *see also* Ex. S [ECF No. 120-17].

| Previous ROWID | ROWID | Number of Missing Rows | Time | Beginning Timestamp | Ending Timestamp |
|---|---|---|---|---|---|
| 399175 | 399244 | 68 | 3.61 | 10/30/2024 15:27 | 10/30/2024 19:04 |

Exhibit S also contains three more messages between Sonstar and Defendant on October 30, 2024. *See* Ex. S [ECF No. 120-17]. At 11:15 p.m. Sonstar again asks Defendant to call him. [*Id.*]. At 11:24 p.m. Defendant lets Sonstar know she is on air but is about to get off, and the final reply from Sonstar at 11:25 p.m. indicates that they will talk soon. [*Id.*]. FTI identified a gap of 258 missing texts messages spanning 14.10 hours following Sonstar's last message at 11:25 p.m. on October 30, 2024 to October 31, 2024 at 1:30 p.m. *See* Hr'g Tr. [ECF No. 118 at 33:10–18, 62:7–15].

| Previous ROWID | ROWID | Number of Missing Rows | Time | Beginning Timestamp | Ending Timestamp |
|---|---|---|---|---|---|
| 399273 | 399532 | 258 | 14.10 | 10/30/2024 23:25 | 10/31/2024 13:30 |

Exhibit T was also marked for identification. [*Id.* at 34:25–35:10]. Exhibit T depicts another text message received by Defendant from Sonstar on November 6, 2024, at 7:52 p.m., asking Defendant to call him. [*Id.*]; *see also* Ex. T [ECF No. 120-18]. Mr. Livachof testified there were eighty-nine missing Row IDs and text messages from Defendant's phone following this text, ranging from November 6, 2024, at 9:30 p.m. to November 7, 2024, at 12:52 a.m. *See* Hr'g Tr. [ECF No. 118 at 35:4–15]. Mr. Livachof also identified Row ID gaps and deletions of 576 and 246 messages preceding this text, spanning from November 5, 2024, to November 6, 2024. [*Id.* at 35:16–36:15].

| Previous ROWID | ROWID | Number of Missing Rows | Time | Beginning Timestamp | Ending Timestamp |
|---|---|---|---|---|---|
| 400905 | 401482 | 576 | 19.60 | 11/5/2024 1:50 | 11/5/2024 21:26 |
| 401484 | 401731 | 246 | 22.32 | 11/5/2024 21:33 | 11/6/2024 19:52 |
| 401732 | 401822 | 89 | 3.36 | 11/6/2024 21:30 | 11/7/2024 0:52 |

Plaintiff further noted that these deletions, including those in Exhibit S, happened after this lawsuit was filed and was considered an active litigation period. [*Id.* at 36:22–39:1]; *see also* [ECF No. 1]; *see also* Preservation Letter [ECF No. 120-1 at 584–87]. Ultimately, FTI was able to identify 2,337 missing Row IDs and text messages in the time between Exhibit S and Exhibit T,

spanning October 30, 2024 (the day after the lawsuit was filed) to November 6, 2024. *See* Hr'g Tr. [ECF No. 118 at 36:22–39:1].

Exhibit J was thereafter marked for identification. [*Id.* at 39:4–12]. Exhibit J is a screenshot of Defendant's phone's "Recently Deleted" folder, depicting a deleted message thread with Sonstar containing four messages. *See* Ex. J [ECF No. 120-10]. The screenshot indicates that the thread will be automatically and fully deleted from Defendant's phone in thirty days. *See* [*id.*]; Hr'g Tr. [ECF No. 118 at 39:19–41:2]. Exhibit AA was marked for identification depicting the same screenshot of Defendant's "Recently Deleted" folder but with added metadata fields. Hr'g Tr. [ECF No. 118 at 42:5–43:8]; *see also* Ex. AA [ECF No. 120-20]. Mr. Livachof testified that the metadata shows that the screenshot of Defendant's "Recently Deleted" folder was created on or around November 14, 2024. Hr'g Tr. [ECF No. 118 at 42:21–43:8]. He also later confirmed this creation date based on his own search of Defendant's phone. *See* [*id.* at 69:10–17, 110:9–113:14].

As part of FTI's analysis, Mr. Livachof also reviewed WhatsApp usage from Defendant's phone. [*Id.* at 44:10–49:2]. Mr. Livachof testified that WhatsApp was not downloaded on Defendant's phone during FTI's first image collection done in April 2025. [*Id.* at 45:15–46:13]. However, FTI was able to determine, based on Wi-Fi traffic generated by the app, that WhatsApp had been used on several dates preceding the collection. [*Id.* at 46:3–47:14, 69:18–70:71]. Indeed, a review of Exhibit M shows that WhatsApp was active on Defendant's phone on seven (7) dates spanning from July 4, 2023, to March 18, 2025. *See* Ex. M [ECF No. 120-13 at 3]. Mr. Livachof reiterated that though FTI was able to see WhatsApp activity on the device, the app itself was not downloaded on Defendant's device when it was turned over to FTI in April 2025. Hr'g Tr. [ECF No. 118 at 48:1–10]. Therefore, it appears that WhatsApp was uninstalled before Defendant's

device was turned over to FTI, and Mr. Livachof testified that any messages held on the WhatsApp app are lost unless there is a backup of those chats. [*Id.* at 48:11–49:2].

Exhibits X, Q, R, S, T, J, M, F, and E were thereafter admitted into evidence and the witness was tendered for cross-examination. [*Id.* at 49:9–50:23]. Exhibit AA was later admitted with restrictions during re-direct examination, as discussed below. [*Id.* at 113:1–14].

<u>Cross-Examination</u>

During cross-examination, Mr. Livachof confirmed that the missing Row IDs represented missing text messages from Defendant's phone. [*Id.* at 51:10–22]. Mr. Livachof admitted he could not determine who sent or received a missing text messages based only on the Row ID gaps, but he could confirm the phone number of the individual who had sent the messages right before and directly after the gaps. [*Id.* at 51:23–52:13]. He further testified that the only way to recover the missing text messages would be from a backup containing the messages. [*Id.* at 52:14–22].

Mr. Livachof confirmed that the Row ID analysis done during direct examination was based on the first imaging of Defendant's phone captured in April 2025. [*Id.* at 52:23–53:16]. Mr. Livachof testified that it is possible that the Row IDs depicted in FTI's analysis could have been created from multiple phones (e.g., Defendant purchased a new phone and transferred the data from her older device). [*Id.* at 54:14–56:18]. However, based on his experience, when data is transferred from one phone to the another, the entire database is transferred with it. [*Id.*]. If Defendant were transferring her data to a new phone, she would not be able to pick and choose specific text messages to carry over to the new phone. [*Id.* at 57:18–58:16].

Mr. Livachof testified to the number of missing messages from the first analysis of Defendant's phone, per year, from 2019 to present:

- 2019: 1,127;[10]
- 2020: 27,873;
- 2021: 19,821;
- 2022: 126,092;
- 2023: 91,963;
- 2024: 70,355;
- 2025: 7,630.[11]

[*Id.* at 58:17–60:4]. He confirmed that each missing Row ID represents a missing text message, that the missing messages could be from group messages, and that he is unable to tell when the messages themselves went missing or were deleted. [*Id.* at 60:6–64:18]. Rather, FTI can locate the time span of deleted messages based on the Row ID before and after the gap. [*Id.*]. Mr. Livachof mentioned that errors could possibly cause Row IDs to go missing but he has not encountered that in his experience. [*Id.* at 66:23–67:12].

Mr. Livachof confirmed that Exhibit AA's metadata fields were created from the first imaging of Defendant's phone, and that Defendant did not modify the metadata of the screenshot on July 11, 2025. [*Id.* at 67:13–69:9]. He further confirmed that he had recovered the screenshot of Defendant's "Recently Deleted" folder depicted in Exhibit J, and that it was not modified. [*Id.* at 69:10–17].

When asked about the WhatsApp activity found on Defendant's device, Mr. Livachof testified that the dates of activity do not tell him whether messages were sent or received by WhatsApp on those dates. [*Id.* at 69:18–70:71]. Rather, it shows that WhatsApp was active over Wi-Fi on those days. [*Id.*].

---

[10] FTI's analysis of Defendant's messages from 2019 began on December 11, 2019, and only covered December 11–31, 2019. [*Id.* at 58:20–59:10].

[11] FTI's analysis of Defendant's messages in 2025 encompassed January 1, 2025 to April 9, 2025.

The parties then discussed the second imaging of Defendant's phone, based on a backup hard drive that was turned over to FTI in July 2025. Mr. Livachof testified that there were messages found on the backup hard drive that were missing from the first imaging of Defendant's device in April 2025. [*Id.* at 73:6–10]. FTI found that there was a 13,000-message difference between the first imaging in April, and the second imaging of the backup in July. [*Id.* at 74:2–76:9]. However, this calculation also included new messages sent and received after the first April 2025 imaging, including messages sent up to July 17, 2025. [*Id.*].

Mr. Livachof confirmed FTI only captured whether WhatsApp was deleted from the device. [*Id.* at 76:15–23]. WhatsApp had been deleted in the original April 2025 imaging but had been redownloaded in the subsequent July 2025 backup, now containing six messages. [*Id.* at 76:23–77:10].

Re-Direct Examination

Mr. Livachof presented two excel sheets during re-direct examination depicting FTI's analyses of missing Row ID gaps from Defendant's phone. The first excel sheet, also shown during direct examination, depicted FTI's analysis of the first image of Defendant's phone in April 2025 (the "April File"). [*Id.* at 78:12–80:3]. The second excel sheet depicted FTI's continuing analysis of the second image from the backup hard drive provided in July 2025 (the "July File"). [*Id.*]. Mr. Livachof, using Row ID gap dates from previous exhibits, compared the two excel sheets to see if any messages missing in the April File were recovered in the July File. [*Id.* at 80:4–19].  Mr. Livachof examined the December 22, 2022, messages in Exhibit R, and found that the Row ID gaps, 66 and 276, were identical in both the April and July Files. [*Id.* at 80:4–81:4]. The same exercise was repeated with one of the date ranges from Exhibit S, October 30, 2024, from 3:27

p.m. to 5:04 p.m., showing matching Row ID gaps in both the April and July Files. [*Id.* at 81:5–19].

Mr. Livachof then acknowledged that while he cannot pinpoint exactly when certain Row IDs and text messages were deleted, logically it would have to be after the message was received or sent. [*Id.* at 81:22–83:5]. For example, if Row IDs and messages were missing on October 30, 2024, between 12:01 p.m. and 12:03 p.m., the messages would have been deleted, at the very least, after October 30, 2024, at 12:03 p.m., the time the last available message was received or sent. *See* [*Id.* at 84:6–7 ("Or in simplest terms, the date of deletion had to at least be after the date of creation. And if the date of creation was after a cutoff, it's the same.")].

<u>Recross-Examination</u>

During recross-examination, Defendant pointed out that in one of the examples used on redirect, there were 190 messages recovered in the July File, thus the April File and July File did not match completely for those time periods. [*Id.* at 83:17–84:4].

<u>Deposition Testimony</u>

Plaintiff presented excerpted video clips from Defendant's deposition on July 21, 2025. *See generally* Def.'s Dep. Tr. [ECF No. 120-1].

<u>Redirect Examination</u>

Mr. Livachof was briefly redirected on Exhibit AA. Mr. Livachof was unable to testify to the "Last Modified" metadata field on Exhibit AA as he did not access the database that produced the metadata for the exhibit. Hr'g Tr. [ECF No. 118 at 110:9–113:14]. However, he was able to confirm the creation date of the screenshot in Exhibit AA and Exhibit J as November 14, 2024, based on his personal search of Defendant's device. [*Id.* at 69:10–17, 110:9–113:14]. Therefore,

the Court accepted Exhibit AA into evidence to the extent that Mr. Livachof confirmed the creation date but disregarded the "Last Modified" metadata field. [*Id.* at 113:1–14].

<u>Absence of Defense Expert and Defendant at Hearing</u>

Lastly, the Court notes that neither Defendant nor her expert testified at the evidentiary hearing. While defense counsel stated that Defendant's expert could have appeared via Zoom, no explicit request was made to the Court prior to the hearing. *See infra* note 16, at 38. Moreover, as stated during the hearing, it is unclear what more Defendant's expert would be able to provide as it is uncontested that messages had been deleted from Defendant's phone and that some were deleted after litigation commenced and Defendant received the Preservation Letter. *See* Hr'g Tr. [ECF No. 118 at 88:10–16, 89:18–91:15].

Defendant was also unavailable due to a last-minute flight cancellation that prevented her from appearing. *See* [*id.* at 98:16–99:12]. However, Defendant was deposed two weeks prior to the hearing where she testified about the deletions under oath. [*Id.*]. Further, Defendant's counsel was able to make factual proffers based on the deposition testimony during the hearing. [*Id.*].

**LEGAL STANDARD**

At its core, "[s]poliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Gaff v. Baja Marine Corp.*, 310 F. App'x 298, 301 (11th Cir. 2009). Federal law governs the imposition of sanctions for failure to preserve evidence in a diversity suit. *See Weston v. Buc-ee's Fla., LLC*, No. 6:24-CV-567-PGB-LHP, 2025 WL 507456, at *7 (M.D. Fla. Feb. 14, 2025) (quoting *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 944 (11th Cir. 2005)). Specifically, the preservation of Electronically Stored Information ("ESI") is governed by Federal Rule of Civil Procedure 37(e). *See Incardone v. Royal Caribbean Cruises, Ltd.*, No. 16-20924-CIV, 2019 WL

3779194, at *18 (S.D. Fla. Aug. 12, 2019) ("[I]t would be inappropriate to analyze the spoliation

sanctions motion concerning [ESI] using the common law inherent power authority . . .

[i]nstead, Rule 37(e) controls."). Rule 37(e) provides:

> (e) FAILURE TO PRESERVE ELECTRONICALLY STORED INFORMATION:
>
> If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
>
> > (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or
> >
> > (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:
> >
> > > (A) presume that the lost information was unfavorable to the party;
> > >
> > > (B) instruct the jury that it may or must presume the information was unfavorable to the party; or
> > >
> > > (C) dismiss the action or enter a default judgment.

Fed. R. Civ. P. 37(e). The Eleventh Circuit recently analyzed the issue of spoliation of ESI under

Rule 37(e) and summarized as follows:

> By its text, Rule 37(e) creates a two-tiered sanctions regime—with lesser sanctions under Rule 37(e)(1) and more severe sanctions under Rule 37(e)(2). Both parts of the rule share two preconditions: (1) "electronically stored information that should have been preserved in the anticipation or conduct of litigation" was "lost because a party failed to take reasonable steps to preserve it" and (2) that information "cannot be restored or replaced through additional discovery." The requirements diverge after that. Rule 37(e)(1) sanctions are centered on the *effect* of a violation; they apply only where lost electronic evidence causes "prejudice to another party," which then justifies sanctions "no greater than necessary to cure the prejudice." Rule 37(e)(2) sanctions, on the other hand, look more to the *cause* of the violation. They require a finding that "the party acted with the intent to deprive another party of the information's use in the litigation." If so, the court is justified in imposing more severe sanctions: adverse jury instructions, and even dismissal or default judgment. Fed. R. Civ. P. 37(e)(2). What's more, Rule 37(e)(2) sanctions do not

> require "any further finding of prejudice." 2015 Committee Notes on Rule 37(e)(2).
> "This is because the finding of intent required by the subdivision can support not
> only an inference that the lost information was unfavorable to the party that
> intentionally destroyed it, but also an inference that the opposing party was
> prejudiced by the loss of information that would have favored its position." *Id.*

*Skanska USA Civil Se. Inc. v. Bagelheads, Inc.*, 75 F.4th 1290, 1311 (11th Cir. 2023). Therefore,

spoliation in the context of Rule 37(e)(2), as is requested here, requires a finding of bad faith. *See*

*id.*

In *Skanska USA Civil Se. Inc.*, the Eleventh Circuit held that "the 'intent to deprive another

party of the information's use in the litigation' is the equivalent of bad faith in other spoliation

contexts."  *Id.* at 1312 (quoting Fed. R. Civ. P. 37(e)(2)). The court went on:

> **In this Circuit's spoliation precedents, bad faith "generally means destruction
> [of evidence]** *for the purpose of hiding* **adverse evidence."** *Tesoriero* [*v. Carnival
> Corp.*], 965 F.3d [1170,] 1184 [11th Cir. 2020] (emphasis added) (quotation
> omitted). This standard is more than mere negligence and aligns with both the text
> and advisory committee notes for Rule 37(e)(2). *See id.* at 1184–86; Rule 37(e)(2);
> 2015 Committee Notes on Rule 37(e)(2). The phrase "intent to deprive" naturally
> requires that the spoliator has a "purpose of hiding adverse evidence" from other
> parties. And the advisory committee notes explain that "intent to deprive" is more
> than negligence or even gross negligence. 2015 Committee Notes on Rule 37(e)(2).
> So rather than adopt a new law of spoliation from scratch for Rule 37(e)(2)
> sanctions, we will borrow our identical and well-trodden standard of "bad faith."
> *See also EEOC v. Jetstream Ground Servs., Inc.*, 878 F.3d 960, 965–66 (10th Cir.
> 2017) (conducting a similar analysis).

*Id.* (emphasis added). Parties may establish bad faith through circumstantial evidence. The Court

may analyze four factors outlined in this district by then Magistrate Judge Rosenbaum in *Calixto*

*v. Watson Bowman Acme Corp.*, 07-60077-CIV, 2009 WL 3823390, at \*16 (S.D. Fla. Nov. 16,

2009), which requires that: (1) at some point, evidence existed "that could fairly be supposed to

have been material to the proof or defense of a claim at issue[;]" (2) the nonmovant "took an

affirmative act causing the evidence to be lost[;]" (3) the nonmovant "did so while it knew or

should have known of its duty to preserve the evidence[;]" and (4) the "affirmative act" that caused

the loss "cannot be credibly explained as not involving bad faith by the reason proffered by the spoliator." Although *Calixto* preceded the modifications made to Rule 37(e) in 2015, the evidence at issue there was electronic in nature, and courts have applied these factors to both spoliation of physical evidence and ESI. *See Penick v. Harbor Freight Tools, USA, Inc.*, 481 F. Supp. 3d 1286, 1292 (S.D. Fla. 2020) (applying these factors to spoliation of physical evidence); *Matter of In re Skanska USA Civil Se. Inc.*, 340 F.R.D. 180, 188 (N.D. Fla. 2021) (applying these factors to spoliation of electronic documents); *Managed Care Sols., Inc. v. Essent Healthcare, Inc.*, 736 F. Supp. 2d 1317, 1331 (S.D. Fla. 2010) (same); *Alabama Aircraft Indus., Inc. v. Boeing Co.*, 319 F.R.D. 730, 743 (N.D. Ala. 2017), *aff'd*, No. 20-11141, 2022 WL 433457 (11th Cir. Feb. 14, 2022) (same).

Moreover, while the burden of establishing prejudice generally falls on the party seeking sanctions, the Court notes that Plaintiff will likely never be able to prove what was contained in the destroyed text messages, and that only Defendant, the party who engaged in the destruction, knows how much prejudice has been (potentially) caused. *See Alabama Aircraft Indus., Inc*., 319 F.R.D. at 743 (citing *Brown v. Chertoff*, 563 F. Supp. 2d 1372, 1379 (S.D. Ga. 2008) ("To require a party to show, before obtaining sanctions, that unproduced evidence contains damaging information would simply turn 'spoliation law' on its head.")). Indeed, the 2015 Advisory Committee Notes on Rule 37(e) addresses this very issue:

> The rule does not place a burden of proving or disproving prejudice on one party or the other. Determining the content of lost information may be a difficult task in some cases, and placing the burden of proving prejudice on the party that did not lose the information may be unfair. In other situations, however, the content of the lost information may be fairly evident, the information may appear to be unimportant, or the abundance of preserved information may appear sufficient to meet the needs of all parties. Requiring the party seeking curative measures to prove prejudice may be reasonable in such situations. The rule leaves judges with discretion to determine how best to assess prejudice in particular cases.

Fed. R. Civ. P. 37(e), 2015 Notes of Advisory Committee. Therefore, where there is evidence of bad faith in the destruction of evidence (including circumstantial), "it may be inferred that missing evidence was unfavorable and that there was prejudice." *Alabama Aircraft Indus., Inc.*, 319 F.R.D. at 743.

## DISCUSSION

As an initial matter, the undersigned will only consider spoliation sanctions for deletions that occurred from when Defendant received Plaintiff's Preservation Letter on October 29, 2024, and onwards. *See* Def.'s Dep. Tr. [ECF No. 120-1 at 333:14–334:18]; *see also* Preservation Letter [*id.* at 584–87]. Plaintiff also seeks sanctions for messages deleted before October 29, 2024, largely premised on the theory that Defendant should have reasonably anticipated litigation and known to preserve evidence based on statements made before the instant lawsuit. *See* [*id.* at 11:8–20, 93:6–94:1, 95:4–96:24]. However, such linkage too tenuous to support spoliation sanctions. *See* [*id.* at 90:5–91:8, 94:15–21, 95:14–20]. Namely, while messages were deleted before Defendant's receipt of the Preservation Letter, it is unclear when these deletions occurred and whether they were done while Defendant reasonably anticipated legal proceedings. *See Brantley v. Handi-House Mfg. Co.*, No. CV 617-089, 2018 WL 3384303, at *4–5 (S.D. Ga. July 11, 2018) (holding Defendants did not reasonably anticipate litigation where there was no "threat of litigation, preservation letter, or other communications . . . suggesting Plaintiffs were contemplating litigation."); *see also In re Elec. Mach. Enters., Inc.*, 416 B.R. 801, 873–74 (Bankr. M.D. Fla. 2009), *aff'd in part*, 474 B.R. 778 (M.D. Fla. 2012) (declining to impose spoliation sanctions "for actions taken at a time when the parties were under no duty to preserve evidence[.]").

While Plaintiff introduced exhibits of Defendant's 2022 and 2024 tweets referring abstractly and figuratively to legal action, this is not enough for the Court to infer Defendant

reasonably and literally anticipated the current litigation. *See* Ex. F [ECF No. 120-6]; *see also* Ex. E [ECF No. 120-5]. Plaintiff's citation to *Alabama Aircraft Industries, Inc.* is also unconvincing as it is factually dissimilar to this case. *See generally* 319 F.R.D. 730 (N.D. Ala. 2017). Indeed, the spoliation dispute in *Alabama Aircraft Industries, Inc.* involved two companies who had previously contracted together, had instituted a document preservation plan regarding sensitive information prior to the lawsuit, and documents and statements from the defendant's officers and lawyers explicitly indicated an expectation of litigation. *See id.*, at *734–42. Thus, the court found that the defendant had a duty to preserve evidence before the lawsuit was filed. *Id.*, at *742 ("Despite the fact that Boeing (1) should reasonably have anticipated litigation, and, in any event, (2) entered into an agreement to preserve Pemco-related ESI, Holden and Smith, [still] deliberately deleted the Pemco-related ESI from Blake's computer. And, they did so knowing that they were required to copy it onto disk and send it to the legal department."). This case is clearly different.

Further, as noted during the hearing, Plaintiff cannot pinpoint exactly when the deletions occurred. *See* Hr'g Tr. [ECF No. 118 at 60:6–64:18]. Rather, logic only dictates that the deletions occurred after the messages were received or sent. *See* [*id.* at 81:22–83:5, 84:6–7]. While this gives the Court a narrowed frame of reference for deletions that occurred post-Preservation Letter, when Defendant was on notice (discussed below), it does not give the Court enough evidence to impose sanctions on pre-Preservation Letter deletions which could have occurred anywhere from December 11, 2019, to when Defendant's phone was imaged. Therefore, the analysis is limited to deletions which occurred after Defendant's receipt of the Preservation Letter on October 29, 2024.

## I.     Rule 37(e) Preconditions

Rule 37(e) contains two general "preconditions: (1) electronically stored information that should have been preserved in the anticipation or conduct of litigation was lost because a party

failed to take reasonable steps to preserve it and (2) that information cannot be restored or replaced through additional discovery." *Skanska USA Civil Se. Inc.*, 75 F.4th at 1311 (internal quotes and citation omitted). Courts have interpreted these preconditions as requiring the movant to prove four threshold elements: (1) there must have been a duty to preserve ESI; (2) the ESI must have been lost or destroyed; (3) the ESI must have been lost due to a failure to take reasonable steps to preserve it; and (4) the ESI must not have been restorable or recoverable through additional discovery. *See DeMartino v. Empire Holdings & Invs., LLC*, No. 22-CV-14301, 2024 WL 712456, at *4 (S.D. Fla. Jan. 26, 2024), *report and recommendation adopted*, No. 22-14301-CIV, 2024 WL 707252 (S.D. Fla. Feb. 21, 2024) (citing *Akkasha v. Bloomingdales, Inc.*, No. 17-22376-CIV, 2019 WL 11215918, at *4 (S.D. Fla. Oct. 18, 2019)).

    (a) <u>Defendant had a duty to preserve ESI.</u>

A duty to preserve evidence arises "once litigation is pending or reasonably foreseeable." *Graff v. Baja Marine Corp.*, 310 F. App'x 298, 301 (11th Cir. 2009). As an initial matter, Defendant undoubtedly had a duty to preserve ESI related to this action the moment she received Plaintiff's Preservation Letter. *See Barton & Assocs., Inc. v. Liska*, No. 9:19-CV-81023, 2020 WL 8299750, at *1 (S.D. Fla. May 11, 2020) (noting defendant "was under a clear duty to preserve evidence" where defendant had "engaged in litigation[,]" and had been previously sent a preservation letter); *see also Swofford v. Eslinger*, 671 F. Supp. 2d 1274, 1278 (M.D. Fla. 2009) (noting duty to preserve based on "specific requests that evidence be preserved.")

As elicited during Defendant's deposition, Defendant received the Preservation Letter on October 29, 2024, indicating Plaintiff's intent to sue and instructions to retain a number of documents and information, including "[a]ny and all communications with or regarding Daystar Peterson" and "[a]ny and all communications with or regarding Sonstar Peterson." *See* Def.'s Dep.

Tr. [ECF No. 120-1 at 333:14–334:18]; *see also* Preservation Letter [*id.* at 584–87]. Defendant acknowledged she received the Preservation Letter on October 29, 2024, and understood that she was not to delete information related to the topics therein. Def.'s Dep. Tr. [ECF No. 120-1 at 333:14–334:18]. Therefore, from October 29, 2024, Defendant was on notice of litigation and had a duty to preserve documents and information related to the case as detailed in the Preservation Letter. *See Barton & Assocs., Inc.*, 2020 WL 8299750, at *1.

      (b) <u>ESI was lost or destroyed</u>.

Next, as noted during the hearing, it is not disputed that messages were erased or deleted from Defendant's phone after she received the Preservation Letter. *See* Hr'g Tr. [ECF No. 118 at 88:10–16]. Indeed, Plaintiff's expert testified at length regarding missing Row IDs from Defendant's phone corresponding to thousands of missing messages from the device after litigation began. *See e.g.*, [*id.* at 17:13–19:9, 21:21–22:8, 23:20–25:13, 63:19–64.10]. A number of these deleted text messages ostensibly related to this case and to the topics ordered to be retained in the Preservation Letter. *See* Def.'s Dep. Tr. [ECF No. 120-1 at 333:14–334:18]; *see also* Preservation Letter [*id.* at 584–87].

For example, the screenshots found in Defendant's "Recently Deleted" messages folder (Exhibit J and AA) show deleted messages from Sonstar Peterson. *See* Ex. J, AA [ECF Nos. 120-10, 20]. Plaintiff's expert testified that the screenshot was created on or around November 14, 2024, following Defendant's receipt of the Preservation Letter. Hr'g Tr. [ECF No. 118 at 122:9–15].

When asked about Exhibit J during her deposition, Defendant was unable to provide a reason why the messages from Sonstar appear in the recently deleted folder. *See* Def.'s Dep. Tr. [ECF No. 120-1 at 344:16–346:19]. While Defendant testified that she often goes on a trip in

November and sometimes deletes messages to make space in her phone for the trip, she stopped just short of stating that Sonstar's messages were deleted for such reason.[12] *See* Def.'s Dep. Tr. [ECF No. 120-1 at 345:22–346:5 ("Q: I think you are about to tell me that maybe you were creating space for – your show? A: I wouldn't say for certain. You just asked me what was kind of going on around that time. I don't– I don't know why.")]. When asked whether she remembered deleting texts from Sonstar she simply stated "No[.]" *See* [*id.* at 346:10–12]. And while she stated she never thought to purposefully delete messages from Sonstar, *see* [*id.* at 346:16–19], objective evidence of the deleted messages with no viable explanation from Defendant gives the Court reason to doubt the credibility of that statement. Indeed, though Defendant testified during her deposition that she stopped communicating with Sonstar following the commencement of the instant lawsuit, her phone records show differently. *See* [*id.* at 107:8–25]; *see also DeMartino*, 2024 WL 712456, at *6 (finding defendant's testimony regarding missing text messages unreliable where evidence showed selective preservation of messages by defendant). The deletions shown in Exhibit J and AA are enough to warrant spoliation sanctions in and of themselves.

Moreover, the temporal proximity of certain deletions to discovered communications between Defendant and Sonstar gives reason for the Court to believe that the deleted messages were related to this case. *See NuVasive, Inc. v. Absolute Med., LLC*, No. 6:17-CV-2206-CEM-LHP, 2023 WL 11910763, at *7 (M.D. Fla. Nov. 22, 2023) ("[N]otably, not *all* text messages were deleted from Defendants' cell phones. Rather, there [was] a gap in text messages during a timeframe . . . crucial to the issues in this case.") (internal citations and quotes omitted); *see also*

---

[12]   Even if Defendant did delete the messages as part of routine preparation for her trip, such conduct would not be "reasonable" as to avoid sanctions because she was still on notice of her duty to preserve such evidence. *See* Fed. R. Civ. P. 37(e) (allowing the imposition of sanctions where a party fails to take "reasonable" steps to preserve ESI evidence).

*Se. Mech. Servs., Inc. v. Brody*, 657 F. Supp. 2d 1293, 1299 (M.D. Fla. 2009) (finding it clear that evidence existed where it is "undisputed that Individual Defendants used their laptops and BlackBerries and that no emails, call logs, or calendar items from these devices were produced.").

Exhibit S and Exhibit T are prime examples of this. Exhibit S depicts four messages between Defendant and Sonstar on October 30, 2024, wherein Sonstar asks Defendant to call him twice. *See* Ex S [ECF No. 120-17]. FTI was able to identify gaps of 65 missing messages and 258 missing messages immediately following each of Sonstar's requests. *See* Hr'g Tr. [ECF No. 118 at 30:18–32:22, 33:10–18, 62:7–15]. Similarly, Exhibit T shows a message from Sonstar on November 6, 2024, again asking Defendant to call him. Ex. T [ECF No. 120-18]. FTI identified a gap of eighty-nine missing messages immediately following this text. Hr'g Tr. [ECF No. 118 at 35:4–15]. Plaintiff's expert also identified missing gaps of 576 and 246 messages preceding the Exhibit T text from November 5 to November 6, 2024. [*Id.* at 35:16–36:15].

Thus, based on the timing of the deletions, occurring immediately after or around the time Defendant received messages from Sonstar, the Court can infer that at least some of these messages would have been relevant to the case. *See Se. Mech. Servs., Inc.*, 657 F. Supp. 2d at 1300 ("[C]ourts must not hold the prejudiced party to too strict a standard of proof regarding the likely contents of the destroyed evidence because doing so allows the spoliators to profit from the destruction of the evidence.").

Lastly, as testified to by Plaintiff's expert and found in FTI's report, WhatsApp was active on Defendant's phone on several dates from 2023–2025 but was deleted from the device when FTI conducted its first imaging in April 2025. *See* Ex. M [ECF No. 120-13 at 3]; *see also* [ECF No. 118 at 44:10–49:2; 69:18–70:71]. Specifically, WhatsApp was active on two post-Preservation Letter dates: March 11, 2025 and March 18, 2025. *See* Ex. M [ECF No. 120-13 at 3]. While

25

WhatsApp appeared in the later backup of Defendant's device turned over in July 2025 containing six messages, these messages did not match the March 2025 usage dates and were sent or received after the first imaging. *See* [*id.* at 71:5–73:5, 76:15–77:10]. Any messages sent or received by Defendant on WhatsApp on March 11 and March 18, 2025, are likely lost unless a backup is found. [*Id.* at 48:11–49:2].

Further, Defendant testified during her deposition that she used WhatsApp to talk to Sonstar when he was out of town, but subsequently deleted the app. *See* Def.'s Dep. Tr. [ECF No. 120-1 at 336:10–338:25]. Defendant acknowledged that she regularly deletes the app and did not dispute that she had used WhatsApp between July 2023–March 2025 to speak with Sonstar. [*Id.*]. As such, the Court may infer ESI was lost that related to this case and likely involved topics Defendant was explicitly ordered to preserve. *See* Preservation Letter [ECF No. 120-1 at 586 (requiring the retention of "[a]ny and all communications with or regarding" Sonstar and Daystar Peterson).

(c)   The ESI was lost due to Defendant's failure to take reasonable steps to preserve it.

As to the third requirement, it is largely uncontested that Defendant failed to take reasonable steps to preserve the ESI. As noted above, Defendant admitted to deleting text messages and WhatsApp during her deposition. *See supra* § 1(b). Moreover, Defendant, when showed the FTI report showcasing thousands of deleted messages from 2019–2025, admitted she had no reason to doubt the accuracy of the report and the deletions. Def.'s Dep. Tr. [ECF No. 120-1 at 341:9–22]; *see also* Ex. M [ECF No. 13 at 6]. Defendant testified that she often deletes messages from her phone to make more room for storage. Def.'s Dep. Tr. [ECF No. 120-1 at 342:1–343:4]. While Defendant testified that she did not delete messages related to Plaintiff or this case, she also testified that she did not know why the texts from Sonstar were deleted and had no clear

explanation for the thousands of deleted messages following the receipt of the Preservation Letter. [*Id.* at 344:16–346:19].

Moreover, when asked whether she preserved messages relevant to this case, Defendant stated that she tried her best to keep messages she "felt like [were] important." *See* [*id.* at 343:18–24]. This is not good enough. *See Ahrens Enters., Inc. v. Winning*, No. 18-80650-CIV, 2019 WL 12520080, at *4 (S.D. Fla. Apr. 18, 2019) (imposing sanctions where "it was not for [defendant] to unilaterally decide what might or might not be relevant."); *DeMartino*, 2024 WL 712456, at *6 ("In the Court's view, parties cannot meet their Rule 37(e) obligations by selectively preserving evidence based on their own unilateral determinations of relevance."); *Wiegand v. Royal Caribbean Cruises Ltd.*, No. 19-CV-25100-DLG, 2021 WL 3934199, at *4 (S.D. Fla. Aug. 11, 2021) ("Denying Plaintiff's request for sanctions under the circumstances would create a dangerous precedent, allowing parties to destroy evidence based on their unilateral determination of its relevance prior to the issuance of a ruling on the discoverability or admissibility of the materials by the Court.")

Defendant was on notice to of her duty preserve **all** evidence related to this case, not just what she "felt" was relevant. *See* Preservation Letter [ECF No. 120-1 at 584–87]. She was specifically told to retain all communications with and related to Daystar and Sonstar. *See* [*id.*]. She failed to take reasonable steps to do so.

(d) The ESI is not restorable or recoverable through additional discovery.

Lastly, the missing text messages are likely not restorable or recoverable through additional practicable discovery. As testified to by Plaintiff's expert, the deleted messages are lost unless a backup is found. *See* Hr'g Tr. [ECF No. 118 at 48:11–49:2, 52:14–22]. While Defendant provided the July File backup which restored around 13,000 messages missing from the initial device image,

relevant text messages are still missing. Further, while Plaintiff has attempted to recover the deleted messages from Defendant and various providers[13], the continued search for thousands of messages does not appear to be an efficient expenditure of resources with trial deadlines looming. Nor is it practicable as it is unclear who some third-party recipients are and whether they would have preserved these messages. Defendant did not object to this element during the hearing, nor did she argue for a continued search of the ESI.

## II.     Bad Faith

Next, because Plaintiff seeks an adverse inference under Rule 37(e)(2), the Court must consider whether Defendant acted with "the intent to deprive" Plaintiff of the ESI. *See* Fed. R. Civ. P. 37(e)(2). The intent to deprive standard is equivalent to bad faith, which can be established through direct or circumstantial evidence. *See Calixto*, 2009 WL 3823390, at *16; *see also Matter of In re Skanska*, 345 F.R.D. at 188. In the absence of direct evidence of bad faith, the Court will consider whether Plaintiff established bad faith through circumstantial evidence.

To meet this burden, Plaintiff must establish the following four factors: (1) evidence once existed that could fairly be supposed to have been material to the proof or defense of a claim at issue in the case; (2) the spoliating party engaged in an affirmative act causing the evidence to be lost; (3) the spoliating party did so while it knew or should have known of its duty to preserve the evidence; and (4) the affirmative act causing the loss cannot be credibly explained as not involving

---

[13] Plaintiff represented she has sent third-party subpoenas to certain phone providers in attempts to recover some messages. *See* Hr'g Tr. [ECF No. 118 at 105:3–14]. However, the Court also notes that such subpoenas often run into roadblocks due to the Stored Communications Act ("SCA"), 18 U.S.C. § 2701 *et seq*., which prevents providers from disclosing the contents of electronic communications pursuant to a civil subpoena, barring statutory exceptions. *See Classic Soft Trim, Inc. v. Albert*, No. 618CV1237ORL78GJK, 2020 WL 6749836, at *3 (M.D. Fla. Sept. 21, 2020).

bad faith by the reason proffered by the spoliator. *See Calixto*, 2009 WL 3823390, at \*16. Here, Plaintiff has established bad faith and intent to deprive.

(a) <u>Evidence once existed that was fairly supposed to have been material to the proof of claim</u>.

The first element is met for the reasons stated in §§ 1(b) and 1(c). Text messages and WhatsApp data once existed that could be fairly supposed to be material to Plaintiff's claims that Defendant spread falsities about Plaintiff that she knew or should have known to be false and could be indicative that Defendant acted at the behest of Daystar and his affiliates. In at least one case, Defendant's messages with Sonstar—exactly the type of messages referenced in the Preservation Letter—were found in Defendant's recently deleted folder and subsequently deleted. *See* Hr'g Tr. [ECF No. 118 at 39:4–41:2]; Ex. J [ECF No. 120-10]; Ex. AA [ECF No. 120-20].

Moreover, Plaintiff was able to show gaps of thousands of missing text messages corresponding to conversations between Defendant and Sonstar after her receipt of the Preservation Letter. *See* Hr'g Tr. [ECF No. 118 at 30:18–32:22, 33:10–18, 62:7–15, 35:16–36:15, 36:22–39:1]. Though the Court and Plaintiff do not know exactly what these messages contained due to Defendant's spoliation, the timing allows the Court to infer that they in some manner related and were material to the issues in this case. *See Nuvasive, Inc.*, 2023 WL 11910763, at \*7; *see also Se. Mech. Servs., Inc.*, 657 F. Supp. 2d at 1300 ("[C]ourts must not hold the prejudiced party to too strict a standard of proof regarding the likely contents of the destroyed evidence because doing so allows the spoliators to profit from the destruction of the evidence."). The same can be said as to Defendant's deletion of WhatsApp, the app she admitted she used to communicate with Sonstar, which was deleted from her phone before FTI's April imaging. *See* Def.'s Dep. Tr. [ECF No. 120-1 at 336:10–338:25]; Hr'g Tr. [ECF No. 118 at 45:15–46:13].

Defendant cites to *Weber v. Carnival Corp.* for the proposition that deleted evidence must prove to be crucial to justify the imposition of sanctions. No. 20-20987-CIV, 2021 WL 3371913 (S.D. Fla. Aug. 3, 2021); *see also* [*id.* at 101:6–104:5, 113:21–23]. However, *Weber* involved non-ESI spoliation and used a pre-*Skanska* standard which largely mirrored Florida's spoliation standard. While Florida law may be used to consult the Court's analysis of spoliation, *see Floeter v. City of Orlando*, No. 605CV-400-ORL-22KRS, 2007 WL 486633, at *5 (M.D. Fla. Feb. 9, 2007), it is federal law and Rule 37(e)(2) that ultimately decides the issue. *See Weston*, 2025 WL 507456, at *7. Moreover, courts in this circuit have stated that Rule 37(e)'s prejudice requirement mirrors the requirement in "non-ESI spoliation cases that evidence be 'crucial' to the moving party's claims or defenses." *Matter of In re Skanska USA Civ. Se. Inc.*, 340 F.R.D. at 187. And sanctions under 37(e)(2) do not require a "further showing of prejudice." *See Skanska USA Civil Se. Inc.*, 75 F.4th at 1311. Rather, "the finding of intent required by [subdivision (e)(2)] can support not only an inference that the lost information was unfavorable to the party that intentionally destroyed it, but also an inference that the opposing party was prejudiced by the loss of information that would have favored its position." 2015 Committee Notes on Rule 37(e)(2). Therefore, as indicated here, Defendant's testimony and pattern of deletions indicate bad faith spoliation, inherently prejudicing Plaintiff.[14] *See Skanska USA Civil Se. Inc.*, 75 F.4th at 1311.

---

[14] The Court also disagrees with Defendant's contention that the imposition of sanctions here, without knowing what was in the deleted messages, would result in a "per se" spoliation ruling for "every case where there's a deleted message." Hr'g Tr. [ECF No. 118 at 103:16–22]. Defendant's interpretation risks the exact opposite situation. Namely, parties would be able to delete or destroy evidence and avoid sanctions by claiming the court and prejudiced party do not know the missing evidence to be "crucial." Indeed, "courts must not hold the prejudiced party to too strict of a standard of proof regarding the likely contents of the destroyed evidence because doing so allows the spoliators to profit from the destruction of the evidence." *Se. Mech. Servs., Inc.*, 657 F. Supp. 2d at 1300 (citing *Kronisch v. United States*, 150 F.3d 112, 128 (2d Cir. 1998)). Rather, the evidence surrounding the deletions—including Defendant's own deposition testimony—has given the Court enough reason to infer that the messages were unfavorable to Defendant and their

(b) <u>Defendant engaged in an affirmative act causing evidence to be lost</u>.

Next, Defendant does not convincingly argue that these deletions happened by accident or by some way other than Defendant herself. While Defendant attempted to lay foundation that the deletions could occur through errors transferring data from one phone to another, *see* Hr'g Tr. [ECF No. 118 at 54:17–58:16, 66:23–67:12], this argument is contrary to Defendant's own deposition testimony where she admitted that she deleted messages from her phone and that she had no reason to doubt FTI's report showing thousands of deleted messages, *see* Def's Dep. Tr. [ECF No. 120-1 at 341:9–22, 342:1–343:4]. And again, while Defendant claimed she did not delete messages relating to Plaintiff, she had no explanations for why she deleted messages from Sonstar, despite being under a duty to preserve those exact messages. [*Id.* at 344:16–346:19]. Her contention that she preserved messages related to Plaintiff that she "felt" were important is equally unconvincing. *See* [*id.* at 343:18–24]; *see also Ahrens Enters., Inc.*, 2019 WL 12520080, at *4; *DeMartino*, 2024 WL 712456, at *6; *Wiegand*, 2021 WL 3934199, at *4.

(c) <u>Defendant engaged in the affirmative act when she knew of her duty to preserve the evidence.</u>

As explained in § 1(a), Defendant undoubtedly had a duty preserve evidence related to this case and was explicitly notified of such duty on October 29, 2024, when she received the Preservation Letter. *See* Def.'s Dep. Tr. [ECF No. 120-1 at 333:14–334:18]. The Preservation Letter specifically outlined that she was to retain "[a]ny and all communications with or regarding" Daystar Peterson and Sonstar Peterson. *See* Preservation Letter [*id.* at 584–87]. Despite this knowledge and notice, Defendant deleted messages, including those directly with Sonstar. *See*

---

absence is prejudicial to Plaintiff. *See Brown*, 563 F. Supp. 2d at 1379 ("To require a party to show, before obtaining sanctions, that unproduced evidence contains damaging information would simply turn 'spoliation law' on its head.").

Def.'s Dep. Tr. [ECF No. 120-1 at 341:9–22]; Ex. J [ECF No. 120-10]. Similarly, she deleted WhatsApp multiple times during this litigation period, which she used to communicate with Sonstar. Def.'s Dep. Tr. [ECF No. 120-1 at 336:10–338:25].

(d) <u>The affirmative act cannot be credibly explained as not involving bad faith.</u>

Lastly, Defendant had no explanation during her deposition, nor did her counsel during the hearing, for these deletions. Rather, when asked about the November texts, Defendant simply responded that she did not know why they were deleted. *See* Def.'s Dep. Tr. [ECF No. 120-1 at 346:6–12]. She provided no other explanation. [*Id.*]. And while she stated she did not delete messages from Sonstar, she simultaneously did not know how or why Sonstar's texts were in her "Recently Deleted" folder. [*Id.* at 346:6–19]. Defendant's lack of a credible explanation for her actions gives the Court no other avenue than to infer that the deletions were made purposefully and knowingly. *See Matter of In re Skanska*, 340 F.R.D. at 189 ("The Court finds the lack of any cogent explanation for these failures, other than 'oops,' points to one answer – [the party] acted in bad faith."); *see also Swofford*, 671 F. Supp. 2d at 1284 (imposing adverse inference for destruction of laptop computer and finding "no cogent, benign explanation for the failure to exempt [the] computer from that routine purging of old computers in light of the preservation demand.").

Ultimately, the undersigned finds that Defendant acted with intent to deprive when she chose to delete the relevant messages and data. *See* Def.'s Dep. Tr. [ECF No. 120-1 at 341:9–22, 342:1–343:4 (discussing Defendant's deletion of messages)].  Here, like in other similar cases, Defendant "had both the motive and opportunity" to either preserve and collect her messages data, or delete it. *See Se. Mech. Sevcs., Inc.*, 657 F. Supp. 2d at 1300. Defendant chose the latter.

Indeed, how "crucial" these messages are is something only Defendant will ever know, which is precisely the issue. *See Pac. Coast Marine Windshields Ltd. v. Malibu Boats, LLC*, 2012

WL 10817204, at *10 (M.D. Fla. Nov. 30, 2012) (*citing Taylor v. Mitre Corp.* 2012 WL 5473715 (E.D. Va. Sept. 10, 2012) ("As a result of Plaintiff's intentional spoliation of relevant evidence, it would be impossible for this Court to ensure that the most relevant facts were being presented and for Defendant to be sure they were presenting their strongest defense. In fact, it would be impossible for this Court to conclude that the trier of fact were being presented the truth.")). Therefore, sanctions are warranted.

### III.   Sanctions

As discussed above, there are two types of sanctions available under Rule 37(e). First, under Rule 37(e)(1), if the adverse party has suffered prejudice from the spoliation of evidence, the court may order whatever sanctions are necessary to cure the prejudice. Fed. R. Civ. P. 37(e)(1) Second, under Rule 37(e)(2), if the Court finds the party "acted with the intent to deprive another party of the information's use in the litigation," the Court may order more severe sanctions, including an instruction to the jury that it "may or must presume the information was unfavorable to the party." Fed. R. Civ. P. 37(e)(2).

Here, Plaintiff seeks an adverse inference. *See* Hr'g Tr. [ECF No. 118 at 99:13–100]. "[T]he determination of an appropriate sanction ... is assessed on a case-by-case basis." *Optowave Co., Ltd. v. Nikitin*, 2006 WL 3231422, at *12 (M.D. Fla. Nov. 7, 2006) (citing *Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 430 (S.D.N.Y. 2004)). "Factors to be considered when determining the seriousness of the sanctions to impose against a party for failure to preserve critical evidence in its custody vary according to (1) the willfulness or bad faith of the party responsible for the loss or destruction of the evidence; (2) the degree of prejudice sustained by the opposing party; and (3) what is required to cure the prejudice." *St. Cyr v. Flying J. Inc.*, 2007 WL 1716365, at *4 (M.D.

Fla. June 12, 2007) (finding adverse instruction sanction sufficient to cure prejudice over destroyed van).

(a) <u>Adverse Inference</u>.

Here, for the reasons stated above, the Court finds that an adverse inference is appropriate to cure the spoliation of messages and data from Defendant's phone. There are different types of adverse inferences, each within increasing levels of harshness based on the nature of the spoliation.

The harshest type of inference instructs the jury that certain facts are deemed admitted and must be accepted as true. *Matter of In re Skanska*, 340 F.R.D. at 191. A second type results in the imposition of a mandatory, but rebuttable, presumption. *Id.* The least harsh adverse inference allows the jury to presume that the lost evidence is relevant and favorable to the innocent party. *Id.* This latter type of adverse inference also allows the jury to consider the spoliating party's rebuttal inference and gives the choice of whether to draw an adverse inference. *Id.*

Here, Plaintiff requests an unrebuttable adverse inference as follows:

A party to a lawsuit, such as the Defendant, has a legal duty to retain and preserve paper and electronic communications and other documents that concern the case. This includes, among other things, all electronically stored information in one's possession, custody, or control such as emails, text messages, and other communications stored on applications on one's phone, computer, or in the cloud.

The day before Plaintiff filed this lawsuit, her attorneys formally notified Defendant that Plaintiff was going to file the case and that she had these retention and preservation duties.

Despite this written notice, and these underlying legal duties, Defendant deleted several thousand text message, emails, and chats from her phone and her WhatsApp and Discord accounts.

In reaching your verdict, you should assume and infer that the documents that Defendant deleted would have shown that her statements about Plaintiff that are at issue in this case were false and that Defendant either knew them to be false when she made them, or had serious doubts about whether they were true when she made them

34

As explained in detail above, the undersigned notes the severity and seriousness of the spoliation that has taken place here, and Defendant's lack of cogent explanation for the same. However, Plaintiff's proposed adverse inference requires the Court to assume facts that have not been proffered by the evidence—namely that the spoliated messages would have explicitly shown Defendant's statements were false and Defendant knew or should have known them to be false. *See Snider-Hancox v. NCL Bahamas Ltd*., No. 17-20942-CIV, 2019 WL 13020785, at *1 (S.D. Fla. May 22, 2019) (altering proposed adverse inference that the court found "too severe and one-sided.").

Rather, the undersigned finds that the following adverse inference is appropriate based on the evidence at the hearing:

> A party to a lawsuit, such as the Defendant, has a legal duty to retain and preserve paper and electronic communications and other documents that concern the case. This includes, among other things, all electronically stored information in one's possession, custody, or control such as emails, text messages, and other communications stored on applications on one's phone, computer, or in the cloud.
>
> The day before Plaintiff filed this lawsuit, her attorneys formally notified Defendant that Plaintiff was going to file the case and that she had these retention and preservation duties.
>
> Despite this written notice, and these underlying legal duties, Defendant deleted thousands of text messages and removed the WhatsApp app from her phone that potentially contained messages and chats.
>
> In reaching your verdict, you should assume and infer that Defendant intended to deprive Plaintiff of the evidence in the deleted messages and chats, that at least some of the deleted messages related to the claims in this case and were about Plaintiff, and that these deleted messages were unfavorable to Defendant.

The above adverse inference is based on the information provided during the evidentiary hearing regarding the nature of the deleted evidence. Namely, the undersigned may infer that the deleted messages were related to Plaintiff and the claims. *See Matter of In re Skanksa*, 340 F.R.D. at 191 (imposing an adverse inference that missing ESI was relevant and unfavorable).

As the Court continues to receive information before and during trial, including more evidence of what may have been contained in the deleted messages, the District Judge may choose to alter or amend the above instruction at her discretion. *See id.* ("Thus, while the Undersigned finds these adverse inferences to be an appropriate sanction based on the present record, they are subject to the trial court's discretion and the trial court's determination[.]"); *Se. Mech. Servs., Inc.*, F. Supp. 2d at 1302 (leaving wording of adverse inference to trial court's discretion).

(b) <u>Monetary Sanctions</u>

In addition to the adverse inference, the undersigned finds that monetary sanctions are also warranted. *See Matter of In re Skanska*, 340 F.R.D. at *191. Defendant shall pay Plaintiff the reasonable amount of fees and costs incurred to bring the spoliation issue to the Court's attention, including the costs incurred as a result of the evidentiary hearing.

## IV.   <u>Defendant's Notice of Hearing</u>

Lastly, the undersigned must address the objections Defendant raised before and during the hearing regarding notice.

As stated before, the parties had been aware of the potential for spoliation proceedings since at least Plaintiff's July 11, 2025, Notice of Discovery Issues and the July 14, 2025, discovery hearing. *See* Notice [ECF No. 90]; *see also* Disc. Hr'g Tr. [ECF No. 97 at 24:5–20, 28:7–23].  On Tuesday, July 29, 2025, Plaintiff emailed the Court renewing her request for spoliation sanctions, citing new discovery pointing to "blatant and rampant spoliation." Plaintiff's counsel indicated they had conferred with Defendant's counsel that morning on the issue and was planning on continuing conferral efforts on the morning of July 31, 2025. Defendant's counsel emailed the Court that same night, July 29th, informing the undersigned that she would not be available for a hearing until at least August 6, 2025.

On Thursday, July 31, 2025, Plaintiff emailed the Court, detailing new evidence of purported spoliation, and again renewing the request for spoliation sanctions. This included new information found from FTI's analysis of Defendant's backup hard drive, and Defendant's testimony from her deposition. Plaintiff's counsel also stated that no meaningful conferral had yet occurred, as both of Defendant's attorneys had been unavailable and "did not understand the rush in meeting and conferring."

Plaintiff also attached an email thread to the July 31st correspondence, detailing messages between the parties and FTI extending back to May 5, 2025. From this attached thread it appears that FTI updated the parties on July 25, 2025, of their findings from the review of the backup drive. Thereafter, on July 28, 2025, Plaintiff's counsel reached out to Defendant's counsel indicating the intent to renew the spoliation request and asking to meet and confer multiple times. Defendant's counsel reiterated they were unavailable and did not see the need for an expedited hearing on the matter.

On Friday, August 1, 2025, the Court informed the parties by email that it would hear the spoliation issues during an in-person hearing on August 6th or August 7th and requested counsels' preference based upon their availability. On Monday, August 4, 2025, the Court informed the parties that it had set an in-person evidentiary hearing for August 7th, at 9:30 a.m. On August 5, 2025, the Court apprised the parties that it had set aside two hours for the hearing.

On August 6, 2025, the day before the hearing, Defense counsel forwarded the Court an email thread between the parties detailing a meet and confer call that purportedly took place on either August 4th or August 5th, and requesting the evidentiary hearing be moved based on a purported stipulated extension of fact discovery.[15] Plaintiff objected. The Court reminded the

---

[15] The Court notes that the meet and confer summary proposed an extension for **third-party**

parties that Plaintiff had renewed its request for an evidentiary hearing more than a week prior on

July 29th, and that Defense counsel had previously represented to the Court in her July 29th email

that she would be available for an evidentiary hearing after August 6th. Therefore, considering

impending case deadlines, the hearing would proceed as set.

With respect to Defendant's expert witness, Defense counsel later at 5:12 p.m. on August

6th, forwarded an email thread indicating that Defendant's expert would be unable to testify in-

person at the hearing the next day.[16] Notably, Defendant did not proffer their expert's opinion on

the missing text messages at the evidentiary hearing and have yet to make a proffer. Moreover, the

---

**discovery**, not fact discovery as a whole.

[16] Defense counsel referenced this email during the hearing and stated that they had requested
Defendant's expert to appear via Zoom, but did not hear back from the Court. *See* [ECF No. 86:18–
88:2, 113:24–114:14]. Putting aside the fact that Defense counsel did not apprise the Court of their
expert's unavailability until the evening before the hearing, the Court notes that counsel did not
actually make a request in the email for the expert to appear via Zoom.

Indeed, the email thread forwarded to the Court shows that Defendant's expert informed Defense
counsel on August 6th at 2:02 p.m. that he would be unavailable to attend the hearing in-person
but would be able to attend via Zoom. The expert requested that counsel ask the Court if he would
be able to appear via Zoom. Counsel forwarded this thread to the Court, but in the message to the
Court simply stated:

> Unfortunately, our expert witness isn't available.  As I said, I did not contemplate
> a full-blown production with 10 people and expert witnesses presenting when I
> said I could be available on the 6th or 7th.  It was not presented as a two-hour
> hearing. At most, I expected them to present a report. This is unduly prejudicial.  I
> will make sure to note my objections on the record.

Nowhere in the message to the Court does counsel actually request for the expert to appear via
Zoom. The Court will not infer a request where none is explicitly made.

Moreover, counsel stated during the hearing that she was told that "nothing could be done via
Zoom." [*Id.* at 114:8–9]. It is unclear where counsel received this information from, but that is not
correct, and such requests are considered by the Court on a case-by-case basis.

fact that the text messages were missing was fully explored at Defendant's July deposition and that the messages are in fact missing is not in dispute.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff's request for spoliation sanctions is **GRANTED** as follows:

1.     Plaintiff is entitled to submit the following jury instruction at trial, pending any alteration or amendment the District Court Judge deems necessary:

> A party to a lawsuit, such as the Defendant, has a legal duty to retain and preserve paper and electronic communications and other documents that concern the case.  This includes, among other things, all electronically stored information in one's possession, custody, or control such as emails, text messages, and other communications stored on applications on one's phone, computer, or in the cloud.

> The day before Plaintiff filed this lawsuit, her attorneys formally notified Defendant that Plaintiff was going to file the case and that she had these retention and preservation duties.

> Despite this written notice, and these underlying legal duties, Defendant deleted thousands of text messages and removed the WhatsApp app from her phone that potentially contained messages and chats.

> In reaching your verdict, you should assume and infer that Defendant intended to deprive Plaintiff of the evidence in the deleted messages, that at least some of the deleted messages related to the claims in this case and were about Plaintiff, and that these deleted messages were unfavorable to Defendant.

2.     The Parties shall meet and confer within five days of entry of this Order as to a reasonable amount of fees and costs that Plaintiff incurred by having to bring this spoliation issue to the Court's attention, including costs incurred as a result of the evidentiary hearing. If the Parties cannot agree, then within ten days of entry of this Order, Plaintiff shall bring the matter to the undersigned's attention by contacting chambers to provide the

undersigned with the amount requested, along with the time entries establishing the amount. Defendant shall then have five days thereafter to respond.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 9th day of October 2025.

_____
LISETTE M. REID
UNITED STATES MAGISTRATE JUDGE


Copies furnished to:  All Counsel of Record