**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

MEGAN PETE, an individual,

*Plaintiff,*                                          Civil Action No. 1:24-CV-24228-CMA

v.

MILAGRO ELIZABETH COOPER,
an individual,

*Defendant.*

_____

**PLAINTIFF MEGAN PETE'S**
**MOTION FOR ENTRY OF PERMANENT INJUNCTION AGAINST**
**CYBERSTALKING PURSUANT TO SECTION 784.0485, FLORIDA STATUTES**

## I.     PRELIMINARY STATEMENT

Plaintiff Megan Pete ("Plaintiff" or "Ms. Pete") hereby moves, pursuant to Federal Rule of Civil Procedure 65 and Section 784.0485, Florida Statutes, for the entry of a permanent injunction against Defendant Milagro Cooper ("Defendant").

Defendant's retaliatory cyberstalking campaign has caused substantial emotional distress to Ms. Pete and put her in reasonable fear for her physical safety and health.  A Permanent Injunction Against Cyberstalking is warranted in light of Defendant's repeated attempts to interfere with the administration of justice in relation to Ms. Pete's reporting of, and proceedings arising from, a violent assault on Ms. Pete; Defendant's willingness to retaliate against those who engage in essential speech related to the reporting of crimes and tortious conduct; and Defendant's continued harassing conduct since the verdict in this case, which demonstrates that she lacks respect for the rule of law and that only injunctive relief will be effective in this context where Defendant otherwise claims to be judgment-proof.  An injunction is essential to protect Ms. Pete against the threat of harm posed to her safety and well-being by Defendant's conduct, and would be consistent with the jury's findings of defamation *per se*, intentional infliction of emotional distress ("IIED"), and promotion of an altered sexual depiction in violation of Section 836.13, Florida Statutes.  ECF No. 226.  An injunction is further warranted because the conduct engaged in by Defendant serves no legitimate purpose, as such forms of cyberstalking and victim and witness retaliation are barred under state and federal criminal laws.[1]

Ms. Pete will continue to suffer irreparable harm if Defendant is permitted to further stalk, bully, and harass Ms. Pete, and to further incite Defendant's "mob" of followers, who has been primed over the last five years with hateful rhetoric directed at Ms. Pete.  There is no legitimate purpose to Defendant's speech; it is wholly unprotected and indeed encroaches on state and federal criminal statutory bars—due not only to the underlying cyberstalking conduct, but also to the obstructive and retaliatory conduct that has sought to punish Ms. Pete and anyone who supports her as a victim and witness.  In support of this motion, Ms. Pete relies on and incorporates the testimony of record, all admitted trial exhibits, and Ms. Pete's previously filed Petition for an

---

[1] *See, e.g.*, 18 U.S.C. § 2261A(2)(A)-(B) (federal cyberstalking); 18 U.S.C. § 1513(c) (federal witness retaliation); Cal. Penal Code § 136.1 (dissuading or intimidating a witness or victim); Fla. Stat. § 914.22 (tampering with or harassing a witness, victim, or informant).

Injunction Against Cyberstalking. *See* Appendix A, ECF No. 37-1. Ms. Pete respectfully requests a narrowly tailored permanent injunction, as set forth in the attached Proposed Order.

## II.    FACTUAL BACKGROUND

### A.    Defendant Coordinates With Convicted Felon Daystar Peterson To Harass Ms. Pete

Defendant's campaign of harassment and cyberstalking stems back to July 2020, when Ms. Pete was shot by Mr. Daystar Peterson (aka Tory Lanez) with a semiautomatic weapon and sustained serious injuries to her feet. In September 2020, just two months after the shooting, Mr. Peterson sent an Instagram direct message to Defendant, asking for her phone number. *See* Trial Ex. J-47 (Defendant's Sept. 2020 Instagram direct message with Mr. Daystar Peterson). Defendant not only shared her phone number, but also responded, "Idk how you're doing your live tonight, but if you gave me that or any exclusive it'd change my life." *Id.* Around the same time, Mr. Peterson's father, Sonstar Peterson, sent a separate Instagram direct message, asking to speak to Defendant "off the record." Trial Ex. J-48 (Defendant's Instagram direct message with Mr. Sonstar Peterson). Defendant promised to "without a doubt keep … [her] lips sealed." *Id.* And such marked the genesis of a carefully coordinated scheme between Defendant and the Petersons over the past five years to obstruct justice—that is, to attempt to falsely exonerate Mr. Peterson by retaliating against Ms. Pete, smearing Ms. Pete's reputation, and casting doubt on her testimony as the victim of a violent crime. By enlisting Defendant to carry out this illicit and retaliatory campaign, Mr. Peterson circumvented his criminal protective and gag orders that barred him from talking about his criminal case or harassing Ms. Pete. Meanwhile, Defendant was compensated for her role in the concerted action to retaliate against Ms. Pete—receiving payments of at least $3,000 from the Petersons, securing exclusive interviews, and securing other financial gain from defaming Ms. Pete, who was featured repeatedly on Defendant's platforms. *See* Milagro Cooper, Trial Tr. 178:19–179:12, Nov. 18, 2025 (acknowledging Mr. Peterson's father paid her "$3,000 … over the course of about 17 or so months" for "birthdays" and "promotion services"); *id.* at 23:10–12 ("I was excited about the idea of the exclusive interview because that's what I imagined that it would be about."); Milagro Cooper, Trial Tr. 257:16–17, Nov. 24, 2025 (Defendant's excitement regarding interview with Sonstar); Amiel Holland-Briggs, Trial Tr. 30:12–14, Nov. 20, 2025 ("It was almost a daily segment [about Ms. Pete], to be honest with you.").

In December 2022, Mr. Peterson was tried and convicted of three felony counts for shooting Ms. Pete. He now serves a 10-year prison sentence. Despite attending every day of Mr. Peterson's criminal trial, Defendant continued to spread disproven theories as to Ms. Pete's injuries and continued to falsely accuse her of lying on the stand.[2]

**B.      The Evidence At Trial Leads The Jury To Render A Complete Verdict Against Defendant Based On Her Harassment Of Ms. Pete**

**1.      Defendant Causes Ms. Pete Severe Emotional Distress And Fosters A Community Directed At Harassment**

After a nine-day jury trial before this Court, the jury expressly found that Defendant falsely accused Ms. Pete of the crime of perjury—a felony—by lying under oath. *See* ECF No. 226. Due to Defendant's defamatory statements, Ms. Pete testified about how people began seeing her "as somebody that would lie and say [she] was shot for no reason just to see somebody suffer." Megan Pete, Trial Tr. 170:6–7, Nov. 20, 2025. The purpose of these false allegations was wholly retaliatory following Ms. Pete's complaint and testimony against Mr. Peterson.

Defendant has long weaponized social media to intimidate, bully, and incite violence against Ms. Pete by continually posting and streaming about Ms. Pete to her audience, which included not just her social media followers but also expanded to followers of anyone who liked, commented on, or re-posted her statements. Prior to this civil trial, the Court entered an Order Governing Pretrial Publicity on June 10, 2025, in part to prevent Defendant from continuing to spread misinformation about Ms. Pete and her case against Defendant. *See* ECF No. 86. In issuing the Order Governing Pretrial Publicity, Judge Reid considered Defendant's harassment of a deponent and future trial witness, Amiel Holland-Briggs. *See* Plaintiff's Counsel, Status Conference Tr. 31:19–24, June 4, 2025 ("[Defendant] has gone after a deponent in this case. He testified, gave us some very important information that goes to whether the defendant knew her statements about Ms. Pete were false. She's attempting to intimidate him and say horrible things about him in her social media posts, using pretty vile language, frankly, that I'm not going to

---

[2]      *See* Milagro Cooper, Trial Tr. 89:4–13, Nov. 18, 2025 (acknowledging she was "sitting in court every day and taking detailed notes"); Trial Exs. J-25 (Defendant's livestream claiming to be one of four women sitting on Tory's side of the courtroom "as family"), J-343, J-344, J-345 (Defendant's handwritten criminal trial notes); *see also* Trial Exs. J-133 ("All this case taught anyone was that your father, brother, cousin, or son could face over 20 years in prison … just because non credible witnesses said you did something."), J-501 ("The only person that lied to you is the person that you upset with me about … I could go down the list of all the different shit that was not true"), J-38 ("Was Megan Thee Stallion caught trying to deceive the courts again?").

repeat."); *see also* Appendix B, Defendant's May 24, 2025 @NewMediaaaa deleted X post ("This n**** [Holland-Briggs] just wants to hurt me.  It's a shame he's wasting the courts time w/ complete lies.  Never.").  This obstructive conduct during the instant case highlights Defendant's flagrant disrespect for the justice system and the courts.

This harassment and cyberstalking resulted from Defendant's colluding with Ms. Pete's assailant to retaliate against Ms. Pete and to perpetuate a false narrative regarding the criminal assault on Ms. Pete.  This was accomplished by Defendant intentionally spreading lies and material falsehoods, and her repeatedly attempting to undermine and discredit Ms. Pete's truthful allegations of a violent and horrific assault.  *See, e.g.*, Megan Pete, Trial Tr. 133:10–12, Nov. 20, 2025 ("Every time that she would go live talking about [Tory], she'll basically say that she got her information from . . .  him or his family."); *id.* at 135:20–22 ("People still think that Tory did not shoot me because Milagro tweeted that his DNA was not on the gun and that's not true."); Megan Pete, Trial Tr. 15:13–14, Nov. 24, 2025 ("Every one of Tory's narratives that works in his favor has come from Milagro.").  This collusion between Defendant and Mr. Peterson—the man who shot Ms. Pete—interfered with Ms. Pete's livelihood, traumatized Ms. Pete, and caused her severe emotional distress.  *See* Dr. Lenore Walker, Trial Tr. 151:6–9, Nov. 19, 2025 ("I think that one of the serious triggers for Ms. Pete is not letting her heal from the trauma of the shooting incident was her belief that Mr. Peterson was continuing to be angry and want to hurt her and was using Ms. Cooper to do that.").  The severe emotional distress that Ms. Pete suffered at the hands of Defendant also impacted her livelihood and her personal and professional relationships, even costing her business deals.  *See* Daniel Kinney, Trial Tr. 100:3–9, Nov. 19, 2025 ("At the time, there had been a lot of negative social media chatter directed at Megan … She had posted on social that she was going to be stepping away for a bit from her social media and from the public eye.  And as soon as [the representatives of the Just Eats Takeaway deal] saw that, they immediately flagged it because they were worried and what it would mean to their campaign."); *id.* at 90:2–10 (testifying that Ms. Pete lost brand deals for Activision, Google Pixel, Just Eats Takeaway, and the U.S. Women's Soccer Team).

The message throughout the entire cyberstalking campaign was clear: to retaliate against Ms. Pete for reporting Mr. Peterson's crimes to law enforcement.  Indeed, Defendant's promotion of Mr. Peterson's "CAP" music video, in which Mr. Peterson severs a horse's leg with a bloody butcher's knife, reflects her trivialization of Ms. Pete's harm.  *See* Trial Ex. J-15 (Defendant's

4

Mar. 12, 2022 X posts connecting the "CAP" video to Ms. Pete).  Moreover, Defendant's posts demonstrate her ability to stoke hate and harassment against Ms. Pete among her followers and vast audience, whom she refers to as her "mob."  Defendant clearly and unequivocally, on repeated occasions, threatened to and did turn this "mob" on Ms. Pete, for no reason other than that Ms. Pete had sought to ensure that her violent assailant be held accountable and brought to justice.  At trial, Ms. Pete testified about how Defendant's posts making light of violent scenes from the music video "created a space" for people to "laugh" and "joke" about threats made to her life.  Megan Pete, Trial Tr. 139:22–140:8, Nov. 20, 2025 ("When I saw her tweeting the screenshots from the video, like I said, I just felt -- I felt confused. . . . I don't understand how or why she thought it was funny and I was really sad because I feel like the people that tune in to her -- like, she's created a space for a lot of people to come speak negatively about me … I am seeing people, you know, continue to joke about the fact that this man is clearly threatening me in his music video.").  The bloodied horse's leg served as a crude and threatening metaphor for what Defendant and Mr. Peterson were willing to do to Ms. Pete as a result of her speaking up as a victim of a violent crime.

Defendant is aware of the influence she wields.  *See* Trial Ex. J-486 (Defendant's June 9, 2024 livestream, "But I'm too influential now, is what I've come to realize.").  Defendant amassed this influence by building a social media and streaming business targeting Ms. Pete.  *See* Megan Pete, Trial Tr. 17:24–18:1, Nov. 21, 2025 ("She is famous because of talking about Megan Thee Stallion in the Tory Lanez's case. . . . She got famous and known for trashing me.").  Defendant acknowledged that she has been speaking about Ms. Pete on her platforms for the past five years, allegedly due to "new development, new documents … new tips, new this, new that, that caused it to be an ongoing conversation, an ongoing like point of interest for the public."  Milagro Cooper, Trial Tr. 103:11–14, Nov. 25, 2025.  In operating numerous social media platforms—including YouTube, Instagram, Twitter, Kick, and Stationhead—"[a]t least five days a week," Defendant's statements have spread far and wide.  Milagro Cooper, Trial Tr. 74:22–75:4, Nov. 24, 2025.  Her statements have incited further hate and threats against Ms. Pete, especially among her "cult-like" following.  Amiel Holland-Briggs, Trial Tr. 28:14–29:14, Nov. 20, 2025.

Defendant's conduct had a lasting impact on Ms. Pete's mental and emotional well-being, thereby further interfering with her livelihood.  At trial, Ms. Pete testified about how years of harassment left her feeling "tired of being alive."  Megan Pete, Trial Tr. 177:22–178:11, Nov. 20, 2025 ("But on my other days, since she's first started speaking about me, it was a time that I

5

genuinely did not care if I live or died. . . . If she could link up with Tory and he tell her what to say and she just -- she does it and everybody believes it, I felt like no -- no way I mattered, no way I even need to feel to be existing.  I don't feel like existing anymore, I don't want to be here.  I am tired of -- I am tired of waking up, I -- I didn't care what happened to me.  I just wanted to die.  I was so tired of being alive.").  In fact, Ms. Pete testified as to how she even believed that Defendant "wants me to kill myself." *Id.* at 178:15.  Ms. Pete's manager, Mr. Travis Farris, likewise testified about the length and severity of Defendant's cyberstalking—nonstop for five years and so egregious that Defendant could find herself in "the Guinness Book of World Records of hating." Travis Farris, Trial Tr. 67:18–21, Nov. 19, 2025.  In the face of this overwhelming evidence of the severe emotional distress suffered by Ms. Pete, the jury found Defendant liable for intentionally inflicting emotional distress.

> **2.**     **Defendant's Harassment Of Ms. Pete Includes Lies About Her Mental State, Family, And Alcohol Consumption**

Defendant's harassment campaign has not been limited to statements and conduct concerning the shooting; rather, the retaliatory harassment is broad and far-reaching.  Defendant has spewed spiteful and derogatory comments about Ms. Pete, including making unfounded accusations regarding Ms. Pete's mental capacity and alcohol consumption.  *See, e.g.*, Trial Exs. J-53 (Defendant's Oct. 12, 2024 livestream claiming Ms. Pete "is actually mentally retarded"), J-135 (Defendant's Jan. 29, 2024 X post alleging that Ms. Pete's manager Travis Farris is her guardian), J-278 (Defendant's July 30, 2024 livestream questioning whether Ms. Pete has a guardian, has "been listed as a capable person," or "ever been deemed like legally retarded"), J-282 (Defendant's Oct. 12, 2024 livestream asserting that Ms. Pete "goes through [a] mental health crisis" due to guilt), J-266 (Defendant's Oct. 30, 2024 livestream alleging "drinking and all of this like seemingly running through … [Ms. Pete's] family"), J-269 (Defendant's Oct. 30, 2024 livestream claiming that Ms. Pete may have "a drinking problem"), J-297 (Defendant's Aug. 1, 2024 livestream asserting that Ms. Pete was "drinking all that motherfucking liquor, looking like a broke dick dog").

Defendant's incessantly false and hateful speech, which enjoys no First Amendment protection, extends to Ms. Pete's family.  Defendant has falsely reported to her wide audience (the "mob") that Ms. Pete's parents and grandparents were criminal thieves and drug addicts.  *See* Megan Pete, Trial Tr. 31:16–21, Nov. 24, 2025 ("It's not just about Tory Lanez shooting me . . . It

is about Milagro trying to dig up information about my deceased family members."); *see also* Megan Pete, Trial Tr. 147:4–10, Nov. 20, 2025 (discussing Defendant's commentary on Ms. Pete's deceased grandfather); *id.* at 147:11–148:6 (discussing Defendant's accusations that Ms. Pete's deceased mother was a thief); *id.* at 148:7–12 (discussing Defendant's accusations that Ms. Pete's deceased father was a drug addict).  The myriad of lies and hateful accusations revealed at trial that there is no line Defendant is not willing to cross to harm Ms. Pete.

### 3.    Defendant Promotes A Deepfake Pornographic Video Of Ms. Pete

Defendant's disturbing fixation on retaliating against Ms. Pete is perhaps best reflected in her willful and malicious promotion, as found by the jury, of the deepfake pornographic video— which was distributed without Ms. Pete's consent and with knowledge that the video did not depict real events.  *See* ECF No. 226; *see also* Trial Exs. J-36 (Defendant's June 8, 2024 X post, "Go to my likes"), J-30 (Defendant's June 8, 2024 X post admitting that she directed individuals to the deepfake video "so that people could see the video another x user posted"), J-34 (Defendant's June 8, 2024 livestream that the video "has got to be AI 'cause I know this bitch is not this dumb"), J-131 (Defendant's June 8, 2024 livestream saying, "[b]e mad that I drew attention to it"), J-321 (Defendant's June 8, 2024 livestream stating, "I'll put [the video] on my motherfucking Discord … [and] tweet about it"), J-350 (Defendant's June 8, 2024 X post, "And that's not illegal[.]  Suck it[.]"), J-398 (June 8, 2024 deepfake video), J-422 (Defendant's June 8, 2024 livestream, "Y'all go to my likes.  This is a fool.  Watch how this post jump."), J-485 (Defendant's June 9, 2024 livestream claiming she "don't understand what the fuck [Ms. Pete is] crying for" after she promoted the deepfake video).

As would anyone, Ms. Pete suffered extreme embarrassment, trauma, and distress upon discovering the deepfake video and Defendant's promotion and amplification of it.  *See* Megan Pete, Trial Tr. 123:11–14, Nov. 20, 2025 ("I felt icky.  I felt shame.  I felt like my grandma that is still alive, this was just something else that I knew that she was going to ask me about, like, is this real?  You know, what's going on.  I just felt really embarrassed."); Travis Farris, Trial Tr. 51:22–52:1, Nov. 19, 2025 ("She cried.  You know, she shut me out the room. . . . You know, she -- she went in her room and just cried, you know, didn't come out for, you know, a few hours.").  In hearing Defendant's livestreams regarding the deepfake, Ms. Pete felt "defeated" and powerless to do anything because notwithstanding the artificial nature of the pornographic video, she believed that Defendant and her followers "wanted it [] to be real."  Megan Pete, Trial Tr. 125:3–

14, Nov. 20, 2025 ("I feel a little, like, defeated, because no matter what -- no matter if the video was fake or not, I feel like Milagro -- I think she wanted it is to be real. . . . So I think even if I said, that's not me, that had already believed what they wanted to believe and everybody was already talking about it, so what -- what was my point in trying to say anything.").

**4.    Defendant Stalked Ms. Pete's Residence Online**

Defendant also has access to and knowledge of Ms. Pete's residential address.  Specifically, Defendant saved at least two screenshots of Ms. Pete's personal residence on her phone, which she admitted to at trial.  *See* Milagro Cooper, Trial Tr. 116:14–22, Nov. 18, 2025 (acknowledging that she came to have two images of Ms. Pete's personal residence on her phone "[b]y looking it up online"); *see also* Trial Exs. J-424 (Defendant's screenshot of Ms. Pete's residential address), J-425 (Defendant's screenshot of aerial imagery of Ms. Pete's home).  Notwithstanding Defendant's alleged reason for possessing Ms. Pete's sensitive personal information, Defendant did not dispute that she searched for, took screenshots of, and shared said information with her former attorney.

Ms. Pete has expressed serious concerns for her safety in light of Defendant's cyberstalking history, corroborated by the testimony of Amiel-Holland Briggs, her former content moderator. *See* Amiel Holland-Briggs, Trial Tr. 26:17–20, Nov. 20, 2025 ("[Defendant] was paying sites to pull these people's information, I believe like their home addresses.  She would go into their backgrounds and she would use that as ammo against them."); Megan Pete, Trial Tr. 176:20–177:7, Nov. 20, 2025 ("When I found out that she had a picture of my house in her phone, I feel like, oh, my God, this is a dangerous person. . . . I'm thinking what are you -- why do you know where I live?  What are you going to do to me?  Like are you going to come to my house . . . it just confirmed I don't know what this stalker is going to do with my address."); Megan Pete, Trial Tr. 33:8–9, Nov. 24, 2025 ("I do think Milagro is dangerous because I don't know why she would have my address or my house saved in her phone.").

Indeed, at trial, Ms. Pete testified that the purpose of the lawsuit was to stop Defendant from "continu[ing] to harass and bully" her.  Megan Pete, Trial Tr. 118:19–22, Nov. 20, 2025 ("[Y]ou think you can team up with a man to continue to harass and bully me online just because you don't -- I don't even know what's the reason but I want her to stop.").  Ms. Pete's testimony underscores the harm that she has suffered on account of Defendant's harassment and cyberstalking.  As the trial record reflects, Defendant's social media is rife with threatening

commentary against Ms. Pete.  *See, e.g.*, Trial Exs. J-15 (Defendant's Mar. 12, 2022 X posts mocking violence against Ms. Pete depicted in "CAP" music video), J-28 (Defendant's Dec. 19, 2022 livestream, "A bitch fuck with my n**** [Tory], imma slap that hoe [Ms. Pete] and whatever come after it, come after it."), J-293 (Defendant's July 30, 2024 livestream, "You better get that bitch away from me before I run that hoe over with this motherfucking car.").

**5.    Defendant's Harassment Continues Even After The Jury Found Her Liable On All Three Counts**

Defendant has been wholly undeterred by the recent verdict in this matter.  This is perhaps unsurprising, given the record evidence demonstrating Defendant's lack of respect for the justice system.  It has only been two weeks since the jury entered a verdict in Ms. Pete's favor and this Court lifted its pretrial publicity gag order, and Defendant has already returned to social media to resume her campaign by posting yet more disparaging comments directed at Ms. Pete.

On December 1, Defendant went on Instagram Live, showing no remorse for her conduct and claiming, "I'm gonna start working on my mixtape.  Because apparently, the only place you can bully people and talk crazy and pop shit is in the studio, but anywhere else is off limits, you know … so, I'm gonna get on my mixtape shit and make sure I channel all my energy into my raps and put that out and let that be artistic expression."[3]  Defendant's stated intent to use the First Amendment shield of "artistic expression" as a sword to cause further harm to Ms. Pete reveals that she views the jury's verdict as a minor inconvenience—not a true deterrent.  Defendant also mocked Ms. Pete's emotional distress on this Instagram Live.  When a social media user commented that Defendant had lost the lawsuit, she responded, "I heard you blocked, too.  Listen, all I'm ever gonna do is block y'all.  I don't get on the Internet and cry about what y'all say."

On December 2, Defendant posted images of herself on X with a promotional photograph of CBS news reporter Gayle King, which members of her audience would reasonably interpret to be a reference to Ms. Pete.  *See* Appendix C.  A reasonable viewer reading Defendant's December 2 post would understand her Gayle King photograph to reference Ms. Pete's interview with Ms. King many years ago, which Defendant unsuccessfully relied on at trial to suggest Ms. Pete lied about her interactions with Mr. Peterson.  *See* Milagro Cooper, Trial Tr. 136:11–17, Nov. 17, 2025 ("What I am saying is that, leading up to [Mr. Peterson's criminal] trial, Megan lied multiple

---

[3]  Milagro Cooper (@milagrogramz), INSTAGRAM (Dec. 1, 2025), https://www.instagram.com/reel/DRvF-M6kXJM/?hl=en.

times…. Did you lie to Gail [sic] King?  Yes.").  Defendant later went on air with CBS News Miami and demonstrated a lack of willingness to take accountability for promoting the deepfake video.  When asked why she promoted the video, Defendant responded, "I think that's a tricky question because I think there are misconceptions about what actually happened.  I did say, 'Go to my likes,' and I did speak about it."  Furthermore, when asked whether she considered the harm of the deepfake video on Ms. Pete, Defendant stated, "Did I personally think that this would cause her to feel those ways?  Absolutely not."[4]

On December 3, Defendant took to X once more to continue to spread misinformation about Ms. Pete, misleading her followers and lying about the jury's verdict.  *See* Appendix D.  Defendant wrote that "[a]nything that had to do with mental capacity or alcoholism never even made it to the final sheet," disregarding the jury's finding that Defendant was liable for IIED based on her statements attacking Ms. Pete's mental capacity and recreational alcohol use.  And it reveals that notwithstanding the jury's verdict with respect to those statements, Defendant intends to double down and continue to perpetuate defamatory falsehoods about Ms. Pete.  Defendant also wrote that the three defamatory statements for which the jury found her liable were not "statement[s] of fact," even though the Court previously determined that they were.  *Compare id. with* ECF No. 36.  The message of this post was clear: Defendant unequivocally denied the jury's finding and suggested to her "mob" of followers that prior statements about mental capacity and alcoholism were, in fact, true when she knew full well that they were false and defamatory.

Defendant was not the only one levying attacks against Ms. Pete and misrepresenting the verdict.  Shortly after the Court dismissed the jury, Defendant's counsel issued a press release falsely claiming that Defendant was found "not liable for Defamation."  Appendix E.  Plaintiff's counsel privately raised concerns with such misstatements on this press release and asked for a retraction.  Defendant's counsel instead posted the private email exchange on social media, subjecting Plaintiff's counsel to undue harassment and doxing by Defendant's followers.  *See* Appendix F.  Defendant and her counsel cast what actually occurred in court in a false light.[5]  As

---

[4]  CBS Miami, "Blogger found liable in Megan Thee Stallion defamation case explains her actions," Dec. 2, 2025, https://www.youtube.com/watch?v=oIo5KX07KZA.

[5]  "The judge has officially signed on the dotted line.  Defamation is OUT.  To every media outlet that falsely reported anything otherwise, correct yourself.  Clock starts now."  Milagro Cooper (@milagropress), X (Dec. 2, 2025, 3:11 PM), https://x.com/milagropress/status/1995949065205678387.

the verdict form plainly states, the jury found Defendant liable on Count I, Defamation *per se*. *See* ECF No. 226. That the Court only entered judgment on Counts II and III has no bearing on the jury's ultimate determination that Defendant was liable for Count I, Defamation.

As recently as December 15, Defendant went on another blogger's livestream and made various accusations against Ms. Pete and other trial witnesses. She accused Amiel Holland-Briggs of committing perjury, claiming, "And I have now, I mean, been betrayed in the worst way. Somebody I used to be friends with. Oh, child, got up on the damn stand against me, lied on me in federal court."[6] Defendant also alleged that Ms. Pete made herself out to be "the black Regina George, who in the film [*Mean Girls*] was a bully." And she attempted to shift blame to Ms. Pete's manager Travis Farris, stating that he "should have been up there" for intentionally inflicting emotional distress because he showed Ms. Pete several of Defendant's harassing social media posts. Throughout the livestream, Defendant downplayed her defamatory statements as mere questions, undermining the defamatory and severe emotional impact of her posts on Ms. Pete.

This was just the latest example of Defendant's harassment against Ms. Pete. Absent an injunction, Defendant's gamesmanship will not stop. Through crowdfunding efforts designed to wholly offset the jury's damages award, Defendant has eschewed the consequences of her action. As her crowdfunding page shows, Defendant will continue to characterize her defamatory and tortious conduct online as rooted in the "right to speak," "right to question," and "right to know." Appendix G. The jury's finding should not be disregarded in this manner.

## III.    LEGAL STANDARD

Section 784.0485(1), Florida Statutes, "create[s] a cause of action for an injunction for protection against stalking" and states that "[f]or the purposes of injunctions for protection against stalking under this section, the offense of stalking shall include the offense of cyberstalking." "The stalking statute specifically allows trial courts to 'grant such relief as the court deems proper' when issuing a permanent stalking injunction." *Klein v. Manville*, 363 So. 3d 1163, 1170 (Fla. 6th DCA

---

"I'm not out of the airport yet. But I did just get word that the judge did sign on the dotted line, so the order is official. Defamation was thrown out. She recognized me and agreed with the jury that I am media. So, I'm gonna need all of y'all to correct them different things that y'all then put online. Okay? Love you!" Milagro Cooper (@milagropress), X (Dec. 2, 2025, 3:23 PM), https://x.com/milagropress/status/1995952073117237594.

"Defamation is a wash." Milagro Cooper (@milagropress), X (Dec. 2, 2025, 7:16 PM), https://x.com/milagropress/status/1996010501218656483.

[6] "Surviving Megan Thee Stallion – The Voice of New Media," Tasha K (@UNWINEWITHTASHA), X (Dec. 15, 2025, 7:02 PM), https://x.com/unwinewithtasha/status/2000718057916989833?s=42.

2023) (quoting Section 784.0485(6)(a)).  Florida courts consistently recognize that the trial judge is the finder of fact in these proceedings and have broad discretion to grant permanent stalking injunctions.  *See, e.g.*, *Strober v. Harris*, 332 So. 3d 1079, 1086–87 (Fla. 2d DCA 2022) (holding sufficient facts were alleged for consideration of petition and remanding for trial court to apply full statutory definition of cyberstalking); *Klein*, 363 So. 3d at 1167 (affirming trial court's findings and cyberstalking injunction); *Zayon v. Valme*, 401 So. 3d 517 (Fla. 3d DCA 2024) (same).

In federal court, a plaintiff seeking injunctive relief "must demonstrate (1) it [plaintiff] has suffered an irreparable injury; (2) remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) the public interest would not be disserved by a permanent injunction.  *Angel Flight of Ga., Inc. v. Angel Flight Am., Inc.*, 522 F.3d 1200, 1208 (11th Cir. 2008).  "For a permanent injunction, the standard is essentially the same [as that required for a preliminary injunction], except that the movant must establish actual success on the merits, as opposed to a likelihood of success."  *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1268 (11th Cir. 2006).

## IV.   ARGUMENT

All factors weigh in favor of entering a permanent stalking injunction that restrains Defendant from harassing and cyberstalking Ms. Pete through her persistent and egregious online activity.  Defendant's relentless campaign to defame Ms. Pete and to destroy her public image and livelihood serves no legitimate purpose but rather an illicit one: to retaliate against Ms. Pete for her cooperation with law enforcement in the prosecution of her assailant.  The sole and apparent aim of this aggressive cyberstalking campaign, as the evidence at trial revealed, was to punish Ms. Pete for none other than her status as a shooting victim of someone who happened to be close friends with the Defendant.

### A.   Ms. Pete Established The Requisite Elements Of Cyberstalking And Harassment To Satisfy Section 784.0485, Florida Statutes

Section 784.048(1)(d), Florida Statutes defines "cyberstalk" as engaging "in a course of conduct to communicate, or cause to be communicated, directly or indirectly, words, images, or language by or through the use of electronic mail or electronic communication, directed at or pertaining to a specific person ... causing substantial emotional distress to that person and serving no legitimate purpose."  A permanent injunction against cyberstalking under Section 784.0485

requires a showing of "substantial evidence" of the following elements: (1) course of conduct directed at or pertaining to a specific individual; (2) use of electronic communication; (3) substantial emotional distress; and (4) no legitimate purpose. *See Baruti v. Vingle*, 343 So. 3d 150, 151 (Fla. 5th DCA 2022). Ms. Pete proved—from her Second Amended Complaint through trial— all elements of cyberstalking exist here, warranting a permanent injunction.

### 1.   Defendant Engaged In A Pattern of Cyberstalking Directed At Ms. Pete

Section 784.048(1)(b) defines "course of conduct" as "a pattern of conduct composed of a series of acts over a period of time, however short, which evidences a continuity of purpose." A cyberstalking pattern of conduct is completed through electronic means. *Id.* at § 784.048(1)(d). A petitioner seeking an injunction against cyberstalking need only "establish two separate acts of following, harassment, or cyberstalking" to prove stalking occurred. *Klein*, 363 So. 3d at 1168.

At trial, Ms. Pete introduced evidence of Defendant's pattern of online bullying and harassment. Defendant used electronic means to promote an artificial pornographic video of Ms. Pete. *See supra* pp. 7–8. She repeatedly accused Ms. Pete of perjury on her social media accounts and coordinated with the Petersons to inflict severe emotional distress on Ms. Pete—from Defendant's comments on the "CAP" video, to her exclusive access to privileged information reserved only for Mr. Peterson and his legal team. Defendant asserted via livestreams that Ms. Pete was mentally incompetent and an alcoholic. *See supra* pp. 6–7. Defendant impugned Ms. Pete's family online. *See supra* pp. 6–7. She flouted her knowledge of Ms. Pete's sensitive contact information, such as her residential address, and risks sharing that information via her social media platforms. *See supra* pp. 8–9. And even after the jury rendered a verdict against her, Defendant continued to harass Ms. Pete by threatening to drop a mixtape specifically intended to bully, ridiculing Ms. Pete's Gayle King interview, and misrepresenting the verdict against her. *See supra* pp. 9–11. In sum, Defendant "created a space" for people to "laugh" and "joke" about threats made to Ms. Pete's life. Megan Pete, Trial Tr. 139:22–140:9, Nov. 20, 2025. That pattern has repeated itself from 2020 to present day. The Court should not allow Defendant to continue with her aggressive and obsessive pattern of harassing, bullying, and stalking Ms. Pete online, all while Defendant possesses Ms. Pete's residential address and fosters a community of likeminded individuals, whom she refers to as the "mob," geared towards hatred of Ms. Pete.

2.      **Defendant's Cyberstalking Caused Ms. Pete Substantial Emotional Distress**

In determining whether harassment or cyberstalking causes substantial emotional distress, Florida courts "apply a reasonable person standard, rather than a subjective standard." *Klein*, 363 So. 3d at 1168. The emotional distress required "is greater than just an ordinary feeling of distress" and must be "extreme and outrageous." *Rosaly v. Konecny*, 346 So. 3d 630, 633 (Fla. 4th DCA 2022). Ms. Pete satisfies that standard. The jury found Defendant liable for Count II, IIED. *See* ECF No. 226. The core principle of IIED is extreme and outrageous conduct that causes severe emotional distress. *See Est. of Duckett ex rel. Calvert v. Cable News Network LLLP*, 2008 WL 2959753, at *4 (M.D. Fla. July 31, 2008). The jury specifically found "that Ms. Pete suffered severe emotional distress as a result of Ms. Cooper's extreme and outrageous conduct." ECF No. 226, Question 10. The jury rendered its decision after Ms. Pete painstakingly detailed how the emotional distress caused by Defendant was so substantial that she wanted to end her life. *See supra* p. 6. There is no dispute: Defendant caused, and risks further causing, Ms. Pete severe emotional distress.

3.      **Defendant's Cyberstalking Has No Legitimate Purpose**

The uncontroverted evidence at trial revealed that the purpose behind Defendant's five-year cyberstalking campaign was to retaliate against Ms. Pete for her complaint against Mr. Peterson; to bully her into future silence; to dissuade her from cooperating in the investigation and eventual prosecution; and to punish her after she did. Only communications that serve legitimate purposes, such as lawful protests or other constitutionally protected activities, are excluded from the definition of cyberstalking. "A communication serves a legitimate purpose when there is a reason for the contact other than to harass the victim." *Kassenoff v. Harvey*, 2024 WL 562738, at *10 (N.D. Fla. Feb. 8, 2024) (internal quotation marks omitted). Here, the reason for the posts went beyond mere harassment—but only insofar as they were aimed at obstruction and witness tampering. Such purposes are not legitimate and highlight the need for injunctive relief.

The jury determined that Defendant's intentional and malicious online harassment served no legitimate purpose. As the evidence successfully showed at trial, Defendant published her social media posts and livestreams to harass Ms. Pete, to retaliate against her, and to hijack Ms. Pete's fame. Defendant's motivation to harass Ms. Pete sprung from her longstanding personal and professional relationship with the Peterson family, which in turn led to her efforts to interfere

14

with the Peterson prosecution. *See supra* pp. 2–3. The jury found that Defendant did not provide disinterested and neutral commentary; rather she advocated for a particular client or personal interest (indeed, an illegal one). ECF No. 226, Questions 3 and 5. She did not impartially disseminate information, but rather purveyed false information—and did so with the apparent aim of obstructing justice. Defamatory speech, obstruction, and stalking are not protected under the First Amendment. Defendant has engaged in all of these forms of unprotected speech and has indicated that she has no intention of ceasing her cyberstalking campaign. There is no legitimate purpose for criminal conduct, and no legitimate purpose for speech that furthers criminal conduct.[7]

## B.    Ms. Pete Is Entitled To A Permanent Injunction Pursuant To Federal Rule Of Civil Procedure 65

Ms. Pete also meets the elements for a permanent injunction pursuant to Fed. R. Civ. P. 65 and federal caselaw. *See e.g., Lavielle v. Acosta*, 281 F. Supp. 3d 1133 (W.D. Okla. 2017) (issuing a post-trial permanent injunction against defendant to prevent continued harassment following a jury finding of IIED)*; Holmes v. Dominique*, 2015 WL 11236539, at *6 (N.D. Ga. Jan. 20, 2015) (issuing a permanent injunction against "posting untrue, derogatory statements about plaintiff on the internet or other public forum"); *Gold Diamond Buyers, LLC v. Friedlich*, 2011 WL 13322791,

---

[7]    Indeed, Defendant's conduct, as established at trial,  tracks the elements of federal criminal cyberstalking under 18 U.S.C. § 2261A(2)(A)-(B). Defendant, "with the intent to . . . harass [and] intimidate" Ms. Pete, used an "interactive computer service . . . to engage in a course of conduct that" placed Ms. Pete in "reasonable fear of the death of or serious bodily injury to a person," and also "cause[d], attempt[ed] to cause, or would be reasonably expected to cause substantial emotional distress" to Ms. Pete. 18 U.S.C. § 2261A(2)(A)-(B). Defendant's conduct since the verdict demonstrates that she does not grasp the severity and potentially criminal nature of her conduct. The cyberstalking was itself done for separate illicit purposes—to interfere with the California investigation and prosecution of Mr. Peterson by retaliating against Ms. Pete and bullying her into further silence. *Cf.* Cal. Penal Code § 136.1(a)(2) (punishing anyone who "[k]nowingly and maliciously attempts to prevent or dissuade any witness or victim from attending or giving testimony at any trial, proceeding, or inquiry authorized by law"); Fla. Stat. § 914.22(1)(a) (punishing anyone who "engages in misleading conduct toward another person . . . with intent to cause or induce any person to [w]ithhold testimony . . . from an official investigation or proceeding").

Making matters worse, when Ms. Pete asserted her rights under applicable law and sought to end this cyberstalking campaign, Defendant responded by attempting to witness-tamper in this case, retaliating against Mr. Holland-Briggs. *Cf.* 18 U.S. § 1513(e) (punishing "[w]hoever knowingly, with the intent to retaliate, takes any action harmful to any person . . . for providing to a law enforcement officer any truthful information relating to the commission or possible commission of any Federal offense"). Were Defendant to be held criminally responsible for her actions and charged with federal criminal cyberstalking, her pattern of conduct could well result in the denial of pretrial release, given her efforts to obstruct and the threat she poses to Ms. Pete. *See* 18 U.S.C. § 3142(f)(2)(B) (providing that a judicial officer *shall* hold a hearing in a case that involves a serious risk the defendant "will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror") (emphasis added); § 3142(g) (instructing courts holding detention hearings to consider, among other factors, the weight of the evidence in determining whether defendant poses danger to any person in the community).

at *3 (S.D. Fla. Sept. 26, 2011) (issuing permanent injunction requiring defendant to remove defamatory statements from the internet).   As a preliminary matter, Ms. Pete has already established the requisite element of success on the merits: a jury considered Ms. Pete's evidence and found Defendant liable for defamation *per se*, IIED, and promotion of an altered sexual depiction.  *See BUC Int'l Corp. v. Int'l Yacht Council Limited*, 489 1129, 1151 (11th Cir. 2007) ("It is well settled that where claims at law and in equity are joined and the legal claims are tried separately by a jury, the jury's verdict operates as a finding of fact binding on the trial court in its determination of equitable claims.").  For the additional reasons set forth, Ms. Pete is entitled to permanent injunctive relief.

### 1.    Ms. Pete Faces Irreparable Harm From Defendant's Ongoing Conduct

First, Defendant's cyberstalking conduct, that has yet to cease following a two-week trial and jury verdict, has and will continue to cause Ms. Pete irreparable emotional and financial harm absent any action by the Court.

"[P]sychological injury . . . can constitute irreparable harm that warrants injunctive relief." *Doe v. Georgia Dep't of Corr.*, 730 F. Supp. 3d 1327, 1349 (N.D. Ga. 2024).  Where a plaintiff's "pain [i]s clear from her testimony," a court can grant injunctive relief.  *Id.* at 1350.  Furthermore, "a likelihood of damage to reputation is by its nature irreparable."  *Bentley Motors Ltd. Corp. v. McEntegart*, 899 F. Supp. 2d 1291, 1303 (M.D. Fla. 2012) (internal quotation marks omitted); *see also La Potencia, LLC v. Chandler*, 733 F. Supp. 3d 1238, 1275 (S.D. Fla. 2024) (quoting *Ferrellgas Partners, L.P. v. Barrow*, 143 Fed. App'x 180, 190–91 (11th Cir. 2005)) (irreparable injury can also occur by a "loss of control of one's reputation" due to the impermissible conduct of the defendant).

Ms. Pete's past and continuing injuries were proven at trial via Ms. Pete, Mr. Kinney, Mr. Farris, and Dr. Walker's testimony.   Ms. Pete herself testified for hours about the extreme emotional impact of Defendant's cyberstalking.  *See supra* pp. 5–8.  Dr. Walker emphasized that if Ms. Pete is continued to be triggered by online posts from Defendant, she may never recover from the trauma of the shooting.  *See supra* p. 4.  Furthermore, Ms. Pete proved at trial that she suffered reputational harm as a result of Defendant's cyberstalking—she lost at least four major brand deals due to the emotional distress suffered at the hands of Defendant.  *See supra* p. 4. Plaintiff has endured more than enough suffering to prove irreparable harm will ensue absent a permanent injunction.

### 2.   Defendant Has Already Proven That Money Damages Are An Inadequate Remedy

There is no adequate legal remedy for Defendant's continued conduct.  *See Doe*, 730 F. Supp. 3d at 1350 (quoting *Chalk v. U.S. Dist. Ct. Cent. Dis. of Cal.*, 840 F.2d 701, 710 (9th Cir. 1988)) ("emotional and psychological . . . injury cannot be adequately compensated for by a monetary award after trial").  After a trial, Defendant was found liable for all Counts by the jury and was ordered by this Court to pay damages.  *See* ECF Nos. 226, 227.  Despite the jury's verdict and the Court's judgment on damages, Defendant continues to post online content that causes irreparable harm to Ms. Pete.  *See supra* pp. 9–11.  Monetary damages and sanctions imposed against her clearly have not deterred Defendant, and they will not adequately compensate Ms. Pete for the severe emotional distress and reputational harm she has and will continue to suffer.

### 3.   The Balance Of Equities And The Public Interest Favor Injunctive Relief For Ms. Pete

The balance of equities tips in Ms. Pete's favor.  Defendant would not suffer any harm from a narrowly tailored permanent injunction—she was already found liable by a jury for engaging in unlawful conduct.  *See La Potencia*, 733 F. Supp. 3d at 1275 ("The harm to Defendants is also mitigated by the narrowly tailored preliminary injunction set forth herein.").  Ms. Pete faces significant emotional and reputational harm if Defendant continues to cyberstalk and harass her. *See Gaffigan v. Does 1-10*, 689 F. Supp. 2d 1332, 1341 (S.D. Fla. 2010) (holding injunctive relief was warranted where "the injury to Plaintiffs' reputations and goodwill outweighs the potential harm a preliminary injunction would cause Defendants").  This harm was evidenced through testimony during trial, including Ms. Pete's testimony as to the potential consequences of Defendant's conduct.  *See supra* pp. 5–6.

Furthermore, the public has no interest in Defendant's illegal cyberstalking of Ms. Pete. *See TracFone Wireless, Inc. v. Hernandez*, 196 F. Supp. 3d 1289, 1302 (S.D. Fla. 2016) (concluding that "the public interest is advanced by enforcing faithful compliance with the laws of the United States and the State of Florida" and entering a permanent injunction).  The public has no interest in the online bullying, harassment, or stalking of any person at all.  *Lavielle,* 281 F. Supp. 3d at 1135 ("[T]he public interest is served by protecting families . . . from the harassing behavior of others.").  Indeed, it is in the public's interest to prevent harassment and stalking of all individuals to ensure others do not experience the harm suffered by Ms. Pete.  *See id.*

### C.      An Injunction Against Defamation Is Also Warranted Under Florida Law

Florida appellate courts have recognized that injunctive relief against defamation is appropriate where defamatory statements are "made as a part and parcel of a course of conduct deliberately carried on to further a fraudulent or other unlawful purpose." *Zimmerman v. DCA at Welleby, Inc.*, 505 So. 2d 1371, 1375 (Fla. 4th DCA 1987) (citation omitted).  Given the jury's factual finding of defamation—and the intersection of the defamatory statements with the tortious cyberstalking and obstructive retaliatory conduct, as well as the interference of such statements with Ms. Pete's business interests—equitable relief is appropriate here.  "Defamatory words uttered in aid of another tort are verbal acts, which, with the aided tort, are subject to restraint, if equitable grounds therefor are present." *Id.* (quoting *Wolf v. Gold*, 9 A.D. 2d 257 (N.Y.A.D. 1 Dept. 1959)); *see also Murtagh v. Hurley*, 40 So. 3d 62, 67 (Fla. 2d DCA 2010) (injunction appropriate if facts show defamation harmed business).  The defamatory statements here not only aided cyberstalking, obstruction, and witness retaliation; such statements also caused substantial harm to Ms. Pete's business interests.  *See* Daniel Kinney, Trial Tr. 98:25–99:6, Nov. 19, 2025 (demonstrating harm to business deals).  An injunction against defamation is thus appropriate here.

This Court's finding regarding the entry of judgment on the defamation count does not change Ms. Pete's entitlement to equitable relief because Ms. Pete has established actual success on the merits.  The legal test for injunctive relief makes clear that the established facts matter, not the question of whether judgment was ultimately entered.  The jury's verdict on the defamation count serves to "establish actual success on the merits" as required by law.  *KH Outdoor, LLC*, 458 F.3d at 1268.  Indeed, Florida courts permit equitable relief against defamation even prior to a factual finding on the merits—that is, prior to a finding that the speech at issue is unprotected. *See, e.g.*, *Zimmerman*, 505 So. 2d at 1376.  If temporary injunctive relief is nonetheless permitted in such circumstances, permanent equitable relief is certainly warranted following a finding on the merits that the speech is unprotected.

### D.      Ms. Pete's Proposed Injunction Complies With The Statute And the Constitution

Section 784.0485(6)(a), Florida Statutes, permits the Court to enter any "such relief as the court deems proper, including an injunction" to "[r]estrain[] the respondent from committing any act of stalking."

18

Ms. Pete's proposed injunction submitted herein is narrowly tailored to protect Defendant's First Amendment rights, while also targeting specific statements for which a jury already found Defendant liable and for which Defendant has no intention of stopping absent an injunction. Florida courts have affirmed injunctions preventing stalkers from communicating about victims to third parties when such injunctions are narrowly tailored, and the prohibited speech "serve[s] no legitimate purpose." *See DiTanna v. Edwards*, 323 So. 3d 194, 202–3 (Fla. 4th DCA 2021) (affirming injunction preventing respondent from contacting petitioner's "neighbors and friends"). Federal courts regularly issue narrowly tailored permanent injunctions to remedy irreparable harm caused by online bullying, harassment, and defamation. *See Lavielle,* 281 F. Supp. 3d at 1133; *Holmes*, 2015 WL 11236539, at *6. For instance, in *Gold Diamond Buyers, LLC*, the Court considered potential First Amendment implications and nonetheless entered a permanent injunction requiring the defendant to "remove [] false and defamatory statements" from the internet. *Gold Diamond Buyers, LLC*, 2011 WL 13322791, at *3; *see also Saadi v. Maroun*, 2009 WL 3617788, at *3 (M.D. Fla. Nov. 2, 2009) (permanently enjoining defendant from "republishing in any manner any statement that [plaintiff] is a terrorist").

Defendant's First Amendment rights will not be infringed with the proposed narrowly tailored injunction. The Supreme Court has recognized that speech falling into certain categories—obscenity, defamation, speech integral to illegal conduct, so-called "fighting words," fraud, and true threats, among other categories—is unprotected and may be restricted based on its content. *United States v. Alvarez*, 567 U.S. 709, 717 (2012) (collecting cases). Several of these exceptions are implicated in this case, where Defendant's speech has been obscene, frequently defamatory, integral to illegal cyberstalking and retaliation, and as a whole "lacks serious literary, artistic, political, or scientific value." *Miller v. California*, 413 U.S. 15, 24 (1973) (discussing obscenity exception); *see also Snyder v. Phelps*, 562 U.S. 443, 452 (2011) (holding that matters of purely private concern are less valuable and less protected than matters of public concern).

Defendant's speech was integral to her tortious and potentially criminal cyberstalking, as well as to the unlawful purpose of retaliating against Ms. Pete for her cooperation in the Peterson prosecution. Such speech is thus permissibly punished under the First Amendment, which has never "include[d] a freedom to disregard these traditional limitations" identified by the Supreme Court. *United States v. Stevens*, 559 U.S. 460, 468 (2010). And given the ongoing course of illegal conduct and speech here, the "prevention" of further unprotected speech will not "raise any

[c]onstitutional problem." *Chaplinsky v. State of New Hampshire*, 315 U.S. 568, 571–72 (1942); *see also Kingsley Books, Inc. v. Brown*, 354 U.S. 436, 441 (1957) (appearing to affirm permanent injunction as a remedy where speech is unprotected; "[w]hether proscribed conduct is to be visited by a criminal prosecution or by a qui tam action or by an injunction or by some or all of these remedies in combination, is a matter within the legislature's range of choice").  The jury's finding that the speech at issue is unprotected, and the extensive record evidence of an ongoing course of conduct that shows no signs of abating, justify an injunction in this case.  *See Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 390 (1973) (finding ordinance that amounted to injunction against certain publications to be permissible, noting it "does not endanger arguably protected speech.  *Because the order is based on a continuing course of repetitive conduct*, this is not a case in which the Court is asked to speculate as to the effect of publication.") (emphasis added).

The continuing course of repetitive tortious conduct engaged in by Defendant justifies an injunction here.  The injunction sought by Ms. Pete seeks only to prevent Ms. Cooper from sharing that specific harmful, unprotected, and defamatory content on her social media accounts.

## V.    CONCLUSION

For the reasons set forth above and in the attached, Ms. Pete respectfully requests the Court grant her motion for a narrowly tailored Permanent Injunction Against Cyberstalking.

Dated:  December 18, 2025

QUINN    EMANUEL    URQUHART    &
SULLIVAN, LLP


*/s/ John O'Sullivan*

Alejandro Brito (Fla. Bar. No 098442)
Jalaine Garcia (Fla. Bar. No. 058632)
abrito@britopllc.com
jgarcia@britopllc.com
BRITO, PLLC
2121 Ponce de Leon Boulevard, Suite 650
Miami, FL 33134
(305) 614-4071

John O'Sullivan (Fla. Bar No. 143154)
Daniel L. Humphrey (Fla. Bar No. 1024695)
johnosullivan@quinnemanuel.com
danielhumphrey@quinnemanuel.com
QUINN    EMANUEL    URQUHART    &
SULLIVAN, LLP
2601 S. Bayshore Drive, Suite 1500
Miami, FL 33133
(305) 402-4880


Mari F. Henderson (pro hac vice)
Marie Hayrapetian (pro hac vice)
marihenderson@quinnemanuel.com
mariehayrapetian@quinnemanuel.com
QUINN    EMANUEL    URQUHART    &
SULLIVAN, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
(213) 443-3000

Joanna E. Menillo (pro hac vice)
Stephanie Kelemen (pro hac vice)
joannamenillo@quinnemanuel.com
stephaniekelemen@quinnemanuel.com
QUINN    EMANUEL    URQUHART    &
SULLIVAN, LLP
295 Fifth Avenue
New York, NY 10010
(212) 849-7050

*Attorneys for Plaintiff Megan Pete*

## CERTIFICATE OF SERVICE

I hereby certify that on December 18, 2025, a true and correct copy of the foregoing was served via electronic mail on the following:

Jeremy McLymont, Esq.
AsiliA Law Firm, P.A.
33 SW 2nd Ave., Ste. 1100
Miami, FL 33130
(786) 420-3014
jeremy@asilialaw.com

Nathacha Bien-Aimé, Esq.
Bien-Aimé Law Firm, PLLC
14681 Biscayne Blvd., #102
North Miami Beach, FL 33181
(954) 686-2446
nathacha@bienaime-law.com