UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MEGAN PETE, an individual,

    Plaintiff,

v.

MILAGRO ELIZABETH COOPER,
an individual,

    Defendant.

Case No. 1:24-cv-24228-CMA

**PLAINTIFF'S MOTION TO REINSTATE JURY
VERDICT AS TO DEFAMATION CLAIM AND TO AMEND FINAL
JUDGMENT OR RENEWED MOTION FOR JUDGMENT
AS A MATTER OF LAW AND INCORPORATED MEMORANDUM OF LAW**

    Plaintiff MEGAN PETE ("Plaintiff"), by and through her undersigned counsel and pursuant to Federal Rules of Civil Procedure 50(b), 59(e) and 60(b), respectfully moves this Court to reinstate the Jury Verdict as to Plaintiff's defamation claim and to amend the Final Judgment consistent with the Jury Verdict, and in support states as follows:

**INTRODUCTION**

    This case should have been tried – and was rightfully tried – on the merits of Plaintiff's defamation claim. At the pleading stage, the Court properly decided a threshold and dispositive status issue: ***"that Defendant is [not] a media defendant entitled to protection under section 770.01."*** *See* Order on Motion to Dismiss [ECF No. 36] (the "MTD Order"). That ruling, which was not challenged by Defendant, governed subsequent proceedings. The parties proceeded through discovery and trial preparation in reliance on that ruling. Under the law of the case doctrine, that legal determination governed later stages of this case absent a recognized exception.

    Despite the fact that Defendant *never* moved for reconsideration of that ruling, *never* moved for summary judgment on the basis that she was a media defendant entitled to pre-suit notice, *never* included this issue in the parties' Joint Pretrial Stipulation [ECF No. 133], and *never* raised this issue at the October 30, 2025 pre-trial conference, Defendant led the Court astray at the

November 10, 2025 final pre-trial conference and during the trial, and re-injected the *rejected* media defendant status defense into the trial. The Court ultimately allowed the inclusion of several special interrogatories in the Verdict Form concerning Defendant's status as a media defendant, including one specifically asking whether Defendant was a "media defendant." The jury returned a verdict for Plaintiff on defamation, but answered the interrogatory asking whether Defendant was a "media defendant" in the affirmative. The Court then entered a Final Judgment that did not include the jury's verdict as to Plaintiff's defamation claim because the jury's conclusion that Defendant was a media defendant "preclude[d] judgment for Plaintiff on the defamation *per se* claim." [ECF No. 227]. This outcome impermissibly allowed Defendant a second bite at the apple on a settled legal issue and should be corrected.

This motion does not seek to relitigate matters already properly decided, nor to present new evidence. Instead, Plaintiff asks the Court to correct a legal error that directly affected the outcome of this case: the submission and use of an ultimate status question that the Court had already decided as a matter of law. Relief under Rules 50(b), 59(e) and 60(b) is warranted to correct this error and prevent manifest injustice.

## **BACKGROUND**

**I.    Factual Background**

Defendant exhibits nothing that a media defendant would – she: (1) is not an objective, disinterested, or neutral reporter; (2) makes biased commentary intended to promote her business; (3) disclaims being a journalist and flouts its code of ethics as inapplicable to her; and (4) disseminates false and defamatory messages that misinform the public.

**A.    Defendant Is Neither Neutral Nor Disinterested—She Is A Biased Representative Of Mr. Daystar Peterson.**

1.    <u>Defendant Aligns With Mr. Peterson Prior To His Criminal Trial</u>.

The evidence at trial and affirmed by the jury proves that Defendant is not a disinterested reporter. Rather, she is a paid surrogate of the Petersons (Sonstar and Daystar Peterson), hired to promote their false narrative that Plaintiff lied about being violently shot and to further smear her reputation by branding her as an alcoholic and mentally retarded, among other attacks.

Mere months after Mr. Daystar Peterson shot Plaintiff, Defendant wasted no time aligning herself with him. *See* Trial Exs. J-47 (Defendant's Sept. 17, 2020 Instagram direct message with

Mr. Daystar Peterson, "Idk how you're doing your live tonight, but if you gave me that or any exclusive it'd change my life"), J-48 (Defendant's Sept. 2020 Instagram direct message with Mr. Sonstar Peterson, who requested to speak to her "off the record").

By aligning herself with the Petersons, Defendant aided Mr. Peterson's circumvention of the protective and gag orders that prevented him from speaking to or about Plaintiff in relation to the criminal case. Defendant willingly became Mr. Peterson's personal publicist and bullhorn—someone Mr. Peterson could rely on to publish his knowingly false and debunked narratives, while maintaining a consistent line of attack against Plaintiff. Defendant performed her services not as an impartial reporter or journalist seeking the truth, but as a ***paid surrogate compensated by her purported "sources"*** to spread the company line to anyone who would listen. *See* Milagro Cooper, Trial Tr. 178:19–179:12, Nov. 18, 2025 (acknowledging Sonstar paid her "$3,000 … over the course of about 17 or so months");Trial Exs. J-261 (Defendant's Oct. 30, 2024 livestream bragging about being on Daystar's "payroll" and receiving birthday wishes from him), J-353.031–2, 46–8 (Defendant's texts with Sonstar discussing Houston meet-up), J-353.052–4 (Defendant's texts with Sonstar discussing Miami meet-up), J-353.087 (Defendant's texts with Sonstar discussing Los Angeles meet-up); Sonstar Peterson Dep., Trial Tr. 58:25–59:2, Nov. 20, 2025 (acknowledging that he paid for Defendant's flight, hotel, and general travel and business expenses when she visited Miami).

        2.      <u>Defendant Proudly Showcases Her Allegiance To Mr. Peterson During His Criminal Trial</u>.

Leading up to Mr. Peterson's criminal trial, Defendant and Mr. Peterson's father coordinated a public relations campaign designed to obstruct justice and attack Plaintiff's credibility. Defendant's flurry of texts with Mr. Sonstar Peterson reflects just that. *See* Trial Exs. J-353.071 (Defendant's Nov. 24, 2022 text with Sonstar, who asks Defendant to send him "those materials ASAP" to forward to attorneys), J-19 (Defendant's Nov. 25, 2022 email to Sonstar with alleged dirt on Plaintiff and attachments "that MAY be of value"), J-353.073 (Defendant's Dec. 2, 2022 text to Sonstar with alleged dirt on Plaintiff), J-353.074–5 (Defendant's Dec. 7, 2022 text with Sonstar, who asks Defendant to call him "asap" to discuss "[b]reaking news" on a detective involved in Daystar's case). Defendant scoured the universe and dug up every dirt, whether true or false, on Plaintiff. But that was not Defendant's sole role. The Petersons knew that with every

exclusive news they broke to Defendant, she would take to social media to "share[] with the Mob [Defendant's following]." Trial Ex. J-353.077 (Defendant's Dec. 9, 2022 text with Sonstar).

Defendant attended every day of Mr. Peterson's criminal trial and sat with Mr. Peterson's family in the courtroom gallery, **not with the media**. Trial Ex. J-25 (Defendant's livestream claiming to be one of four women sitting on Mr. Peterson's side of the courtroom "as family"). Defendant also appeared at Mr. Sonstar Peterson's impromptu press conferences outside the courthouse—**not as a reporter in the press asking questions**, but rather as a proud "daughter" and "sister" standing alongside the Peterson family, making undeniably clear where her allegiance lied. *See* Trial Ex. J-21 (Dec. 23, 2022 Instagram post by @theshaderoom showing Defendant with the Petersons at a post-verdict press conference).

Even after Mr. Peterson sat in prison as a convicted felon for shooting Plaintiff, Defendant not only maintained contact with him, but crossed a line no disinterested reporter would: she flirted with Mr. Peterson, her purported information source. Instead of discussing legal strategies, alleged new evidence, investigative facts relating to Mr. Peterson's appeal, or even Mr. Peterson's music career or any other news, Defendant and Mr. Peterson shared love notes, complimented one another's looks, and expressed mutual adoration. Unadmitted Trial. Ex. J-383[1] (Defendant's June 2, 2024 Instagram direct message with Mr. Peterson; Mr. Peterson: "Looking fye still[.]"; Defendant: "I know you in there charming whoever crosses your path[.] I love you!"). When Plaintiff first sued Defendant, she hired the same law firm, Unite the People, that represents Mr. Peterson in his appeal. She did so despite recognizing that there might be a conflict of interest. *See* Milagro Cooper, Trial Tr. 140:16–18, Nov. 18, 2025 (Q: "And did you talk about potential conflict of interest because they [Unite the People] also represented Tory?" A: "I believe I brought that up."); Ceasar McDowell Dep., Trial Tr. 20:23–21:21, Nov. 19, 2025 (acknowledging that he "recall[s] hearing that" Mr. Peterson asked about a potential conflict of interest, but claiming to not remember why it would be a conflict); *see also* Trial Ex. J-433.317–19 (Defendant's Dec. 18, 2024 text with Sonstar discussing how to explain away $3,000 in payments; Sonstar: "Great very good. But you should send it to the lawyers. I'm wait[ing] to hear from Caesar [sic] [CEO of Unite the People].").

---

[1] A true and correct copy of Unadmitted Trial Ex. J-383 is attached hereto as Exhibit A.

### B. Defendant Promotes Her Personal Brand With Biased, Partial Commentary Favorable To Mr. Peterson.

Defendant built her Mob Radio brand off of defaming Plaintiff. *See* Megan Pete, Trial Tr. 17:24–18:1, Nov. 21, 2025 ("She is famous because of talking about Megan Thee Stallion in the Tory Lanez's case…. She got famous and known for trashing me."); Trial Ex. J-486 (Defendant's June 9, 2024 livestream, "But I'm too influential now, is what I've come to realize."); Amiel Holland-Briggs, Trial Tr. 28:14–29:14, Nov. 20, 2025 (testifying that Defendant's dangerous "cult-like" following believes and further perpetuates anything Defendant disseminates); *id.* at 30:14-17 ("It was almost a daily segment [about Plaintiff], to be honest with you.").

Defendant's obsessive coverage of Plaintiff—particularly concerning Plaintiff's private affairs such as her family background, alleged mental capacity, or alcohol consumption—undercuts her argument that she operated for the purpose of informing the public on matters of public concern. Rather, Defendant built a social media business centered around smearing Plaintiff's reputation.

### C. Defendant Conceded She Is Not A Journalist.

Defendant repeatedly admitted throughout trial that she has never been a journalist. She disclaimed any affiliation with "traditional journalist[s]" or "reporters" and admitted that she never looked into the ethics required of journalists. Milagro Cooper, Trial Tr. 252:6–7, Nov. 24, 2025; *id*. at 253:4–6. Defendant does not believe that the journalistic code of ethics applies to her—she would only follow them if they were "re-worked" to comply with her understanding of "the way that the world works now." Milagro Cooper, Trial Tr. 12:1–3, Nov. 25, 2025.

Defendant also made prior statements on her livestreams, disavowing any claims to being a journalist:

> At what point in time, haven't I told you to go do your own independent research? At what point in time, hasn't this show read that this is for entertainment purposes? At what point in time, did you really think that I was getting up here and I told you, I have a psychology and criminal justice degree. I ain't never told you, I went to school for journalism. What fucking article did I write that I posted and said, y'all read this? What the fuck are y'all talking about? I don't think I'm anything but I know I'm the person that gets under your skin. You don't need to be a journalist to see something and give an opinion about it. So, my whole thing is, if I'm not trying to be a journalist, and you know I'm not, what the fuck you mad about, because I shouldn't be regarded as a news source any damn way.

Trial Ex. J-562 (Defendant's Oct. 30, 2024 livestream); *see also* Milagro Cooper, Trial Tr. 10:17–19, Nov. 25, 2025. In that same livestream, Defendant again disclaimed any connection to being a journalist, claiming, "Everything is not meant to be a news report. I did not tell anybody I was a reporter." Trial Ex. J-262 (Defendant's Oct. 30, 2024 livestream).

Defendant instead characterizes herself as "more of an entertainer." Milagro Cooper, Trial Tr. 253:12–18, Nov. 24, 2025. Indeed, Defendant puts a disclaimer in every description box on all of her videos, claiming that her show "is for entertainment purposes only and shall not be deemed as fact or advice." *Id.* at 256:2–15; *id.* at 85:13–21; *see also* Trial Ex. J-336 (Defendant's July 30, 2024 livestream).

### D. Defendant Disseminates False And Defamatory Messages Intended To Misinform The Public.

There is no dispute that Defendant is a prolific content creator. The evidence at trial demonstrated that Defendant's content about Plaintiff, which constituted the core of her online discussions, was false, biased, and defamatory. *See* ECF No. 226. Defendant, no matter how regularly she released content, did not report on news or information related to matters of public concern. Instead, she was spreading rumors, speculation, and lies favoring Mr. Peterson and designed to obstruct justice in an effort to falsely exonerate him, at the expense of Plaintiff's reputation and emotional state. Indeed, "[e]very one of Tory's narratives that works in his favor has come from Milagro." Megan Pete, Trial Tr. 15:13–14, Nov. 24, 2025; *see, e.g.,* Trial Ex. J-248 (Defendant's Feb. 23, 2022 X post, "BREAKING: It was revealed in court few moments ago that Tory Lanez DNA WAS NOT found on the weapon in the Meg Thee Stallion case."); Megan Pete, Trial Tr. 135:19–22, Nov. 20, 2025 ("So Milagro tweeted this before court and it's just what everybody still believes to this day. People still think that Tory did not shoot me because Milagro tweeted that his DNA was not on the gun and that's not true."); Trial Ex. J-299 (Defendant's July 30, 2024 livestream claiming, "I believe that the damn girl stepped on glass or a ricochet shit came and fucked up. Whatever you say happened, I don't believe you. So you gotta work under the guise that I don't believe she got harmed that way."); Milagro Cooper, Trial Tr. 71:3-5, Nov. 18, 2025 (claiming she was merely posing a question by falsely claiming the gun and bullet fragments were missing).

**II.     Procedural Background**

The only time Defendant raised the media defendant issue prior to trial was at the pleadings stage in her motion to dismiss. *See* ECF No. 30. The Court disagreed with Defendant and denied her motion on that ground. *See* ECF No. 36. The Court, relying on the well-pled facts, found that Defendant lacked media status because she (1) is a "longtime mouthpiece" for Daystar Peterson, Plaintiff's assaulter, and his father Sonstar; (2) worked in concert with the Petersons to harass and discredit Plaintiff on the Petersons' behalf; and (3) publicly admitted "that she is not a journalist." *Id*. Defendant never moved for reconsideration of the Court's ruling. Nor did Defendant move for summary judgment at all, let alone on the basis that she was a media defendant who would be entitled to pre-suit notice.

At the October 30, 2025 pre-trial conference, Defendant again chose not to raise the media defendant issue. *See* ECF No. 172, Pre-Trial Conf. Tr., Oct. 30, 2025. It was only at the final pre-trial conference on November 10, 2025—after the close of pleadings, discovery, summary judgment, and prior pre-trial conferences—that Defendant re-raised the media defendant issue and requested leave to brief the issue on whether Plaintiff was required to prove actual damages on her defamation claim.

On the first day of trial, after the jury was seated and before opening statements commenced, the Court *again* "agree[d] with the Plaintiff that the Defendant does not qualify as a media defendant" and found, "consistent with my ruling in my order on the motion to dismiss, the Defendant is not a media defendant." Trial Tr. 97:16–25, Nov. 17, 2025. Unlike at the pleadings stage, the Court based its ruling with the full benefit of the evidentiary record. It considered Defendant's own statements made during her depositions, as well as her livestreams disclaiming any characterization as a journalist. *See* ECF No. 183.

Nonetheless, on the fifth day of trial, after Defendant had testified, her counsel *again* sought to re-inject the ***twice-rejected*** media-defendant issue. *See* Trial Tr. 100:8–13, Nov. 21, 2025. After the parties submitted briefing and met and conferred, the Court held that the issue would be submitted to the jury, subject to post-verdict briefing. *See* ECF Nos. 183, 207, 208, 211.

Plaintiff then sought to preserve and raise the issue after the Defendant's case in chief, pursuant to Fed. R. Civ. P. 50. The Court advised that Plaintiff could reserve on the motion. *See* Trial Tr. 122:5–9, Nov. 25, 2025. Later that day, at the final charging conference when jury

instructions were being finalized, the Court determined that the effects of the Defendant's purported media defendant status were not for the jury to decide. *Id.* at 127:3–6 (Court: "In your proposed jury instructions that I reviewed, that you now have my edits on, I did not include that language [regarding effects of media defendant status], somebody did. I don't think that's a jury issue, what the effect of their finding is."). Plaintiff clarified that the purpose of including language on potential consequences in the jury instructions was to clarify for the jurors that even if Defendant was a media defendant, Plaintiff would still be entitled to actual damages, which the Court affirmed was a question of law and not a jury issue. *Id.* at 128:3–9 (Court: "Right. It's not a jury issue."). The Court then reiterated that it would address the consequences of a media-defendant finding post-verdict. *See id.* at 128:11–16.

On November 26, 2025, the jury began deliberations. On December 1, the jury rendered a unanimous verdict in Plaintiff's favor on all three of her claims: (1) defamation *per se*; (2) intentional infliction of emotional distress ("IIED"); and (3) promotion of an altered sexual depiction. Specifically, with regard to Plaintiff's defamation *per se* claim, the jury found that: (1) Defendant defamed Plaintiff; and (2) such defamation caused Plaintiff actual damages. *See* ECF No. 226 (Questions 1, 2). The jury also found that Defendant did not "provide[] disinterested and neutral commentary, rather than advocacy for a particular client or personal interest," and did not "impartially disseminate[] information, [but] rather … act[ed] primarily to promote her own business, products, or services." ECF No. 226 (Questions 3, 5). Despite finding that Defendant failed to provide disinterested, neutral, and impartial commentary and used her platform for her own business interests, the jury determined that Defendant qualified as a media defendant. *Id.* (Question 8).

Throughout deliberations, the jury had expressed confusion as to how to properly evaluate the media defendant factors. *See* ECF No. 237 ("We are confused[.] If we believ[e] half [of the factors,] is that considered a yes [as to Defendant's media status]?"). In response, Plaintiff sought to advise the jury that while no one factor is "dispositive," whether a defendant is "disinterested and neutral" (answer to Question 3 of the verdict form) is the most important factor under this Circuit's precedents. Plaintiff's Counsel, Trial Tr. 5:4–6:2, Dec. 1, 2025. Plaintiff also sought to advise the jury that "answering yes to a majority of Questions 3 through 7 does not mean that you must answer yes to Question 8 [that Defendant is a media defendant]," and vice versa. *Id.* at 5:18–

23. Defendant, while agreeing that no one factor is outcome-determinative, argued that a finding for half of the factors would mean Defendant qualifies as a media defendant. Defendant's Counsel, *id.* at 6:3–13. The Court ultimately instructed the jury simply that "[t]here is no set number." ECF No. 237. The jury, as such, did not receive further guidance as to which specific factors should be given greater weight than others.

Thereafter, the Court entered final judgment on Counts II (IIED) and III (promotion of an altered sexual depiction), but not on Count I (defamation *per se*). *See* ECF No. 227.

## MEMORANDUM OF LAW

### I.   Legal Standard

Pursuant to Fed. R. Civ. P. 59(e), a party may seek to alter or amend a judgment if a motion is filed within 28 days after entry of the judgment. The Court may grant a Rule 59(e) motion to correct clear error of law or fact or to prevent manifest injustice. *Association For Disabled Americans, Inc. v. Reinfeld Anderson Family Ltd. Prt.,* 2015 WL 1810536, at *2 (S.D. Fla. Apr. 21, 2015).

Similarly, Fed. R. Civ. P. 60(b) provides that a Court may grant a post-judgment motion under certain circumstances:

> (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or (6) any other reason that justifies relief.

Fed R. Civ. P. 60(b).

A mistake, as contemplated by Rule 60(b)(1), encompasses "a judge's errors of law," and applies to "misconception," "misunderstanding," or "fault in opinion or judgment." *Kemp v. United States,* 596 U.S. 528, 533-34 (2022). A mistake also encompasses the ordinary legal meaning, to include a judge's mistakes of law or fact. *Id.* Similarly, a Rule 59(e) motion "gives a district court the chance 'to rectify its own mistakes in the period immediately following' its decision." *Banister v. Davis,* 590 U.S. 504, 508 (2020).

Rule 60(b)(6) is the "catch-all" ground for relief and "allows for relief for 'any other reason that justifies relief.'" *Association For Disabled Americans, Inc.,* 2015 WL 1810536, at *3. Rule 60(b)(6) is available when there is a "risk of injustice to the parties" or a "risk of undermining the public's confidence in the judicial process." *Securities and Exchange Commission v. Betta,* 2018 WL 11448612, at * 2 (S.D. Fla. Aug. 7, 2018).

The decision to grant a Rule 59(e) or 60(b) motion is committed to the district court's sound discretion. *Transcontinental Ins. Co. v. L.F. Staffing Services, Inc.,* 2009 WL 10668316, at *1 (S.D. Fla. Sept. 2, 2009) ("The district court has wide discretion under Rule 59(e)."); *Betta,* 2018 WL 11448612, at *2 ("Rule 60(b)(6) vests wide discretion in courts."); *Seven Elves, Inc. v. Eskenazi,* 635 F.2d 396, 401 (11th Cir. 1981) (Rule 60 "should be liberally construed in order to do substantial justice.").

Lastly, under Fed. R. Civ. P. 50(b), a movant may file a "renewed motion" for judgment as a matter of law after trial. *See Mc Ginnis v. Am. Home Mortg. Servicing, Inc.,* 817 F.3d 1241, 1254 (11th Cir. 2016) (quoting Rule 50(b)). "The standard for granting a renewed motion for judgment as a matter of law under Rule 50(b) is precisely the same as the standard for granting the pre-submission motion [under Rule 50(a)]." *Id.* (citation omitted). "Thus, as with motions under Rule 50(a), the question for the district court confronting a renewed Rule 50(b) motion is whether the evidence is 'legally sufficient . . . to find for the party on that issue.'" *Id.* (quoting Fed. R. Civ. P. 50(a)(1)). Stated differently, entry of judgment as a matter of law under Rule 50(b) is appropriate when a party "presents no legally sufficient evidentiary basis for a reasonable jury to find for him on a material element of his cause of action." *Collins v. Marriott Int'l,* 749 F.3d 951, 957 (11th Cir. 2014) (citation omitted).

**II.   The MTD Order Decided The Controlling Legal Issue And Became The Law Of The Case For Trial And Post-Trial Proceedings.**

The well-established law of the case doctrine prohibits the re-litigation of legal issues previously decided in the same case. *See Klay v. All Defendants,* 389 F.3d 1191, 1197 (11th Cir. 2004) (citation and internal quotation marks omitted). This policy ensures that there will be an end to litigation by "foreclosing the possibility of repeatedly litigating an issue already decided." *Murphy v. F.D.I.C.,* 208 F.3d 959, 966 (11th Cir. 2000) ("When a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.")

(internal quotation marks omitted); *see also Klay,* 389 F.3d at 1197 ("This doctrine is designed to further important goals vital to just and efficient judicial process, including the provision of an end to litigation, the discouragement of 'panel shopping,' and the promotion of consistency in rulings between courts.").

The MTD Order did more than merely allow this case to proceed. It resolved a discrete legal question essential to liability: whether Defendant is a media defendant entitled to statutory pre-suit notice under Fla. Stat. § 770.01, which the Court clearly and unequivocally decided Defendant *was not*. *See* ECF No. 36. Had the Court determined otherwise, Count I of Plaintiff's Complaint would have been dismissed. *See Buckley v. Moore,* 2021 WL 3173185, at * 5 (S.D. Fla. July 26, 2021) (dismissing defamation claim due to insufficient pre-suit notice, stating "[o]rdinarily, a plaintiff's failure to comply with the pre-notice requirement requires dismissal of the complaint for failure to state a cause of action."); *cf Sirer v. Aksoy,* 2021 WL 4952610, at *5 (S.D. Fla. Oct. 25, 2021) (denying motion to dismiss, finding defendant is not a media defendant entitled to pre-suit notice). Had Count I been dismissed for this reason, Plaintiff could have (and would have) provided pre-suit notice in order to cure this defect in its pleading and thereafter refiled its defamation claim. *See Barbuto v. Miami Herald Media Co.,* 2021 WL 4244870, at *3 (S.D. Fla. Sept. 17, 2021) ("[O]nly '[i]f the time to comply with the statutory precondition has expired, [should] the action [] be dismissed with prejudice.'"). However, the Court's correct determination that Defendant was not a media defendant obviated the need for any pre-suit notice.

No exception authorizes a departure from the MTD Order. *Klay* identifies three narrow exceptions: (1) substantially different evidence; (2) intervening change in controlling law; or (3) clear error in the prior ruling producing a manifest injustice. *Klay,* 389 F.3d at 1198. Defendant presented no new, substantially different evidence bearing on her status that would justify relitigation of the threshold condition precedent question; there was no intervening change in controlling law; and the only manifest injustice here would be the nullification of the merits verdict based on a pre-suit notice requirement the Court already held inapplicable. Indeed, the purpose of Fla. Stat. § 770.01 is to "afford newspapers and periodicals an opportunity to make full retraction in order to correct inadvertent errors and mitigate damages, as well as to save them the expense of answering to an unfounded suit for libel." *Mazur v. Ospina Baraya,* 275 So. 3d 812, 815 (Fla. 2d DCA 2019) (citation omitted). In other words, it was never the intent of the Florida legislature to

have parties in a defamation action proceed all the way through trial only to strike a defamation claim for failure to provide pre-suit notice.

### III. Defendant Waived And Forfeited Any Attempt To Reinject The Statutory Notice Issue At Trial And Is Equitably Estopped From Using It Post-Verdict.

Even apart from the law of the case, Defendant's attempt to resurrect the statutory pre-suit notice issue—after litigation and losing it on the motion to dismiss, declining to seek reconsideration or interlocutory review, and then trying the case on the merits—was waived, forfeited, and barred by fundamental fairness. Plaintiff reasonably relied on the Court's MTD Order and Defendant's silence in shaping discovery, trial preparation, and the presentation of evidence. Defendant never preserved this issue in the Joint Pretrial Statement and never raised it at the October 30, 2025 pre-trial conference—only to spring it on Plaintiff at the final November 10, 2025 pre-trial conference and trial as an end-run around the jury's ultimate decision in favor of Plaintiff on her defamation claim. Florida's equitable estoppel doctrine exists to prevent exactly this sort of sandbagging: a party may not "lull" its opponent into a strategic and legal posture and then take an inconsistent position that inflicts substantial prejudice. *See Major League Baseball v. Morsani,* 790 So. 2d 1071, 1076-77 (Fla. 2001) (explaining that the doctrine "'is applicable in all cases where one, by word, act or conduct, willfully caused another to believe in the existence of a certain state of things, and thereby induces him to act on this belief injuriously to himself, or to alter his own previous condition to his injury'"); *United Automobile Ins. Co. v. Chiropractic Clinics of South Florida, PL,* 322 So. 3d 740, 743 (Fla. 3d DCA 2021) (recognizing the doctrine is "a valid defense to a limitations-period defense" and holding the doctrine applied to prevent insurer from denying coverage based on alleged late billing). Permitting Defendant to do so here would not only reward gamesmanship; it would also risk converting Defendant's belated maneuver into a limitations trap that wipes out Plaintiff's defamation claim entirely. Equity does not tolerate this result.

### IV. The "Media Defendant" Special Interrogatory Was Improper.

A special interrogatory cannot be used to override the Court's controlling legal determinations. *See In re Standard Jury Instructions in Civ. Cases-Rep. No. 09-01 (Reorganization of the Civ. Jury Instructions),* 35 So. 3d 666, 733 (Fla. 2010) ("Status issues determining the choice of instructions [related to public figure, media defendants, and non-media defendants] are

commonly decided as a matter of law, and therefore are omitted from these instructions."). Here, it did just that—override the Court's determination as a matter of law that Defendant is not a media defendant.

The "media defendant" classification under Fla. Stat. § 770.01 involves a similar Court-centric inquiry as the Court's determination of a defamation plaintiff's status as a public figure. The inquiry may involve the examination of facts, but the designation is ultimately reserved for the courts. *See Turner v. Wells,* 879 F.3d 1254, 1272 (11th Cir. 2018) (finding plaintiff to be a public figure and affirming dismissal); *Button v. McCawley,* 2025 WL 50431, at *8 (S.D. Fla. Jan. 8, 2025) (stating that whether a defamation plaintiff is a public figure "is a question of law for the Court"). Critically, Florida courts describe the analysis itself in court-centric terms: to determine limited public figure status, for example, "the court must determine" whether a public controversy exists and whether the plaintiff played a sufficiently central role. *Berisha v. Lawson,* 378 F.Supp.3d 1145, 1160 (S.D. Fla. 2018). That is, while the process may require evaluating the record, it is the Court's job to bestow the legal label (public figure vs. private figure). Likewise, courts have framed the media defendant question in court-centric terms, applying clear legal standards to determine whether a defendant should be classified as such. *See Ortega Trujillo v. Banco Cent. Del Ecuador,* 17 F.Supp.2d 1334, 1338 (S.D. Fla. 1998) ("In defining the term 'media defendant,' courts have considered . . . "); *Mazur,* 275 So. 3d at 817 ("Florida courts have interpreted the statute's [Fla. Stat. § 770.01] 'other medium' language to be limited to news media defendants who publish statements via an 'other medium.'").

Relatedly, courts routinely decide whether a defendant is a media defendant as a matter of law at both the motion to dismiss and summary judgment stages of a case. *See Mazur,* 275 So. 3d at 815 (denying petition for writ of certiorari after trial court found defendants were not media defendants); *Five for Ent. S.A. v. Rodriguez,* 877 F. Supp. 2d 1321, 1327-28 (S.D. Fla. 2012) (denying motion to dismiss and finding defendants did not qualify as media defendants); *McQueen v. Baskin,* 377 So. 3d 170, 180-82 (Fla. 2d DCA 2023) (reversing trial court's finding on motion to dismiss/summary judgment that defendant was a media defendant). Courts routinely "frame" the Fla. Stat. § 770.01 applicability inquiry as a "legal question." *See Mancini v. Personalized Air Conditioning & Heating, Inc.,* 702 So. 2d 1376, 1377 (Fla. 4th DCA 1997) (describing the issue posed by the petition for writ of certiorari as "[t]he legal question" as to whether a columnist fell

within the statute's pre-suit notice protection). Here, too, the Court determined, as a matter of law, that Defendant was not a media defendant at the motion to dismiss stage.

Public figure status allocates constitutional fault burdens (*i.e.,* whether actual malice applies) and shapes what must be proven to impose liability, so the Court describes this status designation to ensure uniform, legally correct application. *See Berisha v. Lawson,* 973 F.3d 1304, 1312 (11th Cir. 2020) (collecting cases and describing actual malice test for public figure plaintiff). Similarly, media defendant status allocates statutory pre-suit protections and operates as a dispositive condition precedent, so the Court likewise decides the status designation to ensure uniform, legally correct application of Fla. Stat. § 770.01's reach. *See Mazur,* 275 So. 3d at 817 (collecting cases and describing how courts construe the statute's application to a "news media" defendant). In other words, both labels are status determinations with major legal consequences. They may depend on underlying facts, but the ultimate classification is the Court's responsibility.

Thus, while the Court may arguably submit narrow factual questions about predicate facts to the jury (which Plaintiff contends was erroneous nonetheless under the law of the case doctrine), the ultimate legal determination – whether Defendant is a media defendant for Fla. Stat. § 770.01 purposes – remains for the Court to decide as a matter of law. A special interrogatory asking the jury this ultimate status determination improperly transferred the Court's gatekeeping role to the jury. Moreover, the pre-suit notice required under Fla. Stat. § 770.01 (if even applicable) is a prerequisite to suit. It is a threshold question that must be resolved before the case proceeds. It is not an issue to be tried after the parties have fully litigated the merits through trial.

Accordingly, the Court should treat the "media defendant" interrogatory answer, together with the other related special interrogatories, as immaterial and/or strike them.

## V.     Defendant Is Not a Media Defendant.

The jury found that the Defendant—despite "advocat[ing] for a particular client or personal interest" and "act[ing] primarily to promote her own business, products, or services"—should "be treated as a media defendant." ECF No. 226, at 2–3. But no court has ever extended media defendant status to a defendant who supplies and receives information to affect criminal proceedings, while maintaining a paid and intimate relationship with the accused. This Court should not be the first.

Florida's pre-suit notice statute applies to members of the media that seek to "inform and to initiate 'uninhibited, robust, and wide-open' debate on public issues." *Ortega Trujillo*, 17 F. Supp. 2d at 1338 (citing *Gertz v. Robert Welch*, Inc., 418 U.S. 323, 329 (1974)). The test is one of function, not form. For instance, operating a blog commercially does not automatically confer media status. *See San Juan Prods., Inc. v. River Pools & Spas, Inc.*, 2023 WL 1994087, at *3 (M.D. Fla. Feb. 14, 2023) (denying protection where blog did not "operate[] to further the free dissemination of information or disinterested and neutral commentary or editorializing as to the matters of public interest."). And although editorials can receive media defendant protections, such protections are conferred only to those that "editorialize as to matters of public interest without being commissioned to do so by [their] clients." *Ortega Trujillo*, 17 F. Supp. 2d at 1338.

Courts have consistently refused to extend media defendant status to parties who disseminate information on behalf of clients or for personal financial gain. In *Ortega Trujillo*, the Court held that a public relations firm registered as an agent of a foreign bank did not qualify as a media defendant, despite having sent press releases to major South Florida media outlets. As the Court found in that case, "false, intentionally misleading or defamatory publications have 'no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." *Id*. Here, Defendant's statements clearly do not benefit order and morality. In fact, the jury found unequivocally that the statements were defamatory, thus outside the ambit of protected speech under the First Amendment. *See* ECF No. 226 (Questions 1–2). Defendant's defamatory statements not only came at the great expense of Plaintiff's emotional well-being and professional and personal relationships, but also, by their very defamatory nature, caused harm to the public. The deleterious impact of her words is all the more evident here, where Defendant's statements sought to intimidate a key witness and crime victim and obstructed criminal legal proceedings.

Likewise, Defendant's use of disclaimers to inform her viewers that she should not be relied on for "fact-reporting" cuts against her receiving media defendant protections. In *Techtronic Industries Co. v. Bonilla*, 2025 WL 2687164 (M.D. Fla. Sept. 19, 2025), the Court applied these principles to deny media defendant status to a short seller who published research reports accusing a publicly traded company—that he had shorted—of accounting manipulation and fraud. *Id.* at *3, *6. The Court held Bonilla was not entitled to pre-suit notice because his admission of "bias and

self-interest" was sufficient to place his statements outside the ambit of "free dissemination of information or disinterested and neutral commentary." *Id.* at *6. Bonilla's own disclaimers proved fatal to his claim of media status—he stated, "[w]e are biased and self-interested" and acknowledged he might have "non-aligned or even directly opposing incentives" from his readers. *Id.* The Court emphasized that Florida law focuses on "whether the defendant engages in the traditional function of the news media, which is to initiate uninhibited, robust, and wide-open debate on public issues," not Bonilla's self-proclaimed, motivated commentary. *Id.* (citation modified).

Defendant falls squarely within the category of non-media defendants identified in *Ortega Trujillo* and *Techtronic*—financially motivated advocacy. Like the public relations firm in *Ortega Trujillo* that was "commissioned" by its client to disseminate information, Defendant admitted she was paid by Mr. Peterson's father—receiving $3,000 over seventeen months for "promotion services"—and sought exclusive interviews that would "change [her] life." Milagro Cooper, Trial Tr. 178:19–179:12, Nov. 18, 2025; Milagro Cooper, Trial Tr. 198:3–8, Nov. 17, 2025. She promised to keep conversations with Sonstar Peterson confidential, stating, "I appreciate you so much and will without a doubt keep my lips sealed." Trial Ex. J-48 (Defendant's Sept. 2020 Instagram direct message with Sonstar); Milagro Cooper, Trial Tr. 11:10–11, Nov. 18, 2025. Her content was neither disinterested nor neutral; she acknowledged that Sonstar "referenced me as daughter" and confirmed receiving paid travel accommodations for meetings with him in Miami. Milagro Cooper, Trial Tr. 22:8–9, Nov. 18, 2025; Milagro Cooper, Trial Tr. 148:22–149:1, Nov. 17, 2025. On the other hand, Defendant claims to have never contacted Plaintiff in an effort to conduct due diligence and a comprehensive investigation into the facts. Milagro Cooper, Trial Tr. 165:4–10, Nov. 18, 2025 (Defendant admitting she has never met or contacted Plaintiff).

Like Bonilla in *Techtronic*, Defendant's own words condemn her claim to media status. She stated definitively and contemporaneously that her commentary is "not meant to be a news report" and "I shouldn't be regarded as a news source any damn way." Trial Exs. J-262, J-267 (Defendant's Oct. 30, 2024 livestream clips). Defendant supplied information to the Petersons in an effort to show that Daystar Peterson was innocent, then published information she received from them without any independent corroboration in order to sway public sentiment. *See, e.g.*, Trial Exs. J-19 (Defendant's Nov. 25, 2022 email to Sonstar Peterson with alleged dirt on Ms. Pete

and attachments "that MAY be of value"), J-353.074–5 (Sonstar's text to Defendant that he has "[b]reaking news" concerning the detective investigating the shooting); Milagro Cooper, Trial Tr. 54:2–4, Nov. 18, 2025 (admitting to sending Sonstar information to help Daystar's criminal defense); *id.* at 35:9–24 (acknowledging she spoke to Sonstar "all the time," including the morning she published false "DNA evidence").

The jury's verdict confirms that they believed Defendant acted on behalf of Mr. Peterson, despite her testimony to the contrary. The jury was instructed that "Ms. Pete claims that Ms. Cooper acted extremely and outrageously by coordinating with Mr. Daystar Peterson and others, to distribute false statements about Ms. Pete and to promote and distribute an altered sexual depiction of Ms. Pete, which caused her severe emotional distress." ECF No. 224, at 7. The Court similarly instructed the jury that Plaintiff sought punitive damages for conduct arising out of that coordination. *Id.* at 10. The jury's verdict in favor of Plaintiff on all counts and its award of punitive damages is unmistakably a factual finding by the jury of coordination between Defendant and Mr. Peterson. *See* ECF No. 226. And not just any coordination, but the kind that is so extreme and outrageous that it "goes beyond all possible bounds of decency … and [is] utterly intolerable in a civilized community." ECF No. 224, at 7.

As the record reflects, Defendant's so-called "reporting" was nothing more than the public-relations arm of the Petersons. Her near-singular focus was falsely discrediting Plaintiff to advance Mr. Peterson's standing in and out of court. And when Defendant was not acting as Mr. Peterson's mouthpiece, she was—as the jury found—inflicting intentional emotional distress and promoting a deepfake pornographic video of Plaintiff. *See* ECF No. 226.

Defendant's conduct is so far afield of what constitutes a media defendant that no court has ever granted media defendant status in these circumstances. This Court has already ruled twice that Defendant is not a media defendant under § 770.01, Fla. Stat., and it should do so again now.

## VI. Relief Under Rule 59(e) And Rule 60(b)(6) Is Appropriate.

Should the Court disagree that the jury's verdict on Defendant's media defendant status was advisory such that the December 2, 2025 Final Judgment (ECF No. 227) was also a final judgment on Count I (defamation *per se*),[2] Plaintiff requests relief from the Final Judgment under

---

[2] The Court invited post-trial briefing on this issue on several occasions, including before, during, and after the trial. Plaintiff reasonably relied on those requests in agreeing to present the

Fed. R. Civ. P. 60(b)(6) (allowing relief from a final judgment or order for "any other reason that justifies relief") and Rule 59(e) (allowing "motion to alter or amend a judgment"). The circumstances here are extraordinary.

The Final Judgment rests on a manifest legal error and results in manifest injustice. Not only did the Court's Final Judgment revisit and reconsider the same legal question it had already decided in the MTD Order, but it also relied on and permitted the jury to resolve legal classifications and standards reserved to the Court. This appears to be the first case of its kind in which a jury decided, as a matter of fact, a defendant's qualification as a "media defendant." The consequences are substantive, not merely technical. This combination of legal error and outcome-determinative effect is exactly what Rules 59(e) and 60(b)(6) are designed to correct to prevent manifest injustice. As such, the Court should alter or amend the judgment to reinstate the Jury's Verdict and enter Final Judgment consistent with that Verdict.

## CONCLUSION

WHEREFORE, Plaintiff respectfully requests that the Court disregard or strike the "media defendant" interrogatory answers as immaterial, enter Final Judgment in Plaintiff's favor on Count I (defamation *per se*) consistent with the Jury's Verdict finding Defendant liable, and enter such other relief the Court deems just and proper.

---

question to the jury in an advisory capacity. If the Court viewed the jury's role differently, Plaintiff respectfully requests relief from the Final Judgment and that it be amended in favor of Plaintiff on Count I.

Dated: December 23, 2025

/s/ Alejandro Brito
Alejandro Brito (Fla. Bar. No 098442)
Jalaine Garcia (Fla. Bar. No. 058632)
abrito@britopllc.com
jgarcia@britopllc.com
BRITO, PLLC
2121 Ponce de Leon Boulevard, Suite 650
Miami, FL 33134
(305) 614-4071

John O'Sullivan (Fla. Bar No. 143154)
Daniel L. Humphrey (Fla. Bar No. 1024695)
johnosullivan@quinnemanuel.com
danielhumphrey@quinnemanuel.com
QUINN EMANUEL URQUHART & SULLIVAN, LLP
2601 S. Bayshore Drive, Suite 1500
Miami, FL 33133
(305) 402-4880

Mari F. Henderson (pro hac vice)
Marie Hayrapetian (pro hac vice)
marihenderson@quinnemanuel.com
mariehayrapetian@quinnemanuel.com
QUINN EMANUEL URQUHART & SULLIVAN, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
(213) 443-3000

Joanna E. Menillo (pro hac vice)
Stephanie Kelemen (pro hac vice)
joannamenillo@quinnemanuel.com
stephaniekelemen@quinnemanuel.com
QUINN EMANUEL URQUHART & SULLIVAN, LLP
295 Fifth Avenue
New York, NY 10010
(212) 849-7050

*Attorneys for Plaintiff Megan Pete*

## **CERTIFICATE OF SERVICE**

I hereby certify that on December 23, 2025, a true and correct copy of the foregoing was served via electronic mail on the following:

Jeremy McLymont, Esq.
AsiliA Law Firm, P.A.
33 SW 2nd Ave., Ste. 1100
Miami, FL 33130
(786) 420-3014
jeremy@asilialaw.com

Nathacha Bien-Aimé, Esq.
Bien-Aimé Law Firm, PLLC
14681 Biscayne Blvd., #102
North Miami Beach, FL 33181
(954) 686-2446
nathacha@bienaime-law.com

                                              */s/ Alejandro Brito*
                                              Alejandro Brito