## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 1:24-CV-24228-CMA

MEGAN PETE, an individual,

Plaintiff,

v.

MILAGRO ELIZABETH COOPER,
an individual,

Defendant.

_____

### BRIEF OF *AMICUS CURIAE* ROBERTA A. KAPLAN IN SUPPORT OF PLAINTIFF'S MOTION FOR INJUNCTIVE RELIEF

## TABLE OF CONTENTS

INTEREST OF *AMICUS CURIAE* ........................................................................................ 1

PRELIMINARY STATEMENT ............................................................................................. 1

ARGUMENT ......................................................................................................................... 4

    I.    The First Amendment Does Not Protect Conduct That Operates as a Mechanism of Harm, Including Sexual "Deep Fakes" ......................................................... 4

    II.   Cyberstalking And Deep-Fake Abuse Fall Outside the First Amendment's Core Protections .................................................................................................. 8

    III.  The First Amendment Does Not Prevent the Court from Issuing Injunctive Relief ......... 11

CONCLUSION .................................................................................................................... 18

## TABLE OF AUTHORITIES

**CASES**                                                                                      ***Page(s)***

*Ashcroft v. Free Speech Coalition*,
    535 U.S. 234 (2002) ............................................................................................ 5

*Auburn Police Union v. Carpenter*,
    8 F.3d 886 (1st Cir. 1993) ...................................................................... 11, 12, 14

*Bantam Books, Inc. v. Sullivan*,
    372 U.S. 58 (1963) ............................................................................................ 11

*Brasse v. State*,
    333 A.3d 593 (Md. Ct. App. 2025). ..................................................................... 6

*Carroll v. Trump*,
    151 F.4th 50 (2d Cir. 2025) ............................................................................... 17

*Chevaldina v. R.K./FL Mgmt., Inc.*,
    133 So. 3d 1086 (Fla. Dist. Ct. App. 2014) ......................................... 11, 12, 13, 14

*David v. Textor*,
    189 So. 3d 871 (Fla. Dist. Ct. App. 2016) .......................................................... 15

*Doe One v. Nature Conservancy*,
    2025 WL 1232527 (D. Minn. Apr. 29, 2025) ........................................................ 7

*Doe v. Constant*,
    2024 WL 3512136 (W.D. La. July 23, 2024) ................................................ 16, 17

*Freeman v. Giuliani*,
    732 F. Supp. 3d 30 (D.D.C. 2024) ...................................................................... 17

*Gertz v. Robert Welch, Inc.*,
    418 U.S. 323 (1974) ............................................................................................. 4

*Giboney v. Empire Storage & Ice Co.*,
    336 U.S. 490 (1949) ............................................................................................. 4

*Hustler Magazine, Inc. v. Falwell*,
    485 U.S. 46 (1988)........................................................................................ 4

*Illinois ex rel. Madigan v. Telemarketing Assocs., Inc.*,
    538 U.S. 600 (2003)...................................................................................... 4

*Kohls v. Bonta*,
    2025 WL 2495613 (E.D. Cal. Aug. 29, 2025) ........................................11

*New York v. Ferber*,
    458 U.S. 747 (1982)................................................................................. 4, 5

*People v. Austin*,
    155 N.E.3d 439 (Ill. 2020) ........................................................................ 6

*Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*,
    413 U.S. 376 (1973)..............................................................................11, 12

*Rosaly v. Konecny*,
    346 So. 3d 630 (Fla. Dist. Ct. App. 2022) ............................................. 15

*S.S. v. Collins*,
    2024 WL 3594350 (D.N.J. July 31, 2024)............................................. 17

*Securities & Exchange Comm'n v. Wall St. Publ. Institute, Inc.*,
    851 F.2d 365 (D.C. Cir. 1988)................................................................ 12

*State v. VanBuren*,
    214 A.3d 791 (Vt. 2019) ........................................................................... 5

*Thoma v. O'Neal*,
    180 So. 3d 1157 (Fla. Dist. Ct. App. 2015)........................................... 15

*United States v. Alvarez*,
    567 U.S. 709 (2012) ............................................................................... 14

*United States v. Fleury*,
    20 F.4th 1353 (11th Cir. 2021)................................................................. 8

*United States v. Tatum*,
  2023 WL 3185795 (W.D.N.C. May 1, 2023)..................................................................... 5

*United States v. Williams*,
  553 U.S. 285 (2008).......................................................................................................... 5

*Virginia v. Black*,
  538 U.S. 343 (2003).......................................................................................................... 4

*Wright v. Norris*,
  320 So. 3d 253 (Fla. Dist. Ct. App. 2021) ...................................................................... 15

**STATUTES**

18 U.S.C. § 2261A ............................................................................................................... 8, 9

Cal. Civ. Code § 1708.86 (2020) ............................................................................................ 6

Colo. Rev. Stat. § 18-7-107 (2025) ......................................................................................... 6

Fla. Stat. § 784.048 .................................................................................................... *passim*

Fla. Stat. § 784.0485 ............................................................................................................. 14

Fla. Stat. § 784.0487 ............................................................................................................. 14

Fla. Stat. § 784.049 ................................................................................................................. 9

Fla. Stat. § 836.13 ...................................................................................................... *passim*

Haw. Rev. Stat. § 711-1110.9 (2021) ...................................................................................... 6

Idaho Code § 18-6606 (2024) ................................................................................................. 6

Mich. Comp. Laws § 752.383 (2025) ...................................................................................... 6

Minn. Stat. § 604.32 (2023) ..................................................................................................... 6

Minn. Stat. § 617.262 (2023) ................................................................................................... 6

Va. Code § 18.2-386.2 (2024) ........................................................................................... 6

**OTHER AUTHORITIES**

Danielle K. Citron, *Sexual Privacy*,
 128 Yale L.J. 1870 (2019) ........................................................................................... 7

H. Judiciary Comm., *Bill Analysis*,
 H.B. 1161, 127th Leg., Reg. Sess. (Fla. 2025) ........................................................... 2

Ivan Taylor, *Texas blogger Milagro Cooper shares her perspective after defamation verdict in
 Megan Thee Stallion case*, CBS NEWS (Dec. 2, 2025),
 https://www.cbsnews.com/miami/news/texas-blogger-milagro-cooper-defamation-megan-thee-
 stallion-verdict/. .......................................................................................................... 18

Mary Anne Franks & Ari Ezra Waldman, *Sex, Lies, and Videotape: Deep Fakes and Speech
 Delusions*, 78 Md. L. Rev. 892 (2020) ....................................................................... 7

S. Appropriations Comm., *Bill Analysis and Fiscal Impact Statement*,
 S.B. 1798, 124th Leg., Reg. Sess. (Fla. Apr. 21, 2022) ....................................... 9, 14

## INTEREST OF *AMICUS CURIAE*

*Amicus* Roberta A. ("Robbie") Kaplan is an accomplished litigator with a focus on constitutional and civil rights litigation, particularly on behalf of victims of sexual assault and defamation.  She has developed substantial expertise on issues involving the dissemination of harmful content online and in the media, and in First Amendment jurisprudence.  Among other relevant matters, Ms. Kaplan currently represents E. Jean Carroll in her defamation and sexual assault cases against President Donald J. Trump; the court-appointed guardian of Wendy Williams in her lawsuit against A&E Networks for the exploitation of Ms. Williams's image in the documentary *Where is Wendy Williams?*; Victim #1 in the prosecutions against Jeffrey Epstein for sexual abuse and trafficking; and the Center for Countering Digital Hate ("CCDH") in litigation brought by X Corp. over CCDH's exposure of hate speech and disinformation on X's online platform.  Ms. Kaplan has also represented victims of violence from the Unite the Right rally in Charlottesville, Virginia; students, teachers, and parents in challenging Florida's "Don't Say Gay" law; Amber Heard in her defamation claim against Johnny Depp; and Edith Windsor in challenging the Defense of Marriage Act.  Ms. Kaplan was a founder of the Time's Up Legal Defense Fund, which provided support to victims of workplace sexual harassment, and she is a long-time instructor at Columbia University School of Law.[1]

## PRELIMINARY STATEMENT

Like many states, Florida has made significant efforts to combat harmful conduct, including harmful sexualized conduct, that takes place online and can reach millions of viewers at the press of a button.  For more than two decades, Florida has prohibited "cyberstalk[ing]," which

[1] No counsel for any party authored this brief in whole or in part.  Funding for the brief's preparation and submission was provided by WIN Together, a not-for-profit 501-c(3) that empowers women from under-served communities with negotiation skill and training.  WIN Together, https://www.wintogether.co/about.

covers a broad range of online harassment and disparagement.  Fla. Stat. § 784.048.  More recently, Florida has spearheaded efforts to address the peculiar evil of "altered sexual depictions," also known as sexual "deep fakes."  Fla. Stat. § 836.13; *see also* H. Judiciary Comm., *Bill Analysis*, H.B. 1161, 127th Leg., Reg. Sess. (Fla. 2025).[2]  These are commendable laws that we as a society should encourage other states to follow, especially given the proliferation of harmful disinformation, misinformation, and offensive conduct online that undermines the individual sense of safety, privacy, and control over one's own image and reputation, and undermines our broader commitment to common truth, decency, and respect for one another.

In this case, Plaintiff Megan Pete, known professionally as Megan Thee Stallion, invoked these laws to put a stop to Defendant's harmful online activity, including Defendant's promotion of a sexually explicit, AI-generated deep fake video depicting Plaintiff.  A unanimous jury determined that Defendant's actions violated Florida's anti-deep fake statute and also formed part of a broader "course of conduct" that constituted cyberstalking.  Having obtained a judgment in her favor and monetary damages, Plaintiff now seeks injunctive relief to prevent Defendant from engaging in future acts of cyberstalking, including through the promotion of pornographic deep fake videos.

Plaintiff's requested relief, in accordance with the laws duly passed by Florida to combat this sort of harm, is fully consistent with the First Amendment to the United States Constitution and the values that it embodies.  The United States Supreme Court has long permitted the regulation of conduct that serves no public purpose and operates only as a mechanism of harm, such as nonconsensual pornography.  Sexually explicit deep fakes—a modern technological twist on an old problem—are no more entitled to protection than are things like "revenge porn" or

---

[2] *Available at* https://www.flsenate.gov/Session/Bill/2025/1161/Analyses/h1161c.JDC.PDF.

sexually explicit images of children, and courts have routinely held that statutes targeted to this new form of digital harm likewise pass constitutional muster.

Anti-cyberstalking statutes, like the Florida statute under which Plaintiff specifically seeks injunctive relief here, are also constitutionally permissible because they regulate conduct, not protected speech.  As such, the Florida statute properly recognizes that the promotion of deep fake pornography can contribute to a "course of conduct" amounting to cyberstalking.  Defendant's actions are a textbook example of the victim-specific electronic misconduct—not protected speech—which the anti-cyberstalking statute rightly, and constitutionally, prohibits.

The fact that Plaintiff now seeks forward-looking injunctive relief to complement the damages award she has already received, and to prevent Defendant from continuing to engage in harassment, does not change the First Amendment analysis.  The general presumption against prior restraints on speech is not at issue when, as here, the plaintiff seeks an injunction that is addressed to conduct whose merits have already been adjudicated and found to lack any free speech protection in the first place.  More broadly, the point of Florida's anti-cyberstalking statute is to provide an injunctive remedy for victims, and courts have never identified a facial constitutional infirmity in the statute.  To the contrary, enjoining the type of conduct Defendant engaged in here is wholly in keeping with the longstanding distinction between protected speech and speech as a vehicle for harmful, illegal conduct.  These types of injunctions are also critical for ensuring that victims like Plaintiff who decide to come forward and prosecute their rights obtain justice, rather than pyrrhic victories, and that those who are found liable, like Defendant, are fully incentivized to comply with the law going forward.

## ARGUMENT

I.   **The First Amendment Does Not Protect Conduct That Operates as a Mechanism of Harm, Including Sexual "Deep Fakes."**

The Free Speech Clause of the First Amendment protects a broad range of expressions and can serve as a defense even in state tort suits.  *See, e.g.*, *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 50–51 (1988).  But that protection is not all-encompassing.  The Supreme Court has long drawn a distinction between expression that serves the purposes of the First Amendment by contributing to public discourse, advancing ideas, or participating in democratic debate, on the one hand, and expression or conduct that operates as a mechanism of harm and serves no societal purpose, on the other.  The First Amendment does not insulate behavior that uses communicative tools to injure, intimidate, or coerce another person.

Consistent with these fundamental principles, the Court has long permitted states to regulate conduct like defamation, *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340–41 (1974), and true threats, *Virginia v. Black*, 538 U.S. 343, 359 (2003).  The Court has likewise held that the First Amendment does not protect speech integral to criminal conduct, where words serve as the operative instrument of the prohibited act.  *See Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 498 (1949).  Other well-recognized exceptions include fraud, extortion, and other forms of expression used to accomplish unlawful ends.  *See Illinois ex rel. Madigan v. Telemarketing Assocs., Inc.*, 538 U.S. 600, 612 (2003).

Building on these general First Amendment limits, the Court has developed a separate body of law addressing sexually explicit and privacy-invasive depictions that cause direct, individualized harm.  The most prominent example is child sexual exploitation materials, which states may ban entirely given the severe and lasting harm their creation and distribution inflicts.  *See New York v. Ferber*, 458 U.S. 747, 757–64 (1982).  Although the Court later struck down a

4

federal prohibition on virtual child pornography in *Ashcroft v. Free Speech Coalition*, it did so because the banned material—which appeared to be child pornography but was produced by means other than using real children, such as youthful looking adult actors—"records no crime and creates no victims by its production," underscoring that *Ferber* still applies where real individuals are harmed.  535 U.S. 234, 250–51 (2002).

The Supreme Court has also recognized that the First Amendment does not protect the use of speech as a vehicle for harmful, illegal conduct.  In *United States v. Williams*, the Court upheld a statute that prohibits the "promotion" of unlawful sexual images, explaining that such acts are "categorically excluded from First Amendment protection" because they function as conduct integral to the underlying harm.  553 U.S. 285, 297–300 (2008).  The Court explained that liability does not turn on whether the underlying image is "real" or "virtual," but rather on the misuse of words or images to facilitate abuse.  *Id.* at 300.  Lower courts have reached the same conclusion. For example, in *United States v. Tatum*, the court credited evidence that the defendant used a "deep fake" generator to create nude images of teen girls and an ex-girlfriend who was a minor, and it treated those images as sexual exploitation materials supporting federal charges.  2023 WL 3185795, at *1, 3 (W.D.N.C. May 1, 2023).  That the images were fabricated did not diminish the harm.

The same logic underlies modern revenge-porn statutes and civil remedies for nonconsensual adult pornography.  Courts across the country have recognized that such conduct falls well outside the protections of the First Amendment because it constitutes a direct invasion of personal autonomy, privacy, and dignity—not the well-protected expression of an idea.  *See, e.g.*, *State v. VanBuren*, 214 A.3d 791, 810 (Vt. 2019) (disseminating sexually explicit images without consent "has no connection to matters of public concern" and instead "involves the most

private of matters"); *People v. Austin*, 155 N.E.3d 439, 459, 468 (Ill. 2020) (statute addressing nonconsensual dissemination of private sexual images "does not burden substantially more speech than necessary to advance its substantial governmental interests").

Deep fake pornography has emerged as a modern form of nonconsensual pornography, and a handful of states have led the charge in enacting statutes expressly addressed to the creation or distribution of such technologically altered sexual images.[3]  Like prohibitions on child sexual exploitation materials and laws targeting the nonconsensual dissemination of intimate images, Florida's deep fake statute, § 836.13, addresses a form of sexualized impersonation that invades a victim's privacy and inflicts severe psychological and reputational harm.  The statute regulates conduct—specifically, the willful creation or promotion of a sexually explicit image that falsely purports to depict another person—when that conduct is used as a tool of abuse.

Given the recency of such laws, only one appellate court has addressed a constitutional challenge to a deep fake statute to date.  Its analysis recognizes that sexually explicit deep fakes are every bit as harmful as real sexually explicit images, and that AI cannot be used to evade the law.  In *Brasse v. State*, the Maryland Court of Appeals upheld amendments to the State's child-pornography statute that were enacted "in response to the developing technology" that allows pornographers to "utilize computers to create images and videos in which the naked eye is unable to identify that the image is not that of an actual child."  333 A.3d 593, 605 (Md. App. Ct. 2025).

---

[3] *See, e.g.*, Cal. Civ. Code § 1708.86 (2020) (creating cause of action for dissemination of digitally altered sexual images); Colo. Rev. Stat. § 18-7-107(1)(b)(III) (2025) (not a defense that the intimate image was "digitally created or altered"); Haw. Rev. Stat. § 711-1110.9(1)(c) (2021) (covering images "of a composite fictitious person"); Idaho Code § 18-6606 (2024) (creating liability for "disclosing explicit synthetic media" when the person knows or should know that disclosure "would cause the identifiable person substantial emotional distress"); Mich. Comp. Laws § 752.383 (2025) (civil liability for dissemination of a deep fake of sexual nature and if the person disseminating the content knows or should know); Minn. Stat. §§ 604.32, 617.262 (2023) (civil and criminal liability for the "nonconsensual dissemination of a deep fake" depicting intimate parts or sexual acts); Va. Code § 18.2-386.2(A) (2024) (covering images "created by any means whatsoever").

The court noted that "one aim of this legislation was a technology dubbed 'deepfakes,'" *id.* at 606 (cleaned up), and held that the statute, which limited liability to images "indistinguishable from an actual and identifiable child," was not overbroad because such imagery "implicate[s] the interests of an actual child" and exposes that child to reputational and emotional harm, *id.* at 606–09.  In other words, when AI-generated imagery uses the likeness of a real, identifiable person to depict sexual conduct, the resulting harm is analogous to established forms of nonconsensual pornography, rather than protected expression.

Other courts have reached the same conclusion about the harm that arises from the use of deep fake sexual imagery.  In *Doe One v. Nature Conservancy*, the defendant created and posted sexually explicit deep fakes of his coworkers, and the court recognized that conduct as inherently harmful and actionable under multiple tort theories.  2025 WL 1232527 (D. Minn. Apr. 29, 2025).  The court did not treat the deep fakes as expressive activity or speech, but rather as a form of personalized digital abuse that caused emotional and reputational harm.

Modern scholarship reinforces this understanding.  One scholar identifies sexual deep fakes as a type of "sexual-privacy invasion" that "should be treated and penalized as such," explaining that the right to be free from such invasion is "foundational to human dignity" and "serves as a cornerstone for sexual autonomy and consent."  Danielle K. Citron, *Sexual Privacy*, 128 YALE L.J. 1870, 1870, 1945 (2019).  As another set of commentators put it, "like other forms of nonconsensual pornography, deep fakes erode the trust that is necessary for social relationships" and "weaponize targets' speech against themselves."  Mary Anne Franks & Ari Ezra Waldman, *Sex, Lies, and Videotape: Deep Fakes and Speech Delusions*, 78 MD. L. REV. 892, 895 (2020).

This Court has already recognized that Plaintiff's allegations under § 836.13 fall within the scope of the statute.  ECF 36 at 18.  And after a trial, the jury found Defendant liable for the

"promotion of an altered sexual depiction" in violation of § 836.13.  ECF 227 at 1.  These rulings confirm that Defendant's conduct fits squarely within the kind of targeted, privacy-invasive abuse the statute was designed to reach.

## II.   Cyberstalking And Deep-Fake Abuse Fall Outside the First Amendment's Core Protections.

The question before the Court now is whether it may enter a cyberstalking injunction based on the jury's findings.  Nothing in the First Amendment forecloses that relief.  Florida's cyberstalking statute targets repeated, malicious electronic conduct, not expressive content, and courts regularly uphold laws of this kind when the challenged behavior operates as harassment rather than speech.  The jury's verdict—that Defendant promoted a sexually explicit deep fake depicting Plaintiff—establishes the sort of conduct the statute lawfully reaches.

Florida's cyberstalking provision falls squarely on the "conduct" side of First Amendment "speech" vs. "conduct" jurisprudence and is constitutional under settled First Amendment principles.  Section 784.048(d) prohibits "willful[], malicious[], and repeated[]" electronic acts directed at a specific person that cause substantial emotional distress.  Fla. Stat. § 784.048(1)(d), (2).  In this respect, the cyberstalking statute functions no differently from traditional harassment or intimidation laws that have long been upheld as constitutional because they regulate behavior, not the ideas conveyed through that behavior.

Federal courts have adopted the same understanding when analyzing the federal cyberstalking statute, 18 U.S.C. § 2261A(2).  In *United States v. Fleury*, the Eleventh Circuit rejected both facial and as-applied First Amendment challenges to § 2261A(2), finding that the statute targets "conduct performed with serious criminal intent" and "is not unconstitutionally overbroad" because its legitimate sweep encompasses "countless amounts of unprotected conduct."  20 F.4th 1353, 1362–63 (11th Cir. 2021).

Florida's cyberstalking statute mirrors the federal statute in all material respects.  Both require (1) a course of conduct, (2) directed at a specific person, (3) performed with the intent to harm (harass, intimidate, threaten), (4) that causes or would reasonably be expected to cause substantial emotional distress.  Because § 2261A(2) is constitutional even when applied to conduct involving speech, § 784.048 logically survives the same scrutiny.

Deep fake sexual imagery used to humiliate or intimidate a real person reflects the same harm that Florida's cyberstalking and cyberharassment laws were intended to prevent.  When an abuser weaponizes deep fake technology to target a specific individual, the abuser engages in the kind of emotional-distress-inflicting behavior that § 784.048 has always addressed: malicious electronic conduct directed at a particular victim.

Florida's legislative history confirms that deep fake abuse belongs within this framework.  Before enacting § 836.13, the Legislature addressed similar image-based abuse primarily through its sexual cyberharassment statute, which prohibits the electronic dissemination of intimate images intended to cause substantial emotional distress.  *See* Fla. Stat. § 784.049.  In the bill analysis for SB 1798—the legislation creating the deep-fake statute—the Legislature explained that emerging technologies, including AI-generated sexual images, enabled offenders to evade existing cyberharassment and cyberstalking provisions.  S. Appropriations Comm., *Bill Analysis and Fiscal Impact Statement*, S.B. 1798, 124th Leg., Reg. Sess. (Fla. Apr. 21, 2022).[4]  Legislators identified this technological gap and passed § 836.13 to close it—adopting the same harm-based structure that defines Florida's cyberstalking regime.  Both statutes focus on the misuse of electronic tools to inflict targeted abuse, not on the content of any underlying expression.  In this way, § 836.13

---

[4] *Available at* https://www.flsenate.gov/Session/Bill/2022/1798/Analyses/2022s01798.ap.PDF.

functions as a focused extension of Florida's cyberstalking protections, addressing a modern technique through which a cyberstalker can injure a victim.

This same reasoning supports the Court's authority to treat Defendant's deep fake conduct as part of the "course of conduct" under Florida's anti-stalking statute, § 784.048. The cyberstalking statute does not require each act within the course of conduct to violate the same statute or to constitute a separate criminal offense. Instead, it asks whether the defendant used electronic means to engage in a pattern of malicious behavior that caused substantial emotional distress and served no legitimate purpose. Deep fake sexual impersonation naturally satisfies that inquiry. When an abuser disseminates or amplifies a sexually explicit synthetic image of a victim, the abuser enhances the coercive force of the harassment and magnifies its emotional impact. Florida's stalking framework does not hinge on whether the abuser uses words, images, or digital fabrication software; it hinges on whether the abuser uses electronic tools to harm a targeted individual.

Defendant's conduct is a prime example of these harms. She "liked" a sexually explicit deep fake video purporting to depict Plaintiff and—as the jury found—willfully promoted it to thousands of followers. *See, e.g.*, Trial Tr., Nov. 17, 2025, at 161:23–24 (Defendant's acknowledgment at trial that "if [I] said go to my likes and I posted it, that it would bring attention to [Plaintiff]"). In light of the Legislature's stated intent and the structure of Florida's statutory scheme, that conduct is not an isolated act outside the stalking analysis; it is a core part of the malicious, distress-inflicting "course of conduct" that § 784.048 authorizes courts to enjoin. *See, e.g.*, Trial Tr., Nov. 20, 2025, at 177:12–24 (Plaintiff's testimony that, as a result of Defendant's behavior—including promoting the deep fake—"I genuinely did not care if I live or died"). The

cyberstalking statute empowers courts to prevent ongoing harassment by considering all components of the defendant's electronic abuse.

To be sure, not all deep fakes fall outside the protections of the First Amendment. Political or satirical deep fakes, for example, will often lie at the heart of protected expression. But the issue here is very different. Unlike the law struck down in *Kohls v. Bonta*, 2025 WL 2495613 (E.D. Cal. Aug. 29, 2025), for example, which regulated political deep fakes criticizing elected officials, § 784.048 does not burden public commentary at all. The conduct at issue here involves a sexually abusive deep fake targeted at a single individual. Florida's cyberstalking statute targets precisely that kind of victim-specific electronic misconduct, not protected speech.

### III.   The First Amendment Does Not Prevent the Court from Issuing Injunctive Relief.

The First Amendment analysis is not altered by the fact that Plaintiff seeks an injunction to put an end to Defendant's campaign of harassment or face penalties going forward.

First, courts of course may grant injunctive relief in circumstances like these, where the merits of the speech have been fully adjudicated and found to be beyond the scope of any possible constitutional protection. To be sure, prior restraints on speech "bear[] a heavy presumption against [their] constitutional validity," *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963), and an "injunction directed to speech is a classic example of prior restraint on speech triggering First Amendment concerns," *Chevaldina v. R.K./FL Mgmt., Inc*., 133 So. 3d 1086, 1090 (Fla. Dist. Ct. App. 2014). But prior restraint analysis does not come into play where the First Amendment is not implicated as to liability in the first place. "An injunction that is narrowly tailored, based upon a continuing course of repetitive speech, and granted only after a final adjudication on the merits that the speech is unprotected does not constitute an unlawful prior restraint." *Auburn Police Union v. Carpenter*, 8 F.3d 886, 903 (1st Cir. 1993) (citing *Pittsburgh Press Co. v. Pittsburgh*

*Comm'n on Hum. Rels.*, 413 U.S. 376, 390 (1973), and *SEC v. Wall St. Publ'g Inst., Inc.*, 851 F.2d 365, 370 (D.C. Cir. 1988)).

Here, in denying Defendant's motion to dismiss the amended complaint, this Court implicitly rejected Defendant's arguments that the conduct in question—promoting a pornographic deep fake video depicting Plaintiff and engaging in the other actions that formed the basis for the cyberstalking claim—was protected by the First Amendment.  ECF 36.  Following trial, a jury then determined that Defendant's actions fell squarely within the boundaries of conduct that is impermissible under Florida's anti-deep fake statute, § 836.13, and that the same course of conduct constituted intentional infliction of emotional distress. ECF 227.  In reaching that verdict, the jury necessarily found that Defendant engaged in conduct that was "extreme and outrageous," undertaken with at least reckless disregard of the probability of causing severe emotional distress, and that in fact caused such distress.  ECF 224.  Because Defendant's "continuing course of repetitive speech" has been established, and because there has been a "final adjudication on the merits that the speech is unprotected," the "narrowly tailored" injunction that Plaintiff now seeks does not implicate concerns about prior restraint.  *Auburn Police Union*, 8 F.3d at 903.

Even beyond the particular findings of the jury, prior restraint principles do not prevent the Court from exercising its authority to give meaning to Plaintiff's judgment and stop further efforts at harassment.  The Supreme Court "has never held that all injunctions [on speech] are impermissible."  *Pittsburgh Press Co.*, 413 U.S. at 390.  In particular, Florida courts have recognized that "[t]here is . . . a limited exception to the general rule" prohibiting speech injunctions "where the defamatory words are made in the furtherance of the commission of another intentional tort."  *Chevaldina*, 133 So. 3d at 1090.

12

In her briefing on the motion to dismiss, Defendant principally relied on *Chevaldina* for the proposition that "[t]he First Amendment prohibits such restraints [on speech] through the use of injunctive relief."   ECF 30 at 18.   But as noted above, *Chevaldina* recognizes that this prohibition is not absolute.  133 So. 3d at 1090.  And the court's analysis of the record there, which led it to reverse the lower court's entry of a temporary injunction, illuminates why the injunctive relief Plaintiff seeks falls within the exception to the rule.  In *Chevaldina*, the appellate court lifted the lower court's injunction on conduct that allegedly amounted to tortious interference with business relationships and defamation because "the record . . . fail[ed] to support an inference that Ms. Chevaldina's blogs [were] having a deleterious effect upon prospective tenants."  *Id.*  The court further held that the injunction was overbroad because it "improperly burden[ed] Ms. Chevaldina's speech more than necessary, attempt[ed] to enjoin future defamation, and fail[ed] to put Ms. Chevaldina on notice as to what she may or may not do under the injunction."  *Id.* at 1091.  The court reversed the injunction on conduct allegedly constituting stalking and trespass for similar reasons: "the appellees failed to introduce evidence that specific blog posts were being used 'to communicate, or to cause to be communicated, words, images, or language . . . directed at a specific person, causing substantial emotional distress to that person and serving no legitimate purpose.'"  *Id.* at 1091–92 (quoting Fla. Stat. § 784.048(1)(d)).  Thus, injunctive relief was improper because the record below failed to establish that the conduct being enjoined was in furtherance of any of the underlying intentional torts.

No such evidentiary deficiency exists here.   Rather, a jury has already found that Defendant's actions violated Florida's anti-deep fake statute, and that her promotion of the pornographic deep fake video depicting Plaintiff, along with other conduct, constituted cyberstalking.  This "final adjudication on the merits" obviates prior restraint concerns altogether,

*Auburn Police Union*, 8 F.3d at 903, as noted, but even to the extent that the principle comes into the picture, the record establishes that the relief Plaintiff now seeks is covered by the "exception to the general rule" articulated in *Chevaldina*, 133 So. 3d at 1090.

In fact, there can be no question that Florida's Legislature intended for courts to enter injunctive relief in these circumstances. The deep-fake statute provides that "[a]n aggrieved person may initiate a civil action against a person" who generates or promotes a pornographic deep fake in order "to obtain appropriate relief," including "[i]njunctive relief." Fla. Stat. § 836.13(7)(a). And Florida's anti-stalking statute expressly "create[s] a cause of action for an injunction for protection against stalking," which "shall include the offense of cyberstalking." Fla. Stat. § 784.0485(1). In a separate statute, the Legislature established procedures governing circumstances where an "injunction for protection against stalking or cyberstalking has been violated." *See* Fla. Stat. § 784.0487(1).

In enacting these statutes, the Legislature was cognizant of potential First Amendment concerns, but it determined that any such concerns did not stand as an obstacle to providing effective redress for victims of such heinous conduct. For example, although the Florida Senate acknowledged that a "complete ban of [deep fake] images would likely run afoul of constitutional protections under the First Amendment," it recognized that "certain categories of speech, including defamation, fraud, true threats, and the imminent-and likely incitement of violence, do not receive protections under the First Amendment," and that "[s]ome deep fakes will likely fall into one of those categories." *Impact Statement to S.B. 1798*; *see also United States v. Alvarez*, 567 U.S. 709, 717 (2012) (true threats, speech integral to criminal conduct, defamation, and obscenity are not protected by the First Amendment).

14

The careful drafting of these statutes explains why courts interpreting them have never identified a facial constitutional infirmity in their allowances for injunctions. *Amicus* is not aware of any judicial decisions concerning injunctive relief entered pursuant to Florida's anti-deep fake statute. But courts routinely grant injunctive relief under the cyberstalking statute at issue here. *See, e.g.*, *Rosaly v. Konecny*, 346 So. 3d 630, 634 (Fla. Dist. Ct. App. 2022) ("course of conduct," including driving by petitioner's house and using a drone to spy on her, "supports the issuance of an injunction"); *Thoma v. O'Neal*, 180 So. 3d 1157, 1160 (Fla. Dist. Ct. App. 2015) (conduct, including mailing a flyer that "identifies the Victim by name and face, gives her residence address, and encourages people to approach her at home" supported injunction). Where courts have determined that injunctive relief is not warranted, they have typically done so because the evidence does not support a finding of stalking. *See, e.g.*, *Wright v. Norris*, 320 So. 3d 253, 255 (Fla. Dist. Ct. App. 2021) (cyberstalking injunction improper where emails and text messages "were not addressed to [petitioner] herself," online posts "were not directed at a specific person," and petitioner "did not testify to the content of the text messages" sent to her). Indeed, "Section 784.048 itself recognizes the First Amendment rights of individuals by concluding that a 'course of conduct' for purposes of the statute does not include protected speech." *David v. Textor*, 189 So. 3d 871, 876 (Fla. Dist. Ct. App. 2016). Accordingly, Florida courts have declined to enter injunctions where, as applied to the relevant conduct, the injunction would restrain protected speech. *See, e.g.*, *id.* (injunction improper to restrain "online postings [that] simply provide information . . . regarding [petitioner] and the many lawsuits against him"). Conversely, they have upheld injunctions on speech that falls beyond the boundaries of the First Amendment. *See, e.g.*, *Thoma*, 180 So. 3d at 1160 ("[T]he flyer 'crosses the line,' in terms of First Amendment protection,

because the mailing of the flyer to the Victim's home, by itself, was an attempt to force unwanted speech upon her in the privacy of her home.").

Granting an injunction in this context is consistent with how the law remedies similarly egregious violations of decency. Revenge porn, "the nonconsensual dissemination of another's intimate visual images," is a close cousin of the kind of sexually explicit deep fakes Defendant promoted here. *Doe v. Constant*, 2024 WL 3512136, at *4 (W.D. La. July 23, 2024). Its harms are also similar: as with deep fakes, "[t]he impact of revenge porn can include public shame and humiliation, an inability to find new romantic partners, mental health effects such as depression and anxiety, job loss or problems securing new employment, and offline harassment and stalking. Furthermore, once disseminated, it is challenging to completely remove these images from the internet." *Id.* (internal citation omitted). Those are precisely the kinds of serious harms to which Plaintiff and others testified at trial. Plaintiff explained to the jury that as a result of Defendant's actions, she didn't "feel like existing anymore," was "tired of waking up," and "just wanted to die." Trial Tr., Nov. 20, 2025, at 178:8–10. Plaintiff's manager, a longtime friend and confidant who first showed her the deep fake, described Plaintiff's immediate reaction after seeking the video on her tour bus: "She cried. You know, she shut me out the room . . . [S]he went in her room and just cried, you know, didn't come out for, you know, a few hours." Trial Tr., Nov. 19, 2025, at 51:22–52:1. Plaintiff's psychologist testified to the longer-term effects of Defendant's conduct, including impacting Plaintiff's familial and other interpersonal relationships, negatively affecting her desire to work, and contributing to a diagnosis of post-traumatic stress disorder. *See id.* at 159:5–163:25. Plaintiff's counsel summed up the harms in his closing statement: "once [a deep fake] is in the system, the lies, it perpetuates and it goes viral—and you have ruined somebody's life." Trial Tr., Nov. 25, 2025, at 167:2–4.

Given the severity of the harms it creates, courts regularly enter injunctions to prevent revenge porn. *See, e.g.*, *Doe*, 2024 WL 3512136, at *4 (granting preliminary injunction and noting that "the [federal anti-revenge porn] statute under which Plaintiff seeks relief expressly contemplates the issuance of injunctive relief"); *S.S. v. Collins*, 2024 WL 3594350, at *7–8 (D.N.J. July 31, 2024) ("the Court finds that the public interest would be served with the issuance of a permanent injunction against Defendant for the dissemination of intimate images and videos of Plaintiff"). And Congress engaged in the "careful and explicit creation of [a] statutory cause of action" permitting injunctive relief "to protect persons from this insidious form of harassment." *Doe*, 2024 WL 3512136, at *4.

The revenge porn cases, like the cases arising in Florida courts under the anti-stalking statute, reflect the unfortunate reality that injunctive relief is often a necessary remedy to ensure that victims of malicious and degrading conduct like Defendant's are not victimized again. Courts can and often do provide substantial monetary damages to plaintiffs for defamation and related torts—damages that, while not strictly injunctive in nature, are clearly designed to dissuade future wrongdoing by those against whom they are directed. *See, e.g.*, *Freeman v. Giuliani*, 732 F. Supp. 3d 30, 63 (D.D.C. 2024) (affirming jury verdict awarding $145,969,000 in compensatory and punitive damages for defamation and intentional infliction of emotional distress); *Carroll v. Trump*, 151 F.4th 50, 79–86 (2d Cir. 2025) ("the jury's duly rendered damages awards"—totaling $83.3 million in compensatory and punitive damages—"were reasonable in light of the extraordinary and egregious facts of this case," including President Trump's continued defamation following a prior jury verdict as to defamation on the same issue). To be sure, damages awards can have salutary forward-looking effects. But they are not always enough to deter future conduct. Here, for example, Defendant has already characterized the jury's verdict against her as "a win" because

it did not result in "a multimillion dollar settlement or fining."[5]  It was, in other words, a price she apparently was willing to pay—and may be willing to pay again—to harm and degrade Plaintiff.

At trial, Plaintiff recognized that, as a public figure, her willingness to fight back against Defendant's heinous actions could have positive effects beyond her own case: "maybe I am going through all of this because there's another woman out there that may be a victim and she sees me going through it, and she sees me come out on the other side and it may give her the courage or the strength to speak up and say, this happened to me and I am not—I'm not going to be scared of you. I am not going to be intimidated by you."  Trial Tr., Nov. 20, 2025, at 178:18–24.  Entry of the injunction Plaintiff now requests would send the same sort of important and broad-reaching message to victims of sexualized online abuse.  The First Amendment does not stand as an obstacle to this Court making sure that the law, and the jury's verdict, are followed going forward.

## CONCLUSION

This case demonstrates how technological advances can amplify familiar forms of online harm, including harm based on sexually explicit images.  Deep-fake sexual imagery does not contribute to public debate; it reproduces patterns of intimidation and degradation that the law has long deemed unprotected.  Florida's statutory framework acknowledges this reality, and the jury's findings confirm that Defendant's conduct falls within it.  Nothing in the First Amendment prevents a court from ensuring that the harm does not recur, and that individuals need not endure the continued weaponization of digital tools against their dignity and safety.  *Amicus curiae* respectfully submits that granting the requested relief accords with both constitutional principles and the longstanding role of courts in protecting victims of targeted abuse.

---

[5] Ivan Taylor, *Texas blogger Milagro Cooper shares her perspective after defamation verdict in Megan Thee Stallion case*, CBS NEWS (Dec. 2, 2025), https://www.cbsnews.com/miami/news/texas-blogger-milagro-cooper-defamation-megan-thee-stallion-verdict/.

Dated: January 9, 2026

Respectfully submitted,

Roberta A. Kaplan (*Pro Hav Vice*)
D. Brandon Trice (*Pro Hac Vice*)
Christopher K. Connolly (*Pro Hac Vice*)
Zahraa Nasser Jazayeri (*Pro Hac Vice*)
KAPLAN MARTIN LLP
1133 Avenue of the Americas,
Suite 1500
New York, New York 10036
(212) 316-9500
rkaplan@kaplanmartin.com
btrice@kaplanmartin.com
cconnolly@kaplanmartin.com
zjazayeri@kaplanmartin.com

*/s/ Stephen F. Rosenthal*
Stephen F. Rosenthal
Florida Bar No. 0131458
PODHURST ORSECK, P.A.
2525 Ponce de Leon Blvd., Suite 700
Coral Gables, FL 33134
(305) 358-2800
srosenthal@podhurst.com

*Attorneys for Amicus Roberta A. Kaplan*

19

## LOCAL RULE 7.1(a)(3) CERTIFICATION

On December 22, 2025, *amicus* conferred via email with counsel for all parties in a good faith effort to resolve by agreement the issues to be raised in the "Motion of Roberta A. Kaplan to Appear as *Amicus Curiae* and to File *Amicus Curiae* Brief" as required by this Court's Local Rules.  Counsel for the parties did not advise whether they consent to the relief sought in the motion as of the date the motion was filed on December 23, 2025.  The Court has since granted leave to file the Amicus Brief [DE 289] so no further conferral was necessary.

Dated: January 9, 2026

*/s/ Stephen F. Rosenthal*
Stephen F. Rosenthal

20

**CERTIFICATE OF SERVICE**

I hereby certify that on January 9, 2026, I electronically filed the foregoing with the

Clerk of the Court using CM/ECF.  I also certify that the foregoing is being served this day on all

Counsel of Record via transmission of Notices of Electronic Filing generated by CM/ECF.


*/s/ Stephen F. Rosenthal*
Stephen F. Rosenthal