**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 24-24228-CIV-ALTONAGA/Reid**

**MEGAN PETE**,

     Plaintiff,

v.

**MILAGRO ELIZABETH COOPER**,

     Defendant.

_____/

## **<u>ORDER</u>**

**THIS CAUSE** came before the Court on Plaintiff, Megan Pete's Motion for Entry of Permanent Injunction Against Cyberstalking . . . [ECF No. 250].  Defendant, Milagro Elizabeth Cooper, filed a Response [ECF No. 306]; to which Plaintiff filed a Reply [ECF No. 307].[1]  The Court has reviewed the parties' written submissions, the record, and applicable law.  For the following reasons, the Motion is denied.

### **I.  BACKGROUND**

*Introduction.*  This case arises out of defamation per se and related state-law claims, brought by Plaintiff, a Grammy-winning hip-hop artist known professionally as Megan Thee Stallion, against Defendant, an online personality who goes by Milagro Gramz or Mobz World. (*See* Second Amended Complaint ("SAC") [ECF No. 37] ¶¶ 10, 12, 27).  Plaintiff alleges that Defendant orchestrated a retaliatory smear campaign against her because of her role in the 2022 conviction of Daystar Peterson, a Canadian rapper and singer known as Tory Lanez, who, after a widely publicized trial, was found guilty of assaulting Plaintiff with a firearm.  (*See id.* ¶¶ 1–9).

---

[1] Roberta A. Kaplan filed an amicus brief in support of Plaintiff's Motion.  (*See* Br. of Amicus *Curiae* Roberta A. Kaplan . . . ("Kaplan Br.") [ECF No. 298]).

In her Second Amended Complaint, Plaintiff brought claims of defamation per se (Count I); promotion of an altered sexual depiction under section 836.13, Florida Statutes (Count II); intentional infliction of emotional distress ("IIED") (Count III); and cyberstalking under section 784.0485, Florida Statutes (Count IV). (*See id.* ¶¶ 89–124). A jury found Defendant liable to Plaintiff on Counts I, II, and III. (*See generally* Jury Verdict ("Verdict") [ECF No. 226]).[2] Based on its findings, the jury awarded Plaintiff compensatory and punitive damages. (*See id.* 4–5).[3] The Court retained jurisdiction to consider Plaintiff's request for permanent injunctive relief against cyberstalking in Count IV. (*See* Final J. [ECF No. 227] 2).

*Plaintiff's Cyberstalking Petition.* To bring a cyberstalking claim, Florida Statute section 784.0485(3)(a) requires a plaintiff to file a verified petition alleging the existence of cyberstalking and setting forth "the specific facts and circumstances for which relief is sought." *Id.* Plaintiff did so and attached a sworn Petition for Injunction Against Stalking ("Petition") to her SAC, detailing the incidents she relies on to seek a permanent injunction against Defendant. (*See generally* Mot., Ex. A, Pet. for Injunction Against Stalking ("Pet.") [ECF No. 250-1]); *see also* Fla. Stat. § 784.0485(3)(a).

Plaintiff's request for a permanent injunction — like her requests for damages in her other claims — centers on Defendant's commentaries about Plaintiff and Plaintiff's testimony related to Peterson's criminal conduct. On July 12, 2020, Los Angeles police conducted a traffic stop involving Peterson and Plaintiff following reports of gunfire in the area. (*See* SAC ¶ 17). During

---

[2] (*See generally* Nov. 17, 2025 Trial Tr. ("Nov. 17 Tr.") [ECF No. 228]; Nov. 18, 2025 Trial Tr. ("Nov. 18 Tr.") [ECF No. 229]; Nov. 19, 2025 Trial Tr. ("Nov. 19 Tr.") [ECF No. 230]; Nov. 20, 2025 Trial Tr. ("Nov. 20 Tr.") [ECF No. 231]; Nov. 21, 2025 Trial Tr. ("Nov. 21 Tr.") [ECF No. 232]; Nov. 24, 2025 Trial Tr. ("Nov. 24 Tr.") [ECF No. 233]; Nov. 25, 2025 Trial Tr. ("Nov. 25 Tr.") [ECF No. 234]; Nov. 26, 2025 Trial Tr. ("Nov. 26 Tr.") [ECF No. 235]; Dec. 1, 2025 Trial Tr. ("Dec. 1 Tr.") [ECF No. 236]).

[3] The Court uses the pagination generated by the electronic CM/ECF database, which appears in the headers of all court filings.

the stop, officers discovered a recently discharged firearm with an empty magazine and observed injuries on Plaintiff's feet, later confirmed to be gunshot wounds. (*See id.* ¶¶ 17–18). Peterson was arrested for possession of a concealed weapon, and Plaintiff was transported to the hospital for treatment. (*See id.*).

According to the Petition, Defendant's campaign of harassment and cyberstalking began shortly after this incident in July 2020. (*See* Pet. 3). About a month later, Plaintiff publicly identified Peterson as the shooter via social media; and on October 8, 2020, Peterson was charged with felony assault with a firearm and later with illegal possession and negligent discharge of a firearm. (*See* SAC ¶¶ 19–20; Pet. 3).

Plaintiff's Petition cites as an example of Defendant's conduct Defendant falsely posting in May 2022 on her X account that it was "'CONFIRMED'" Plaintiff injured herself "by 'stepping on glass,' instead of being shot by Mr. Peterson." (Pet. 3). Plaintiff testified at Peterson's trial, recounting the night she was shot and the trauma it caused in her personal and professional life. (*See id.* 4; *see also* SAC ¶¶ 21–22). Plaintiff explains that Defendant was present with Peterson's family during Plaintiff's testimony and throughout the criminal trial and was "frequently posting" about the trial online, calling Plaintiff a "liar and a perjurer." (Pet. 4; *see also* SAC ¶ 23).

On December 21, 2022, Defendant posted a livestream video on her Instagram account questioning whether Plaintiff was shot and implying that Plaintiff was lying in her testimony, and that Defendant threatened her with violence. (*See* Pet. 4; *see also* SAC ¶ 36). Around the same time, Defendant referred to Plaintiff "as a 'non[-]credible witness' who falsely accused [] Peterson of a felony." (Pet. 4 (alterations added)).

Peterson was convicted of all charges and sentenced to ten years in prison. (*See* SAC ¶¶ 1, 24). After the conviction, Defendant continued sharing and posting content about Plaintiff's

testimony at the criminal trial. (*See* Pet. 4–5 (describing multiple posts from January 22, 2023 through October 28, 2024)).

Included in the Petition are incidents unrelated to the criminal trial. On January 29, 2024, Defendant posted on X that Plaintiff was "'fcking'" her manager and wrote that Plaintiff was "'slow and needed'" a guardian. (*Id.* 6). In another post dated July 30, 2024, Defendant asked whether Plaintiff had ever been "'deemed, like, legally retarded'" or "'listed as a capable person.'" (*Id.* (alteration adopted)). On October 30, 2024, Defendant posted that Plaintiff has "'drinking seemingly running through [her] family'"; and stated that Plaintiff's grandfather was an alcoholic, while making disparaging comments about her father. (*Id.* (alteration added)). On November 3, 2024, Defendant called Plaintiff a "'drunkie'" and questioned whether her "'liver even functions well.'" (*Id.*).

The final incident alleged in the Petition occurred in June 2024, when Defendant promoted an altered sexual depiction of Plaintiff. (*See id.*). Plaintiff alleges that on June 8, 2024, Defendant "liked" an X post featuring a deepfake video showing Plaintiff engaging in sexual acts (the "Deepfake Video") and shortly thereafter posted, "'Go to my likes[,]'" directing individuals to view the video from Defendant's archived "likes." (*Id.* (alteration added)). Defendant acknowledged that she "'drew attention'" to the Deepfake Video. (*Id.* 7). The next day, Defendant confirmed on another livestream that she "'told whoever follows [her] on social media to go to [her] likes to see what it is that we're discussing." (*Id.* (alterations added; other alteration adopted)).

*Defendant's Post-Trial Conduct.*  The jury rendered its Verdict on December 1, 2025.  (*See generally* Verdict).   According to Plaintiff, Defendant's harassment has continued after the Verdict.  Defendant's more recent conduct, as described by Plaintiff, is reproduced below:

- On December 1, 2025, Defendant went on Instagram Live and stated, "I'm gonna start working on my mixtape.  Because apparently, the only place you can bully people and talk crazy and pop shit is in the studio, but anywhere else is off limits, you know . . . so, I'm gonna get on my mixtape shit and make sure I channel all my energy into my raps and put that out and let that be artistic expression."

- During the same December 1, 2025 Instagram Live, a social media user commented that Defendant had lost the lawsuit, and Defendant responded, "I heard you blocked, too.  Listen, all I'm ever gonna do is block y'all.  I don't get on the Internet and cry about what y'all say."

- On December 2, 2025, Defendant posted a photo of herself on X with a promotional photograph of CBS News Reporter Gayle King.

- That same day, while on air with CBS News, Defendant was asked why she promoted the Deepfake Video, and Defendant responded, "I think that's a tricky question because I think there are misconceptions about what actually happened.  I did say, 'Go to my likes,' and I did speak about it."  When asked if she considered the harm of the Deepfake Video to Plaintiff, Defendant stated, "Did I personally think that this would cause her to feel those ways?  Absolutely not."

- On December 3, 2025, Defendant wrote on X that "anything that had to do with mental capacity or alcoholism never even made it to the final sheet," and that the three defamatory statements for which the jury found her liable were not "statements of fact."

- Defendant's counsel issued a press release stating that Defendant was found "not liable" for defamation.  Her counsel then posted on social media a private e-mail exchange between Plaintiff's and Defendant's counsel and subjected Plaintiff's counsel to undue harassment and doxing.

- On December 15, 2025, Defendant went on another blogger's livestream. She made comments about Amiel Holland-Briggs, who testified on behalf of Plaintiff, stating, "And I have now, I mean, been betrayed in the worst way. Somebody I used to be friends with.  Oh, child, got up on the damn stand against me, lied on me in federal court."  Defendant then said that Plaintiff made herself out to be "the black Regina George, who was a bully" and that Plaintiff's manager, Travis Farris, "should have been up there" for IIED for showing Plaintiff several of Defendant's social media posts.

(*See* Mot. 10–12).  No evidence of any post-December 2025 events has been presented.

*The Request for a Permanent Injunction.*  Plaintiff states she is entitled to a permanent injunction under section 784.0485, Florida Statutes, because of Defendant's cyberstalking.  (*See generally* Mot.).  She seeks a permanent injunction (1) barring Defendant from any direct, indirect, or third-party contact with Plaintiff; (2) requiring Defendant to remain at least 500 feet from Plaintiff, her home, and any location she is expected to be, and 1,000 feet from her musical performances; (3) prohibiting disclosure of Plaintiff's private personal identifying information; (4) forbidding the promotion, distribution, or transmission of the Deepfake Video or any other altered sexual depictions of Plaintiff; (5) barring defamatory statements regarding Plaintiff's testimony at Daystar Peterson's criminal trial, her mental and emotional state, alcohol use, or family; (6) prohibiting communications intended to incite third parties to threaten or harm Plaintiff, her team, or her family; (7) enjoining harassment, threats, assault, stalking, cyberstalking, impersonation, or other disturbing conduct; and (8) requiring removal of all statements and postings about the jury's Verdict.  (*See id.*, Proposed Order [ECF No. 250-8] 1–2).

Several of these restrictions fall outside the scope of the harassment described in the Petition.  For example, Plaintiff requests an injunction barring Defendant from direct, indirect, or third-party contact; requiring her to remain at specified distances from Plaintiff and locations where Plaintiff may be; and prohibiting disclosure of private personal identifying information. (*See* Proposed Order at 1–2).  There is no evidence that Defendant has ever attended Plaintiff's performances or attempted to contact or seek out Plaintiff.  (*See generally* Mot.; Reply; Nov. 18 Tr. 165:4–15; Nov. 20 Tr. 116:7–12).  It is unclear how Defendant could govern her conduct to be

at least 500 feet from any location Plaintiff is expected to be, nor how the claimed cyberstalking is associated with any physical proximity to Plaintiff.

Regarding personal identifying information, the only PII at issue appears to be Plaintiff's Florida residential address. (*See* Mot. 9). Defendant testified she obtained the address from public voter registration records after the lawsuit was filed to brief a venue challenge. (*See* Nov. 24 Tr. 184:10–186:17). Plaintiff does not contend that Defendant has threatened to disclose it or any other private information. And Plaintiff's request that Defendant be required to remove all statements and postings addressing the jury's Verdict is far removed from any redress for the claimed harassment and is far too broad a restriction on speech.

The Court thus limits consideration of the Motion to the requested restrictions that are connected to the cyberstalking events described in the Petition. Plaintiff asserts a permanent injunction is warranted because Defendant's cyberstalking has caused and will continue to cause Plaintiff irreparable emotional and financial harm; monetary damages and sanctions do not adequately compensate Plaintiff for her severe emotional distress and reputational harm; and equitable considerations such as the public interest and balance of hardships do not favor denial of an injunction. (*See* Mot. 16–18). According to Defendant, the pages and platforms containing the offending speech are now defunct; she has voluntarily limited her public commentary, and "Plaintiff has not shown that any existing content continues to cause injury or poses an imminent threat." (Resp. 6; *see also id.* 6–7). Finally, Defendant argues that Plaintiff's requested injunction is an unconstitutional prior restraint. (*See id.* 7).

## II. LEGAL STANDARD

Courts have "broad discretion in deciding to award injunctive relief." *RJ's Int'l Trading, LLC v. Crown Castle S., LLC*, No. 23-10453, 2024 WL 1509156, at *2 (11th Cir. Apr. 8, 2024)

(alteration added; citations omitted). Injunctive relief is an "extraordinary and drastic remedy." *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1247 (11th Cir. 2016) (quotation marks and citation omitted). "[T]he standard for a permanent injunction is essentially the same as for a preliminary injunction except that the movant must show actual success on the merits instead of a likelihood of success on the merits." *St. James Ent. LLC v. Crofts*, 837 F. Supp. 2d 1283, 1292–93 (N.D. Ga. 2011) (alteration added; citing *Siegel v. LePore*, 234 F.3d 1163, 1213 (11th Cir. 2000)). Upon prevailing on the merits, to obtain a permanent injunction, a plaintiff must demonstrate she (1) suffered an irreparable injury; (2) her remedies at law are inadequate; (3) the balance of hardships weighs in her favor; and (4) a permanent injunction would not disserve the public interest. *See Barrett v. Walker Cnty. Sch. Dist.*, 872 F.3d 1209, 1229 (11th Cir. 2017) (citing *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)).

Plaintiff, as the party seeking the injunction, carries the burden of satisfying each element before the Court may grant such relief. *See eBay*, 547 U.S. at 391; *L.E. by & Through Cavorley v. Superintendent of Cobb Cnty. Sch. Dist.*, 55 F.4th 1296, 1299–1300 (11th Cir. 2022) (citing *Davidoff & CIE, S.A. v. PLD Int'l Corp.*, 263 F.3d 1297, 1300 (11th Cir. 2001)). And while the Court may award a combination of equitable and legal remedies, Plaintiff may not obtain "double recovery for the same injury[.]" *F.T.C. v. Leshin*, 719 F.3d 1227, 1232 (11th Cir. 2013) (alteration added; quotation marks omitted; quoting *MCA Television Ltd. v. Pub. Int. Corp.*, 171 F.3d 1265, 1274 (11th Cir. 1999)). Finally, if granted, "[i]njunctive relief should be limited in scope to the extent necessary to protect the interests of the parties." *Keener v. Convergys Corp.*, 342 F.3d 1264, 1269 (11th Cir. 2003) (alteration added; collecting cases).

### III.  DISCUSSION

Plaintiff insists she has established the elements of cyberstalking and harassment to satisfy Florida Statute section 784.0485, as well as the requirements for permanent injunctive relief.  The Court first examines whether Plaintiff has succeeded on the merits of her cyberstalking claim, before addressing the matter of irreparable harm and Defendant's assertion that an injunction would operate as an impermissible prior restraint.

### A.  Cyberstalking: Success on the Merits

Florida Statute section 784.0485(1) creates a civil cause of action for injunctive relief against stalking, including cyberstalking.  *See Hoover v. Peak ex rel. C.P.*, 392 So. 3d 261, 263 (Fla. 1st DCA 2024) (citing Fla. Stat. § 784.0485(1)).  Stalking occurs when a person "willfully, maliciously, and repeatedly follows, harasses, or cyberstalks another person[.]"  Fla. Stat. § 784.048(2) (alteration added).  To commit "cyberstalking" is

> [t]o engage in a course of conduct to communicate, or to cause to be communicated, . . . words, images, or language by or through the use of electronic mail or electronic communication, directed at or pertaining to a specific person . . . causing substantial emotional distress to that person and serving no legitimate purpose.

*Id.* § 784.048(1)(d)1 (alterations added); *see also Strober v. Harris*, 332 So. 3d 1079, 1086 (Fla. 2d DCA 2002) (applying the definition of "cyberstalk" in section 784.048 to claims brought under section 784.0485).

To prevail on a section 784.0485 claim of cyberstalking, a plaintiff must prove:

> the defendant [1] willfully, maliciously, and repeatedly [2] engaged in a course of conduct [3] that involved[ — ]directly or indirectly[ — ]communicating or causing to be communicated words or images [4] using electronic communications [5] directed at or pertaining to a specific person that [6] caused substantial emotional distress to that person and [7] served no legitimate purpose.

*Kassenoff v. Harvey*, No. 23-cv-24085, 2024 WL 562738, at *10 (N.D. Fla. Feb. 8, 2024) (alterations added; citation omitted).  "Whether the conduct meets the statutory requirement is a

question of fact for the trier of fact." *Biggs v. Elliot*, 707 So. 2d 1202, 1202 (Fla. 4th DCA 1998); *see also Lopez v. Lopez*, 922 So. 2d 408, 410 (Fla. 4th DCA 2006).

In their Joint Pretrial Stipulation, the parties asked the Court to decide "[w]hether a cyberstalking injunction is warranted after receiving the jury's [V]erdict." (Joint Pretrial Stip. 3 (alterations added)). Plaintiff argues she "has already established the requisite element of success on the merits" because a jury considered the evidence and found Defendant liable for defamation per se, IIED, and promotion of an altered sexual depiction. (*See* Mot. 17). The Court is not so convinced.

First, and by way of example, to prevail on a claim of cyberstalking, Plaintiff must prove that Defendant acted "willfully, maliciously, and repeatedly." Fla. Stat. § 784.084(2). The Florida Standard Jury Instructions define "willfully" as "knowingly, intentionally, and purposely" and "maliciously" as "wrongfully, intentionally, and without legal justification or excuse." Fla. Std. Jury Instr. (Crim.) 8.6. The jury found that Defendant acted "intentionally or recklessly." (Verdict 3). "Intentionally" or "recklessly" were defined as acting "with the intent to cause severe emotional distress or with reckless disregard of the high probability of causing severe emotional distress." (Jury Instructions 7). Because the Verdict is disjunctive, it is unclear whether the jury found intentional conduct or only recklessness. (*See* Verdict 3).

Second, the statute requires that Defendant's communications serve no legitimate purpose. *See* Fla. Stat. § 784.048(2). "A communication serves a 'legitimate purpose' when 'there is a reason for the contact other than to harass the victim — even if the victim may find the communication disturbing.'" *Kassenoff*, 2024 WL 562738, at *10 (quoting *Hammer v. Sorenson*, 824 F. App'x 689, 693 (11th Cir. 2020)). Florida courts construe this element broadly, finding the inquiry into "legitimate purpose" covers a "wide variety of conduct." *David v. Textor*, 189 So. 3d

871, 875 (Fla. 4th DCA 2016) (finding an email threatening the recipient that he "would be 'sorry' if he didn't settle" legitimate for the purpose of encouraging the recipient to drop a lawsuit); *Hammer*, 824 F. App'x at 693–94 (finding graphic gun violence emails had the legitimate purpose of intending to dissuade the recipient from continuing to support the continued availability of assault rifles); *Alter v. Paquette*, 98 So. 3d 218, 220 (Fla. 2d DCA 2012) (finding text messages demanding money and threatening disclosure of the recipient's affair to his wife had the legitimate purpose of seeking repayment of a loan); *Goudy v. Duquette*, 112 So. 3d 716, 717 (Fla. 2d DCA 2013) (finding a hostile phone call from a parent to a dance team coach had the legitimate purpose of addressing his daughter's participation in the dance team competition).

Plaintiff contends that the jury determined Defendant's intentional and malicious online harassment served no legitimate purpose (*see* Mot. 15), pointing to the jury's findings that Defendant did not provide disinterested and neutral commentary rather than advocacy for a particular client or personal interest, and did not impartially disseminate information (*see* Verdict 2). But Plaintiff's argument overlooks other findings: the jury concluded that Defendant regularly disseminated news or information to the public; "operated for the purpose of informing the public about matters of public concern through news reporting, analysis, or commentary"; and functioned in a similar manner to traditional news media. (*Id.* 2–3).

In short, the Court is not convinced the Verdict shows Plaintiff succeeded on the merits of her cyberstalking claim in Count IV. Nor is the Court convinced, as the trier of fact on Count IV, that Plaintiff met the requirement of showing Defendant's communications "served no legitimate purpose" with the trial evidence and the post-Verdict events described in the Motion. That said, the request for a permanent injunction is denied for two other reasons, addressed below.

11

**B. Irreparable Injury and Adequacy of Remedies at Law**

The Court considers whether Plaintiff has shown she will suffer an irreparable injury without a permanent injunction. A showing of irreparable injury is "the *sine qua non* of injunctive relief." *Northeastern Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990) (citation omitted). "The asserted irreparable injury must be neither remote nor speculative, but actual and imminent." *Siegel*, 234 F.3d at 1176–77 (quotation marks and citations omitted). "An injury is 'irreparable' only if it cannot be undone through monetary remedies." *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. Unit B 1981) (citations omitted). "The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Northeastern Fla. Chapter of Ass'n of Gen. Contractors of Am.*, 896 F.2d at 1285 (quotation marks and citation omitted).

Certainly, a court may combine "equitable and legal remedies . . . [such as] an injunction that prevents future harm along with . . . damages that compensate[] for past harm." *Leshin*, 719 F.3d at 1232 (alterations added; citation omitted). But a plaintiff may not obtain "double recovery for the same injury[.]" *Id.* (alteration added; citation and quotation marks omitted)).

As explained, section 784.0485(3)(a) requires Plaintiff to file a verified petition alleging the existence of cyberstalking and setting forth the facts and circumstances for which relief is sought. *See id.* Plaintiff's Petition concerns conduct that forms the basis of the three claims for which Plaintiff sought and obtained compensatory damages. (*See generally* Pet.). In other words, the Petition is premised on allegations that *predate* the trial and that the jury factored into its damages award. (*See generally id.* 2–7; *see also* SAC; Jury Instructions; Verdict).

12

The jury found Defendant was "liable to [Plaintiff] for defamation *per se* by accusing [Plaintiff] of perjury — a felony — by lying under oath in a criminal trial" (Verdict 1 (alteration added); *compare* Jury Instructions 5–6, *with* Pet. 4–5), awarding Plaintiff both actual and punitive damages (*see* Verdict 5).  In her IIED claim, Plaintiff alleged that Defendant "coordinat[ed] with . . . Peterson and others, to distribute false statements about [Plaintiff] and to promote and distribute an altered sexual depiction of [Plaintiff], which caused her severe emotional distress."  (Jury Instructions 7 (alterations added)); *compare id.*, *with* Pet. 3 ("[Defendant] is a paid mouthpiece for Daystar Peterson . . . , who has conspired with him to smear, harass, and cyberstalk me." (alterations added)); *see also id.* 4–7).  The jury found that Defendant "intentionally or recklessly engaged in extreme and outrageous conduct toward [Plaintiff]" and awarded additional actual and punitive damages.  (Verdict 3 (alterations added); *see also id.* 4–5).  Lastly, the jury found that Defendant "willfully and maliciously promoted, without [Plaintiff's] consent, a visual depiction of [Plaintiff] that she knew or reasonably should have known was an altered sexual depiction" and awarded Plaintiff compensatory damages.  (*Id.* 4 (alterations added); *compare id.* 5, *with* Pet. 6–7).

The Verdict represents an adequate remedy at law for Defendant's past conduct.  (*See generally* Verdict).  Because the Petition is based on the exact conduct for which Plaintiff received a complete, legal remedy, Plaintiff must show a likelihood of future irreparable harm that cannot be redressed by monetary damages to obtain a permanent injunction prohibiting future conduct. *See Strickland v. Alexander*, 772 F.3d 876, 883 (11th Cir. 2014) ("[A] plaintiff seeking . . . injunctive relief must allege and ultimately prove, a real and immediate — as opposed to merely hypothetical or conjectural — threat of future injury." (alterations added; quotation marks, citation, and emphasis omitted)).

CASE NO. 24-24228-CIV-ALTONAGA/Reid

In seeming acknowledgment of this requirement, Plaintiff argues that money damages are inadequate because "[d]espite the jury's verdict and the Court's judgment on damages, Defendant continues to post online content that causes [Plaintiff] irreparable harm[.]" (Mot. 18 (alterations added)). But Plaintiff has not shown that any of the content at issue in the SAC and addressed at trial remains publicly available. (*See generally* Mot.; Reply); *cf. Saadi v. Maroun*, No. 07-cv-01976, 2009 WL 3617788, at *2 (M.D. Fla. Nov. 2, 2009) (finding an injunction appropriate because the defendant did not remove two of the postings a jury found were defamatory). Nor does she point to new content that is causing injury. Indeed, Defendant advises that her "prior pages have been deleted, are inaccessible," and "no longer exist." (Resp. 6); *cf. Thomas v. Bryant*, 614 F.3d 1288, (11th Cir. 2010) (noting "the irreparable-injury requirement may be satisfied by demonstrating a history of past misconduct, which gives rise to an inference that future injury is imminent." (citations omitted)).

Plaintiff does not dispute this but argues that Defendant's post-Verdict harassment is continuing and her wrongful conduct *could resume* through new accounts and platforms. (*See* Reply 7–8). Neither argument is persuasive. Plaintiff does not assert that Defendant's "post-Verdict harassment" consists of cyberstalking. (*See generally* Mot. 10–12). Instead, Defendant's alleged post-Verdict harassment consists of Defendant: saying she is "gonna start working on [her] mixtape[;]" responding to a social media user that she does not "get on the Internet and cry about what" social media users say; posting images with a promotional photograph of CBS news reporter Gayle King; sharing her perspective of the action during a CBS *News Miami* interview; posting about the contents of the Verdict form; accusing a witness who testified for Plaintiff of perjury; saying Plaintiff made herself out to be the "the black Regina George"; and allegedly downplaying her defamatory statements. (*Id.* 10–12 (alterations added; citations and quotation marks omitted)).

14

This described post-Verdict conduct, for which no cyberstalking Petition was filed, does not satisfy the definition of cyberstalking. It does not consist of "a course of conduct to communicate, or to cause to be communicated, . . . words, images, or language by or through the use of electronic mail or electronic communication, directed at or pertaining to a specific person . . . causing substantial emotional distress to that person and serving no legitimate purpose." *Id.* § 784.048(1)(d) (alterations added). "Whether a communication causes substantial emotional distress should be narrowly construed and is governed by the reasonable person standard." *David*, 189 So. 3d at 875 (citations omitted). And as noted, "whether a communication serves a legitimate purpose is broadly construed" and covers "wide variety of conduct." *Id.* Even accepting that Defendant's post-Verdict posts and words pertain to Plaintiff, Plaintiff does not explain how a reasonable person would experience substantial emotional distress from these posts and words alone. (*See generally* Mot. 10–12); *David*, 189 So. 3d at 875. Nor does she show that Defendant's posts and words serve no legitimate purpose.

Further, Plaintiff's contention that Defendant's wrongful conduct *could* resume through new accounts and platforms, absent more, is insufficient to support entry of a permanent injunction. Again, Plaintiff's "asserted irreparable injury must be neither remote nor speculative, but actual and imminent." *Siegel*, 234 F.3d at 1176–77 (quotation marks and citations omitted); (*see also* Reply 7–8).[4] The few cases Plaintiff cites are unpersuasive. (*See* Mot. 16 (citing *Holmes*

---

[4] Defendant's December 1, 2025 statement on Instagram Live that she is "gonna start working on [her] mixtape. Because apparently, the only place you can bully people and talk crazy and pop shit is in the studio, but anywhere else is off limits, you know . . . so, [she's] gonna get on [her] mixtape shit and make sure [she] channel[s] all [her] energy into [her] raps and put that out and let that be artistic expression[,]" undermines Plaintiff's concern that Defendant intends to replicate her wrongful conduct through new accounts and platforms. (Mot. 10 (alterations added; footnote omitted); Reply 7–8). Although cited as evidence of ongoing harassment, this statement demonstrates Defendant's awareness of the limitations imposed by the jury's Verdict and the risks to Defendant should she engage in other wrongful conduct.

*v. Dominique*, No. 13-cv-04270, 2015 WL 11236539, at *6 (N.D. Ga. Jan. 20, 2015); *Friedlich*, 2011 WL 13322791, at *3; *Lavielle v. Acosta*, 281 F. Supp. 3d 1133 (W.D. Okla. 2017))).

Two of Plaintiff's cited cases — *Holmes* and *Friedlich* — are inapplicable, as they involve defaulted defendants. In *Holmes*, the plaintiff secured a default judgment for libel per se and IIED and sought an injunction requiring removal of defamatory posts and prohibiting further defamation. *See* 2015 WL 11236539, at *6. The court granted the injunction, restraining the defendant "from making derogatory, untrue comments about [the p]laintiff on the internet or in other public forums" because, given his persistent harassment and disregard for court rules, "it [was] not unlikely that he [would] continue to post defamatory comments[.]" *Id.* (alterations added).

Likewise, in *Friedlich*, the plaintiff sued for defamation and tortious interference after the defendant circulated false statements to customers, regulators, and business associates. *See* 2011 WL 13322791, at *2. In addition to damages, the plaintiff sought a permanent injunction requiring removal of the statements, barring further dissemination, and compelling a public retraction. *See id.* The court entered default judgment and granted limited equitable relief, noting the statements "remained posted during the pendency of th[e] lawsuit[,]" and the defendant had not responded to the proceedings. *Id.* at *3 (alterations added).

Even *Lavielle*, which did not involve a defaulting defendant, fails to persuade. *See* 281 F. Supp. 3d at 1134. In *Lavielle*, after a jury verdict, the defendant engaged in in-person harassment, including reporting plaintiffs to the Oklahoma Department of Human Services, repeatedly driving past a store plaintiffs were visiting, and following plaintiffs throughout the town for miles. *See id.* at 1135. The court issued an injunction barring contact because the defendant's conduct drove the plaintiffs from their home. *See id.* Plaintiff does not present evidence of ongoing physical

16

harassment, nor does she offer instances of new activities constituting cyberstalking. (*See generally* Mot.; Reply).

Plaintiff's request also suffers from an additional defect: she does not explain how Defendant's post-Verdict conduct has caused or is likely to cause irreparable harm, nor why she believes Defendant is likely to repeat her wrongful conduct. Plaintiff asserts her "past and continuing injuries were proven at trial" through witness testimony, relying on some of the very testimony that formed the basis for the jury's damages award. (Mot. 17). For example, Daniel Kinney testified regarding Plaintiff's lost brand deals and business opportunities. (*See* Nov. 19 Tr. 90:2–10, 100:2–9). Dr. Walker testified about Plaintiff's emotional distress and how Defendant's conduct exacerbated Plaintiff's trauma from the shooting. (*See id.* 160:22–161:20). Plaintiff relied on this evidence in seeking damages, which she received, and now relies on this same evidence in seeking injunctive relief. (*See* Nov. 26 Tr. 15:21–17:01; *see also* Mot. 17).

The jury already found as to the claim in Count II under Florida Statute section 836.13, that Defendant "willfully and maliciously promoted, without [Plaintiff's] consent, a visual depiction of [Plaintiff] that she knew or reasonably should have known was an altered sexual depiction" and awarded Plaintiff compensatory damages. (Verdict 4 (alterations added)). Section 836.13(7)(c) entitles Plaintiff to seek "[r]easonable attorney fees and costs." *Id.* (alteration added). "[D]amages awards can have salutary forward-looking effects." (Kaplan Br. 23 (alteration added)).

Plaintiff does not provide the Court with any reason to believe that Defendant — who is not accused of creating or initially posting the Deepfake Video and voluntarily removed her post — has not been adequately deterred by the Judgment awarding Plaintiff damages and Plaintiff's potential future recovery of reasonable attorney's fees and costs. (*See generally* Mot.; Reply;

CASE NO. 24-24228-CIV-ALTONAGA/Reid

Kaplan Br.; *see also* Nov. 17 Tr. 170:2–4; 171:8–10). Following the trial, Defendant has acknowledged having learned her lesson and expressed regret "that someone was hurt" because of her words. (*Cooper Shares Her Perspective After Defamation Verdict in Megan Thee Stallion Case*, CBS NEWS, Dec. 2, 2025 (quotation marks omitted)). At bottom, Plaintiff offers no evidence or arguments sufficient to persuade the Court that she will suffer irreparable harm if a permanent injunction is not entered. Based on this record, the Court is hard pressed to find any evidence of an actual and imminent injury flowing from Defendant's conduct that has not already been redressed by money damages.

### C. Additional Equitable Considerations

Even if Plaintiff met her burden in showing a likelihood of irreparable harm, Plaintiff's alleged threatened injury does not outweigh the harm a permanent injunction would inflict on Defendant because Plaintiff's requested relief constitutes an impermissible prior restraint on Defendant's speech.

The First Amendment prohibits almost all restraints on future speech. *See, e.g.*, *N.Y. Times Co. v. United States*, 403 U.S. 713, 714 (1971). And the First Amendment generally prohibits the government, including the judiciary, "from dictating what we see or read or speak or hear." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 235 (2002). An injunction forbidding certain communications before they are made is known as a "prior restraint" on speech. *Alexander v. United States*, 509 U.S. 544, 550 (1993).

Courts are divided on whether prior restraints of defamatory statements violate the First Amendment. Some courts suggest the remedy is "'*per se* unconstitutional,'" while others "leave open the possibility that under some circumstances an injunction following trial could be permissible." *Basulto v. Netflix, Inc.*, No. 22-cv-21796, 2023 WL 7129970, at *52 (S.D. Fla. Sep.

18

20, 2023) (alteration added; citing *Sindi v. El-Moslimany*, 896 F.3d 1, 30 (1st Cir. 2018); collecting cases). Although the Eleventh Circuit has not yet weighed in on the issue, six federal circuit courts "have concluded that a narrowly tailored permanent injunction is constitutionally permissible after an adjudication on the merits." *Studiorotan LLC v. Howell*, No. 25-cv-20, 2025 WL 3041940, at *10 (N.D. Ala. Oct. 31, 2025) (collecting cases); *see also Wagner Equip. Co. v. Wood*, 893 F. Supp. 2d 1157, 1161 (D.N.M. 2012) (collecting cases). Still, courts in this "modern" camp recognize that "[a]n injunction against defamatory statements, if permissible at all, must not through careless drafting forbid statements not yet determined to be defamatory[.]" *McCarthy v. Fuller*, 810 F.3d 456, 462 (7th Cir. 2015) (alterations added).

Even if the Court were inclined to adopt the modern approach, doing so would not assist Plaintiff here. "Generally, a judgment provides strong incentive for a defendant to remove any . . . statements that the jury has found to be defamatory, because the continued existence of the statements would expose the defendant to further, likely successful legal action" against her. *Saadi*, 2009 WL 3617788, at *2 (alteration added). The modern approach contemplates "an impecunious defamer" who, absent an injunction against defamatory statements, would remain "undeterrable" and "free to repeat all their defamatory statements with impunity." *McCarthy*, 810 F.3d at 462 (citation omitted). Plaintiff has not shown Defendant is an "impecunious defamer" who requires additional incentives to remove her defamatory statements — again, the content at issue in the SAC and redressed by the trial and Verdict is no longer publicly available. *Id.*; (*see generally* Mot.; Reply).

Plaintiff's proposed permanent injunction would forbid Defendant from "mak[ing] further defamatory statements" about Plaintiff's (1) testimony at the Peterson trial, "including the circumstances and causes" giving rise to Plaintiff's injuries; (2) mental and emotional state; (3)

19

alcohol use; and (4) extended family, among other proscriptions.  (Proposed Order 2 (alteration added)).  This request is not tied to any statements uttered since the November 2025 trial and impermissibly "forbid[s] statements not yet determined to be defamatory."  *McCarthy*, 810 F.3d at 462 (alteration added).

The Court's conclusion is bolstered by Florida law.  Florida appellate courts have consistently found that "injunctions are not available to stop someone from uttering insults or falsehoods."  *Logue v. Book*, 297 So. 3d 605, 614 (Fla. 4th DCA 2024) (collecting cases).  As Florida's Third District Court of Appeal explained:

> Angry social media postings are now common. Jilted lovers, jilted tenants, and attention-seeking bloggers spew their anger into fiber-optic cables and cyberspace. But analytically, and legally, these rants are essentially the electronic successors of the pre-blog, solo complainant holding a poster on a public sidewalk in front of an auto dealer that proclaimed, "DON'T BUY HERE! ONLY LEMONS FROM THESE CROOKS!"  Existing and prospective customers of the auto dealership considering such a poster made up their minds based on their own experience and research.  If and when a hypothetical complainant with the poster walked into the showroom and harangued individual customers, or threatened violence, however, the previously-protected opinion crossed the border into the land of trespass, business interference, and amenability to tailored injunctive relief.  The same well-developed body of law allows the complaining blogger to complain, with liability for money damages for defamation if the complaints are untruthful and satisfy the elements of that cause of action.  Injunctive relief to prohibit such complaints is another matter altogether.

*Chevaldina v. R.K./FL Mgmt., Inc.*, 133 So. 3d 1086, 1092 (Fla. 3d DCA 2014).  Plaintiff has certainly accused Defendant of creating "offensive[,] vulgar[,] and insulting posts[;]" but such conduct alone does not justify imposing an overbroad injunction directed at Defendant's future speech.  *Logue*, 297 So. 3d at 619 (alterations added).

Plaintiff also asks this Court to restrain Defendant from "mak[ing] any communications about Plaintiff that are intended to incite third parties to engage in threats or violence against Plaintiff, her professional team, and/or her family."  (Proposed Order 2 (alteration added)).

20

According to the Petition, Defendant's online posts "caused vast swaths of her followers to attack [Plaintiff] online." (Pet. 4 (alteration added)). And because of Defendant's "lies and misinformation," Plaintiff is allegedly "the target of hurtful, angry, offensive, humiliating, racial[,] and gender[-]based hate made in online posts" by Defendant's followers. (*Id.* 7 (alteration added)).

"As tempting as it might be to force some civility into the matter by staunching [Defendant's] speech against [Plaintiff]" through an injunction, doing so would "ignore the protections of the First Amendment[.]" *Logue*, 297 So. 3d at 618 (alterations added). Aside from Defendant's posted insults and falsehoods, Plaintiff has not shown that Defendant has incited action by urging her followers to threaten harm to Plaintiff, her professional team, or her family; or that Defendant's followers would reasonably perceive that intent. (*See generally* Pet.); *see also Logue*, 297 So. 3d at 618–19.

At bottom, Plaintiff's proposed permanent injunction directed at Defendant's future speech is overbroad and a classic example of a prior restraint on speech that triggers First Amendment concerns. On this record, Plaintiff has not demonstrated why her need for a permanent injunction outweighs Defendant's future exercise of her First Amendment rights.

### IV.  CONCLUSION

For these reasons, it is **ORDERED AND ADJUDGED** that Plaintiff, Megan Pete's Motion for Entry of Permanent Injunction Against Cyberstalking . . . **[ECF No. 250]** is **DENIED**.

**DONE AND ORDERED** in Miami, Florida, this 20th day of April, 2026.

_____
**CECILIA M. ALTONAGA**
**CHIEF UNITED STATES DISTRICT JUDGE**

21