**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 24-24228-CIV-ALTONAGA/Reid**

**MEGAN PETE**,

  Plaintiff,

v.

**MILAGRO ELIZABETH COOPER**,

  Defendant.

_____/

## <u>ORDER</u>

**THIS CAUSE** came before the Court on Plaintiff, Megan Pete's Motion to Reinstate Jury Verdict as to Defamation Claim and to Amend Final Judgment or Renewed Motion for Judgment as a Matter of Law . . . [ECF No. 257].  Defendant, Milagro Elizabeth Cooper filed a Response [ECF No. 304]; to which Plaintiff filed a Reply [ECF No. 305].   The Court has reviewed the parties' written submissions, the record, and applicable law.  For the following reasons, the Motion is granted in part.

## I.  BACKGROUND

***Introduction.***   On October 24, 2024, Plaintiff, professionally known as Megan Thee Stallion, filed suit against Defendant, an online personality known as Milagro Gramz or Mobz World.  (*See generally* Compl. [ECF No. 1]; *see also* Am. Compl. ("AC") [ECF No. 28] and Second Am. Compl. ("SAC") [ECF No. 37]).  Plaintiff alleged that Defendant coordinated a social media smear campaign against her following the 2022 conviction of Canadian rapper and singer, Daystar Peterson, known professionally as Tory Lanez, on charges related to a July 2020 incident where he shot Plaintiff.  (*See* SAC ¶¶ 1–10, 12, 17, 27).  Plaintiff asserted that Defendant acted as Peterson's longtime mouthpiece, using multiple social media platforms including Instagram,

TikTok, X.com, and YouTube to spread vicious and hateful rumors to her more than 100,000 followers in retaliation for Plaintiff's testimony at Peterson's trial. (*See id.* ¶ 1; *see also id.* ¶¶ 26–27).

***Procedural Background.*** On December 10, 2024, Plaintiff filed her Amended Complaint, asserting four claims for relief: defamation per se (Count I); promotion of an altered sexual depiction, in violation of section 836.13, Florida Statutes (Count II); intentional infliction of emotional distress ("IIED") (Count III); and cyberstalking, in violation of section 784.0485, Florida Statutes (Count IV). (*See* AC ¶¶ 89–124). In a Motion to Dismiss the Amended Complaint, Defendant argued Plaintiff's defamation per se claim should be dismissed because Plaintiff failed to comply with a Florida pre-suit notice requirement. (*See* Mot. to Dismiss [ECF No. 30] 2–3). Under Florida Statute section 770.01, at least five days before a plaintiff sues a "news media" defendant "for publication or broadcast, in a newspaper, periodical, or other medium, of a libel or slander," she must give written notice to the author "specifying the article or broadcast and the statements therein which he or she alleges to be false and defamatory." *Id.* Plaintiff insisted the statute did not apply because nothing in the Amended Complaint was sufficient to support a finding on a motion to dismiss that Defendant was a media defendant entitled to such notice. (*See* Resp. to Mot. to Dismiss [ECF No. 33] 5; *see also id.* 4–6). Accepting the Amended Complaint's allegations, the Court found Defendant was not a media defendant. (*See* Feb. 7, 2025 Order [ECF No. 36] 6).[1]

---

[1] Defendant attached appendices to her Motion "as additional context for Plaintiff's defamation claim" and could have used the appendices to establish her media-defendant status, but Defendant did not argue the appendices served that purpose, nor did the appendices "depict Defendant as a media entity impartially reporting on public matters[.]" (Feb. 7, 2025 Order 7 n.6 (alteration added)).

Plaintiff then filed a Second Amended Complaint, to which Defendant responded, reasserting the defense of lack of statutory pre-suit notice. (*See* Ans. [ECF No. 38] ¶ 130). No summary judgment motions were filed seeking a ruling on the affirmative defense.

As trial approached, the parties came before the Court for a series of pretrial conferences. At a November 10, 2025 pretrial conference, the parties and the Court discussed whether the jury should decide the matter of Defendant's media-defendant status. (Nov. 10, 2025 Tr. ("Nov. 10 Tr.") [ECF No. 314] 124:8–19). Defendant's counsel argued, "in this case, whether [Defendant] is a media defendant should be a question for the jury." (Nov. 10 Tr. 123:13–14 (alteration added)). The Court then suggested the parties preface the relevant jury instructions with the phrase, "As to media defendants" (*id.* 123:24–25 (alteration added)), prompting the following discussion:

| [Defendant's Counsel]: | I don't have an — an issue with that. |
|---|---|
| [Plaintiff's Counsel]: | So yes, they would have to find the factual predicate that she's — and then we have to give them some guidance, I would say the motion to dismiss — |
| [The Court]: | What is a — what is a media defendant? What does that mean, right? |
| [Plaintiff's Counsel]: | Right. And I — I think, if you look at it, it has some standards, but I don't know if that is a jury issue, but yes, you could set it up that way and I guess we would be okay with that. |
| [The Court]: | I think — |
| [Plaintiff's Counsel]: | It's fair. |

(*Id.* 124:6–124:17). Following this discussion, the parties agreed to work together to draft a jury instruction based on the Court's suggestion. (*See id.* 126:2–22).

CASE NO. 24-24228-CIV-ALTONAGA/Reid

But the issue remained unsettled as the case advanced to trial. On November 12, 2025, Plaintiff filed a memorandum reasserting that Defendant was not a media defendant. (*See generally* Mem. of Law Regarding Def.'s Non-Media Status [ECF No. 183]). On the first day of trial,[2] the Court stated it agreed with Plaintiff but noted, "[i]f the Defense wants to present something to the contrary to persuade me otherwise, [they] certainly may do so." (Nov. 17 Tr. 97:20–22 (alterations added)).

On the fifth day of trial, the parties agreed that jury instructions would reflect the Court's ruling unless Defendant's briefing persuaded the Court otherwise. (*See* Nov. 21 Tr. 99:20–101:9, 102:10–18). The next day, Defendant submitted a response memorandum [ECF No. 207], and Plaintiff filed a reply [ECF No. 208]. Defendant then asked the Court to defer ruling on Defendant's media-defendant status until after the close of the evidence. (*See* Nov. 24 Tr. 12:6–18). Later, Defendant moved for judgment as a matter of law under Federal Rule of Civil Procedure 50(a), which the Court denied. (*See id.* 92:24–99:11, 155:9–163:8).

***Evidence Concerning Defendant's Media Status.*** At trial, Defendant presented evidence regarding her business operations, trademarks, and media activities starting in 2017. (*See id.* 72:3–17; *see also id.* 74:21–75:20). As Defendant testified, she formed her limited liability company on May 23, 2020 and discussed her trademarked moniker "Milagro Gramz" under which she provides:

> [e]ntertainment in the nature of live performances distributed via various platforms across multiple forms of transmission media by an entertainer in the nature of ongoing live radio personality performances; [e]ntertainment in the nature of visual and audio performances by an entertainer, namely, live visual and audio

---

[2] The trial lasted several days. (*See generally* Nov. 17, 2025 Trial Tr. ("Nov. 17 Tr.") [ECF No. 228]; Nov. 18, 2025 Trial Tr. ("Nov. 18 Tr.") [ECF No. 229]; Nov. 19, 2025 Trial Tr. ("Nov. 19 Tr.") [ECF No. 230]; Nov. 20, 2025 Trial Tr. ("Nov. 20 Tr.") [ECF No. 231]; Nov. 21, 2025 Trial Tr. ("Nov. 21 Tr.") [ECF No. 232]; Nov. 24, 2025 Trial Tr. ("Nov. 24 Tr.") [ECF No. 233]; Nov. 25, 2025 Trial Tr. ("Nov. 25 Tr.") [ECF No. 234]; Nov. 26, 2025 Trial Tr. ("Nov. 26 Tr.") [ECF No. 235]; Dec. 1, 2025 Trial Tr. ("Dec. 1 Tr.") [ECF No. 236]).

> performances by a radio personality host; [e]ntertainment, namely, live commentary in the nature of providing information, news and commentary in the field of entertainment; [e]ntertainment, namely, personal appearances by an entertainer in the nature of a radio personality host; [e]ntertainment services, namely, providing a web site featuring entertainment news and entertainment commentary information[.]

(Ex. J-625 ("Milagro Gramz Trademark") [ECF No. 253-10] (alterations added); *see also* Nov. 24 Tr. 72:3–17, 73:11–22; Certificate of Formation 2).

On May 22, 2020, Defendant filed a Certificate of Formation for Mob Radio LLC.  (*See* Ex. J-624 [ECF No. 253-9] ("Certificate of Formation") 1–3).  Defendant discussed her trademark for Mob Radio under which she provides:

> [e]ntertainment in the nature of live radio personality performances; [e]ntertainment services in the nature of live visual and audio performances by a radio personality; [e]ntertainment services, namely, personal appearances by a radio personality; [e]ntertainment services, namely, providing a web site featuring entertainment commentary, nondownloadable music videos, and nondownloadable film clips and photographs.

(Ex. J-626 ("Mob Radio Trademark") [ECF No. 253-11] (alterations added); *see also* Nov. 24 Tr. 74:13–19).

Defendant testified that since 2017, she has used social media and other online platforms such as Stationhead, YouTube, Twitch, Kik, Instagram, and Twitter to report news, hold interviews, and blog.  (*See* Nov. 24 Tr. 74:21–75:20).  Defendant was featured by Stationhead on October 8, 2019 (*see* Ex. J-623 [ECF No. 253-8]); and approached by The Shade Room on December 11, 2019, about joining its podcast network on Spotify (*see* Ex. J-630 [ECF No. 253-14]).  She has collaborated with groups like The Shade Room and Onsite and contracted with Stationhead after completing a one-year trial period.  (*See id.* 75:25–80:23; *see also* Ex. J-623; Ex. J-630).  Defendant testified that she obtained these opportunities either before or independently from her relationships with Daystar Peterson and his father, Sonstar Peterson.  (*See* Nov. 24 Tr.

76:14–77:7; 79:9–17; 80:13–18).  She described a broadcasting schedule spanning several hours a day, covering topics from politics and world news to entertainment; and she testified that she reported on events — including Peterson's trial — as a member of the media.  (*See id.* 87:9–88:1; 88:20–24, 254:1–2; *see also id.* 100:5–103:25 (playing Ex. J-336, a July 30, 2024 episode of Defendant's show that discussed seven topics spanning over one hour and thirty-six minutes before Plaintiff's name was mentioned)).

**Three Claimed Defamatory Statements.**  Plaintiff accused Defendant of acting as Daystar Peterson's longtime mouthpiece when uttering three defamatory statements: (1) Defendant's statement that Plaintiff was a non-credible witness; (2) Defendant's statement that she "could go down the list of all the different shit that was not true"; and (3) Defendant's question, "Was Megan Thee Stallion caught trying to deceive the courts again?"  (Verdict [ECF No. 226] 1).  The jury found "by a preponderance of the evidence" that Defendant was liable to Plaintiff for defamation per se based on those three statements.  (*See id.*).  The following summarizes the trial evidence concerning the three defamatory statements and Defendant's communications with Daystar Peterson and his father, Sonstar Peterson.

On July 12, 2020, the Los Angeles Police Department stopped Daystar Peterson's vehicle after receiving reports of shots being fired, arresting him on charges of carrying a concealed weapon.  (*See* SAC ¶ 17).  Three days later, Plaintiff announced on social media that the injuries she suffered the night of Daystar Peterson's arrest were gunshot wounds; and on August 20, 2020, Plaintiff publicly identified Daystar as the shooter.  (*See id.* ¶ 19).

On September 17, 2020, Daystar Peterson sent Defendant an Instagram direct message requesting her phone number.  (*See* Ex. J-047 [ECF No. 251-3] 1; *see also* Ex. J-167 [ECF No. 251-18] 12).  Defendant responded by providing her number and stating, "Idk how you're doing

your live tonight, but if you gave me that or any exclusive it'd change my life." (Ex. J-047 1). Around September 24, 2020, Sonstar Peterson sent Defendant an Instagram direct message stating, "Hello, Mila, this is Tory[']s Dad.  Been Listening to [M]ob [R]adio.  I would like to talk to you off the record." (Ex. J-048 [ECF No. 251-4] (alterations added)).  Defendant interviewed Sonstar Peterson around September 28, 2020.  (*See* Ex. J-018 [ECF No. 248-5] 1–3; *see also* Ex. J-433 [ECF No. 251-59] 339).

Defendant's relationship with the Petersons continued after the interview.  Sonstar Peterson and Defendant often communicated by phone and text.  (*See generally* Ex. J-353 [ECF No. 251-49] (text messages between Defendant and Sonstar Peterson between September 25, 2020, through December 23, 2024)).  Sonstar made five payments totaling $2,500 to Defendant between October 2020 and April 21, 2021.  (*See* Ex. J-114 [ECF No. 251-13] 3–5 ($500 on October 28, 2020; $1,000 on February 23, 2021; $300 on February 27, 2021; $200 on March 7, 2021; $500 on April 21, 2021)).  Further, Defendant openly discussed her close relationship with the Peterson family.  For example, in a June 18, 2021 text message, Amiel Holland-Briggs stated, "Who else can say they have this kind of relationship with [Sonstar] and [Day]star."  (Ex. J-195 [ECF No. 251-21] 2 (alterations added); *see also* Ex. J-078 [ECF No. 251-10]).

Defendant testified that as "a thank you for being unbiased," Daystar Peterson's team provided information to her before sending it to TMZ.  (Nov. 18 Tr. 34:16; *see also id.* 34:9–23). Defendant also supplied Sonstar Peterson with information.

For example, on November 24, 2022, Sonstar texted Defendant, "Mila, can you please send me those materials ASAP.  This is go time now and the attorneys need them as quickly as we can get them." (Ex. J-353 [ECF No. 251-49] 71).  The next day, Defendant emailed "things that MAY be of value[,]" including screenshots of social media posts by Plaintiff's former friend's mother

and sister criticizing Plaintiff, information from a conversation with Plaintiff's former friend, screenshots of a post from Plaintiff's ex-boyfriend implying Plaintiff physically assaulted him, and a video showing Defendant discussing those posts.  (Ex. J-019 [ECF No. 248-6] (alteration added)).  And on December 2, 2022, Defendant sent Sonstar, at his request, a video of Plaintiff in a pool with a gun.  (*See* Ex. J-353 73).

Daystar Peterson's criminal trial began on December 12, 2022.  (*See* SAC ¶ 21).  The next day, Daystar sent Defendant an Instagram direct message asking, "What's ya number gotta ask u something," and Defendant provided her number.  (Ex. J-049 [ECF No. 251-5]).  On December 21, 2022, Daystar texted Defendant, "It's Tory[.]   Hit me[.]"  (Ex. J-050 [ECF No. 251-6] (alterations added)).  That same day, Defendant uttered the first defamatory statement, a post on X from her @MilagroGramz account calling Plaintiff a non-credible witness.  (*See* Ex. J-133; *see also* Nov. 18 Tr. 65:24–66:23).

On December 23, 2022, the jury entered a guilty verdict against Daystar Peterson.  (*See* SAC ¶ 24).  Sonstar and Defendant remained in contact following the verdict.  (*See* Ex. J-353 79 (texts from December 27 and December 28, 2022 asking Defendant to call him)).  On January 5, 2023, Sonstar texted Defendant, "Hi Mila, call me asap."  (*Id.*).  That day Defendant appeared on DJ Akademiks's podcast to discuss the Daystar Peterson trial and made the second defamatory statement: "I could go down the list of all the different shit that was not true, that I've been saying, "That's not true, that's not true."  (Ex. J-501 [ECF No. 252-9] 2; *see also* Nov. 24 Tr. 222:24–25).

On January 12, 2023, Sonstar asked Defendant to call him because Instagram had "wiped [his] page" and instructed her to "[p]lease let the people know."  (Ex. J-353 83 (alterations added)).  Months later, on June 10, 2023, Sonstar invited Defendant to a Zoom meeting entitled, "Friends of Sonstar and Daystar."  (Ex. J-433 [ECF No. 251-59] 7).  During the meeting, a user identified

as "Tory Lanez Source" stated it was important to emphasize "that Tory has never made it his mission to weaponize his fans against [Plaintiff], despite what the DA claimed[.]" (*Id.* 46 (alterations added)). The user further stated, "with this news it's better to have other people saying this instead of Torey [sic]" and emphasized, "[i]t has to be a third party. Not from him. Things he say can be held against him putting this out." (*Id.* 48 (alteration added)).

Defendant then shared a transcript highlighting a sentence implying Plaintiff stepped on glass the night of the shooting and asked, "Are things like this along the lines of what you're looking for?" (*Id.* 51). A day later, Sonstar and Defendant exchanged messages regarding a failed Zelle payment and agreed to switch to Cash App. (*See* Ex. J-353 92–94).

Defendant's posts about Plaintiff continued. (*See* Ex. J-287 [ECF No. 251-36] 2 ("Ooooh I can't stand her motherfuckin ass. Just shut the fuck up.")). On February 28, 2024, Sonstar asked Defendant whether she would be willing to speak with a producer involved in another high-profile lawsuit because he "can't speak at this time to anything that links Daystar's case." (Ex. J-353 102). Defendant agreed to speak with the producer. (*See id.*).

In the ensuing months, Defendant's posts about Plaintiff intensified. On June 8, 2024, Defendant posted on X, "Go to my likes[,]" directing users to a deep fake pornographic video of Plaintiff. (Ex. J-027 [ECF No. 249-7]).[3] During a July 30, 2024 livestream, Defendant asked if Plaintiff had "ever been deemed like legally retarded" (Ex. J-420 [ECF No. 251-34] 2), stated "[y]ou better get that bitch away from me before I run that hoe over with this motherfucking car"

---

[3] By contrast, when confronted with negative information about Daystar during this period, Defendant refrained from immediately commenting. On June 12, 2024, Sonstar texted Defendant about her lack of commentary on an issue concerning Daystar Peterson's son's mother and requested she call him because "there was something [he] believe[d] [Defendant] should know." (Ex. J-353 103 (alterations added)). Defendant responded, "she absolutely w[ould]" reach out, stating "[w]ith Daystar's freedom being the most important thing, I didn't want to speak out of turn or agitate anything." (*Id.* 104 (alterations added)).

(Ex. J-293 [ECF No. 251-37] 2 (alteration added)), and reiterated her belief that "the damn girl stepped on glass or a ricochet shit came and fucked up" (Ex. J-299 [ECF No. 251-41] 2).

On August 1, 2024, Defendant again discussed Plaintiff during another livestream, stating, "What does losing somebody have to do with lying on some damn body?  So if you lost somebody, it's okay to lie on people and get them sent to prison and make money out for the propaganda in the bullshit." (Ex. J-297 [ECF No. 251-40] 2).  Less than a week later, Defendant issued the third defamatory statement: an X post from her @MobzWorld account accompanied by screenshots of legal documents from another case, asking, "Was Megan Thee Stallion caught trying to deceive the courts again?" (Ex. J-038; *see also* Nov. 24 Tr. 122:1–5).

***The Jury Finds Defendant Was Entitled to Pre-Suit Notice.***   As the end of trial approached, the Court gave the parties the option to "wait until the evidence is closed" for a ruling on Defendant's media-defendant status or to address the issue then.  (Nov. 24 Tr. 279:15–20).  Plaintiff's counsel asked if the Court viewed Defendant's media status as a question of law; to which the Court noted that while media status "is typically resolved at the inception of the case. . . . [h]ere, the issue was resolved at the motion to dismiss on the record that the Defendant presented and based on the pleading alone," but "the record is materially different from that which [the Court] was presented at the inception of the case."  (*Id.* 281:20–282:4 (alterations added)).

The Court had directed the parties to confer on how to proceed, including whether to submit the question of Defendant's media status to the jury through a special interrogatory.  (*See id.* 276:14–19; *see also id.* 280:2–282:22).  Following conferral, Plaintiff's counsel requested the issue be submitted to the jury, while Defendant insisted on the Court announcing a ruling as a matter of law:

[The Court]:                             I'll hear from the parties.

CASE NO. 24-24228-CIV-ALTONAGA/Reid

[Plaintiff's Counsel]:        Yes, Your Honor. So we have conferred and thought about this. Our side is okay with the issue, as we talked at the first pretrial conference, going to the jury. If we can get reliable criterion [sic] for which they would decide it, which should be the same criterion [sic] you used at the beginning of the case and you would have used on summary judgment. And we raised that with the other side, but they are not okay with that. They want you to rule, yourself, on the record.

(*Id.* 283:5–14).

After the Court gave assurances that post-verdict briefing on the issue would remain available, Defendant withdrew her request, and both parties agreed to proceed with a special, agreed-upon interrogatory. (*See id.* 283:11–285:19). Plaintiff's counsel further explained he "was just concerned about the record not being complete but now that we have merged these things, I think it's fine." (*Id.* 285:17–19).

The next day, at the lunch break, Plaintiff sought to make an oral motion that Defendant had failed to establish she was a media defendant. (Nov. 25 Tr. 122:2–7). As the Court advised, Plaintiff could reserve on the motion. (*See id.* 122:8–11). At the close of the evidence, Defendant moved for a directed verdict on Plaintiff's IIED claim, which the Court denied. (*See generally* Def.'s Mot. for Directed Verdict . . . [ECF No. 220]; *see also* Nov. 25 Tr. 249:7–257:18).

The Verdict Form contained six questions related to Defendant's news-media status:

Question 3:    During the time period when the statements were made, do you find, by a preponderance of the evidence, that Ms. Cooper provided disinterested and neutral commentary, rather than advocacy for a particular client or personal interest?

Question 4:    During the time period when the statements were made, do you find, by a preponderance of the evidence, that Ms. Cooper regularly disseminated news or information to the public, rather than an isolated or one-time publication?

11

Question 5:    During the time period when the statements were made, do you find, by preponderance of the evidence, that Ms. Cooper impartially disseminated information, rather than acting primarily to promote her own business, products or services?

Question 6:    During the time period when the statements were made, do you find, by a preponderance of the evidence, that Ms. Cooper operated for the purpose of informing the public about matters of public concern through news reporting, analysis, or commentary?

Question 7:    During the time period when the statements were made, do you find, by a preponderance of the evidence, that Ms. Cooper functioned in a similar manner to traditional news media, such as newspapers, magazines, television, radio, or their online equivalents?

Question 8:    Considering your answers to Questions 3 through 7 together, do you find, by a preponderance of the evidence that Ms. Cooper should be treated as a media defendant with regard to the statements made in this case?

(Verdict 2–3; *see also* Instructions to Jury [ECF No. 224] 5).

During deliberations, the jury submitted a question regarding the media-defendant issue, asking "if we believ[e] half is that considered a yes?" (Jury Notes [ECF No. 237] 9 (alteration added)). The parties agreed that the Court should respond, "[t]here is no set number." (Dec. 1 Tr. 9:7 (alteration added); *see also id.* 9:8–17).[4]

_____

[4] Plaintiff's counsel proposed the following answer:

So our proposal, if you were inclined to say something is to say that though there is no set number of factors that conclusively determine the outcome of the question on media defendant, . . .[t]he [c]ourts in this [C]ircuit have indicated that the answer to Question 3, whether the Defendant is disinterested and neutral, are the most important in the analysis and that a [d]efendant should not be treated as a media defendant if the answer to Question 3 is no. That's our proposal. I mean, we have something that we attempted to be more practical and it's — the proposal there is[,] although your answers to Questions 3 through 7 should guide your answer to Question 8, the media[-]defendant question[,] [t]he considerations referenced in Questions 3 through 7 are not exhaustive, not dispositive[,] and not necessarily entitled to equal weight in answering Question 8. You are free to give those considerations whatever weight you think each deserves in determining the answer to Question 8. Thus, answering yes to a majority of Questions 3 through 7 does not mean that you must answer yes to Question 8, likewise, answering no to a majority of Questions 3 through 7 does not mean that you must answer no to Question 8. Ultimately, you should consider all the factors together to determine if the Defendant should be considered a media

The jury found for Plaintiff on Counts I (defamation), II (promotion of altered sexual depiction), and III (IIED) of the Second Amended Complaint. (*See generally* Verdict). Although its answers to the news-media interrogatories were mixed, the jury concluded, considering the effect of the answers, that Defendant qualified as a media defendant. (*See id.* 2–3).[5] After the jury was dismissed, the Court discussed preparation of the final judgment. (*See* Dec. 1 Tr. 17:17–18:2). Plaintiff's counsel expressed, "the weight of the evidence is that [Defendant] is not [a media defendant]" but "underst[oo]d that that's the way [the jury] filled out the [Verdict F]orm[,]" noting his objection. (*Id.* 19:15–17 (alterations added)). Given the jury's findings and Plaintiff's failure to give pre-suit notice, the Court entered Final Judgment on Counts II and III in Plaintiff's favor, but not as to Count I. (*See* Final J. [ECF No. 227]).

***The Present Motion.*** Plaintiff now asks the Court, under Federal Rules of Civil Procedure 50(b), 59(e), and 60(b), to disregard or strike the "media-defendant" interrogatory answers as immaterial and enter judgment in Plaintiff's favor on Count I. (Mot. 2, 18; *see also generally id.*; Reply). As the Court agrees that relief is warranted under Rule 60(b), it does not reach Plaintiff's Rule 50(b) and 59(e) arguments.

## II. LEGAL STANDARDS

Federal Rule of Civil Procedure 60(b) permits a party to seek relief from a final judgment under a limited set of circumstances. The Rule permits a court to relieve a party from a final judgment for certain reasons, including: (1) mistake, inadvertence, surprise, or excusable neglect; or (6) any other reason that justifies relief. *See* Fed. R. Civ. P. 60(b)(1), (6).

---

defendant[,] *i.e.*, one who engages in disinterested and neutral commentary.

(Dec. 1 Tr. 4:23–6:2 (alterations added)).

[5] The jury answered questions three and five in Plaintiff's favor; and four, six, and seven in Defendant's favor. (*See* Verdict 2–3).

"Where it is the court's misunderstanding or misapplication of the law that is asserted in a Rule 60(b)(1) motion, the movant must demonstrate that the court's mistake involved 'a plain misconstruction of the law and the erroneous application of that law to the facts.'" *Lumbermens Mut. Cas. Co. v. Dadeland Cove Section One Homeowners' Ass'n, Inc.*, No. 06-22222-Civ, 2008 WL 879021, at *1 (S.D. Fla. Mar. 28, 2008) (internal quotation marks omitted; quoting *Nisson v. Lundy*, 975 F.2d 802, 806 (11th Cir. 1992)).  In contrast, Rule 60(b)(6) "is available only when Rules 60(b)(1) through (b)(5) are inapplicable" and "extraordinary circumstances . . . justify reopening." *Kemp v. United States*, 596 U.S. 528, 533 (2022) (alteration added; quotation marks and citation omitted).

### III.  DISCUSSION

Relying on Rule 60(b)(1), Plaintiff contends the Final Judgment rests on a manifest legal error because it (1) reconsidered the same legal question decided in the February 7, 2025 Order on Defendant's Motion to Dismiss the Amended Complaint; and (2) permitted the jury to resolve legal classifications and standards reserved to the Court.  (*See* Mot. 18).  She also argues that the circumstances are extraordinary enough to warrant relief under Rule 60(b)(6).  (*See id.*; *see also generally id.*; Reply).

The Court addresses the arguments in turn.  For the reasons below, Plaintiff's contentions of manifest legal error are unpersuasive.  Even still, extraordinary circumstances warrant relief under Rule 60(b)(6) because the Court assured the parties the media-defendant issue would remain subject to post-verdict review, and the trial record establishes Defendant was not entitled to pre-suit notice.

14

CASE NO. 24-24228-CIV-ALTONAGA/Reid

### A.  Rule 60(b)(1); Plaintiff Does Not Show Manifest Legal Error

***Law-of-the-Case Doctrine.***  According to Plaintiff, the law-of-the-case doctrine barred the Court from revisiting its February 7, 2025 determination regarding Defendant's news-media status. (*See* Mot. 18, 10–12).  Plaintiff's reliance on the doctrine is misplaced.

The law-of-the-case doctrine "posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Pepper v. United States*, 562 U.S. 476, 506 (2011) (quotation marks and citation omitted).  The doctrine applies "only where there has been a final judgment." *Vintilla v. United States*, 931 F.2d 1444, 1447 (11th Cir. 1991) (quotation marks and citation omitted).  Yet "a court's previous rulings may be reconsidered as long as the case remains within the jurisdiction of the district court." *United States v. Williams*, 728 F.2d 1402, 1406 (11th Cir. 1984).

The law-of-the-case doctrine does not apply to the February 7, 2025 Order.  "[A] district court's denial of a motion to dismiss is not a final order." *Alsobrook v. Alvarado*, 656 F. App'x 489, 493 n.3 (11th Cir. 2016) (alteration added); *see also Vintilla*, 931 F.2d at 1447 ("[T]he district court's denial of the government's initial motion to dismiss was not a final judgment.  The court was therefore free to reconsider its ruling . . . at the summary judgment stage." (alterations added)); *Munro v. Fairchild Tropical Botanic Garden, Inc.*, No. 20-20079-Civ, 2022 WL 452257, at *6 n.4 (S.D. Fla. Jan. 13, 2022) ("[T]he law of the case [doctrine] is an *appellate* principle. . . .  [A]ny ruling at the motion-to-dismiss stage does not preclude the Court from reaching a different result after considering the record evidence . . . ." (italics in original; alterations added; citations omitted)).  The Court's resolution of the lack-of-pre-suit-notice defense on a motion to dismiss was not a controlling legal ruling precluding later reconsideration, particularly given Defendant preserved the issue in an affirmative defense to the Second Amended Complaint.

15

***Media-Defendant Special Interrogatories.***   Next, Plaintiff contends that the Court's media-defendant special interrogatories were improper.  (*See* Mot. 18, 12–14).  According to Defendant, the jury was authorized to decide her news-media status, and Plaintiff is barred by the invited-error doctrine from complaining.  (*See* Resp. 2–3).

Plaintiff asserts that media status under Florida Statute section 770.01 generally presents a threshold question for the court.  (*See* Mot. 12–14).  She is correct that issues concerning public figures and whether a defendant qualifies as a media or non-media defendant are commonly resolved as matters of law outside the jury's presence.  (*See id.* 12–13 (citing *In re Standard Jury Instructions in Civ. Cases-Rep. No. 09-01* (Reorganization of the Civ. Jury Instructions), 35 So. 3d 666, 733 (Fla. 2010))).  Indeed, "Florida's pre-suit notice statute was intended to give putative defendants the opportunity to retract allegedly false and/or defamatory statements and, potentially, to avoid litigation altogether."  *Tobinick v. Novella*, No. 14-cv-80781, 2015 WL 1191267, at *8 (S.D. Fla. Mar. 16, 2015) (citation omitted).  At trial, the undersigned likewise recognized the preliminary nature of those determinations:

> The question is typically resolved at the inception of the case.  Because if a party fails to give pre[-]suit notice, the claim goes away with leave to amend later or leave to file a new action later.  Here, the issue was resolved at the motion to dismiss on the record that the Defendant presented and based on the pleading alone.  Now, we are at the conclusion of the evidence or near the conclusion of the evidence, the record is materially different from that which I was presented at the inception of the case.

(Nov. 24 Tr. 281:20–282:4 (alteration added)).

And yet, the Florida Standard Jury Instructions contemplate circumstances where status issues may be submitted to the jury.  *See In re Standard Jury Instructions*, 35 So. 3d at 733–34 ("Status issues . . . are *commonly* decided as a matter of law . . . .   If a status issue is deemed a jury question, it may be submitted by a preliminary instruction modeled after instruction 401.14 *et seq*."

16

(alterations added; emphasis added)).   The record here supported submission of questions regarding Defendant's news-media status to the jury.

Assuming the Court erred by submitting the issue to the jury, Plaintiff invited the error.  "A party that invites an error cannot complain when its invitation is accepted." *Cent. Baptist Church of Albany, Inc. v. Church Mut. Ins. Co.*, 146 F.4th 1003, 1013 (11th Cir. 2025) (citations and quotation marks omitted).  Plaintiff not only requested that Defendant's news-media status be submitted to the jury but also participated in drafting and approving the relevant questions and jury instructions.  *See United States v. Maradiaga*, 987 F.3d 1315, 1322 (11th Cir. 2021) ("This is a textbook case of invited error.  By proposing the exact language that the district court adopted, [the party] invited any purported error." (alteration added)).

Plaintiff first agreed to the use of media-defendant special interrogatories on November 10, 2025, at a pretrial conference.  (*See* Nov. 10, 2025 Minute Entry [ECF No. 182]).  Defendant's counsel proposed treating Defendant's news-media status as a factual issue for the jury, and the Court suggested structuring the instructions "[a]s to media defendants[.]" (Nov. 10 Tr. 123:13–25 (alterations added)).  Rather than object to the procedure, Plaintiff responded that the jury would need guidance on the applicable standards and acknowledged the issue could "be okay" to submit to the jury and that the proposal was "fair." (*Id.* 124:6–17).  Following that discussion, the parties agreed to work together to draft a jury instruction implementing the Court's suggestions.  (*See id.* 126:2–22).

On November 17, 2025, before opening statements, the Court addressed Plaintiff's memorandum reasserting Defendant was not a media defendant.  (*See* Nov. 17 Tr. 97:13–15; *see generally* Mem. of Law Regarding Def.'s Non-Media Status).  Although the Court confirmed tentative agreement with Plaintiff's position, the Court also explained Defendant would have the

opportunity to present evidence and attempt to persuade the Court otherwise. (*See* Nov. 17 Tr. 97:20–22). And when the Court revisited the issue on November 21, the parties agreed the jury instructions would remain subject to further revision depending on the evidentiary record developed at trial. (*See* Nov. 21 Tr. 99:20–100:13). Plaintiff therefore proceeded through trial aware the issue remained open and could ultimately be submitted to the jury.

On November 24, 2025, when Defendant had nearly completed her case-in-chief, the Court again addressed the matter of Defendant's media-defendant status. Plaintiff, undeterred by Defendant's response in support of Defendant's news-media status and the evidence Defendant presented in her case-in-chief, maintained that "the analysis of the issue, factually, is the same as it was at the motion to dismiss." (Nov. 24 Tr. 275:21–22). The Court disagreed, explaining that "at the conclusion of the evidence the record is quite different." (*Id.* 276:11–12; *see also id.* 276:20–21). The Court once again proposed submitting the issue to the jury through special interrogatories. (*See id.* 276:14–19).

Even then, Plaintiff did not object to the jury deciding the issue. Instead, her counsel sought clarification regarding what evidence prompted the Court's reassessment and discussed revising the instruction's language. (*See id.* 278:17–280:1). The Court then directed the parties to confer regarding how to proceed. (*See id.* 280:2–282:22).

Following that conferral, it was *Plaintiff* — not Defendant — who advocated for sending the issue to the jury. Plaintiff told the Court, the "issue . . . [could go] to the jury" so long as the jury received appropriate criteria to guide its determination. (*Id.* 283:5–14 (alterations added)). Defendant, instead, requested a ruling from the Court as a matter of law. (*See id.*). After the Court clarified that post-verdict briefing would remain available, Defendant withdrew her request, and both parties agreed to proceed with the interrogatories. (*See id.* 284:11–17). Plaintiff's counsel

then confirmed he was satisfied proceeding in that manner because, as he put it, "now that we have merged these things, I think it's fine." (*Id.* 285:17–19).

Plaintiff's counsel also participated in finalizing the jury instructions and raised only a limited objection regarding language describing the effect of the media-defendant finding. (*See* Nov. 25 Tr. 125:11–126:17). Plaintiff raised no further objections, and the parties submitted the final instructions without identifying additional concerns. (*See id.* 257:22–258:22).

Plaintiff also took an active role in addressing a jury question regarding how to properly evaluate the media-defendant factors. Her counsel participated in drafting, revising, and approving the jury instructions and special interrogatories without making the objections Plaintiff now asserts in the Motion. (*See* Nov. 25 Tr. 123:3–134:9; 257:22–258:22; *see also* Dec. 1 Tr. 9:7, 9:8–17). On this record, Plaintiff invited any alleged error and thus may not challenge the interrogatories under Rule 60(b)(1). *See United States v. Frank*, 599 F.3d 1221, 1240 (11th Cir. 2010) ("[The litigant] invited error when he not only agreed with the supplemental instructions and special verdict form, but [when he] requested them." (alterations added)).

In sum, Plaintiff falls short of showing a "manifest legal error" warranting relief under Rule 60(b)(1).

## B. Rule 60(b)(6); Plaintiff Shows Extraordinary Circumstances.

Moving on, the Court considers whether Plaintiff has established extraordinary circumstances justifying relief. Rule 60(b)(6)'s "catchall provision" authorizes the Court to exercise its "sound discretion" when "the circumstances are sufficiently extraordinary to warrant relief." *Cano v. Baker*, 435 F.3d 1337, 1342 (11th Cir. 2006) (quotation marks and citation omitted). The Rule "does not reward a party that seeks to avoid the consequences of its own free, calculated, and deliberate choices." *Aldana v. Del Monte Fresh Produce N.A., Inc.*, 741 F.3d 1349,

1357 (11th Cir. 2014) (quotation marks and citations omitted). Rather, Rule 60(b)(6) applies "only as a means to achieve substantial justice when *something more*" is present. *Fast Response Marine Towing & Salvage, LLC v. M/V Bad Habits*, No. 25-cv-20917, 2026 WL 81763, at *4 (S.D. Fla. Jan. 11, 2026) (emphasis in original; quotation marks and citation omitted).

The Eleventh Circuit has recognized "that Rule 60(b) is an appropriate escape valve when counsel has acted diligently and in reliance upon statements of the trial court." *Useden v. Acker*, 947 F.2d 1563, 1570 (11th Cir. 1991) (citing *Harnish v. Manatee Cnty.*, 783 F.2d 1535, 1538 (11th Cir. 1986)). The Court agrees extraordinary circumstances justify Rule 60(b)(6) relief. Throughout trial, the Court stated post-verdict briefing on the media-defendant issue would remain available; and the parties agreed to submit the issue to the jury in reasonable reliance, in part, on those assurances. (*See, e.g.*, Nov. 24 Tr. 283:18–20 ("[The Court]: [T]his is an issue depending on how it's answered by the jury that will be a subject of post-verdict briefing." (alterations added)); *see also* Dec. 1 Tr. 20:3–5; *id.* 21:1–2). Thus, the Court's repeated statements regarding post-verdict briefing and Plaintiff's diligence in filing her Motion present "an extraordinary circumstance" rendering Rule 60(b)(6) relief appropriate.

***Defendant Was Not Entitled to Pre-Suit Notice.*** On the merits, Plaintiff asserts that courts routinely decide whether a defendant enjoys media status and is entitled to pre-suit notice as a matter of law at the motion to dismiss and summary judgment stages of a case. (*See* Mot. 13–14 (citation omitted)). Plaintiff acknowledges that the Court could "arguably submit narrow factual questions about predicate facts to the jury" but insists "the ultimate legal determination — whether Defendant is a media defendant for Fla. Stat. § 770.01 purposes — remains for the Court to decide as a matter of law." (*Id.* 14). The Court first decided on the question based on the Amended

Complaint's allegations. (*See* Feb. 7, 2025 Order 6). The Court now decides it based on the trial record.

Again, under Florida law, a plaintiff must provide written pre-suit notice before bringing any civil action for defamation based on a publication or broadcast by a media defendant "in a newspaper, periodical, or other medium." Fla. Stat. § 770.01. A publication qualifies as an "other medium" if it "is operated to further the free dissemination of information or disinterested and neutral commentary or editorializing as to matters of public interest." *Comins v. Vanvoorhis*, 135 So. 3d 545, 557 (Fla. 5th DCA 2014) (emphasis omitted). Blogs may fall within the statute when they serve as "an alternative medium of news and public comment." *Id.* at 559.

Defendant's broadcasts qualify as an "other medium" because her shows are operated to provide "live commentary in the nature of providing information, news and commentary in the field of entertainment." (Milagro Gramz Trademark 1; Nov. 24 Tr. 73:17–19; *see also* Mob Radio Trademark 1; Nov. 24 Tr. 74:17–19). As Defendant testified, she selects topics by analyzing social media algorithms; reviewing viewer-submitted content; and consulting reports, articles, and court documents to determine matters of interest to her audience. (*See* Nov. 24 Tr. 88:6–19). Because her broadcasts are live, Defendant also reviews and responds to comments from viewers in real time "to give commentary and to incorporate [the viewers' comments] into the show." (*Id.* 106:2–3 (alteration added)).

To be sure, although Defendant is a broadcaster, not every statement she makes falls within the purview of section 770.01. *See Mishiyev v. Davis*, 402 So. 3d 443, 452 (Fla. 2d DCA 2025) (finding broadcaster's statements that were "not made for the purpose of disseminating information or commentary or editorializing on matters of public interest" were not entitled to pre-suit notice).

Plaintiff identified three defamatory statements: (1) Defendant's statement that Plaintiff was a non-credible witness; (2) Defendant's statement that she "could go down the list of all the different shit that was not true"; and (3) Defendant's question, "Was Megan Thee Stallion caught trying to deceive the courts again?" (Verdict 1). The first was a December 21, 2022 post on X from Defendant's @MilagroGramz account following Peterson's conviction. (*See* Ex. J-133 [ECF No. 251-16]; *see also* Nov. 18 Tr. 65:24–66:23). The second occurred during a January 5, 2023 podcast episode, where Defendant was being interviewed about the Peterson trial. (*See* Nov. 24 Tr. 222:24–25). The third was an August 7, 2024 X post from Defendant's @MobzWorld account accompanied by screenshots of legal documents from another case. (*See* Ex. J-038 [ECF No. 249-8]; *see also* Nov. 24 Tr. 122:1–5).

Plaintiff argues that Defendant was not entitled to pre-suit notice because she engaged in "financially motivated advocacy" and disseminated information at the Petersons' direction. (Mot. 16). Plaintiff relies on the jury's findings that Defendant did not provide "disinterested and neutral commentary" or "impartially disseminate[] information," and "acted extremely and outrageously" by coordinating with Daystar Peterson and others. (*Id.* 17 (alteration added; citing Court's Instructions to the Jury 7)).

That Defendant did not provide "disinterested and neutral commentary" or "impartially disseminate[] information" does not automatically destroy her media status. (*Id.* (alteration added)). The existence of "a particular agenda . . . does not rob [the speaker] of the protections afforded . . . by the pre-suit notice statute." *Tobinick*, 2015 WL 1191267, at *9 (alterations added) (finding a non-profit entitled to pre-suit notice even where in its website it challenged certain health care practices); *see also Grlpwr, LLC v. Rodriguez*, No. 23-cv-16480, 2023 WL 5666203, at *2 (N.D. Fla. Aug. 25, 2023) (holding that the owner and operator of a YouTube channel with an anti-

multi-level marketing agenda remained entitled to pre-suit notice). And media defendants are not limited to those who "'impartially disseminate information,' or 'issue unsolicited, disinterested and neutral commentary as to matters of public interest'"; "[t]he term also applies to those who 'editorialize as to matters of public interest *without being commissioned to do so by their clients*.'" *Tobinick*, 2015 WL 1191267, at *8 (alterations added; alteration adopted; emphasis added; quoting *Ortega Trujillo v. Banco Cent. Del Ecuador*, 17 F. Supp. 2d 1334, 1338 (S.D. Fla. 1998)). The key question, therefore, is whether Defendant was commissioned by the Petersons to publish or broadcast those three defamatory statements.

In this regard, Plaintiff's citation to *Ortega Trujillo*, 17 F. Supp. 2d 1334, is instructive. (*See* Mot. 16). In *Ortega Trujillo*, a public-relations firm disseminated a defamatory press release on behalf of its client and sought the protection of section 770.01. *See Ortega Trujillo*, 17 F. Supp. 2d at 1336–37. The court disagreed, explaining that as registered agent for its client, the firm was in the business of public relations and lobbying and did not "issue unsolicited, disinterested and neutral commentary as to matters of public interest, or editorialize as to matters of public interest without being commissioned to do so by its clients." *Id.* at 1338.

The evidence shows Defendant was commissioned by the Peterson family to make the three defamatory statements. When first approached by Daystar Peterson on September 17, 2020, Defendant stated, "if you gave me . . . any exclusive it'd change my life" and afterward maintained a close relationship with the Petersons. (Ex. J-047 1; *see also* Ex. J-167 12; Ex. J-195 2; Ex. J-078). The first defamatory statement — Defendant's December 21, 2022 post calling Plaintiff a non-credible witness — was made the same day Daystar texted Defendant, "It's Tory[.] Hit me[.]" (Ex. J-050 (alterations added); *see also* Ex. J-133; Nov. 18 Tr. 65:24–66:23). By that date, Defendant had received payments from Sonstar, obtained information from the Peterson team

23

before other media outlets, and sent materials to assist Daystar's criminal defense. (*See* Ex. J-114 3–5; Nov. 18 Tr. 34:9–23; Ex. J-019). The second defamatory statement — Defendant's January 5, 2023 appearance on DJ Akademiks's podcast — was also made the same day Sonstar texted Defendant, "Hi Mila, call me asap." (Ex. J-353 79; *see also* Ex. J-501 2; Nov. 24 Tr. 222:24–25).

The third defamatory statement — Defendant's August 7, 2024 post asking whether Plaintiff was "caught trying to deceive the courts again" — followed the June 10, 2023 Zoom meeting where participants, including Defendant, discussed using a "third-party" strategy because statements damaging to Plaintiff needed to come from someone other than "Tory[,]" whose own statements "[could] be held against him[.]" (Ex. J-433 48 (alterations added)). Defendant confirmed her understanding of that role, inquiring about the content the Petersons were "looking for[.]" (*Id.* 51 (alteration added)). And as late as February 2024, Sonstar continued to direct Defendant to speak on matters he could not address himself. (*See* Ex. J-353 102). The third statement was consistent with that ongoing arrangement.

In sum, because the trial record shows that Defendant was commissioned by the Petersons to publish or broadcast the three defamatory statements, the Court finds as a matter of law that Defendant was not entitled to pre-suit notice.[6]

## IV. CONCLUSION

Accordingly, it is

**ORDERED AND ADJUDGED** that Plaintiff, Megan Pete's Motion to Reinstate Jury Verdict as to Defamation Claim and to Amend Final Judgment or Renewed Motion for Judgment as a Matter of Law . . . **[ECF No. 257]** is **GRANTED in part**. The jury's verdict as to **Count I** of Plaintiff's Second Amended Complaint **[ECF No. 37]** is reinstated. An amended final judgment

---

[6] The Court does not find that Defendant could never be considered a media defendant and only reaches Defendant's role in publishing the three statements the jury determined were defamatory.

CASE NO. 24-24228-CIV-ALTONAGA/Reid

will issue by separate order.

**DONE AND ORDERED** in Miami, Florida, this 29th day of May, 2026.

_____
**CECILIA M. ALTONAGA**
**CHIEF UNITED STATES DISTRICT JUDGE**

25